**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN DOE,<br>Address Withheld,<br><br>     Plaintiff,<br><br>   v.<br><br>PRINCETON UNIVERSITY,<br>Princeton, NJ 08544<br><br>     Defendants. | **Civil Action No. 3:22-cv-05887** |

## **COMPLAINT**

John Doe, by his counsel, files this Complaint against Princeton University

("Princeton" or " the University") for gender-based discrimination in violation of

20 U.S.C. § 1681 (commonly known as Title IX), as well as breach of contract and

negligence.  In support of his Complaint, Mr. Doe alleges as follows:

TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 1

**PARTIES** ........................................................................................................... 8

**JURISDICTION AND VENUE** ......................................................................... 8

**STATEMENT OF FACTS** ................................................................................. 9

    I.  Princeton's Sexual Misconduct Policies and Procedures ......................... 9

    II. Title IX at the University ...................................................................... 13

    III. Overview of Roe's Allegations, the Investigation, and Princeton's Decisions ...................................................................................................... 26

    IV. The Encounters as They Actually Happened ........................................ 33

    V. The Incidents are Investigated ............................................................... 41

    VI. Formal Notice of Charges and Doe's Response ................................... 63

    VII. The First Merits Decision and Sanction ............................................. 65

    VIII. The First Appeal ............................................................................... 76

    IX. Continued Investigation on Remand ................................................... 77

    X. The Second Merits Decision and Sanction ........................................... 87

    XI. The Second Appeal ............................................................................. 98

**CAUSES OF ACTION** .................................................................................... 100

    Count I – Violation of Title IX (20 U.S.C. § 1681) .................................. 100

    Count II – Breach of Contract .................................................................. 104

    Count III – Breach of the Covenant of Good Faith and Fair Dealing ........ 107

    Count IV – Negligence .............................................................................. 108

**PRAYER FOR RELIEF** ................................................................................. 110

## INTRODUCTION

1.     On October 27, 2019, Jane Roe accused John Doe of having sexually assaulted her more than eight months earlier.  Back then, she'd told one of her closest friends, who took *contemporaneous notes on his phone*, that Doe had "ma[de] her go to his room and force[d] himself on her" as she "beg[ged], plead[ed], and crie[d] for him to stop raping her," before she "sprint[ed] away while sobbing[.]"

2.     That story was completely false.  And Roe knew she couldn't sell it to Princeton, given that no fewer than four different witnesses had seen her leaving Doe's room that night and would say that it never happened.

3.     So Roe tweaked the story into one she thought she *could* sell.  But even then, she couldn't keep her story straight.

4.     In her first interview with Princeton, Roe said that she told Doe no "ten or more times" but he ignored it.  She said that after Doe fondled and kissed her without her consent, he forced her to have vaginal sex and oral sex—in that order.  She did not say that she "sprint[ed] away while sobbing," but rather that she just walked out, while not crying, and called her friend on the phone.

5.     But in her second interview with Princeton, Roe said that the oral sex came first and the vaginal sex came second.  And again, nothing about sprinting.

6.     To bolster her narrative for a complaint that already had several gaping holes and took her almost a year to file, Roe reached back even further in time and claimed this was actually the *second* time Doe had assaulted her in his room.

7.     The first time, she claimed, took place over a year before the second, when she was a high school senior visiting Princeton as a prospective freshman. That allegation was even more lurid, including an allegation that Doe physically forced her to perform oral sex on him as she gagged.

8.     When Roe finally filed her complaint against Doe (two years after the first allegation and eight months after the second), she likely did not count on the fact that Doe, fortunately for him, hadn't happened to delete any of the many texts and pictures that showed what their interactions were *really* like. And that evidence showed, beyond any doubt, that he did not assault Roe.

9.     With respect to the *first* alleged assault, Roe sent Doe many friendly and occasionally flirtatious text messages for more than a year afterwards. She asked him about Princeton. She shared her joy at getting accepted. She texted him good night. She even said she was "thankful" he was in her life, as Doe relayed to a friend:



10.     Roe even asked Doe on a date just two weeks before the second incident.  None of this could be squared with Doe's having violently assaulted her when she was still in high school.

11.     With respect to the *second* alleged assault, an overwhelming amount of evidence—from witnesses who were right in the next room, to Roe's own text message to a friend about being tempted to "break [her] celibacy ple[d]ge" with Doe—showed that never happened, either.

12.     But perhaps the most *visually* striking evidence belying Roe's false accusation of a start-to-finish assault the second time were the photos Doe and his friends had taken of the *dozen hickeys* that Roe had covered his neck with—hardly the mark of a passive victim, as she claimed to be.

13.     In fact, Doe was *so embarrassed* about the hickeys, given that he was about to meet everyone in his new eating club later that day, that he immediately

took pictures of them and texted the pictures to a female friend asking for "help"—

which she gave him, in the form of concealer:



14.

15.     *Falsus in uno, falsus in omnibus*.  So one would think that Roe's fabrication of the "pre-frosh" assault from two years earlier would doom her credibility for the second assault—especially given how hard it is to square giving someone a dozen hickeys with a story in which one is a completely passive victim from start to finish.

16.     But not at Princeton.

17.     At Princeton, Roe was able to take advantage of an ethos—fueled by relentless pressure from the federal government, its students, and its alumni—to appear tough at all costs on claims of sexual assault, especially those brought by women against men.  *See, e.g.*, *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022) (noting the intense pressure that Princeton was under to treat female accusers more favorably than male respondents).  That ethos demanded that Doe be found responsible for *something*. If Princeton couldn't find some way to split the baby, it might face another massive protest—including a 200-hour sit-in— about its handling of sexual assault, just as it had just months before Roe filed her complaint.[1]

---

[1] https://www.dailyprincetonian.com/article/2019/05/title-ix-updated-demands (May 12, 2019).

18.     So split the baby it did, in a manner so completely incoherent that it is almost hard to describe.

19.     Princeton cleared Doe entirely of Roe's pre-frosh allegations.

20.     It cleared Doe of Roe's nonconsensual *oral* sex allegation from the second incident.

21.     And it cleared Doe of Roe's nonconsensual *vaginal* sex allegation from the second incident, too.

22.     But at the same time, Princeton did *not* clear Doe of the nonconsensual *foreplay* allegations that immediately preceded the (consensual) oral sex and the (consensual) vaginal sex—the very time during which Roe had to be giving Doe the hickeys that provably blanketed his neck.

23.     So Princeton's finding was, put plainly, as follows:

   a. During foreplay, Doe kissed Roe and touched her breasts *without* her consent;

   b. At *precisely the same time* that she blanketed his neck with hickeys;

   c. And *after* which Roe immediately consented to both oral sex *and* vaginal sex.

24.     The panel was able to get there by doing something truly extraordinary: explicitly declaring that Roe's credibility regarding the pre-frosh incident had *nothing to do* with her credibility for the second incident.  Even

though, of course, *she brought both charges at the same time*. In other words, *falsus in uno, falsus in… uno*. (*Nihil homini post velum*.)

25.    The panel went to similarly extraordinary lengths to downplay evidence suggesting Roe's motives to bring these false charges.

26.    It refused to seriously consider that she had mixed feelings about losing her virginity to Doe during the second incident, feelings made no better by the fact that when she left Doe's room, she encountered four of his roommates laughing—and thought, wrongly, that they were laughing at *her*.

27.    It ignored evidence showing that Roe filed her complaint against Doe—again, more than eight months after the second incident and 24 months after the first—right around the time that Doe ended a brief relationship with someone she knew.

28.    In the end, Princeton found Doe responsible for Nonconsensual Sexual Contact and sanctioned him to 48 months of disciplinary probation, likely thinking it had appeased Roe in a way that would not *really* hurt Doe. After all, it's just probation, right?

29.    Not at Princeton, where findings of probation are noted in a student's permanent record and will be disclosed to any future graduate school or employer who asks. And even with a relatively light sanction, the sexual-misconduct finding itself will doom Doe's chances at most top graduate schools and top jobs.

30.     John Doe did not assault Jane Roe—not when she was a pre-frosh, and not when she was a freshman.  Jane Roe brought these charges against him for reasons we may never know.  But what we *do* know is that Princeton's contortions in this case make absolutely no sense.  They violated Doe's contractual rights with the school, and they were clearly influenced, at least in part, by gender bias.

31.     John Doe is innocent, and he wants his future back.  So he has come to this Court for redress.

## PARTIES

32.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a citizen of a State other than New Jersey.  He was a student at Princeton at all times relevant to this Complaint.

33.     Defendant Princeton University is a private university located in Princeton, New Jersey.

## JURISDICTION AND VENUE

34.     The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Mr. Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because Mr. Doe is a citizen of a State other than New Jersey, Princeton has its principal place of business in the State of New Jersey, and the amount in controversy exceeds $75,000.

8

35.    The Court also has supplemental jurisdiction over Mr. Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

36.    Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

I.    <u>Princeton's Sexual Misconduct Policies and Procedures</u>

A.    **The Contractual Relationship Between Mr. Doe and the University**

37.    Under New Jersey law, the University's codes and policies are terms in a contractual relationship between Mr. Doe and the University.

38.    That contractual relationship began when Mr. Doe matriculated as a freshman at Princeton.  The terms of that contract include various University publications that Princeton gives to its students.

39.    Upon his matriculation, Mr. Doe received a copy of Princeton's code of student conduct titled "Rights, Rules, Responsibilities" (hereafter the "Code").

40.    In consideration for his tuition and attendance at the University each year, Mr. Doe received and was given assurances by the University that it would

9

follow and comply with the numerous policies and procedures adopted and put

forth by the school in place at the time paid that tuition, including those promises

in its Code.

41.     Section 1.3 of the Code, titled "Sex Discrimination and Sexual

Misconduct" (hereafter the "Sexual Misconduct Policy" or the "Policy"),

proscribed certain conduct by students at the University and established procedures

for investigating and resolving claims of proscribed conduct.

42.     Among other things, the Policy prohibited Non-Consensual

Penetration and Non-Consensual Sexual Contact.  It defined the former as "[a]ny

act of vaginal or anal penetration by a person's penis, finger, other body part, or an

object, or oral penetration by a penis, without consent."  It defined the latter as

"[a]ny touching other than non-consensual sexual penetration without consent."

43.     Like most schools, Princeton did not (and does not) prohibit all

drunken sexual activity.  Rather, consent was nullified under the Policy only when

a person was so intoxicated as to be incapacitated, which the Policy defined as "the

state in which a person's perception or judgment is so impaired that the person

lacks the cognitive capacity to make or act on conscious decisions."

44.     To find someone responsible based on incapacitation, it must be that

the person initiating sexual activity "kn[ew] or ought reasonably to have

understood that [the other] individual [wa]s incapacitated."

45.     Under the Policy, claims of sexual misconduct were both investigated *and* adjudicated by the same body—specifically, "a three-person investigative panel of University administrators and/or investigators" who would both "conduct an inquiry and determine, by a preponderance of the evidence, whether this policy was violated."

46.     The Policy promised that all such panelists would "have training in investigating and evaluating conduct prohibited under the policy" and that they would be "impartial and unbiased."

47.     **The Policy provided accused students with no chance for a live hearing or live cross-examination of their accuser or any witnesses.**  The investigation and resolution, rather, consisted of the panel's conducting separate interviews of the parties and witnesses, then reviewing outside their presence the documentary evidence collected.

48.     At the conclusion of its investigation, a panel would "meet to determine, by a majority decision, whether the respondent, based on the preponderance of evidence standard, violated University policy."  The panel was required to then "prepare a report, which will include findings of fact, findings of responsibility, and the panel's rationale."

49.     When a respondent was "found responsible" for violating the Policy, "the dean of undergraduate students and the deputy dean for academic affairs of

the Graduate School" were to "jointly determine the penalty."  The Office of the

Dean of Undergraduate Students or of the Graduate School would then "record the

penalty and retain records in accordance with protocols for all other disciplinary

cases. In all cases, the case file will also be archived by the Title IX Coordinator."

50.     The Policy required Princeton to "seek to complete the investigation

and any resulting disciplinary process *and* provide notice of the outcome within 60

calendar days after the investigative panel's first interview of the complainant."

(Emphasis added.)

51.     Either party to a sexual misconduct disciplinary proceeding was

permitted to appeal the panel's finding and any resulting sanction.  Appeals were

resolved by panels of three members.  All such members were required to "have

training regarding Title IX and prohibited conduct defined under this policy" and

to "be impartial and unbiased."

52.     Appeals were permitted on three grounds: "that: (1) there [wa]s

substantial relevant information that was not presented, and reasonably could not

have been presented during the investigation; (2) the imposed penalty d[id] not fall

within the range of penalties imposed for similar misconduct, or (3) there [had

been] procedural unfairness during the disciplinary process."

53.     The Policy required Princeton to seek to resolve appeals within "20

calendar days" from the date of receipt.

54.     **The initial investigation and adjudication of Roe's complaint against Doe took more than 100 days; its ultimate resolution took more than 250 days.**

## II.     Title IX at the University

55.     For years, a steady stream of statements, directives, and actions by the University has shown that Princeton's response to sexual assault is deeply informed by gender bias.

56.     Beginning in 2011, Princeton came under heavy pressure from the federal government to appear tough at all costs on claims of sexual assault, especially those brought by women against men.  That pressure was exerted primarily through enforcement of a "Dear Colleague Letter" (DCL) published by the Education Department's Office for Civil Rights (OCR) in April of that year, which concerned the ways schools were to enforce Title IX and address claims of sexual assault on their campuses.

57.     Enforcement of the DCL's gender-biased regime was stepped up when Catherine Lhamon became the head of OCR in 2013.  (Out of office during the Trump administration, she reclaimed the position in October of 2021.)  As one national media outlet reported in October 2016, in a story on OCR's Title IX campaign:

> Lhamon says she is frustrated.  As she sat in her
> Washington, D.C. office during an interview with

SI.com, she said she couldn't help but to think about the
women who are suffering every day.

58.     Similarly, an OCR press release notified the public that, on May 1,

2014, Ms. Lhamon would be speaking at the culmination of an event titled, "Walk

a Mile in Her Shoes," "an event that will raise awareness about sexual assault and

highlight men's roles in preventing sexual violence."[2]  And in August 2015 she

would tell a different national media publication, "'We don't treat rape and sexual

assault as seriously as we should,'" citing a statistic about the rate of unwanted

sexual activity experienced specifically by college women.[3]

59.     Ms. Lhamon also left no doubt about the consequences schools faced

if they failed adequately to heed OCR's mandates: They would lose all of their

federal funding.  "Do not think it's an empty threat," she told a group of university

administrators in July 2014.[4]  "There is 'a need to push the country forward,'" she

---

[2] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two
California Universities to Highlight Successes in Addressing Community
Responses to Sexual Assault" (available at https://www.ed.gov/news/media-
advisories/us-assistant-secretary-civil-rights-catherine-e-lhamon-visit-two-
california-universities-highlight-successes-addressing-community-responses-
sexual-assault, last visited January 25, 2018).

[3] David G. Savage and Timothy M. Phelps, "How a little known education office
has forced far-reaching changes to campus sexual assault investigations," LOS
ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-
na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

[4] *See, e.g.*, Rachel Axon, *Feds Press Colleges on Handling of Sex Assault
Complaints*, USA TODAY (July 14, 2014),

said in August 2015, echoing the same sentiment.[5]  "It's nice when you carry the

big stick of the federal government," she would say again in October 2016, leaving

no doubt that the threat of having one's federal funding yanked remained very

real.[6]

      60.    That pressure was brought to bear directly upon Princeton.  In 2010

and 2011, it was the subject of three separate OCR complaints.  In response, OCR

launched a multi-year investigation into Princeton's enforcement of Title IX and its

handling of claims of sexual assault.  That investigation resulted in a finding, in

November 2014, that Princeton had been in violation of Title IX and in a resolution

agreement under which Princeton agreed to make critical changes skewed towards

complainants, including the elimination of live hearings and adoption of a

---

http://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/ (last visited January 25, 2018); Robin Wilson, *2014 List: Enforcer*, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014), http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last visited January 25, 2018); Tyler Kingkade, *Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases*, THE HUFFINGTON POST (July 14, 2014), http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-summit_n_5585654.html (last visited January 25, 2018).

[5] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

[6] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited January 25, 2018).

preponderance of evidence standard in place of the higher evidentiary standard it had used in such cases.  Upon information and belief, the resolution agreement required Princeton to submit documentation to OCR regarding its response to claims of sexual assault for some time after the signing of the agreement, ensuring it would remain under OCR pressure to vigorously enforce its gender-biased regime.

61.    Princeton continued to received attention and pressure related to claims of sexual assault on its campus, and in particular sexual assault by males against females.

62.    On November 5, 2014, for example, a news article reported alleged sexual misconduct at one of Princeton's eating clubs, the Tiger Inn, stating that "an intoxicated first year female student" was photographed performing a sex act, and the photograph was subsequently distributed.[7]

63.    Likewise, upon information and belief, in May 2016, another complaint was filed with OCR alleging Princeton failed to adequately respond to a female student's claims of sexual misconduct by a male, and an investigation was opened in August 2016.

---

[7] *See* Peter Jacobs, *Princeton Eating Club Under Investigation For Allegedly Distributing Photo Of Lewd Sex Act*, Business Insider (Nov. 5, 2014), https://www.businessinsider.com/princeton-eating-club-under-investigation-for-allegedly-distributing-photo-of-sexual-assault-2014-11.

64.     Similarly in 2017, Princeton received widespread attention and pressure when it initially declined to terminate or suspend a male faculty member accused of sexual misconduct by a female graduate student.  The backlash led Princeton to adopt a default sanction of suspension for such violations.  That pressure motivated Princeton to appear tough at all costs on claims of sexual assault brought by women against men.

65.     That pressure continued in late 2017, when the Education Department rescinded the DCL and announced its intent to establish new regulations governing schools' responses to claims of sexual misconduct.  Students and administration leaders alike responded to rescission of the DCL by insisting that Princeton adhere to—or even exceed—the DCL's gender-biased regime, and exhibited the gender bias that informed Title IX enforcement at Princeton in other ways as well.

66.     Rescission of the DCL and its eventual replacement were motivated by a desire to provide common sense procedural protections to students accused of sexual misconduct, procedures widely viewed as appropriate to truth-seeking and taken for granted in so many contexts.   Secretary Betsy DeVos's press release preceding rescission of the DCL acknowledged the massive pressure the DCL had improperly placed on universities ("[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears

shaming by—or loss of funding from—Washington") and noted that due process had to be "the foundation of any system of justice that seeks a fair outcome.[8]

67.    Even before the DCL was rescinded, Princeton's school newspaper, the *Daily Princetonian*, was warning the student body to be leery of any changes Secretary DeVos might make to the DCL, particularly given "the facts on the ground" that the DCL was meant to address: that "between 18 and 20 percent of women experience rape or some other form of sexual assault while in college."[9]

68.    Not surprisingly, then, the rescission of the DCL's gender-biased regime was overwhelmingly attacked at Princeton.  Administrators immediately stated that Princeton would not change its policies and procedures, insisting that its DCL-era procedures were "working well" and were "fair."[10]

69.    Indeed, in early 2018, the *Daily Princetonian*'s Editor-in-Chief penned an op-ed stating that Princeton's DCL-required Title IX procedures were not *biased enough* towards "the victims, the survivors."[11]  And when the Education Department published its new proposed regulations later that year, she wrote

---

[8] Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

[9] https://www.dailyprincetonian.com/article/2017/02/dump-devos (Feb. 8, 2017).

[10] https://www.dailyprincetonian.com/article/2017/09/devos-reverses-campus-sexual-assault-rules (Sept. 22, 2017).

[11] https://www.dailyprincetonian.com/article/2018/01/in-response-to-an-honor-code-fairer-than-title-ix-proceedings (Jan. 6, 2018).

another, specifically noting that "[w]omen's rights groups" opposed the changes.[12]
She lamented that victims will have to "show[] they are indeed a victim" and that
accused students would be "protect[ed]" by such basic procedural protections as
"cross-examin[ation]." *Id.*

70.    Other articles in the *Daily Princetonian* warned of the backlash the
University would face if it refused to toe the line drawn by the DCL: "The
University, with its $25.9 billion dollar endowment, well-connected alumni, and
strongly-opinionated student body, would likely face severe public backlash, as it
has in the past, if it rolled back its Title IX protections for students. With a faculty-
student sex scandal in 2017 and two others in 2014, the University's public image
has the potential to be tainted more by lax Title IX enforcement, making the
relaxation of policy all the more unlikely."[13]

71.    Not surprisingly, Princeton itself, as an institution, formally criticized
the proposed regulations twice.  In January 2019, in conjunction with several other
universities, it attacked the regulations' (1) requirement that schools provide for
live cross-examination at disciplinary hearings, and (2) bar on using a lower
standard of proof in sexual assault proceedings than in proceedings involving other

---

[12] https://www.dailyprincetonian.com/article/2018/11/protect-our-students-protect-our-survivors (Nov. 21, 2018).
[13] https://www.dailyprincetonian.com/article/2018/11/title-ix-changes-are-going-to-hurt-those-that-need-the-enforcement-the-most (Nov. 28, 2018).

student conduct violations.[14]  And in conjunction with the New Jersey State Bar

Association, it again attacked the proposed regulations on those same grounds later

that month.[15]

72.    Those actions did not appease student leaders, who continued to exert

very public pressure on Princeton to make its handling of sexual assault still more

biased in favor of complainants and women, just months before Roe would file her

formal complaint.

73.    In May of 2019, a group called Princeton Students for Title IX

Reform (PIXR) protested outside the University president's building for more than

200 hours straight and issued a list of 11 demands.[16]  Those demands included,

among other things, (1) a complete external audit of Princeton's Title IX regime;

(2) social workers dedicated to helping "survivors" (but not respondents); (3) a

fund to support "survivors'" mental health; and, most tellingly, (4) the "immediate

departmentalization of the Program in Gender and Sexuality Studies" as a "key

step in challenging ***dominant paradigms of toxic masculinity***, homophobia,

---

[14] https://www.aau.edu/key-issues/aau-comments-department-educations-proposed-title-ix-rule (Jan. 24, 2019).

[15] https://tcms.njsba.com/personifyebusiness/Portals/0/NJSBA-PDF/Reports%20&%20Comments/CommentsProposedAmendmentsHigherEducation.PDF (Jan. 30, 2019).

[16] https://www.dailyprincetonian.com/article/2019/05/title-ix-updated-demands (May 12, 2019).

transphobia, and gender-based violence on campus."[17]  They also demanded the immediate firing of Princeton's Title IX Coordinator, Regan Crotty.  Their protest gained widespread support: more than 1,700 Princeton students and alumni pledged, at the protesters' request, not to give any money to the University until the protesters' demands were met.[18]

74.    PIXR specifically insisted that Princeton adhere to its current Title IX procedures as much as possible, "in spite of" the proposed regulations.[19]  It complained that those current procedures themselves were insufficient and that things would only become worse under the proposed regulations.  *Id.*

75.    After 200 hours of continuous presence outside his administrative building, Princeton's president, Christopher Eisgruber, agreed to meet with six representatives of PIXR.[20]  As explained further below, he would agree to commission two reviews of Princeton's Title IX regime as a result.

---

[17] https://docs.google.com/document/d/1nnilcneEcs-nKKdTIxTc0nEK26OKYjLHzBg6VS-mfsA/edit (emphasis added).
[18] https://www.change.org/p/princeton-university-princeton-title-ix-reform?recruiter=958527092&recruited_by_id=707a4290-714a-11e9-9617-5982860e6a9b&utm_source=share_petition&utm_medium=copylink&utm_campaign=psf_combo_share_initial&utm_term=share_petition (last visited May 2, 2022).
[19] https://www.dailyprincetonian.com/article/2019/05/title-ix-updated-demands (May 12, 2019).
[20] https://www.dailyprincetonian.com/article/2019/05/title-ix-office-protests-come-to-a-close-after-demonstration-in-front-of-prospect-house (May 16, 2019).

76.     Pressure on Princeton came from other quarters as well.  At the 2019 Baccalaureate, approximately 200 students silently protested that year's speaker (Pulitzer Prize-winning columnist and author George Will) because of his prior statements on the treatment of campus sexual assault.[21]  That same weekend, a panelist on a panel about sexual assault walked off of the panel because one of her fellow panelists (renowned attorney Beth A. Wilkinson) had defended a man accused of sexually assaulting a woman and had been asked to discuss the need for fair procedures for adjudicating such claims.[22]  The panelist was followed out by dozens of students.  *Id.*

77.     In the wake of PIXR's very public criticism of Princeton's process and those implementing it—criticism expressly informed by gender bias—Princeton announced the following year, when the Education Department promulgated its final rule, that it would nonetheless strive to adhere as closely as possible to its "current system[]" in implementing that final rule.[23]  The *Daily Princetonian* quoted the President and CEO of the National Women's Law Center as stating that the final rule would "protect[] abusers and harassers" and noted that

---

[21] https://www.dailyprincetonian.com/article/2019/06/george-will-gs-68-speaks-at-2019-baccalaureate-amid-student-protest (June 3, 2019).

[22] https://www.dailyprincetonian.com/article/2019/06/students-alumni-walk-out-of-metoo-panel-protest-at-p-rade-for-title-ix-reform (June 3, 2019).

[23] https://www.dailyprincetonian.com/article/2020/05/u-to-amend-sexual-misconduct-policy-after-devos-releases-new-title-ix-regulations (May 6, 2020).

the DCL had warned against some of the procedural protections contained in the final rule.  *Id.*  It also quoted a Princeton administrator as explaining, as if by way of apology, that Princeton was "required" to now implement such safeguards.  *Id.*

78.    Princeton showed itself to be highly susceptible to the pressure PIXR was exerting.  It responded by authorizing two separate reviews of its Title IX regime, one external and one internal.[24]  Both reviews resulted in lengthy reports that proposed various ways Princeton might better address sexual misconduct, including by offering training sessions on "toxic masculinity" and encouraging students "to attend functions at Princeton Women*s Center."[25]

79.    PIXR continued to exert pressure on Princeton in other ways.   A piece written by its members was published in the *Daily Princetonian* and claimed that the final version of the regulations published by the Education Department was "clearly aimed at silencing survivors" and called for increased funding for Princeton's Women's Center.[26]  It insisted that Princeton reduce violence by "tackling destructive campus norms" via "increased funding to the Gender and Sexuality Studies Program," echoing the gender bias it had advanced the year

---

[24] https://www.dailyprincetonian.com/article/2019/10/title-ix-reports (Oct. 24, 2019).

[25] https://sexualmisconduct.princeton.edu/sites/sexualmisconduct/files/external-review-report.pdf

[26] https://www.dailyprincetonian.com/article/2020/05/pixr-title-ix-devos-regulations (May 11, 2020).

before.  *Id.*  The article insisted that Princeton use whatever discretion was left to it to limit the scope of the new regulations.  *Id.*

80.    Princeton administrators responded accordingly the following month. Its Vice Provost for Institutional Equity and Diversity, Michelle Minter, labeled the new regulations "problematic in a number of ways" in explaining how they would be implemented at Princeton.[27]

81.    The following month, the *Daily Princetonian* ran yet another piece critical of the new regulations, one that contrasted the protections for survivors under the DCL with the new rules that had "cast them out to sea."[28] It stated that "[o]ne in five women are sexually assaulted during their time in college" and claimed that the new rules would prevent survivors from coming forward.  *Id.*  It reiterated the need for students and alumni to sign the petition PIXR had circulated the year before and for the University to accede to PIXR's demands.  *Id.*

82.    Princeton, in the wake of all of that pressure, chose to comply with the new regulations by adopting an admittedly "complicated" two-track system for resolving claims of sexual misconduct.[29]  Under that system, the procedural

---

[27] https://www.dailyprincetonian.com/article/2020/06/usg-town-hall-title-ix-policy-changes (June 15, 2020).

[28] https://www.dailyprincetonian.com/article/2020/07/resetting-sexual-misconduct-to-the-title-ixs (July 30, 2020).

[29] https://www.dailyprincetonian.com/article/2020/08/princeton-sexual-harassment-misconduct-betsy-devos-cross-examination (August 3, 2020).

protections required by the new regulations would apply to only the narrowest set of claims required by those regulations. *Id.* The rest would be resolved under a separate set of procedures that did not provide parties with, among other things, the right to conduct live cross-examination through their advisors. *Id.*

83.    The pressure on Princeton to combat sexual assault in gender-biased ways continued. The *Daily Princetonian* ran an article on August 16, 2020, lamenting the sexual misconduct training incoming freshmen had received and insisting that prevention required addressing "the harmful implication of underlying causes like toxic masculinity."[30]

84.    Princeton, in short, has been under near-constant pressure for years— from the federal government, public attention in media publications, and its student body and alumni—to enforce Title IX in gender-biased ways that consciously skew in favor of complainants, especially female complaints accusing men. And it was experiencing that pressure in intense ways precisely when Roe brought her complaint against Doe.

85.    The effect on Doe's proceeding was dramatic.

_____

[30] https://www.dailyprincetonian.com/article/2020/08/misconducting-sexual-misconduct-education-not-anymore (August 16, 2020).

III.   **Overview of Roe's Allegations, the Investigation, and Princeton's Decisions**

86.   Roe filed her complaint with Princeton on October 27, 2019.  She accused Doe of sexually assaulting her in his room on two occasions: during her pre-frosh visit two years earlier in October 2017, and then again, 16 months later, on February 8, 2019.

87.   As to the first incident, she claimed that Doe had lured her to his room when she was extremely drunk, was rough with her in the stairwell up to his room, then physically forced her to perform oral sex on him as she verbally said no, even forcing her to continue as she gagged.

88.   As to the second incident, she claimed that Doe *again* lured her to his room while she was extremely drunk, that she said no to him "ten or more times" once they got there, but that he nevertheless kissed her, took off her clothes, fondled her, and made her engage in both vaginal and oral sex.  She also added, strangely, that before he would let her leave, Doe made her give him a *single hickey* so that he could show it off at his new eating club later that day.

89.   Doe told very different, much less lurid, and much more believable stories about their two encounters.

90.   As to the first, he said that Roe *asked* to stay in his room because her host wouldn't let her back in and refused his offer to convince her host to let her back in the room so late.  He said that when Roe asked him how to perform oral

sex, he told her he didn't know because he was so inexperienced—something too odd to make up.  He said that Roe apologized for not doing it well more than once—also something else too odd to make up.  And he said that after they were done, he made a bed for her on their couch, he offered her cookies that his grandmother baked for him, and they exchanged social media information—which is completely inconsistent with a forcible sexual assault.

91.    As to the second incident, Doe testified that after kissing on campus, Roe suggested they go to his room, where she took charge in an almost aggressive way.  She pushed Doe down on his bed with both hands, climbed on top of him, and intensely gave him hickeys on his neck.  She told Doe she'd "learned so much since last time," pulled down his pants, and gave him oral sex.  She then asked him to get a condom, climbed on top of him, and had sex with him—until Doe, who'd only ever had sex with one longtime ex-girlfriend, grew uncomfortable and asked her to stop, after which Roe became visibly upset and left quickly.  Another story just too weird to make up.

92.    The evidence that Princeton would subsequently collect overwhelmingly corroborated Doe and undermined Roe.

93.    As to the first incident, Doe produced evidence showing that Roe had connected with him on social media *immediately* after their encounter; had messaged him about Princeton during the following year; had sent him an excited

video letting him know she'd been admitted, sent him friendly and flirty messages once she got to Princeton; and literally asked him on a date *two weeks* before the second incident.  It also heard evidence from *Roe herself* that on the night of the second incident, she *consensually* kissed Doe before returning to his room—something that would make no sense if he'd forcibly assaulted her the only other time they'd been together.

94.     As to the second incident, Princeton collected evidence that consistently contradicted Roe:

- Roe texted a friend at 12:21 a.m.—precisely when she would have been talking to, and eventually making out with, Doe—to say she was tempted to "break [her] celibacy ple[d]ge."

- Roe told the panel in her first interview that the oral sex preceded the vaginal sex, but said the opposite in her second interview—not even realizing the contradiction until the panel pointed it out.

- Doe testified that in the middle of their sexual activity, Roe's phone went off, Roe got up and checked it, and then told Doe it wasn't important and they should continue.  Roe denied that—but Student F's phone records proved it happened.

- Multiple friends of Doe testified that immediately after the incident, Doe had told them that Roe had been the aggressor and how strange the whole experience had been.

- Multiple friends of Doe also testified that Doe was visibly upset when he learned about the hickeys covering his neck and took concrete steps to conceal them.

- Roe, by contrast, told almost none of her friends any details of what supposedly happened—and the only two people with whom she shared any

details were told a story *completely* at odds with her later story to the investigators.

95.    In the face of that evidence, the hearing panel nonetheless went to extraordinary lengths to find in favor of Roe.

96.    It cleared Doe, as it had to, regarding the first incident, but did so in a way that artificially kept Roe's obvious lack of credibility from infecting her claims about the second incident.  It explicitly stated that it was going to make *separate credibility determinations* as to both Roe and Doe for each of the allegations, even though Roe had brought them and testified about them at the same time.  It also credited—without explanation—Roe's preposterous excuses for why she stayed in touch with Doe, flirted with him, consensually kissed him, and went to his room despite his having purportedly forcibly assaulted her 16 months earlier.  But since Doe seemed credible, too, the panel said it would rule in favor of Doe—the tie goes to the runner.

97.    As to the second allegation, the panel initially ruled against Doe nearly across the board.  It found that the kissing, fondling, oral sex and vaginal sex *all* were nonconsensual.  It cleared Doe only of the ridiculous allegation that he'd demanded a hickey *after* all of that, because Roe had obviously given them (in the panel's words) "ardent[ly]."

98.    But it did not hold that lie about the hickeys, or any of the other problems with Roe's story, against her.  Incredibly, it found that the dramatic

change to the heart of her story *bolstered* her credibility because Roe was "forthright" about having memory impairment on that point—as though "I don't remember" hadn't been both an obvious and desperate attempt to excuse her many contradictions. The panel also found that that it *bolstered* her testimony that Roe had told her friends about the second incident in the days afterwards—even though the only two people who heard *any* details were told very different stories.

99. The panel did the opposite as to Doe: It found him partially "not credible" based on completely peripheral topics (such as whether he *knew*, or merely *suspected*, that he'd been rejected by a certain eating club before the second incident)—topics on which the evidence, furthermore, squarely *supported* Doe, as explained in detail below.

100. Based on those findings, Doe was sanctioned with a two-year suspension.

101. Doe filed an appeal of those findings that meticulously demonstrated (1) the ways that Roe's testimony had changed during the investigation, and (2) how the evidence had contradicted her in ways the panel had failed to confront her about. The appeal was granted based primarily on the "procedural unfairness" in the hearing panel's weighing of Roe's credibility. The matter was then remanded to the same panel.

30

102.   On remand, the panel spent the vast majority of its time searching for more evidence with which to find Doe not credible.  It spent considerable effort delving further into when Doe definitively knew he'd been rejected from a certain eating club, thinking it had caught Doe in a (completely irrelevant) lie.  It also spent considerable time challenging whether Doe had in fact helped a severely drunk girl out of a scary situation one night much earlier.

103.   When it reinterviewed Roe, however, and finally confronted her squarely with her change as to the hickeys she gave Roe, Roe again leaned on her "I don't know" excuse and said it was possible she'd given Doe some of those hickeys while they were on his bed and she was on top of him.

104.   Even though Roe had contradicted the very heart of her claim; had told wildly different versions of events to her friends; and was contradicted by the undeniable evidence of the dozen hickeys she had given Doe, the panel announced it would credit Roe on every "element[] that she consistently and [allegedly] clearly recalled."  It gave no basis for explaining why it found Roe credible enough to do that; why it felt it could silo its credibility determinations that way; or why the comparatively minor "contradictions" Doe had told, on entirely peripheral issues, did not merit crediting *his* testimony, too, as to any item on which he'd been consistent—which was nearly everything that actually mattered.

105.   Based on its decision to artificially splice every statement by Roe and credit the ones that had never been expressly contradicted by the evidence, the panel was left with only one out: the foreplay. Because with respect to everything else, there was just too much unignorable evidence showing that Roe was lying.

106.   The panel thus found Doe *not responsible* for the oral sex, *not responsible* for the vaginal sex, *not responsible* for demanding a hickey at the end, but *responsible* for fondling and kissing Roe without consent *immediately before* all of those things.  It reasoned that Roe's admission that the hickeys *may* have happened on the bed before the sex meant that Doe could have reasonably thought the sex was consensual.

107.   But, it reasoned, that could *not* be the case as to the foreplay (the kissing and fondling), because Roe had claimed she'd said no "ten or more times" at the beginning—and since she'd never expressly contradicted that, they would deem it credible.

108.   Based on that reasoning, which artificially spliced Roe's testimony and pretended each statement existed in a vacuum; based on the panel's completely disparate treatment of Doe's testimony; and based on the panel's willful blindness to the overwhelming problems with Roe's story, Doe was sanctioned with 48 months of probation.

## IV.   The Encounters as They Actually Happened

### A.      The First ("Pre-Frosh") Encounter: October 14-15, 2017

109.   Roe and Doe met on Princeton's campus on October 14, 2017.  Doe was a Princeton student, and Roe was attending a preview weekend for prospective freshmen.  They met outside, where a group of people were hanging out.

110.   On the same night, Roe and another student, Student C, helped walk a drunk person home, after which Student C and Roe kissed.  Roe then asked Student C if she could spend the night at his place because her host student was upset with her.  Student C felt uncomfortable with the request and decided not to engage with Roe any longer.  When Doe came over and began talking with Roe, Student C backed away from the conversation.

111.   Roe and Doe immediately hit it off.  Doe, knowing that Roe had just kissed Student C, texted Student C to ask if Student C would be upset if Doe hooked up with her.  Student C said no.  Roe and Doe talked, flirted, and eventually kissed.  Doe offered to give Roe a tour of the campus, and Roe accepted.

112.   As Roe and Doe walked, they got to know each other better and would stop periodically to kiss and touch each other.  Roe talked with Doe about her family and the fact that she did high school debate, among other things.

113.   After some time, Roe told Doe, as a pretext, that she preferred not to keep kissing outside and asked Doe if she could stay the night in his room—just as she had asked Student C.  Doe offered to walk Roe back to her host student's room, but Roe refused the offer.

114.   Doe texted his roommate, Student D, and told him he'd offered to walk Roe back and knock on Roe's host student's door, but that Roe had said no and that this confused Doe.  Doe told Roe she could sleep on the couch in his dorm, and the two of them walked there.  Doe texted Student D to say he'd let Student D know if Roe went immediately to sleep once they got there.

115.   The entire time they were together, Roe exhibited no physical, verbal, or intellectual signs of severe intoxication, or anything close to it.

116.   When they got to Doe's dorm, Roe and Doe went to his room and kissed.  Roe told Doe she did not want to have vaginal sex, which relieved Doe, because he was a virgin.  They continued to kiss, and then to undress. Doe had never taken off a bra before, so he asked Roe for help in removing her bra.

117.   Doe then asked Roe if she would be willing to perform oral sex on him.  Roe told Doe she had never done it before.  Doe told Roe he couldn't offer much guidance because he had very little experience receiving oral sex.

118.   Roe agreed to do it.  Once or twice, she paused while doing so and said, "Sorry if this isn't good," before continuing.

119.    When Doe was close to ejaculating, he asked Roe to get paper towels for him, and he ejaculated into them.  Roe then resumed performing oral sex on Doe, and Doe told her she could stop.  Doe then texted Student D to let him know Roe was changing and would soon be going to the common room, where the couch was.

120.    Doe took sheets and a pillow out to the common room and made a makeshift bed on the couch for Roe.  He offered her cookies and water.  He got her set up there, and they exchanged contact information on Snapchat.  Doe went back to his room and again texted Student D, saying it was wrong of Roe's host to ditch her.

121.    By the time Doe woke up the next morning, Roe had already left.  She had neatly folded the sheets she'd used and placed them on the couch.  Doe thanked her doing so via Snapchat.  Doe told some friends over the next few days that he and Roe had hooked up.

122.    Over the next several months, Roe and Doe would periodically exchange friendly messages.  Roe would ask Doe questions about Princeton and seek his advice.  When she was accepted to Princeton, she sent Doe an ecstatic video telling him that.

123.    But when Roe arrived at Princeton that fall, the dynamic between them changed.  Roe became bolder with respect to her feelings about Doe.  In

September, she texted Doe "goodnight" one night and included a number of smiley faces, something Doe told Student C about via text.  Roe's messages then got more and more flirtatious:  On November 22, she texted Doe, "Thankful today.  Grateful to have you in my life," following by a "kissy face" emoji.  Roe would also ask to visit Doe's room, purportedly to see his roommate's pet hedgehog.

124.   Then in late January—just two weeks before the second incident— Roe actually asked Doe to go on a date, something Doe told Student M via text.

## B.   The Second ("Freshman") Encounter: February 7-8, 2019

125.   On the night of February 7, Doe and Roe were out with different groups of friends at a campus eating club called Quadrangle (Quad), and Roe approached Doe to talk.  Doe talked with her briefly but ended the conversation because he'd been put off by an interaction he'd had with her earlier that year.  In that interaction, he'd asked Roe to intervene on behalf of an obviously severely intoxicated student, Student Y, who Doe believed was being preyed on by a male student.  Roe briefly talked to Student Y but did not take the issue seriously and did nothing to get Student Y to a safe place, so Doe did it himself.

126.   Shortly after ending the conversation on February 7th, Doe came to think he was being too hard on Roe and re-engaged her in conversation.  They talked for a while and wound up kissing for about five minutes.  Roe's friend,

Student F, asked Roe if she wanted to leave with him, but Roe said she wanted to stay.

127.   Just as she had done in 2017, Roe told Doe she didn't want to kiss in front of other people, as a pretext to go to Doe's room.  Roe and Doe then walked to Doe's room in the snow (a nine-minute walk), talking as they went.  Roe showed no signs of severe intoxication.

128.   Earlier that night, at 12:21 a.m., at a time she would have been hanging out with Doe, Roe had texted her friend, Student E, stating that she was tempted to break a celibacy pledge she'd made:

[Student E] FO I BREAK MY CELIBACY PLEGE IM SO TEMOTEF

"Temotef" is "tempted" with two fat-finger typos: "o" is right next to "p" on the keyboard and "f" is right next to "d."  They are the kind of typos autocorrect often fixes and which people often choose not to manually correct.  The fact that the text was in all caps suggested Roe had deliberately activated that feature to convey her emotions.

129.   Student E quickly asked Roe, "Are you ok?" and Roe immediately responded, "Yesssss."  Roe then asked Student E if *he* was doing ok, referring back to even earlier texts between them that night.  They exchanged several coherent, nearly typo-free texts about what was getting Student E down before Roe asked if Student E wanted her to come back.  Student E—despite hearing Roe say she was

tempted to break her celibacy pledge, and seeing a few typos in their texts—was not concerned about Roe's ability to consent to sexual activity but instead told her not to worry and to have fun.  Roe offered Student E final words of encouragement at 1:01 a.m.

130.   At 1:35 a.m. (before they'd gotten to Doe's room), perhaps to check in on Student E but more likely because she was nervous about taking the step of breaking her celibacy pledge, Roe texted Student E again and said, typo-free, "Call me in 5 and insist I come back."  Nothing about the text conveyed a sense of fear or concern.  Around the same time, Roe texted Student F and likewise asked Student F to call her.  Roe purposely set her phone's volume to high so that she would hear any response.

131.   When Roe and Doe got to Doe's dorm, they went into his bedroom and resumed kissing, as they had been doing at Quad.  Roe then became aggressive:  She pushed Doe down on the bed with both hands and got on top of him.  Doe touched Roe's vulva over her underwear, and Roe moaned as she intensely kissed and sucked on Doe's neck.  After some time Roe then said, "It's my turn," took off Doe's pants and underwear, and began to aggressively perform oral sex on him.  As she did so, she told Doe, "I've learned so much since last time."

132.   Soon after, Roe and Doe decided to have sex, so Doe retrieved a condom.  Roe was a virgin, and Doe had only had sex with one girl he dated after last hooking up with Roe.  He had never used a condom before.  He had trouble putting it on, so Roe did what she could to help him.  Roe then climbed on top of Doe and moved around as the two had sex.  She also intensely kissed the other side of Doe's neck as they did so.

133.   At some point during their interaction—likely as they made out or as Doe retrieved the condom—Roe's phone notification sound began going off loudly.  Student F had texted her at 1:57 a.m., and again at 1:58 a.m., in response to her earlier text asking that he call her.  Roe went to check the phone but chose not to answer or respond to Student F, telling Doe it wasn't important.

134.   After having sex for a short while, Doe grew unnerved at how things had quickly progressed, since this was his first time having casual sex and he could not maintain an erection.  He told Roe, as a pretext to stop, that he wanted to fix the condom.  As he pretended to do so, he then told her it wasn't a good idea to continue.

135.   At that moment, Doe and Roe both heard laughter in the common room.  Roe grew visibly disturbed and asked why there were people there.  She began to get dressed to leave.  Doe, seeing that Roe was upset and fearing that his roommates might comment in ways that would make her feel worse, texted them

and expressly told them to "let her leave in peace."  When Doe and Roe went

through his door into the common room, they saw four shirtless guys sitting around

laughing.

136.   Roe said nothing and quickly left.  She called a friend and asked the

friend to meet her halfway back to her dorm.  She started crying, presumably upset

at how she'd lost her virginity, culminating in the boys seemingly laughing at her.

137.   Doe's roommates, meanwhile, immediately told Doe that he had a

large number of big, darkly colored hickeys on both sides of his neck.  Doe was

upset to hear that: He would be meeting a large number of people later that day in

connection with his recent admission to an eating club and was embarrassed at the

idea of being seen with his neck covered in hickeys.  He texted a video of his neck

to a female friend with the caption "help" and asked his friends what he should do.

Later that day, he would obtain and apply concealer to cover up the hickeys as best

he could.

138.   Over the next few days, Doe told multiple friends how surprisingly

aggressive Roe had been in the second encounter.

139.   Doe and Roe did not interact over the next several months, although

Doe would occasionally see things she posted on Instagram.

140.   Around October of that year, Doe had a brief relationship with

Student GG, someone Roe knew.  Shortly after the relationship ended—and more

than eight months after the second incident—Roe filed a complaint with Princeton's Title IX office.  She alleged that Doe had physically forced her to perform oral sex on him in October 2017; had physically forced her to perform vaginal and oral sex in October 2019; and strangely, had made her give him a hickey after the oral and vaginal sex in October 2019 before allowing her to leave his room.

## V.     The Incidents are Investigated

141.   Princeton appointed three people to investigate and adjudicate Roe's claims: Associate Dean of Undergraduate Students Joyce Chen Shueh, and investigators Randy Hubert and Walter Wright.

### A.     Roe's First Interview

142.   Roe sat for her first interview on November 26, 2019.  As to the first incident (from October 2017 when she was a prospective student), Roe told a story that made no sense at all given all of her friendly, and often flirtatious, interactions with Doe after that night.

143.   Roe testified that before she left with Doe, she had 4-5 shots of hard liquor in a 30-minute period, *and* a lot of beer from playing beer pong—quantities that likely would have resulted in her total impairment.  She claimed that when her host stopped answering her texts, Doe offered his couch for her to sleep on, and

she accepted.  **Not a single text message in the entire case supported this claim.** And in fact, Roe's host explicitly contradicted her claims.

144.   She said that before they even *got* to his room, Doe was rough with her, pushing her against a wall in the stairwell.  **Not a single text message in the entire case—or the testimony of even a single witness—supported this claim.**

145.   She said that in his room, Doe asked her for oral sex and said he would teach her how to do it.  Roe said she expressly told Doe "no" but that he then *pushed her shoulders and head down* and made her do it, *even after she started gagging*.  **Not a single text message in the entire case—or the testimony of even a single witness—supported this claim.**

146.   Notwithstanding these allegations of what would have constituted a brutal assault—of a *high school senior*, no less—Roe admitted that she then became friends with Doe on Snapchat and Instagram and communicated with him there over the next *year*.  She claimed that she was then "friendly" with him when she got to Princeton—not because she *liked* him, but so it wouldn't be awkward. That, she said, is why she continued to message with him on Snapchat and even asked to visit his room on one occasion.

147.   That incredibly violent story of assault made no sense in light of their provable friendship after the fact, but the panel would nevertheless take it at face value.

148.   Nor did that tale of violent assault make sense in light of what Roe admitted about the *second* incident (from February of 2019).  As to *that* incident, Roe admitted that she kissed Doe that night before going to his room and that it was *consensual*—an odd thing to do if, when she was but a high school senior, Doe had orally raped her to the point of gagging.

149.   And as she would do again and again in the case, Roe told a lie that she could never quite back up: She claimed that after a while, she realized her friends had left and texted them to ask where they were.  **Neither Roe nor her friends, however, would ever produce *any* such texts in the investigation, despite producing several others.**  That is because Roe never sent any such texts; she made this up to explain away her agreeing to go back to Doe's room.

150.   As noted above, however, Roe did text them *something* from the party—that she was "[TEMPTED]" TO "BREAK [HER] CELIBACY PLEDGE."

151.   Roe next said that she asked Doe to take her home, and he agreed. But first, he said, he had to check on his sick roommate.  And Roe, despite what she claimed happened in his room a year earlier, believed him and followed him. On the way there, she texted two of her friends asking them to call her in a few minutes.  One of them, Student E, was the same friend she'd texted about breaking her celibacy pledge.  Although this was plainly an effort to help her honor her pledge, Roe would later claim it was because she was afraid of Doe.

152.   But if that had been true, Roe could have just walked away from him. Or told her friends to come get her.  Or told them to call her right away, rather than in five minutes.  Yet she did none of those things.  Instead, she chose to accompany Doe to his room.

153.   Roe claimed that she felt uncomfortable in Doe's room, so she put her phone volume on high so that she would hear it when her friends called or texted her back.  She claimed that, when they got to Doe's room, she said "no" to kissing him—despite having admitted kissing him *consensually* just minutes earlier.  She claimed Doe ignored her "no's" and then took off her clothes, without explaining how he did so without her help.  She said Doe got a condom and that she said "no" again.  She said he then had vaginal sex with her, but that *she* was on top of *him*. She claimed he then took off the condom and "pushed her head down" to make her perform oral sex on him.  And she claimed it all happened rather quickly, with just a few minutes passing from the time she said no to the time she was forced to have sex.

154.   **Roe then claimed something completely counterintuitive: that *after* the oral sex, Doe made her give him a hickey, so she gave him "one."**  She said Doe wanted it because the next day he'd be seeing people in connection with learning about his admission to an eating club and wanted people to see it.  The evidence the panel collect would indisputably disprove *all* of that.

155.   Roe next said that when she left, there were guys laughing in the common room.   She said that after she left, she called one of her friends to meet her halfway back to her dorm.  She never explained why she hadn't done the same as she walked to Doe's room in supposed fear, or why she hadn't done it while in his room.  Roe claimed Doe messaged her on Snapchat later that day and she then blocked him on all social media.

156.   Roe testified in this interview that Student H, who would later be interviewed, was "one of her best friends."  As the investigation would reveal, Roe told Student H a *completely* different story about the incident than she would ever tell the panel—and that Student H was the *only* friend to whom she'd told about this incident in any appreciable detail.

157.   Despite claiming she was severely intoxicated, Roe never testified she had any difficulty talking, communicating, or physically interacting with Doe.

**B.    Doe's First Interview**

158.   Doe sat for his first interview with the panel on December 13, 2019, more than 10 months after the second incident.  He testified truthfully to what had happened both during and between the first and second encounters.

159.   As to the first encounter, Doe testified to the things described in paragraphs 109-21 above.  He testified that after flirting with Roe, they kissed, and he took her on a tour of campus, during which they kissed some more, discussed

her family, discussed the fact that Roe did debate, and discussed the fact that Roe

didn't want to kiss more outside.  He testified to how Roe said her host was mad

and didn't want Roe coming back to the room.  He explained how he had texted

Student D in confusion because he'd offered to knock on Roe's host's door but

Roe had said no.  He explained how he'd told Student D he'd let him know if Roe

went straight to sleep.

160.   Doe then explained what happened during their sexual activity.  He

described how they kissed and Roe had said she didn't want to have sex, and how

relieved that had made him feel because he was a virgin.  He explained other

details too unusual to make up, including that he had never taken off a woman's

bra before and had asked Roe for help.  He then explained how he asked Roe for

oral sex and how she agreed but said she'd never done it and said more than once

in the middle of it that she was sorry if it wasn't good—yet another detail too

strange to have been made up.  He recalled offering her water and his

grandmother's cookies to eat.  He described how Roe kept going even after Doe

had ejaculated and how he had to ask her to stop—still another detail too odd to

make up.  He then explained how he told Student D that Roe was changing, that

Roe had asked for his Snapchat information, that he'd gotten Roe set up on their

couch, and that he'd texted Student D about how it was wrong of Roe's host to

have ditched her.  He concluded by explaining how the next morning, Roe was

gone when he woke up, the sheets he'd laid out for her were folded, and he thanked her via Snapchat for doing that.

161.   Doe then described his interactions with Roe between the first and second incidents, as recounted above in paragraphs 122-24.  He explained how they texted periodically about Princeton before she enrolled.  He described how she'd sent him an ecstatic video upon being accepted.  And he described how during her freshman year she became more forward with him.  He told how she had texted him goodnight with smiley face emojis, something he told Student C via text.  He explained how the texts became semi-flirtatious and **how she'd texted in November 2018 that she was "[g]rateful" to have him in her life**.  And he testified that Roe had asked him on a date just two weeks before the second incident.

162.   With respect to the second incident, Doe testified to the things recounted in paragraphs 125-38, above.  He explained how Roe had approached him at Quad and how they'd talked more after he re-engaged her later there.  He said they kissed for about five minutes, Roe said she didn't want to hook up in front of others, so they walked nine minutes in the snow to his room.  He described how they kissed on his bed before Roe pushed him down with both hands, got on top of him, and moaned and gave him hickeys as he touched her vulva over her underwear.  Roe then said, "It's my turn" and took off Doe's pants and underwear

herself and aggressively performed oral sex on him.  He testified how Roe said,
"I've learned so much since last time"—the kind of odd detail anyone is unlikely
to have made up.  He said he didn't remember whose idea it was to have sex but
that Roe asked if he had a condom, as she wouldn't have sex without one.  Doe
testified he got the condom, it was his first time ever using one (yet another detail
someone wouldn't just make up) and Roe helped him put it on.  And he testified—
before seeing *any* of Roe's or her witnesses' evidence—that Roe's phone had been
going off in the midst of all of it but that Roe told him not to worry about it.

163.    As to the actual sex, Doe testified that after they got the condom on,
Roe got back on top of him and they had sex as Roe gave him hickeys on the other
side of his neck.  He then explained how he was uncomfortable with how things
were going and he couldn't keep an erection, so he told Roe as a pretext that he
wanted to fix the condom and then told her as he pretended to do so that it wasn't a
good idea to continue—the kind of story that, again, is too unusual to be made up.
Doe testified that when they then heard laughing in the common room outside, Roe
asked why people were there, got visibly disturbed, and left.

164.    Doe went on to testify that after Roe left, his friends (who had been
shirtless in the common room) told him he had hickeys all over his neck, and he
was upset.  He told the panel how he'd gotten concealer later that same day to
cover them up because he'd be seeing people later that day.

165.   Doe also explained in that interview how—contrary to Roe's claims—she had *not* blocked him on all social media after that night.  He described how they were still friends on Instagram account as late as October 26—more than eight months later—as proven by a link she posted that day that he was able to access. He also described links posts she had made related to Model United Nations sites that he could not have seen had she blocked him after the second incident.  He told the panel how Roe hadn't actually blocked him until soon after that date—the very day he ended a brief relationship with Student GG, with whom they had mutual friends.

**C.     Witness Interviews**

166.   After interviewing Roe, the panel interviewed a large number of witnesses.  Those witnesses—both those friendly to Doe *and* those friendly to Roe—gave testimony that *repeatedly* undermined Roe's stories and confirmed Doe's.

**1.     Testimony About the First Incident**

167.   **Student A** testified that Roe told her an incredible story—that she went to Doe's room only after trying to climb into her host's dorm window and finding it was locked.  Nothing like that happened, and not even Roe claimed it did in the investigation.

168.   **Student B** testified that shortly after the encounter, Doe had told him that he and Roe had hooked up *and* that they didn't have sex because Roe said she hadn't wanted to—confirming both that Doe viewed the incident as positive (since he was talking about it) and that he said from the beginning, before anyone accused him of *anything*, that Roe had said she didn't want to have sex and that Doe had readily agreed.

169.   **Student C** testified about his interactions with Roe consistent with Doe's testimony.  He stated that he made out with Roe before she asked to sleep in his room—confirming Roe had no intention of trying to sleep in her host student's room that night.  He went on to say that her request weirded him out, which is why he ended their interaction.  He further testified that Roe seemed only buzzed at the time.  Student C said he was glad when Doe became interested in Roe and used it as an excuse to leave her.  And he confirmed that Doe told him soon after the incident the same thing Doe told in the investigation—that he gave Roe a tour, she said she couldn't get into her host's room and so asked to sleep at Doe's place, she performed oral sex on Doe, and she then slept on Doe's couch.

170.   Student C further testified to a time he and Doe witnessed a male attempting to lure an obviously drunk woman, Student Y, to his room and Doe intervened to prevent it.

171.   **Student D** testified that earlier that night, Doe had told him that Roe's host was mad at her for not returning the host's calls or texts.  He went on to say that when he returned to his and Doe's room that night, Doe was making a bed for Roe and Roe didn't seem intoxicated.  He further testified that the next day, Doe told him Roe was really cool and that she'd performed oral sex on him, again confirming Doe viewed the incident positively.

172.   Perhaps most significantly, **Student I**—a friend of Roe's—testified that Roe told her she "had hooked up" with Doe during her visit back in 2017 because she felt like she owed it to him "as a favor" for letting her sleep in his room.  **That directly contradicted Roe's account and clearly described a *consensual* encounter.**

173.   **Student P**, a friend of Roe's who had been with her on the night of the first incident, also testified that Roe later told him she and Doe had hooked up and that his (Student P's) impression from what Roe said was that it had been consensual.

174.   Finally, **Student W**, a friend of Doe's, testified that after the first incident, Doe had told him that he and Roe had "hooked up."

## 2.   Testimony About the Second Incident

175.   The witness testimony about the second incident even *more* overwhelmingly contradicted Roe's claims about that night.

176.   **Student C** testified that Doe told him shortly after the incident—again, well before anyone had accused him of *any* kind of wrongdoing—that the incident was weird because Roe had been "really aggressive," had thrown him on the bed, and had told him she was better at performing oral sex than she'd been the first time.

177.   **Student D** (Doe's roommate) testified that when he saw Roe leaving the dorm that night, she didn't seem distraught and seemed very aware of what was going on.  He said that the next day, Doe told him that Roe had said she'd have sex with Doe if he had a condom, but that Doe couldn't stay erect and used it as an excuse to stop—a story no rapist fabricates to a friend, let alone before anyone has accused him of anything.  Student D also said that Doe told him how he'd never had anyone be so direct with him about wanting sexual activity.  He also said *twice* how completely shocked Doe was when he learned about the hickeys Roe had left on his neck—proof Doe hadn't *asked* for them for the *express purpose* of wanting them to be seen, as Roe bizarrely claimed.

178.   **Student E**—whom Roe had texted during her time with Doe that night—testified that he understood the text Roe had sent to her that night: that Roe "was about to break her celibacy pledge."  He also tellingly testified that Roe *never* told him any of the details about the alleged assault—almost surely because Roe knew it wouldn't jibe with the celibacy text she'd sent him earlier that night.

179.   Roe's friend **Student F** gave testimony that (perhaps unwittingly) undermined *multiple* parts of Roe's story.  As to the beginning of the night, Student F testified that while Doe was talking to Roe, he told Roe to leave with him but that Roe said she'd wait for Students I and H—something Roe left completely out of her story and which contradicted her claim that suddenly her friends were gone and so she left with Doe.  The investigators would never confront Roe with that contradiction.

180.   Tellingly, Student F also testified that he asked Roe if she was going to hook up with Doe that night and that Roe said no—something *else* Roe left out of her story, but which suggested an obvious potential reason Roe might decide to claim what happened was nonconsensual.  This, too, the investigators never put to Roe.

181.   Most importantly of all, Student F testified that after Roe texted him that night asking him to call her, he both called her phone and texted her twice but that Roe didn't answer—confirming what Doe had said, before seeing *any* evidence, about Roe receiving and ignoring messages while she was in his room.

182.   As to the actual sexual activity, Student F also importantly testified that Roe told him Doe had "asked" for oral sex that night.

183.   **Student G**, another of Roe's friends, gave still more testimony showing Roe was not credible.  Student G testified that the day after the second

incident, Roe told her that Doe had "pressured her to stay" and talk to him when her friends were leaving to go to Terrace—directly contradicting Student F's testimony that he had *asked Roe to leave with him* and Roe had expressly told him no.

184.   **Student H—one of Roe's closest friends—gave perhaps the most damning testimony of all.**  Unlike the rest of Roe's friends, Student H *had* been told specifics by Roe about the alleged assault.  And what she told him *completely* and *dramatically* contradicted what Roe would later say.

185.   Student H testified that Roe told him (1) Doe had literally pinned her to the bed (not that he had pulled her *on top of him*); (2) that she said no and was *sobbing* as he did that; (3) that Doe then forcibly raped her; and that Roe (4) literally ran out of the dorm after Doe was done.  He testified, too, that he "wrote notes immediately after their initial conversation" about what had supposedly happened, one of which read, "She begs, pleads, and cries for him to stop raping her but he does not.  He finishes, and Complainant sprints away while sobbing."

186.   **Student I** gave testimony that matched one part of the contradictory story Roe had told Student H:  She testified that Doe "was on top of her and wouldn't let her leave" when he assaulted her during the second incident—again contradicting Roe's own testimony to investigators that she in fact was on top of Doe.  Student I also testified that after the incident, Roe told her Doe had texted

her and said something like, "You're not going to tell anyone, right?"  That was a *complete lie*, effectively confirmed by Roe's failure to produce any such texts in the investigation.

187.   While Roe's friends were undermining her story, and her credibility, to the investigators, Doe's witnesses were doing the exact opposite.

188.   **Student L**, for instance, testified that *the day after the second incident*, Doe had told him (1) he and Roe had had sex, (2) she had asked him to get a condom, (3) Doe was nervous because he'd only had sex once or twice before, and (4) Doe couldn't stay erect, which had made Roe uncomfortable. Student L confirmed, in short, that the day after the incident, well before any hint of alleged wrongdoing, Doe was telling the same embarrassing story he would later tell the investigators.

189.   **Student M** further corroborated Doe's story.  She testified that in January (about a month before the second incident), Doe had told her that Roe had been flirting with him.  And Student M testified that a couple of days after the second incident, Doe told her that Roe had been the aggressor and that she had been "wild."  Student M also testified that Doe sent her a video showing his hickeys with the caption "help" and frantically texted her something to the effect of, "Holy shit, everybody's going to see this!"—confirming Doe had *not* wanted the hickeys, contrary to what Roe had claimed.

190.   **Student N** provided further corroboration.  He first corroborated Doe's testimony that there had been an occasion where Doe had asked Roe to tend to a drunken female and that Roe had not done so, a story Roe had unsurprisingly denied.  Student N also testified that when Roe left Doe's dorm on the night of the second incident, she seemed uncomfortable at having to walk through the common room seeing four shirtless males laughing.  Student N further testified that after Roe left, Doe said how Roe had been very into it, then "got nervous" when he was told there were hickeys on his neck because he was going to meet people in his new eating club the next day didn't want people seeing them.  Student N testified to how Doe got concealer the next day to try to cover them up.

191.   **Student Q** testified that when Roe left Doe's dorm that night, she didn't seem distraught.  Student Q further testified that when Doe learned the next day that he hadn't gotten into Ivy, he was very upset, confirming Doe had not been definitively told that information.

192.   Finally, **Student W** testified that after the second incident, Doe had told him and some others that he had "hooked up with Complainant again." Student W further testified that Doe had several hickeys on his neck and that he'd tried to use makeup to hide them.

**D.    Documentary Evidence**

193.    The investigation also uncovered a large amount of documentary evidence undermining Roe's claims and corroborating Doe's, much of which has been discussed above.  It included the following items:

     a. Texts confirming Doe was upset that Roe's host had ditched her as to the first incident;

     b. Texts from Doe to friends confirming Roe had sent him flirty texts before the second incident and had asked him on a date;

     c. Roe's texts to Student E stating she was tempted to break her celibacy pledge on the night of the second incident;

     d. Roe's texts to Students E and F asking them to call her but not to come get her, or asking where they were, or suggesting she was in imminent danger;

     e. Texts proving Doe had not been definitively told he had been rejected from Ivy before the second incident; and

     f. Screenshots confirming Doe had access to Roe's Instagram long after she claimed to have blocked him.

     g. Student H's contemporaneous notes detailing the fantastic story Roe had told him.

**E.    Roe's Second Interview**

194.    Roe sat for her second interview on January 13, 2020.  The interview consisted mostly of the panel asking Roe to repeat or clarify parts of her stories, and asking her simply to respond to Doe's version of events.  On the few occasions where they asked her about evidence that seemed to contradict her claims, they did

little more than present the evidence to her and ask what her response was.  They asked her, for instance, about Doe's texts to friends stating that Roe had been flirting with him before the second incident, and were content when she responded that she didn't think she'd said what he claimed or that if she did it wasn't meant to be flirty.

195.   Worse still, when Roe ended up contradicting herself in that interview on *some of the most important parts of her story*, the panel did almost nothing to challenge her, and in fact offered her ways to explain the contradictions away.

196.   Roe, for instance, testified in that interview that Doe had first made her perform *oral* sex on the night of the second incident, and only *afterwards* made her have vaginal sex—***the exact opposite of what she said in her first interview***. Yet the panel's first response wasn't to confront her with this glaring contradiction; it wasn't even to *note* that she'd previously said the exact opposite.  The panel's response was instead to gift-wrap her a way out, immediately asking her ***"if she didn't really remember the order that things happened on Respondent's bed."*** Roe not surprisingly answered that that was the case.  Then, much later in the interview, when she was directly told she'd testified differently on this point in her first interview, she took their cue and responded that yes, she just couldn't remember the order but knew that both were nonconsensual.

197.   To take another example, Roe also contradicted another key part of her original story: her effort to put her phone volume on high precisely so that she'd hear when her friends texted or called her.  As to that, Roe testified she **"didn't know if she would have gotten a notification sound for a text if a text had come in"** because she didn't know what her sound notification were set for.  And the panel **did literally nothing to confront Roe with this blatant contradiction** that went to heart of her purported fear in being with Doe and concrete actions she supposedly took in response.

198.   The only important item on which the panel meaningfully challenged Roe was regarding the hickeys she gave Doe, and even there only with kid gloves. Roe had testified in her first interview that she gave Doe "one" hickey before hearing people in the next room and leaving.  And she initially testified again in her second interview that she gave him "a hickey" after they'd had sex.  But by then the panel had seen the pictures, which showed *multiple* hickeys on *each side* of Doe's neck.  Yet rather than immediately and directly confront Roe with the fact she had actually given Doe far more than "one" or "a" hickey, the panel instead showed her the picture and gave her a chance to say *it reflected what she'd testified to*, asking her **"if the size and placement of the hickeys [plural] in the picture seemed to accord with the hickeys [plural] she gave [Doe]."**  Roe responded, "I think so," and even *then* was not asked why she'd earlier testified she'd given Doe

only "one" or "a" hickey.  She was only asked to describe how she'd given him such "large," "darkly colored" hickeys.  Roe implausibly responded that the hickey was the last thing he was making her do before she left, so she "just kept going because I wanted to leave."

199.   The panel then moved on to other topics.  Near the end of the interview, Roe again testified that Doe had asked her to give him "a hickey."  *Even then* the panel did not confront her with her prior testimony saying she'd given him "one" or "a" hickey.  Instead the panel asked her "*if she remembered* if she gave him one or multiple hickeys," again gift-wrapping her a way out of a contradiction by blaming her memory.  Roe again took the cue and "said she didn't know."

### F.    Doe's Second Interview

200.   Doe sat for his second interview with the panel on January 28, 2020, nearly a year after the second incident.  **In stark contrast with Roe's interviews, Doe's second interview was almost entirely confrontational, with the panel pressing Doe on perceived inconsistencies in his testimony on the most peripheral of topics, topics that had little to no direct bearing on the incidents.**

201.   The panel, for instance, spent nearly a *third of the interview* challenging Doe on whether he in fact had received a letter of commendation for helping a certain student safely return to her dorm at a time when she was severely intoxicated.  This was nothing short of bizarre.  Doe had shared the letter of

commendation as evidence of his character, to show he was not the kind of person to take advantage of a drunken woman, but in fact was the kind of person who would do the exact opposite.

202.   The panel, based on its own digging, challenged Doe on whether that letter could have been issued to him because of his interactions with that student as opposed to *some other* student, as though the identity of the student mattered.  Doe would later clarify for the panel that he was mistaken about the specific incident for which he had been issued the letter—he had in fact helped drunken students *multiple* times, as multiple witnesses attested.  Despite its peripheral relevance, the panel repeatedly challenged Doe on the specifics of the letter, as though it were looking for *some* basis on which to label him dishonest.

203.   The panel spent even *more* time challenging Doe on yet another peripheral issue: whether Doe learned in advance the eating club to which he had been admitted.  Roe had testified that on the night of the second encounter, Doe was upset about not being accepted into Ivy, his first choice.  Doe, in his interview, had explained he did not learn of his rejection by Ivy until *after* the second encounter.  None of it mattered at all as to what happened in his room between him and Roe that night, but the panel repeatedly pressed Doe on how Roe could have known he was not being admitted to Ivy if he did not learn it until the following day.  Doe explained that at the time of the second incident he thought it was *likely*

that he had not been accepted into Ivy because he'd been recently told that he and Student D would not both be admitted, and he believed Student D had the stronger application.

204.   Doe would later point the panel to evidence showing he did not actually *know* he'd been rejected until the following day, and that witness testimony confirmed he was very disappointed when he learned it *that day*, proving he had not learned it before then.  That evidence included texts with a friend *after* Roe left stating that he didn't "care about" what the final results would be, he was "just waiting and wanna hear" them.

205.   Whether he told Roe he *knew* he'd been rejected, or merely *suspected* he'd been rejected, or in fact had never spoken of the issue with Roe, had absolutely no bearing on whether it was more or less likely that he had assaulted Roe, but the panel, in another desperate effort to find some basis on which to discredit him, pressed the issue in ways they would press Roe on *none* of the far more material contradictions in her changing stories.

206.   The panel also pressed Doe on whether Student L had been in the common room when he and Roe got to his room that night, as Doe had testified. Doe clarified that he himself had no memory of whether Student L had been there but that Student L had told him (mistakenly, in retrospect) that he had been.  Doe conceded Student L likely was not there when he and Roe arrived that night.

207.  In perhaps its most transparent effort at playing "gotcha" with Doe, the panel also asked him why Roe would testify that she couldn't sleep in her own bed and had panic attacks after the second incident unless she'd been assaulted—*as if Roe's having claimed those things meant they must be true*.  It made no sense, on its face, for Roe to claim she could now no longer sleep in *her* bed when the alleged assault hadn't happened in *her* bed, or even in her *building*.  Doe, in any event, could have absolutely no idea as to why Roe might claim such things except to say, "She's making it up," or, "I don't know, but it's not because I assaulted her, because that never happened."  The question betrayed a panel that had already concluded Doe must have done *something* wrong and which was primarily interested in manufacturing some basis on which to doubt his credibility.

## VI.  Formal Notice of Charges and Doe's Response

208.  On February 6, 2020, Princeton sent Doe official notice of the allegations against him.  It told Doe that he had only until February 13, 2020, to respond in writing to the allegations and identify potential evidence and witnesses.

209.  Doe submitted his response on February 13.  It identified dozens of inconsistences, contradictions, and implausibilities told by Roe and ways her testimony was contracted by the evidence as to both incidents, more than enough to demonstrate Roe was wholly not credible.

210.   For example, as to the first encounter, Doe noted how Roe's claimed intoxication level and asserted memory lapses were completely inconsistent with things she claimed to have remembered, observed, and considered.  He noted how she claimed she hadn't paid attention to Doe at the pregame—yet also claimed *that* was when she added him on Snapchat (to mitigate the obviously bad fact of having done so *after the purported assault*).  He noted how she claimed her bra stayed on, then later said it had come off.  He noted how she claimed she'd touched Doe's bare penis with her hand, then later said she'd only touched it over his pants.  And he noted many other contradictory, implausible, and unsupported things claimed by Roe.

211.   Doe's response also noted the many friendly communications he'd had with Roe between the first and second encounters and how her allegations made no sense in light of them.

212.   And his response also noted how Roe claimed her friends left her at Quad, despite Student F's testimony that Roe had chosen to stay.  He noted how Roe claimed in her first interview that Doe had touched her vulva under her underwear, but stated in the second it was only over.  He noted that Roe had claimed the "celibacy pledge" was simply about not kissing guys, even though she had elsewhere admitted that kissing guys on the Street was something she "often" did with her friends.  He noted how her testimony changed from saying she gave

Doe "a" hickey to saying she just "kept going" and thus gave him several.  He

noted how Roe's explanation for not having most of her texts from the night of the

incident made no sense.  And he noted many other contradictory, implausible, and

unsupported things claimed by Roe.

213.   Despite the overwhelming number of contradictions, implausibilities

and unsupported statements Doe documented for the panel, they refused to speak

again with Roe or confront her with any of those problems before rendering their

decision.

## VII.   The First Merits Decision and Sanction

214.   On March 20, 2020, the panel rendered its findings and conclusions.

More than half of the decision was spent simply summarizing the testimony and

other evidence.  Its actual analysis of the evidence and findings went to

extraordinary lengths to downplay exculpatory evidence, to find Roe credible, and

to find some basis on which to find Doe less than fully credible.

215.   That effort began at the very start of the analysis, where the decision

stated that because the two incidents "involved different circumstances, occurred

more than sixteen months apart, and had varying degrees of corroborative

evidence," the panel had "conducted independent credibility assessments for each

of the two incidents."  It did not explain why that was appropriate given that Roe

had *reported* both incidents at exactly the same time, and therefore that her honesty (or lack thereof) as to one incident had direct bearing on the other.

216.   As to the first encounter, the panel found Doe not responsible because it concluded that both parties—who told vastly different stories about the night— were largely credible, and therefore that there was insufficient evidence to convict. Doing so allowed them to avoid making a negative credibility finding against Roe that would necessarily implicate her credibility as to the second incident as well.

217.   To find Roe credible, the panel twisted evidence that any objective panel would have concluded was evidence of her *dishonesty* into evidence of her *credibility*.  It found Roe credible, for instance, because she was "forthright in acknowledging that her memory was impaired due to her alcohol consumption and therefore she 'did not really remember' certain parts of the night"—even though Roe had consistently used that supposed lack of memory only to explain away anything that *undermined* her claim, while consistently claiming to remember anything that *supported* it.

218.   The panel additionally found Roe credible because she admitted in her second interview to having omitted a key exculpatory fact in her first interview: that she had told Doe she didn't want to have sex and that Doe agreed.  Roe admitted to it only when directly asked if it were true—after Doe had told the panel it was.  Rather than find that critical omission to *undermine* her credibility, or at

least to find that its belated admission under questioning was *neutral* as to her credibility, the panel literally admitted that her admitting it, under questioning, was *affirmative evidence* of her credibility.  Put simply, the panel gave Roe *credit* for initially misleading them and then confessing when caught.

219.   In the same vein, the panel found Roe credible for the further reason that she "was forthright" with respect to a piece of information "she may have believed would undermine her credibility": the fact that she consensually kissed Student C before the first incident.  The panel never addressed two obvious alternatives: (1) that Roe knew Student C (who was not her friend) would say that anyway, so she might as well front it, and moreover that waiting 16 months to accuse *two* students of assaulting her on the same night would look even more ridiculous; or (2) that Roe knew that admitting sexual activity with another student was consensual would *bolster* her claim that her interactions with Doe were different.

220.   Notably, in finding Roe credible as to this first encounter, the panel did not address, ***in any way,*** Roe's repeated communications with Doe after the incident, both over social media and in person when she matriculated at Princeton—objective evidence that directly undermined her claims.

221.   As to the second encounter, the panel found Doe responsible for nonconsensual contact and penetration for nearly all of the activity that Roe said

occurred: kissing, touching her breasts, oral sex, and vaginal sex.  It did so largely because it found Roe credible and found "significant concerns" regarding Doe's credibility.  But its stated bases for those findings defied logic and the evidence, in obvious and straightforward ways.

222.   The panel found Roe credible even though it expressly concluded that her claim about why she gave Doe so many hickeys—that she just "kept going," even though she was doing it because she *wanted to leave*—"was implausible" and not credible.  **The panel never explained why that contradiction, which the panel was forced to acknowledge, had no bearing on Roe's *overall* credibility, as though it hadn't been made by the same person accusing Doe of everything else.**

223.   The panel also found Roe credible because it believed she had "no apparent reason" to falsify her claims, even though she'd provably taken a celibacy pledge that at least one friend knew about, had lost her virginity in what turned out to be an embarrassing fashion (with people laughing in the next room, which she wrongly assumed was about her), and had filed her report soon after learning Doe had ended a brief relationship with someone she knew.

224.   The panel then found Roe credible because she was "sobbing" and "distraught" after the incident, but never explained why any of the above things couldn't *also* have explained any legitimate distress.

225.   Then panel next found Roe credible because "within the following days," she described the incident as "nonconsensual" to Students I, F, G, H and E, as though just *calling* it that made it so.  The panel said *nothing* about how—apart from just calling it "nonconsensual"—Roe had not told any actual *details* of the purported assault to most of those friends, and that the two with whom she *did* share details (Students I and H) recounted versions *completely at odds with Roe's story to the panel*.

226.   On that last point, the decision went to great lengths to artificially save Roe's credibility.  As to Student I—who'd testified that Roe said Doe "wouldn't let her leave," the panel *acknowledged* that what she was told was "discrepant" with Roe's testimony, but claimed it didn't affect the credibility assessment because Roe may have been "***feeling like***" she couldn't leave.

227.   As to Student H's testimony—that Doe had *held her down* and *forcibly raped her* before she *ran away sobbing*—the gulf between what Roe had told Student H and told the panel was too great to bridge with sophistry.  **So the panel simply stated it was not crediting Student H's account, full stop.**  The panel didn't address that it was *Roe herself* who had told Student H, "one of her best friends," that incredible account; that Student H had literally taken contemporaneous notes on it (the only witness who did that); and that he was *the only one to whom she'd given any kind of detailed account*.

69

228.   In short, to the extent that Roe's communications to friends contained *any* details, they completely undermined her credibility.  Yet the panel instead concluded that her communications with her friends bolstered it—not that they were neutral, but that they *bolstered* it—simply because she'd labeled it "nonconsensual."

229.   The panel then found Roe credible for the same reasons it found her credible as to the first incident: that she admitted her memory was impaired, that she left out key facts but admitted to them under questioning, and that she did not lie about *everything* but admitted certain facts that might undermine her story.  An objective panel would have viewed *all* of those things either as undermining her credibility or as being neutral with respect to it.  But not this panel.

230.   The panel next went to great lengths to explain why three damning things did *not* undermine Roe's credibility.  It first said it credited Roe's absurd excuse that—despite Doe's having allegedly raped her as a pre-frosh—she was friendly with him when she got to Princeton, "consensually kissed" him before the second encounter, and agreed to go back to his room "because she did not want her experience at Princeton to be 'clouded by a bad experience.'"  While that might explain her being friendly with Doe in the way she'd be friendly with any other student, it manifestly could not explain why she *kissed* him or *went back to his room*.

231.   The panel then stated, by way of further explanation, that people may have "complicated relationships" with those "whom they feel harmed them."  That purported "harm" could only refer to the first incident—an incident as to which the panel had *expressly found insufficient evidence of assault*.

232.   The second fact the panel stretched to explain away was Roe's text to Student E stating she was tempted to break her "celibacy" pledge.  The panel stated that it "credited" Roe's explanation that she was referring only to "kissing" and not sex—but gave *literally no reason for crediting that highly unusual use of the word "celibacy."*  The panel literally just stated that it was choosing to credit it, without giving a single reason as to *why*.

233.   Worst of all, the panel then used its own gift-wrapped excuse to explain the impossible contradiction at the heart of Roe's story: that she'd initially said the vaginal sex occurred first, only to unwittingly change it in her second interview.  As to that contradiction, the panel noted that her "memory was impaired" and again stated that Roe was actually "forthright" in admitting her memory impairment.  Roe could have changed her testimony on literally any aspect of the incident and the panel would not have held it against her—they'd instead have used it to bolster her credibility.

234.   Tellingly, as will be discussed below, the panel expressly said it was *not* relying on anything about Roe's demeanor in finding her largely credible.

235.   The panel took the opposite tack in purporting to analyze Doe's credibility as to the second incident.  Its reasoning not only was implausible, illogical, and contrary to the evidence, but also exhibited clear marks of gender bias.

236.   The panel first found Doe not credible because it found it implausible that Roe, as a virgin, would help Doe put a condom on when he had trouble doing so, or that she would be upset that Doe wanted to stop having sex.  That kind of "Good Girls Don't" reasoning betrayed archaic assumptions about Roe's desires for, and knowledge of, sexual activity as a female who was then still a virgin.

237.   The panel next stated that, while Doe had repeatedly described the incident as consensual and Roe as the aggressor to friends in the days that followed, that account "was completely contradictory to [Roe's] words and actions in the following days."  *Of course it was*—because Doe maintained his innocence. The panel did not explain how Doe's having consistently described the incident as consensual somehow *undermined* his credibility.

238.   The panel then found Doe not credible because his testimony that Roe was no higher than a "three" on an intoxication scale of 1-10 was contradicted by people who testified she seemed more intoxicated than that.  But the panel disingenuously omitted that those people testified to seeing Roe that much earlier in the night, closer to the time of her drinking.

239.   The panel next discredited Doe's denial that he'd ever told Roe that his roommate was sick, simply because Roe had told that lie to three friends over the course of the following week.  The panel ignored the obvious reason that someone in Roe's shoes, who was making up a story, would do that: to explain why she had gone back to Doe's room at all so late at night if she hadn't been planning to be sexual with him.

240.   The panel's longest discussion of Doe's supposed credibility problems had to do with a completely irrelevant topic: when he found out that he'd been rejected by Ivy.  The panel relied for its adverse finding on Student D's testimony that earlier that day, Student D had been told he'd gotten into Ivy and Doe had been told he'd gotten into Another Eating Club.  *But students can get into more than one eating club.* Student D never said that Ivy had formally rejected Doe— only that they both merely *suspected* it, precisely as Doe had testified.  Student D, in fact, expressly testified that Doe was *not* upset when told he'd gotten into Ivy, but *was* upset later that week—*after learning he'd been rejected from Ivy*.  The panel truncated Student D's testimony, on a completely peripheral topic, to manufacture a basis on which to find Doe not credible.

241.   The panel next said it found Doe not credible because **he** could not adequately (in their view) explain why Roe was sobbing after she left his place or was upset at seeing him on campus afterwards.  But that both flipped the burden of

proof on its head and made no sense—Roe had just lost her virginity to someone she barely knew (yet was clearly enamored with) and heard people laughing in the next room, so there are all sorts of reasons she might be upset about that.  Doe's not being able to read Roe's mind had nothing to do with his credibility.

242.   Finally, the panel also found Doe not credible based on yet another peripheral issue: its conclusion that Doe had not actually asked Roe to intervene when Student Y seemed very drunk one night.  It did so simply because "four witnesses . . . *did not recall* a female student intervening."  But as the evidence showed, Student N *expressly did* remember Doe asking Roe to intervene, and none of the other four stated it *never happened*, only that they *didn't recall it*—a completely unremarkable fact given that Roe's "intervention" was nothing more than her speaking briefly to Student Y in a group social setting, something no one would have reason to remember several months later.  The panel gave no reason for rejecting the testimony of Student N or for turning this difference of memory into an adverse credibility finding against Doe.

243.   In short, the panel found Doe not credible based on what they effectively called his "lies" about peripheral topics that in fact were supported by the evidence; yet found Roe credible despite contradictions about *the very heart of the incident*, and in fact used her "memory impairment" excuse—which they never once called "lies"—as a reason to *bolster* her credibility.

244.   In light of those twisted credibility findings, the panel then not surprisingly credited Roe's version of events over Doe's.  It found that Roe was intoxicated but not incapacitated.  It then found that Roe told Doe "ten or more times" that she was too drunk to kiss Doe, that Doe continued to kiss her, removed her clothes, fondled her breasts, pushed her head down for oral sex, then tried to have vaginal sex with her after she asked for a condom.  It found Doe then, when things were done, asked Roe for "a" hickey and that Roe then gave him "multiple."

245.   The panel then concluded that all of the above actions, except for the hickeys, were nonconsensual.  As to the hickeys, the panel found that Doe had asked for "a" hickey, but that Roe, in giving Doe "dark, long, and numerous" hickeys, had "complied in an ardent way."  It never explained why, after discrediting Roe's ridiculous explanation for why she did that (that she just wanted it to be *over* with), it didn't also discredit her testimony that the hickeys came at the *end* of the encounter—the single most *implausible* time for them to have occurred.

246.   The panel conspicuously *failed* to make findings on a number of things that undermined Roe's story.  It never explained how it believed Doe got Roe's clothes off without her help.  It never explained why it found the oral sex had *preceded* the vaginal sex, given Roe's conflicting stories and her ultimate position that she simply couldn't remember.  It never explained why it believed

Roe didn't hear or wouldn't have heard her phone go off, after having set its volume to "high," when Student F repeatedly tried to contact her while she was in Doe's room.  And it never made a finding as to *why* Roe might "ardent[ly]" give Doe multiple hickeys if she'd actually just had an incredibly bad experience.

247.   On April 2, 2020, Dean Kathleen Diegnan and Deputy Dean Cole M. Crittenden announced Doe's sanction—a two-year suspension, effective that day. Their letter paradoxically noted that, while the allegations against him normally would result in expulsion, they had chosen to sanction him more leniently because "there had been a previous encounter [with Roe], and we considered the circumstances of that encounter."  The letter, in other words, suggested not just that they viewed the evidence as to the first incident to be insufficient to convict, but that it affirmatively weighed in Doe's favor—and thus *necessarily* implied Roe had lied about that incident.  That only further highlighted the prejudice to Doe in the panel's unfounded decision to make separate credibility findings for the two incidents, thereby walling off Roe's lies about the first incident from the analysis of the second.

## VIII.  **The First Appeal**

248.   Doe submitted a 38-page appeal of the panel's decision on April 13, 2020.  He based his appeal primarily on the ground that the panel had committed "procedural unfairness."  He also submitted new evidence that he said was not

reasonably available to him during the investigation and argued that his sanction was excessive.

249.   Doe's argument as to "procedural unfairness" was that the panel had failed to properly weigh the evidence, had disregarded significant portions of evidence (including undisputed evidence), had failed to address exculpatory testimony and evidence, and had reasoned in ways that suggested archaic gender bias.  The main thrust of his appeal was bias, not some technical violation that the same panel could easily correct on remand.

250.   Princeton decided the appeal on May 4, 2020.  The appeal panel announced it was granting the appeal based on two of the grounds of "possible procedural unfairness" identified by Doe: that "related to credibility" and that "related to the finding of non-consensual sexual penetration."  The decision did not elaborate further on either one.

251.   As explained above, Doe's appeal wasn't based on a technicality—it was a frontal attack on the panel's plainly biased approach to the case. Nevertheless, his case was remanded back to that very same panel.

## IX.   <u>Continued Investigation on Remand</u>

252.   In the wake of the appeal decision, the panel re-interviewed Roe on May 13, 2020, where it finally confronted her with many of the inconsistencies in her prior testimony and the ways her testimony conflicted with the evidence, as

Doe had pointed out in his appeal.  Despite Roe's being unable to explain them, the panel still never held that against her credibility.

253.   With respect to the pre-frosh encounter, Roe did a complete 180.  In her first interview, Roe had told the panel that Doe had physically forced her to perform oral sex on him—that his "hand was on her head and pushing it," that "there was a lot of pressure," and that even after she "started gagging," Doe "stopped for a moment but went back to pushing her head down."   But in this final interview, Roe *now* said that Doe's touching her head during oral sex was "*more of a suggestion* because he thought he was *teaching* me" (emphasis added).  *Nothing* about force, pressure, or gagging.  The panel neither confronted Roe with this massive change in her story nor mentioned it in its subsequent decision—not even when evaluating her credibility.

254.   Roe's discussion of the second encounter was similarly fraught with contradictions.  As to why Roe had produced just *a single text message from her own phone from that night* (with Student H) as evidence—and literally no others— Roe stated she set her text messages to delete after eight weeks because they were taking up a lot of storage on her phone.  She claimed not to remember when she did this except to say that it must have been after the second encounter—something she *had* to admit, given that she had screenshots of messages she sent to Student H about the second incident.  She went on to state, incredibly, that she believed she

had changed the settings "'more recently . . . during this Title IX investigation.'"

The panel never asked her the obvious follow-up question—why she hadn't

screenshotted or preserved all of her messages about the incident before changing

her settings, but instead had only saved a small number of messages exchanged

with one person.

255.   Roe went on to claim that as to messages from those other friends, she

asked them to send her any relevant messages because she "'had difficulty

scrolling.'"  She had difficulty, she said, because her and her friends texted a lot so

there were a lot of messages to scroll through.  The panel never asked her why it

wouldn't therefore also be "difficult" for her friends to have scrolled through their

messages with her, too.  Nor did they press her when a minute later, in response to

a specific question about her messages with Student G, Roe testified that she

"'remember[ed] scrolling back to look for any messages from that day[.]'"

256.   When asked why she sent messages to two friends (Students E and F)

during her walk to Doe's dorm asking them to call her, Roe responded that she

didn't feel she could leave and wanted an excuse.  When asked why she felt she

couldn't leave, she didn't claim that Doe was somehow pressuring or threatening

her; she stated instead that she "'didn't want to be alone'" on her walk.  The panel

never confronted her with the obvious problem with her response—that a phone

call would still require her to walk alone.  Nor did it ask her why she didn't text a

friend to *meet* her, rather than call her, if that were her actual concern.  Roe, it was clear, was simply making things up on the fly, and the panel refused to challenge her.

257.   Roe also denied that she had told Student H—who took *contemporaneous notes* of their conversation—that Doe had held her on the bed and forcibly raped her, and she couldn't explain why Student H would make that up.

258.   As to her testimony to the first panel that she had told Doe in his room that she wanted to leave, Roe now hedged and said she'd only told him she didn't want to be sexual, and that in her mind this implied that she wanted to actually leave.

259.   Despite testifying earlier that she had *not* told Doe she was a virgin that night, Roe admitted in this third interview, "I think I may have told him I was a virgin."

260.   As to whether the oral sex or the vaginal sex happened first, Roe now said she didn't know.  Not surprisingly, she also changed her answer to the question of when she felt "resigned" to what was happening.  Now, she said she felt that way at the *very beginning of their foreplay*, "when he wouldn't listen to me telling him, 'Stop'"—not simply before the vaginal sex (as in her first interview) or the oral sex (as in her second interview).

261.   Roe also gave implausible testimony about Doe's use of a condom that night.  When asked where *she* was when Doe got the condom, she stated, "I guess I was still on his bed."  Yet when asked if Doe had to get off the bed to get the condom, Roe implausibly responded that she couldn't remember—undoubtedly because his leaving her would have given her a clear chance to end the encounter, and her remaining there was a clear sign of consent.  Her answer was made even less credible when Roe admitted that *she* was the one to ask Doe get the condom. The panel never asked her how she could remember asking him that, yet not remember whether he had to stand up and leave the bed to retrieve a condom vs. being able to just grab one from right where they were.

262.   As to the hickeys, Roe was confronted with the fact she had initially said she gave Doe "a" hickey at the end of the encounter, then—after seeing pictures showing *how many* hickeys she had given him—had said she "just kept going" after the first one.  When asked what her testimony was now about whether she gave him multiple hickeys, Roe implausibly testified that she didn't remember but was simply focused on leaving.  When asked by the panel why she kept going after giving him a hickey if all she wanted to do was leave, she simply repeated that she was just trying to get things over with.  When asked if the time it took to give him the hickeys had been "quick or longer," she again responded that she couldn't remember.  When asked how they were positioned when she did so, she

81

said they were standing up next to his bed—and implausibly claimed she had no

difficulty giving Doe hickeys on the sides of his neck stretching towards the back

from that position despite their relative heights.  She suggested some of the hickeys

may have come from a different time but admitted she did not see any hickeys

when they were kissing at Quad earlier.

263.   None of Roe's testimony, in short, was consistent with the idea that

she gave Doe hickeys at the *end* of the encounter, while they were *standing up*,

because she *simply wanted to leave*.  Her thoroughly implausible testimony

highlighted the common-sense truth of what Doe had consistently said—that she

had given them to him before any sex, as she knelt on top of him and repeatedly

took the role of aggressor.

264.   In fact, the panel would soon ask Roe if it were possible that she had

given Doe the hickeys while they were on the bed.  And Roe, despite having

unequivocally stated *multiple* times, in *multiple* interviews, that the hickeys

happened while they were standing up at the end of the encounter, amazingly

responded, "I really don't remember, but maybe."  When then asked if they

hickeys could have happened *before she allegedly resigned herself to sexual*

*activity*, she even more implausibly responded, "I really don't want to speculate . . .

. I don't want to make a guess."  Yet rather than probe further on this dramatic

hedging of her testimony, the panel offered her a way out, asking if perhaps *some*,

but not all, of the hickeys had occurred while they were standing up afterwards. Roe capitalized on the suggestion and stated that yes, she was certain at least some of the hickeys had occurred then.

265.   Roe also testified that she called Student F as she was "on the way out the door" from Doe's room and that she saw, at that time, that Student F had responded to her earlier text asking him to call her.  Yet despite testifying that she turned her phone ringer to high for the *express purpose* of hearing any such response while in Doe's room, Roe again denied having any memory of hearing the notification—which she *had* to, because it was so clearly a ripcord she chose not to pull.  Her denial made even less sense given that Roe had said all sexual activity ceased when she heard something else—the commotion in the common room, through Doe's *closed door*.  But the panel never confronted her with any of this.

266.   Although remand had been ordered to correct "procedural unfairness" regarding the "not credible" finding as to Doe and the "credible" finding as to Roe, the panel spent almost *all* of its re-investigating time—besides its interview of Roe—searching for evidence to gin up an adverse credibility finding against Mr. Doe.

267.   The panel did not re-interview a single non-party witness who might have challenged Roe's credibility; the only witness on Roe's side it went back to was Roe herself.

268.   It started by re-interviewing Student D on May 13 about a single topic: whether Doe had learned of his Ivy rejection before or after the second encounter.  Student D expressly confirmed that it was *after*, and that Doe had only *assumed* he'd be rejected once he found out he got into Another Eating Club.

269.   The panel then re-interviewed Student L on May 18, again only seeking to discredit Doe—this time, his statement that Student L had been present when he and Roe returned to the dorm that night.  That is an issue it could have explored just as easily before its first decision but chose not to explore until its credibility findings were questioned.

270.   The panel obtained Student L's "prox" records (electronic records showing when Student L swiped to open various door around campus) to determine whether he had been in the dorm when Roe and Doe returned.  The panel also interviewed Student L about that on May 18.  Student L insisted that he remembered Doe and Roe entering the common room, despite the records showing that he seemed to be elsewhere at the time.

271.   The panel then interviewed *another* witness about this incident, a campus public safety officer, to seek clarity on Student L's prox records.

272.   Finally, the panel re-interviewed Doe on May 22.  And it focused almost the entire time on Doe's and Student L's testimony that Student L had been present in the common room when Doe and Roe arrived and had briefly spoken to Roe.

273.   Consistent with the testimony he gave in his second interview, Doe repeatedly explained that he himself had been unsure whether he'd spoken with Student L before or after he'd had sex with Roe in his room; he simply remembered that he seen him that night in the common room.  Doe further explained that he had previously testified he'd talked to Student L before he and Roe had sex because Student L had *told* him that that's when they'd spoken, and he had no reason to doubt Student L's memory.

274.   The panel repeatedly refused to be satisfied with that answer.  Over and over again, they pressed Doe on whether Student L in fact had been there, insisting that he acknowledge, in light of the prox records, that Student L had not been.  Doe repeatedly told the panel the only thing he could—that he knew he'd seen Student L at some point, that Student L insisted it was beforehand, and that there were reasons that could possibly reconcile the prox records with Student L's having been there (like the fact that they often propped their door open and didn't need to swipe in to enter the room).

275.   The panel's relentless questioning of Doe bore no resemblance to its treatment of Roe, even when asking her about glaring contradictions on *central*—as opposed to peripheral—issues.

276.   Student L, the panel knew, had insisted *even in the face of the prox records* that he had a memory of Doe and Roe coming into the dorm while he was in the common room, confirming Doe's testimony that Student L had *told* him he remembered this and that was why Doe had reported it.

277.   Roe submitted a response to the newly collected evidence after it was shared with the parties.  Her response attached a number of statements from friends stating that times they had purportedly witnessed Roe in distress and were told it was because of Doe.  Roe did not justify why she was only now submitting such manufactured "impact" evidence.  One of these witnesses, however (Student T), testified to seeing Roe terrified once when Doe passed them in their hall—even though Doe had *never set foot in that hall* after the second incident.

278.   By the end of its investigation and re-investigation, the panel had interviewed at least 17 witnesses offered by or primarily connected to Roe, or who were interviewed to challenge parts of Doe's story ("Roe's witnesses").  They had spoken to nine offered by or primarily connected to Doe ("Doe's witnesses").

279.   The panel's treatment of Doe's witnesses was far more confrontational than its treatment of Roe's witnesses.  For example, the panel

asked seven of the nine Doe witnesses whether they had spoken to Doe or his

lawyers about their testimony, or whether Doe had otherwise influenced their

testimony.  (All seven denied any such influence.)  **By contrast, the panel did not**

**ask those questions of even a *single one* of Roe's witnesses—not even her**

**closest friends.**

X.      <u>The Second Merits Decision and Sanction</u>

280.   On June 23, 2020, the merits panel issued its new findings.  Its

summary of the new evidence skewed heavily towards the evidence it sought to try

to find Doe "not credible."  It summarized its re-interview of Roe in just two

paragraphs: the first containing her denial that she'd seen Student L when they

arrived that night, and the second claiming how she "vividly" remembered giving

Doe hickeys while they stood up.

281.   The panel then spent *four times as much space* summarizing the new

evidence about (1) Student L's prox records and his and Doe's testimony about

whether he was there; and (2) the new "impact" evidence Roe could have

submitted at any time during the original investigation.

282.   The panel them made credibility findings as to the parties.  Despite

the overwhelming evidence to the contrary, the panel still refused to find Roe

generally "not credible."  Instead, it decided to deem Roe credible "with respect to

those elements that she consistently and clearly recalled."  In other words, the

panel explicitly refused to use her lies and contradictions against her when evaluating her overall credibility.  Again: *falsus in uno*, *falsus in… uno*.

283.   To get there, the panel took several completely unjustified steps.  It first concluded that Roe's story was "largely believable on its face," *except* for her claim as to why she gave Doe so many hickeys.  The panel never explained why, if the hickey story was *not* believable on its face, they should take Roe's other stories on faith.

284.   Despite the fact that Doe had pointed out the ways that Roe's own witnesses—especially Students I and H—reported hearing very different stories from her than what she told the investigators, the panel left unchanged its finding that these witnesses *supported* Roe's credibility, simply because she told them that what happened was "nonconsensual."  The label was all that mattered; what she'd *actually said* to them did not.

285.   The panel again unjustifiably concluded that because Roe did not lie about *every* fact that might have cut against her, that *affirmatively bolstered* her credibility.  It also said that it was crediting her when she said there were things she remembered "vividly," without explaining why.

286.   The panel also again praised Roe for being "candid" about her memory impairment, ignoring that she claimed such impairment when trying to explain away the most exculpatory facts.

287.   The panel also said that because there were "difficulties with respect to assessing credibility, the panel found it appropriate to specifically identify those aspects of the parties' accounts where contemporaneous text messages… supported either party's accounts."  **But it went on to cite *only* text messages that supported Roe's account** ("the texts she sent to two friends requesting that they call her") **and *ignore* text messages that supported Doe's** (such as the text messages Student F sent Roe while she was in the room, which she ignored and initially denied even receiving; Roe's own text message to Student E declaring she intended to break her "celibacy pledge'"; and Doe's text messages to his friend to leave Roe alone when she left because she was upset about the laughing—***all* of which were mentioned in the panel's first decision, but *none* of which were mentioned in its second decision**).

288.   The panel noted that Roe, in her third interview, had testified that it was "possible" that she'd given Doe hickeys when they kissed before getting to his room and *perhaps* even had done so on his bed.  They thus didn't credit her initial account that she'd only given Doe hickeys at the end of the whole encounter.  But they never explained why (or even whether) they thought it plausible that Roe gave Doe *any hickeys at all* at the end of the encounter—a critical finding given the number of hickeys she provably gave him and the short amount of time in which she could have done so.

289.   The panel also reversed its own previous interpretation of the "celibacy pledge" text—but tried to hide what it was doing.  **In its first decision, the panel mentioned it *five times*** and interpreted it as "referring to kissing, not sex"—in other words, that Roe was saying she just wanted to *kiss* Doe, not have sex with him.  **But in its second decision—**which found Doe responsible *only* for kissing and foreplay, *not* for sex—**the panel didn't mention the "celibacy pledge" text *at all*.**  The word "celibacy" literally doesn't appear in the second decision.  Nor could it, if the panel's baby-splitting plan were to work.

290.   As to whether Roe had a motive to lie, the panel did something that was nothing short of amazing—and directly contradicted the evidence before it. The panel said it would credit Roe's claim that the reason she reported Doe when she did was that, according to her, *another* student (Student GG, who'd just had a brief relationship with Doe) had told her about problematic interactions with him, and still others had supposedly told her that Doe made them feel uncomfortable.

291.   *But the panel never interviewed Student GG.*  Moreover, Student R told the panel that Student GG had said the exact *opposite* about Doe.  According to Student R, Student GG told her that Doe "was 'overly cautious and careful' during their sexual encounters."  And when Roe told Student R that Doe had assaulted her, Student GG was standing right there.  According to Student R, Student GG was  "shocked and taken aback" by Roe's allegations.  So the panel's

reasoning made no sense at all—much like its decision to not interview Student GG.

292.   To the extent that the panel might have thought that Roe was referring to still other people who felt that way about Doe, it never bothered to ask Roe who they were, much less try to interview them.  Instead, it just used Roe's wild and anonymous allegations—two of which it knew Student R had expressly contradicted—to explain away Roe's motive to bring her claim.

293.   In sum, the panel credited Roe's testimony for the few things that she consistently recalled but brushed aside all of her provable lies and contradictions— an inexplicable siloing of its credibility analysis.

294.   It did not do the same for Doe.

295.   Doe had consistently and clearly testified to literally *everything* that happened in his room with Roe—but the panel did not credit him for that.

296.   The panel's reasons for finding *Doe* "not credible" were pretextual, unsupported by the evidence—and had nothing to do with what happened in the room.

> a. It *again* found against his credibility because Roe, *earlier in the night*, seemed more intoxicated to others than Doe reported she seemed later.  This had nothing to do with what happened in the room.

> b. It *again* found against his credibility about Doe's having told Roe he needed to check on a sick roommate.  This had nothing to do with what happened in the room.

c.  It *again* found against his credibility because of the ridiculous Ivy-admission dispute, ignoring the clear evidence that he just *suspected*, but didn't yet know, that he hadn't gotten in.  This had nothing to do with what happened in the room.

d.  It *again* found against his credibility based on its conclusion that Student L was not present when Roe and Doe returned, ignoring the evidence from Doe's second interview—before the first decision, in other words—that he was unsure about that part of things, and the evidence from Student L showing he firmly believed he'd witnessed that and had said so to Doe.  This had nothing to do with what happened in the room.

e.  It *again* found against his credibility because it rejected Doe's theory as to why Roe was making up her story, as though he were required to affirmatively prove her motive.  This had nothing to do with what happened in the room.

f.  It *again* found against his credibility because of Doe's testimony about asking Roe to help Student Y, even though Student N expressly confirmed it happened.  This had nothing to do with what happened in the room.

297.  Based on all of that, the panel concluded that "making credibility determinations was challenging in this case" and concluded it would find Roe credible on those things she'd consistently testified to, *without explaining why it would not do the same for Doe*.  It never explained why Roe's many lies and contradictions, on issues central to the case, meant that she'd still be deemed credible as to everything else, but Doe's supposed lies and contradictions on *peripheral* issues, didn't mean the same thing.

298.   It never explained why, or even *that*, it found Roe *more* credible than Doe.  It never explained, in short, why when both parties had testified consistently about something, it picked Roe's story over Doe's.

299.   In light of its credibility findings, the panel's second decision found Doe not responsible for all of Roe's allegations except one: the allegation that Doe had kissed her and touched her breasts without consent at the *beginning* of the encounter.  The decision, like the credibility findings that preceded it, was a transparent attempt to hold Doe responsible for *something* despite the overwhelming evidence to the contrary.  The panel's painfully contorted rationale proved it:

   a.  Roe said "ten or more times" before the kissing that 1) she didn't want to do it and 2) that she was too drunk to do it.  The panel gave no reason for crediting that story; it presumably did so simply because Roe herself never *expressly contradicted* it, as she did so many other things.

   b.  The kissing and fondling that followed therefore were not consensual.

   c.  As to the oral sex that came next, Doe "pushed [Roe's] head down."

   d.  But since Roe admitted in her post-appeal interview that it was possible she gave Doe hickeys on the bed, it's possible those hickeys preceded the oral sex, and hickeys might suggest interest in further sexual activity.  (So the hickeys, according to the panel, showed the *oral sex* was consensual, but not the foreplay that immediately preceded it.)

   e.  Performing oral sex is an active thing, and Roe said she was resigned and "just did it."

f.   Therefore, it may have appeared to Doe that Roe was consenting to the oral sex, even though Roe did not in fact want to do it.  (As to how they squared this with their finding that Roe had just said no "ten or more times," to *kissing*, the panel was silent.)

g.   As to the vaginal sex that followed, there likewise were acts possibly indicating to Doe that Roe was consenting, even though she actually wasn't:

i.   The seemingly consensual oral sex that preceded it;

ii.   The fact that Roe asked for a condom;

iii.   The fact that Roe admittedly was "moving on top of him" in an effort to get it over with; and

iv.   The fact that Roe possibly gave Doe hickeys before the vaginal sex.

300.   To support these contortions, the panel had to justify another implausible finding: that it was not even *possible* for the hickeys to have been given near the beginning of the kissing.  (Otherwise, that would have shown *consent for the foreplay, too*, and the panel wouldn't have been able to split the baby as it did.)  Its **sole** basis for doing so was Roe's self-serving claim that she had said no "ten or more times" at the beginning.  "[I]t was implausible," the panel concluded, "that Complainant gave Respondent hickeys at the same time that she repeatedly said no to his kissing her[.]"  As explained above, it gave no basis for crediting that statement of Roe's; it apparently felt it could do so with a straight face, despite her provable lies, because she had never expressly contradicted herself on having said no "ten or more times."

301.   But the evidence—and the panel's *own earlier findings*, which it tried to hide in its second decision letter—proved the hickeys had to have been first given right at the beginning of the encounter in Doe's room.

302.   To begin, that is what Doe had consistently testified to—that Roe began giving him hickeys as they kissed on his bed.  That, of course, would be the natural point at which to do so—before the more intimate sexual activity occurred.

303.   Then take the panel's finding about how much time elapsed between Roe's purportedly saying "no" and the start of oral sex.  The panel's first decision found, based on Roe's testimony, that only a "few minutes" passed between Roe saying no "*ten or more times*" and the beginning of the oral sex.  That would leave *no time whatsoever* for Roe to have endured nonconsensual kissing, *and* nonconsensual removal of her clothes, *and* nonconsensual touching, and *then* to have "ardent[ly]" given Doe *multiple dark, long hickeys*, which would *itself* take several minutes.  It would leave no doubt that if hickeys had been given on the bed, they almost surely would have begun *as soon as the parties started kissing*— consistent with how Doe had repeatedly testified.  And it would *certainly* mean they were given before the alleged clothing removal and touching.

304.   So when the panel issued its second decision, ***it omitted, without any explanation, its previous finding that only a "few minutes" had passed between Roe's purported "no's" and the oral sex.***  To find in Roe's favor, the panel had to

implicitly find Roe not credible as to yet another part of her story—but this time, one she had never expressly contradicted.

305.   Together, the evidence showed overwhelmingly that Roe started giving Doe hickeys almost right away.  The parties agreed that the vaginal sex did not last long—Roe could not have given Doe most of the hickeys during the vaginal sex.  She quite obviously could not have done so while she was performing oral sex.  And the panel agreed that her testimony about doing so afterwards was not credible.  That left "before oral sex" as the only time the evidence allowed for a majority of the dozen or so hickeys to have been given.  And that, in turns, meant that Roe would had to have started giving them almost right away—*precisely* as Doe had consistently testified.

306.   The panel, in short, took objective evidence that proved Roe was lying about saying "no" ten or more times and instead purported to credit her lie because it was the only way to find Doe guilty of *something*.

307.   The panel also failed to address a number of other things that directly undermined its rationale:

   a. It never explained why Doe, if he'd received hickeys during the sexual activity, would implausibly ask Roe at the end for *yet another*. But since Roe had been "consistent" that Doe had asked for a hickey at the end, the panel had to ignore that implausibility in order to maintain its position that Roe be credited whenever she was "consistent."  It is further evidence of the rationale's incoherence.

b. It omitted from its second rationale that Roe had "ardent[ly]" given Doe the hickeys in his room, undoubtedly because that implies she did so for a longer period of time and didn't fit its new rationale.

c. It said ***nothing at all*** about the testimonial and documentary evidence proving that Doe was shocked at learning he had hickeys, was upset and embarrassed by it, and took affirmative steps to conceal them the next day.

308.   Most critically of all, the panel never explained why *Doe's* consistent testimony about the timing of the hickeys would not be credited.  Doe had consistently testified they began when one would expect—very early in their sexual activity—and continued as they had vaginal sex.  The ***only*** evidence they had as to the timing of the hickeys was Roe's inconsistent and found-to-be-not-credible testimony about it and Doe's *consistent* testimony about it. Yet the panel never explained why it nonetheless credited Roe's version over Doe's.

309.   Compare the treatment of the hickeys—where the panel was clearly trying to give Roe *something*—to the treatment of whether the oral sex preceded the vaginal sex. Here, too, Roe had given inconsistent testimony before ultimately saying she couldn't actually remember when things happened—just as she did with the hickeys.  Doe, on the other hand, had consistently testified that the oral sex preceded the vaginal sex.  **But the panel didn't conclude, "Roe has changed her story and has no memory, and Doe generally isn't credible, so we don't know what the true order was."**  They instead ***adopted Doe's version and expressly found that the oral sex preceded the vaginal sex.***  They treated the testimony

about the hickeys differently precisely because doing so was necessary to find Doe guilty of *something*.

310.  Finally, as with its first decision, the panel expressly said it was *not* relying on anything about either party's demeanor in making its credibility findings.

311.  Dean Diegnan and Deputy Dean Crittenden gave Doe their second sanctions decision on July 2, 2020.  They sanctioned Doe with "censure" and 48 months of disciplinary probation—a curiously long number that also sounds like baby-splitting, given that Doe would graduate in fewer than *24* months.  The letter noted that the sanction would appear on his "permanent record at the University" and would be shared with outside institutions pursuant to standard record release requests, ensuring the sanction would follow him after his graduation and require him to repeatedly explain that he'd been found responsible for sexual misconduct.

## XI.  **The Second Appeal**

312.  On July 13, 2020, Doe submitted his appeal of the merits panel's second decision.  He pointed out many of the implausible and contradictory things that showed his innocence and Roe's dishonesty, which the panel had ignored. They included:

   a.  That the panel had used Roe's supposed sexual inexperience to bolster her credibility, even though the evidence (and Student E's testimony in particular) suggested she was *more* sexually experienced than Doe;

    b.   That Roe had ignored Student F's loud calls and texts while she was in Doe's room, proving she had not texted Students E and F on her walk to his room because she wanted an excuse to leave;

    c.   That the facts Roe happened to omit from her first interview all happened to be facts that critically undermined her story;

    d.   That there was no reason Roe's inconsistencies and flawed memory should not have affected the panel's view of her claim about purportedly saying no "ten or more times" as they kissed;

    e.   That the hickeys obviously prove Roe had *not* protested during the kissing and foreplay; and

    f.   That the permanent and disclosable nature of the sanction made it completely disproportionate to what he'd been found responsible for.

313.   The appeals panel denied Doe's second appeal on August 3, 2020, in boilerplate fashion.  It stated that it believed the merits panel followed appropriate procedures in determining Roe's credibility and repeated the deans' reasons for stating that the sanction was not unduly harsh despite its permanent nature.  It never did not address any of Doe's actual arguments.

314.   Later that very same day, Princeton announced its implementation of its new Title IX procedures, the ones required by the Education Department's new regulations.  Its email announcement reiterated that Princeton was "required" to implement those new policies by the federal government.  It also noted that Princeton would be using a two-track system to resolve claims of sexual misconduct, limiting the reach of those new and much fairer procedures to as small a number of cases as legally allowed.

## CAUSES OF ACTION

## <u>Count I – Violation of Title IX (20 U.S.C. § 1681)</u>

315.   John Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

316.   The University receives federal funding, including in the form of federal student loans given to students, and therefore is subject to the requirements of Title IX.

317.   Title IX prohibits gender discrimination in the educational setting.

318.   Unlawful discrimination exists when gender bias is a motivating factor in a student's discipline, which in turn occurs when gender bias motivates an outcome or sanction at least in part.

319.   The finding and sanction against John Doe were the product of gender bias at least in part, as exhibited by all of the following things, each of which courts have recognized as supplying evidence of gender bias:

- Extreme pressure upon Princeton by the federal government to enforce a gendered view of Title IX enforcement, exhibited both by nationwide enforcement of the Dear Colleague Letter and the resolution agreement Princeton entered into in 2014;

- Extreme pressure from Princeton's student body and alumni to enforce a gendered view of Title IX (particularly in the wake of rescission of the Dear Colleague Letter) and to identify things like "toxic masculinity" as the root cause of the problem;

- The University's responsiveness to that gender-biased pressure, including:

o  actions taken in the wake of on-campus protests and publications;

o  Princeton's pledge to adhere as closely as possible to the DCL's gender-biased regime;

o  Princeton's adoption, in the midst of Doe's proceeding, of a complicated two-track system for resolving claims of sexual misconduct designed to limit the reach of the 2020 regulations;

- The statements and actions of a biased hearing panel which, among other things:

o  Took Roe's incredible claims at face value, including her claim that despite his having supposedly violently assaulted her as a pre-frosh, she messaged with Doe for a year, flirted with him at Princeton, and *consensually kissed* him before the second incident, simply to treat Doe "normally";

o  Repeatedly questioned Doe much more pointedly and confrontationally than it did Roe, despite the more glaring, more central, and more numerous contradictions and inconsistencies she told;

o  Offered Roe ways to explain away some of her most damning inconsistencies;

o  Found Roe credible, despite her lies, whenever she managed to be consistent, yet refused to do the same for Doe;

o  Found that Roe's texts to friends after the second encounter corroborated her account, yet refused to accord the same weight to Doe's texts to *his* friends;

o  Found Roe credible based on items that actually undermined her credibility, like the wildly different

101

stories she told to friends in the days after the second incident;

o Found Roe credible based on archaic assumptions about male and female sexuality and sexual experience;

o Used a remand designed to correct "procedural unfairness" to Doe mostly to manufacture new evidence of his supposed lack of credibility;

o Applied disparate standards to the same types of evidence depending on the party offering it, including the witness testimony supporting each party; and

o Refused to complete its investigation in the targeted timeframe identified in the Policy;

• An incoherent and unsupported rationale that calls the decision against Doe into grave doubt, by concluding that the timeline of the hickeys could not be substantiated, even though:

o Roe was *found* to have lied about why she gave Doe the hickeys;

o Roe was *found* to have given them "ardent[ly]";

o The number and nature of those hickeys *required* them to have been given over an extended period of time;

o The timeline—which the panel tried to bury in its second rationale—*required* Roe to have started giving those hickeys near the *very beginning* of the encounter in Doe's room;

o Doe had *consistently said* Roe started giving him those hickeys early on; and

o Giving Doe those hickeys *as they kissed and touched each other* was the most obvious and most natural time for them to have been given in the first place.

102

- A rationale that entirely failed to address significant exculpatory evidence, including:

    o Testimonial and documentary evidence *proving* Doe did not want hickeys and would not have asked for any, let alone after already having received some; and

    o Undisputed evidence proving Roe had ignored communications from friends while in Doe's room.

- A rationale that failed even to *try* to justify key findings, like the finding that oral sex preceded vaginal sex, because doing so required crediting Doe;

- A permanent, disclosable sanction that will gravely impact Doe's future and which is disproportionate to the violation he was (wrongly) found to have committed.

320.   As a direct result of the University's violation of Title IX, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

321.   Accordingly, Princeton is liable to Doe for violations of Title IX and for all damages arising out of that violation.

## **Count II – Breach of Contract**

322.   John Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

323.   At all times relevant hereto, a contractual relationship existed between the University and John Doe.  The University's Code and Policy were a part of that contract.  Under that contract, the University was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, in the process of sanctioning students, and in resolving appeals.

324.   Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.

325.   The covenant required the University to implement the contractual provisions identified below in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

326.   The University breached this contract with John Doe, and the covenant of good faith inherent in it, by failing to comply with the Policy in at least the following ways:

## A.     Failure to Apply the Preponderance Standard

327.   The Code promises that the University will apply a "preponderance of the evidence" standard to claims of sexual misconduct, meaning that respondents may be found responsible only if the evidence "more likely than not" shows a complainant's claims to be true.

328.   As stated above, the University was aware of a large amount of evidence that called Roe's credibility into question and undermined her claims.  It was further aware that she repeatedly changed her story.  It was also aware that Doe had testified consistently and was overwhelmingly supported by the objective evidence.

329.   Despite that, it still found against Doe, based on a rationale that was incoherent and unsupported by the evidence.

330.   As to at least some parts of the evidence, furthermore, Princeton flipped the burden of proof, requiring Doe to affirmatively prove things (such as Roe's motives for lying) or else have it held against him.

331.   The finding against Mr. Doe, and its rationale, were arbitrary and capricious, without reasoned basis, ignored contrary evidence, and were the products of pre-determined bias in favor of Roe.

332.   In all of those ways, and the ways described in more detail above, Princeton failed to apply the preponderance of the evidence standard.

**B.      Failure to Provide an Impartial, Unbiased, and Adequately Trained Panel**

333.   The Policy promised that Title IX panelists would "have training in investigating and evaluating conduct prohibited under the policy," and further that they would be "impartial and unbiased."

334.   As explained in Count I, Doe's panel was far from impartial and unbiased in investigating and resolving Roe's claims.  The "procedural unfairness" it engaged in, and continued to engage in on remand, also shows it was not properly trained as required by the Policy.  Despite that, the appeals panel remanded the matter to that same hearing panel, even after agreeing that it had unfairly collected and analyzed the evidence the first time around.

335.   Princeton further breached this contractual provision by using a single body to both investigate and adjudicate Roe's claims.  That model is inconsistent with the requirement under New Jersey law that private school disciplinary proceedings be "fundamentally fair."  Among other things, it exposes the decision-making body to a host of irrelevant and prejudicial information encountered in an investigation.  In Doe's case, that single body was not composed of judges or other individuals professionally trained to disregard such evidence, but instead was composed of employees of a university whose jobs and professional training concern different things altogether.

336.    Princeton further breached this contractual provision by refusing to resolve Roe's allegations through a live hearing that allowed for direct, real-time cross-examination of Roe, or even to conduct adequate indirect cross-examination of Roe by confronting her with the many questions, contradictions, and inconsistencies posed and identified by Doe in his many submissions.

337.    As a direct result of the University's breaches of its contract with Mr. Doe, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

**<u>Count III – Breach of the Covenant of Good Faith and Fair Dealing</u>**

338.    Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

339.    Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.  It required the University to implement the contract in ways that were not arbitrary, capricious or without

reasoned basis, that did not ignore evidence to the contrary, and that did not steer

Mr. Doe's disciplinary proceeding to a predetermined conclusion.

340.   For all of the reasons stated in Count II, the University breached the

covenant of good faith and fair dealing.

341.   Princeton also breached its covenant in employing a biased and unfit

panel to investigate and adjudicate Roe's claims.

342.   As a direct result of the University's violation of the covenant of good

faith and fair dealing, and as a direct and proximate cause thereof, John Doe has

been seriously and irreparably damaged in the following ways, among others: he

has been falsely branded a sexual assailant, which he will have to report to

many future schools and future employers; endured extreme emotional and

psychological suffering as a result of the University's one-sided treatment of the

false sexual misconduct charges against him; and will suffer a permanent reduction

in lifetime earnings.

343.   Accordingly, the University is liable to Mr. Doe for violation of the

covenant of good faith and fair dealing and for all damages arising out of that

violation.

## Count IV – Negligence

344.   Plaintiff incorporates by reference all of the preceding paragraphs of

this Complaint as though fully set forth herein.

345.   In conducting its investigation and adjudication of Roe's complaint against John Doe, the University owed a common law duty to Doe to exercise reasonable care, with due regard for the truth and to apply procedures evenhandedly, with due consideration of the important and irreversible consequences of its actions, as well as Doe's various liberty and property rights and interests generally.

346.   Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of Doe.

347.   In particular, the University has negligently hired, trained and supervised the people it employs to investigate and adjudicate claims of sexual misconduct or otherwise implement its policies and procedures, as described above.

348.   By way of further example, and upon information and belief, those individuals are trained (1) to implement the goal of combating "toxic masculinity" and "rape culture," a chief element of which is to not express any doubt about the sincerity of sexual assault claimants, especially women bringing claims against men; and (2) to otherwise credit the testimony of sexual assault claimants unless there is clear and convincing evidence, or something akin to that, of its falsity, in

contravention of the requirement that all facts be determined by a preponderance of the evidence.

349.   As a direct result of the University's negligence, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

350.   Accordingly, the University is liable to John Doe for negligence and for all damages arising out of that violation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against the University, and order relief against Defendant as follows:

a.    That this Court issue permanent injunctive relief: (1) ordering the University to vacate and expunge its finding of responsibility as to Doe; (2) restraining the University from reflecting, in any manner whatsoever, in John Doe's records or elsewhere, the findings or sanctions imposed upon Doe based on its adjudication of Roe's complaint; and (3) restraining the University from

maintaining any records related to that sanction, as it was the product of the University's erroneous finding that he violated the Policy, which was itself the product of a flawed disciplinary process; and

       b.      That the University be ordered to pay compensatory damages as appropriate to compensate John Doe for his losses caused by its misconduct; and

       c.      That the University be ordered to pay punitive damages; and

       d.      That this Court award John Doe his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

## Certification Pursuant to L. Civ. R. 11.2

We hereby certify that the matter in controversy here is not the subject of any other action pending in any court, or of a pending arbitration proceeding; that no other action or arbitration proceeding is contemplated; and that we know of no other parties who should be joined in this action at this time.

## Certification Pursuant to L. Civ. R. 201.1(d)(1)

This matter does not fall within the compulsory arbitration requirement set forth in L. Civ. R. 201.1(d)(1) because John Doe seeks injunctive relief in addition to money damages.

Dated: October 5, 2022

Respectfully submitted,

**KAISERDILLON PLLC**

/s/ Justin Dillon
Justin Dillon (*pro hac vice* pending)
Christopher C. Muha (*pro hac vice* pending)
1099 14th St. N.W.
8th Floor West
Washington, D.C. 20005
Phone:  (202) 640-2850
Fax:  (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

**WARREN LAW GROUP**

By: /s/ *Jon-Jorge Aras*
Jon-Jorge Aras, Esq.
jj@warren.law
14 Penn Plaza, 9th Floor
New York, NY 10122
212-580-2303

*Counsel for Plaintiff John Doe*

## <u>Certification of Justin Dillon</u>

I, Justin Dillon, being of full age, certify as follows:

1.      I represent John Doe in this matter.

2.      I have read the Complaint in this matter.

3.      To the best of my knowledge, the factual allegations made in the Complaint are true and correct to the best of my knowledge, information and belief.

4.      I am authorized by John Doe to state that the factual allegations made in the Complaint are true and correct to the best of his knowledge, information and belief, as well.

5.      I, rather than John Doe, am attesting to these facts because John Doe seeks to remain anonymous, for the reasons reflected in a motion seeking such relief being filed contemporaneous with this Complaint.

6.      I certify that the foregoing statements made by me are true.  I am aware that if any are willfully false, I am subject to punishment.


Dated:  October 5, 2022                               /s/ Justin Dillon
                                                                 Justin Dillon