## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

JOHN DOE,

              Plaintiff,

      v.

PRINCETON UNIVERSITY,

              Defendant.

**Civil Action No. 3:22-cv-05887-ZNQ-DEA**

**Motion Day:  February 6, 2023**

## JOHN DOE'S OPPOSITION TO PRINCETON'S MOTION TO DISMISS

KAISERDILLON PLLC

Justin Dillon (*pro hac vice*)
Christopher C. Muha (*pro hac vice*)
1099 14th St. N.W. - 8th Floor West
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

WARREN LAW GROUP

Jon-Jorge Aras, Esq.
jj@warren.law
14 Penn Plaza, 9th Floor
New York, NY 10122
(212) 580-2303

January 23, 2023

*Counsel for Plaintiff John Doe*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 4

    A.    Title IX At Princeton ........................................................................... 4

    B.    Doe's Proceeding ................................................................................. 6

        1.    The Pre-Frosh Incident ............................................................. 7

        2.    The Second Incident ................................................................. 8

        3.    The Second Incident – The Parties Are Re-Interviewed .......... 10

        4.    The First Decision .................................................................. 11

        5.    Appeal And Remand ............................................................... 13

        6.    The Second Decision .............................................................. 14

STANDARD OF REVIEW ...................................................................................... 15

ARGUMENT ........................................................................................................ 16

    I.    THE COMPLAINT AMPLY STATES A TITLE IX CLAIM ................... 17

    A.    The Complaint Readily Pleads a Title IX Claim Under the Third Circuit's Decisions in *U. Sciences* and *Princeton III* .......................................... 18

        1.    The Pressure on Princeton During Doe's Proceeding Was Exactly the Same Pressure Found in *Princeton III* ....................................... 19

        2.    Doe Pleads Greater Evidence of Differential Treatment Than What the Court Relied on in *Princeton III* ........................................... 21

    B.    The Complaint Pleads Sources of Gender Bias Even Beyond What Existed in *U. Sciences* and *Princeton III* ........................................................ 23

    II.    THE COMPLAINT STATES CLAIMS FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT ............................................ 26

    A.    Doe's Breach of Contract Allegations Mirror Those in *Princeton III* ................... 26

    B.    Doe's Breach of the Implied Covenant Claim Also Mirrors *Princeton III* ........... 27

    III.    THE COMPLAINT STATES A CLAIM FOR NEGLIGENCE ................ 28

CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................16

*Collick v. William Paterson Univ.,*
  No. 16-471 (KM),(JBC), 2016 WL 6824374 (D.N.J. Nov. 17, 2016)......................20

*Doe v. Amherst Coll.,*
  238 F. Supp. 3d 195 (D. Mass. February 28, 2017)..................................................20

*\*Doe v. Columbia Univ.,*
  831 F.3d 46 (2d Cir. 2016) ...............................................................17, 20, 21, 22, 23

*Doe v. Dordt Univ.,*
  No. 19-CV-4082 CJW-KEM, 2022 WL 2833987 (N.D. Iowa July 20, 2022).........21

*Doe v. Grinnell College,*
  473 F. Supp. 3d 909 (S.D. Iowa July 9, 2019)..........................................................25

*Doe v. Marymount Univ.,*
  297 F. Supp. 3d 573 (E.D. Va. 2018) ................................................................23, 25

*Doe v. Miami Univ.,*
  882 F.3d 579 (6th Cir. 2018) ....................................................................................17

*\*Doe v. Oberlin Coll.,*
  963 F.3d 580 (6th Cir. 2020) .........................................................................17, 21, 23, 24

*\*Doe v. Princeton Univ.,*
  30 F.4th 335 (3d Cir. 2022) ............................................................................*passim*

*Doe v. Princeton Univ.,*
  No. 3:20-cv-4352-MAS, 2021 WL 194806 (Jan. 20, 2021).......................................1

*Doe v. Purdue Univ.,*
  928 F.3d 652 (7th Cir. 2019) ...............................................................................22, 23

*Doe v. Regents of the Univ. of Cal.,*
  23 F.4th 930 (9th Cir. 2022) .....................................................................................20

*Doe v. Regents of the Univ. of Minn.*,
  999 F.3d 571 (8th Cir. 2021) ....................................................................................20, 21

*Doe v. Rider Univ.*,
  No. 3:16-cv-4882, 2018 WL 466225 (D.N.J. Jan. 17, 2018)............................................16, 19

*Doe v. Rider Univ.*,
  No. 3:16-CV-4882, 2020 WL 634172 (D.N.J. Feb. 4, 2020) ........................................16

*Doe v. Samford Univ.*,
  29 F.4th 675 (11th Cir. 2022) ....................................................................................19

*Doe v. The George Washington University*,
  366 F. Supp. 3d 1 (D.D.C. 2018) ..............................................................................17

*Doe v. Trs. of the Univ. of Pa.*,
  270 F. Supp. 3d 799 (E.D. Pa. September 13, 2017) ................................................21

*Doe v. Univ. of Ark. – Fayetteville*,
  974 F.3d 858 (8th Cir. 2020) ....................................................................................23

*Doe v. Univ. of Miss.*,
  361 F. Supp. 3d 597 (S.D. Miss. 2019) ....................................................................17

*\*Doe v. Univ. of the Sciences*,
  961 F.3d 203 (3d Cir. 2020) ..............................................................................*passim*

*Doe v. Univ. of the South*,
  No. 4:09-cv-62, 2011 WL 1258104 (E.D. Tenn. March 31, 2011) ...........................30

*Doe v. Washington & Lee Univ.*,
  2021 WL 1520001 (W.D. Va. Apr. 17, 2021) ............................................................25

*Draney v. Bachman*,
  138 N.J. Super. 503 (Law. Div. 1976)........................................................................29

*Dunphy v. Gregor*,
  136 N.J. 99 (1994) ......................................................................................................30

*Hardwicke v. Am. Boychoir Sch.*,
  *188* N.J. 69, 902 A.2d 900 (2006) ............................................................................28

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)....................................................................................................17

*Menaker v. Hofstra Univ.,
   935 F.3d 20 (2d Cir. 2019) ................................................................................18, 23

Papelino v. Albany Coll. of Pharmacy of Union Univ.,
   633 F.3d 81 (2d Cir. 2011) ................................................................................29-30

Schwake v. Arizona Bd. of Regents,
   967 F.3d 940 (9th Cir. 2020) ............................................................................16, 21

State v. Lisa,
   919 A.2d 145 (N.J. Super. Ct. App. Div. 2007) ......................................................30

Steinberg v. Sahara Sam's Oasis, LLC,
   226 N.J. 344 (2016) ................................................................................................29

Stuyvesant Assocs. v. Doe,
   221 N.J. Super. 340, 534 A.2d 448 (Law Div. 1987) ..............................................29

Tsuruta v. Augustana Univ.,
   No. 4:16-cv-4107, Docket No. 13 (D.S.D. June 16, 2016) ......................................30

Vengalattore v. Cornell Univ.,
   36 F.4th 87 (2d Cir. 2022) ......................................................................................19

Verdu v. Trustees of Princeton Univ.,
   No. 19-12484, 2020 WL 1502849 (D.N.J. Mar. 30, 2020) ......................................21

Verdu v. Trustees of Princeton Univ.,
   No. 20-1724, 2022 WL 4482457 (3d Cir. Sept. 27, 2022) ......................................21

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,
   429 U.S. 252 (1977)..........................................................................................17, 23

**Statutes**

N.J. Stat. Ann. § 2A:53A-7(c) ......................................................................................28

**INTRODUCTION**

Respectfully, Princeton should have just Answered. Instead, it has chosen to fight the very same battle it lost in the Third Circuit just last year. In *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) ("*Princeton III*"), that court reinstated a Title IX claim, a breach of contract claim, and a breach of the implied covenant claim against Princeton 1) based on *exactly* the kinds of allegations that *this* Doe makes; 2) involving *exactly* the same version of Princeton's policy;[1] 3) in an investigation conducted by *two of the same three panelists from Doe's case*;[2] and 4) where those panelists worked on that case at *exactly* the same time they worked on Doe's[3]—a time the Third Circuit recognized as one of intense pressure at Princeton to appear tough at all costs on claims of sexual assault brought by women against men. *Princeton III*, 30 F. 4th at 339-40. *Princeton III* forecloses Princeton's arguments. But Princeton can't admit that, presumably because the same pressure that demanded Doe's discipline is still alive and well.

How we got here is an all-too-familiar story: Faced with nonsensical sexual assault claims from a complainant to whom they felt compelled to give *something*, and under tremendous pressure to appear tough on men accused of sexually assaulting women, Princeton put a thumb on the scale. It found Doe responsible for arguably the least serious thing he was accused of (kissing and fondling Roe) and gave him four years' probation. In its motion to dismiss, Princeton asks this Court to view that result as almost a gift. *See, e.g.*, Mot. at 8 (noting that the panel "revised the penalty from two-years' *suspension* to 48 months of *probation*")

---

[1] *See John Doe v. Princeton Univ.*, No. 3:20-cv-4352-MAS (April 15, 2020), ECF No. 1-2 (attaching 2019 version of Princeton's Rights, Rules, Responsibilities).

[2] *Compare Doe v. Princeton Univ.*, No. 3:20-cv-4352-MAS, 2021 WL 194806, at *3 (Jan. 20, 2021) (identifying "**Randy Hubert**, Ed White, and **Joyce Chen Shueh**" as plaintiff's panelists in that case) *with* Compl. ¶141 (identifying "**Joyce Chen Shueh**, [] **Randy Hubert** and Walter Wright" as Doe's panelists") (emphasis added).

[3] *Id.* at 2 (noting that Princeton "commenced" that investigation "in November 2019").

(emphasis in original). After all, Princeton asks, how big a deal can it really be to be found responsible for a sexual assault you didn't commit if, in the end, you just got *probation*? To ask that question is to answer it.  And it bespeaks a profound cynicism on the part of Princeton.

To understand exactly *how* cynical Princeton's approach to Doe's case has been, it's important to understand just how absurd Roe's claims were—and how little evidence she was able to produce to support them. Her claims came more than a year apart and were strikingly graphic. The first was that, while she was visiting Princeton as a prospective freshman, Doe pushed her into a wall and forced her to perform oral sex as she gagged. (Tellingly, no witness would claim Roe said *anything* like this at the time.) Her second claim was that, 16 months later, Doe tricked her into going to his room and made her engage in vaginal and oral sex, *in that order*. She added that, *after* the sex, Doe made her give him "one" hickey—a bizarre allegation given that hickeys, like most forms of foreplay, tend to come before sex (and usually in plurals). Finally, Roe told Princeton she gave this account to her close friends, including Students H and I.

**By the end of Princeton's investigation, every single one of those points would be contradicted.** Roe herself would admit that Doe had not physically forced her to do *anything*— much less *pushed her into a wall*—during the first incident. Regarding the second incident, one of her own friends would reveal that Roe had texted beforehand about breaking a "celibacy pledge" that night. Then Roe unwittingly reversed the order of the sexual activity during her second interview, now claiming the oral sex came *first*. After being confronted with a photo Doe's friend took right after she left his room, Roe now admitted that it wasn't just "a" hickey she'd given him, but a lot of them—"maybe" even *before* sex, not just after as she'd originally claimed. And her friends, Students H and I? They would both say Roe told them a *completely* different story than the one she told Princeton. Princeton knew all of this—yet still, in a decision

that strained so hard you can almost hear the tearing, managed to somehow find Doe responsible for assaulting Ms. Roe. Better that than force Roe to leave its Title IX process empty-handed.

And that's because Roe had something going for her that Doe didn't: She brought her claims at a time when Princeton was under extraordinary pressure to appear tough at all costs on claims of sexual assault brought by women against men. In that environment, Princeton concocted a tortured rationale to find Doe responsible for at least *something*. Among other things, it decided to believe anything Roe said as long as it wasn't *explicitly contradicted* by Roe at a later time—but failed to extend that same strange courtesy to Doe. It siloed its credibility analysis of Roe's testimony, ignoring all of the times it clearly *hadn't* believed her without explaining why it should nonetheless believe her on other things. It concluded that because Roe never contradicted her own (absurd) claim to have said "no" "ten or more times" before Doe kissed her at the beginning of the *second* encounter, the kissing must have been nonconsensual. But—and here the contortions become *truly* evident—since Roe conceded that the hickeys "maybe" occurred before the oral sex, Doe might have thought the oral sex was consensual. And since the oral sex *might* have seemed consensual, the vaginal sex *might* have seemed consensual, too. **Princeton thus found Doe responsible for *sexual assault* (kissing and fondling) on the basis that hickeys—long kisses—indicate consent *to oral sex*, but *not to kissing and fondling*.**

That rationale and the process Princeton used to get there make so little sense that, when combined with the pressure Princeton was under, it more than gives rise to "a plausible inference that Princeton discriminated against him based on his sex." *Princeton III*, 30 F.4th at 343. Doe, in fact, alleges far *more* evidence of bias and unfairness than was alleged there. Princeton does all it can to minimize that case and doubtless wishes that it had come out the other way. But it didn't, so Doe respectfully asks this Court to follow it and deny Princeton's motion to dismiss.

**FACTUAL BACKGROUND**

**A.    Title IX at Princeton**

Since 2011, and continuing through Doe's disciplinary proceeding in 2019-20, Princeton was under heavy pressure to appear tough at all costs on claims of sexual assault, especially those brought by women against men. Beginning in 2011, the federal government used a "Dear Colleague Letter" (DCL) to pressure schools to enforce a gendered view of Title IX that courts across the country have, even years later, continued to recognize as supplying evidence of gender bias in Title IX proceedings. Statements by Catherine Lhamon, who spearheaded those efforts at the Education Department's Office for Civil Rights (OCR) from 2013-16, made clear that the view being enforced understood women as typical Title IX complainants, men as typical respondents, and the watering down of respondents' due process rights as a solution to the problem of campus sexual assault. *See* Compl. ¶¶57-58 (collecting her statements). Between 2014 and 2016, she threatened more than once to revoke schools' federal funding if they failed to comply. *Id.* ¶59. Princeton itself, in November 2014, bowed to that pressure and eliminated key procedural protections for respondents, including live hearings and the "clear and convincing" evidentiary standard it had been applying for years in Title IX cases. *Id.* ¶60.

This gendered view of Title IX enforcement became entrenched at Princeton and was repeatedly demanded by its student body. Princeton repeatedly showed itself to be responsive to such pressure. In 2017, when a male faculty member was not suspended or fired following sexual harassment complaints by a female graduate student, Princeton caved to public pressure and adopted a default minimum sanction of suspension for such violations. *Id.* ¶64. And later that year, when the Education Department announced that it would be rescinding the DCL and implementing basic procedural protections for accused students, its student body repeatedly

4

demanded Princeton adhere to—and even exceed—the complainant-centered regime established by the DCL, echoing Ms. Lhamon's language that doing so was intended to protect women in particular. The *Daily Princetonian*, for example, ran an article warning about any changes to the DCL regime, noting that the "facts on the ground" it was meant to address were the reported rate at which "women experience rape or some other form of sexual assault while in college."  *Id.* ¶67.  The following year, the paper's editor-in-chief wrote that the DCL *didn't go far enough*, that women's rights groups opposed changes to it, and that the new system being contemplated would harm complainants by giving respondents basic procedural protections. *Id.* ¶69. The paper ran still more articles that year insisting that Princeton's 2014 and 2017 Title IX scandals meant that it could not afford to be lax in enforcing Title IX. *Id.* ¶70.

As it had in 2017, Princeton responded in 2018 by once again caving to student pressure. It publicly opposed OCR's proposed changes to the DCL regime the following year, specifically attacking OCR's intent to give certain basic procedural protections to accused students, including one specifically criticized in the *Daily Princetonian*. *Id.* ¶71. But the pressure on Princeton only intensified. In May 2019, just months before Roe would report her allegations, a group named Princeton Students for Title IX Reform (PIXR) organized a *200-hour protest* that was widely reported in the *Daily Princetonian* and garnered the support of over 1,700 Princeton students and alumni, who pledged not to give Princeton any money until PIXR's demands were met. *Id.* ¶73. Those demands included numerous additional resources for complainants (but none for respondents), adherence to the DCL regime as much as possible, and the "immediate departmentalization of the Program in Gender and Sexuality Studies" as a "key step in challenging the dominant paradigm[] of toxic masculinity" on campus. *Id.* ¶¶73-74. Once again, Princeton bent like a reed in a hurricane: Its President met with PIXR and commissioned two

comprehensive studies of its Title IX system, which (echoing PIXR) recommended that Princeton offer training sessions on "toxic masculinity" and encouraged students "to attend functions at Princeton Women*s [*sic*] Center." *Id.* ¶¶75, 78.

PIXR and the *Daily Princetonian* continued to pressure Princeton during the pendency of Doe's disciplinary proceeding. In April 2020, PIXR authored an article for the paper criticizing OCR's new Title IX regulations as "aimed at silencing survivors" and called for increased funding of the Women*s Center. *Id.* ¶79. It lay blame at the feet of "destructive campus norms," *id.*, echoing its words about "toxic masculinity" from the year before. Two months later, while Doe's proceeding was on remand, the *Daily Princetonian* again insisted that the new regulations would "cast [complainants] out to sea" and insisted that students continue to sign PIXR's year-old petition, again noting the reported rate of sexual misconduct experienced by college women. *Id.* ¶¶ 79-81. Princeton administrators responded by calling the new regulations "problematic in a number of ways" and adopting an admittedly "complicated" two-track system of adjudication to limit the reach of the new regulations as much as possible. *Id.* ¶¶ 80, 82.

## B.    Doe's Proceeding

Princeton's investigation of Roe's claims occurred at the height of that pressure campaign. In November 2019—just weeks after the reviews of Princeton's Title IX process were completed (and also when the complaint in *Princeton III* was filed)—Roe alleged that Doe had sexually assaulted her in October 2017 during her pre-frosh visit, then tricked her into going there *again* on February 8, 2019, where he assaulted her again. *Id.* ¶86. Her testimony about both would change dramatically over the course of the investigation and be contradicted by a host of evidence. The opposite would be true of Doe.

### 1.     The Pre-Frosh Incident

Roe's initial story about the pre-frosh incident was a Grand Guignol tale of physical abuse from start to finish. She said that Doe was rough and pushed her against the wall on the way to his room, then pushed her head and shoulders down to make her perform oral sex on him once they got there, even after she expressly said no. *Id.* ¶¶144-45. She said she gagged and that Doe *continued* pressing her head down to force her to keep going. *Id.* ¶146. But the few witnesses she identified about the incident contradicted her. Her friend Student I said Roe told her she "hooked up" with Doe "as a favor" for letting her sleep there. *Id.* ¶172. Her friend Student P said Roe told him they'd "hooked up" and made it sound consensual. *Id.* ¶173.

Doe, by contrast, told a story of an awkward sexual encounter between two inexperienced people that was too weird to make up. He said he was *upset* that Roe's host student had ghosted her, a fact confirmed by contemporaneous texts he produced. *Id.* ¶160. He said Roe said no to intercourse but yes to oral sex. He said he had no experience taking off a bra and had to ask Roe for help with hers. *Id.* ¶116. He said he told Roe he couldn't tell her how to perform oral sex because he had so little experience receiving it. *Id.* ¶117. He said that Roe paused as she performed oral sex to apologize if it wasn't good. *Id.* ¶118. He said that after he ejaculated into some paper towels, Roe resumed the oral sex, and he had to tell her she could stop. *Id.* ¶119. Then Doe made a bed for her and offered her some of his grandmother's cookies. *Id.* ¶120. Doe explained how they'd kept in touch during Roe's senior year and how Roe excitedly sent him a video when she was admitted to Princeton. *Id.* ¶161. And he produced text messages showing that Roe had flirted with him and asked him on a date after arriving at Princeton. *Id.*

Witnesses consistently supported Doe's version of events: Student B said that Doe told him shortly afterwards that they'd hooked up but hadn't had sex because Roe had said she didn't

want to. *Id.* ¶168. Students C and D confirmed Doe had told them the above story shortly after

the incident. *Id.* ¶¶169, 170. Student W also confirmed Doe had told him afterwards that he and

Roe had hooked up. *Id.* ¶174. And *Roe herself*, in a follow-up interview, *admitted* that Doe had

asked her if she wanted to have intercourse, that she said no, and that he respected it. *Id*. ¶218.

     **2.**      **The Second Incident**

     As to Roe's initial report about the *second* incident 16 months later, Roe grossly

downplayed her warm relationship with Doe after matriculating at Princeton.  *Id.* ¶146. She

claimed that when talking to Doe late one night, she consensually kissed him (despite the horrific

attack she alleged 16 months before) but says she then texted her friends to ask where they were

but they never responded. *Id.* ¶149. Roe never produced those texts. She said Doe then tricked

her into going back to his room. *Id.* ¶151. She texted (not called) two friends on the way back.

*Id*. She didn't ask them to meet her or call right back, but only to call her in five minutes. *Id*. She

said *nothing* about—and again, never produced—a text she sent to one of them, just a little

earlier that night, stating that she was tempted to break a *celibacy* pledge. *Id*. She said she turned

her phone volume to high so she would hear when one of them called back. *Id.* ¶153.

     Roe then claimed that when they got to Doe's room, she said no "ten or more times" as

Doe kissed and touched her. *Id.* Within a few minutes, she claimed Doe forced her to have sex.

*Id.* She never explained and was never asked how Doe managed to get her clothes off. *Id.* She

said Doe made her have vaginal sex (strangely, with *Roe* on top), then oral sex. *Id.* She weirdly

claimed that *after* the oral sex, Doe made her give him "a" hickey so that people would see it the

next day, so she gave him "one."  *Id.* ¶154.  She would not testify to hearing her phone go off at

any point. *See id*. But as soon as she left, she called a friend—who answered. *Id.* ¶155.

As with the first incident, Roe's own witnesses again contradicted her story. Student F said he asked Roe to leave with him when she was talking with Doe but that Roe refused. *Id.* ¶179. Student F (whom Roe had texted on the way to Doe's room) both testified and produced cell phone data confirming he texted Roe back *twice* and called her *once* (as requested) but that Roe never answered. *Id.* ¶181. Student E said that Roe texted him saying she was tempted to break her "celibacy pledge." *Id.* ¶178. Student I (one of only two friends to whom Roe told *any* details) was told by Roe that *Doe* was on top during sex and wouldn't let her leave, which contradicted Roe's own story. *Id.* ¶186. And Student H, one of Roe's self-described "best friends," *id.* ¶156, and the only other witness given *any* alleged details by Roe, was told that Doe had pinned Roe to the bed and forcibly raped her as she begged for him to stop, until she finally ran out of the room sobbing—which *completely* contradicted what Roe told Princeton. *Id.* ¶185. He even produced notes he took contemporaneously with Roe telling him that story. *Id.* ¶193.

As before, Doe again told Princeton a story that was too weird to make up and was overwhelmingly supported by the evidence. He said that Roe was very aggressive in his room, pushing him down on the bed with both hands and giving him multiple hickeys as he touched her vulva. *Id.* She then said, "It's my turn," took off his pants and underwear, told him she'd "learned so much since last time," and aggressively performed oral sex. *Id.* He said—*before seeing any of Roe's or Student F's testimony*—that Roe's phone had gone off multiple times but that Roe had said to ignore it. *Id.* He said Roe asked for a condom and helped him put it on, since he'd never used one before. *Id.* ¶163. He said Roe got back on top of him and they had sex, but he grew uncomfortable and couldn't keep an erection. *Id.* He told Roe as a pretext that he wanted to fix the condom, then told her after they'd stopped that he'd grown uncomfortable. *Id.* Roe then heard laughing from the room next door—where four of Doe's roommates were—and left

embarrassed. *Id.* When Doe joined those friends, they told him that his neck was covered in hickeys. *Id.* ¶164. Doe produced pictures of them and a Snap message he sent to a female friend desperately asking for help, *id.*, proving he hadn't wanted them, contrary to Roe's strange claim.

Doe's witnesses supported his too-weird-to-fabricate story. Student C said that Doe had told him shortly afterwards that Roe had been peculiarly aggressive. *Id.* ¶176. Students D and L both said that Doe had told them shortly afterwards that Roe had asked for a condom, Doe couldn't stay erect, and Doe had made up an excuse to stop. *Id.* ¶¶177, 188. Student D said Doe was shocked when he learned about the hickeys, *id.* ¶177, and Student W described how Doe had tried to hide them with makeup afterwards, *id.* ¶192.

### 3.    The Second Incident – The Parties Are Re-Interviewed

Despite the evidence, the panel conducted a highly confrontational re-interview of Doe and a highly deferential re-interview of Roe. *Id.* ¶194. Roe incredibly testified in her second interview (without realizing the problem) that the oral sex preceded the vaginal sex—the *exact opposite* of what she'd earlier said, regarding the very heart of her claim. *Id.* ¶196. And the panel, rather than confront her on that, instead asked if she just "didn't really remember the order that things happened," a lifeline Roe grabbed. *Id.* As to Student F's phone records, Roe responded that she "didn't know if she would have gotten a notification" from the texts, but gave *no explanation at all* why she wouldn't have heard the call. *Id.* ¶197. Incredibly, the panel didn't push back, even though Doe, before seeing *any* evidence, had already testified about Roe telling him to ignore the call. And as to the pictures proving Roe had covered Doe's neck with hickeys, the panel tried to help Roe bridge the gap between her testimony and the evidence, asking her if the "hickeys," plural, that she gave him accorded with the "hickeys" in the photo—even though they knew she'd said Doe asked for "a" hickey and she'd given him "one." *Id.* ¶198.  Doe, by

contrast, was *grilled* about perceived discrepancies in his testimony, all about entirely peripheral topics. The panel, for instance, spent extended periods challenging Doe on the identity of a drunken student he'd helped months earlier—an act for which he'd literally *received an award*—and about when he learned he'd been rejected from a certain eating club. *Id.* ¶¶201-04.

### 4.      The First Decision

The panel's first decision found Doe not responsible for the pre-frosh incident and responsible for everything but the hickey in the second. It took a large number of wholly unsupported steps to find Doe responsible. To insulate Roe's obvious lies about the first incident from the second, it said it was conducting "independent credibility assessments" for each incident—which makes no sense on its face. *Id.* ¶215. It further insulated the second incident by finding Roe largely credible as to the first incident, based mostly on things that showed she wasn't. *Id.* ¶216. It found her credible *because* she admitted to memory loss—even though she invoked it purely opportunistically. *Id.* ¶217. It found her credible *because* she'd omitted—but belatedly acknowledged—a fact that completely contradicted her story: Doe respecting her "no" to intercourse. *Id.* ¶218. And it said *nothing* about the large amount of third-party evidence that contradicted Roe. *Nothing* about the multiple friends who said she described it as a hook-up. *Nothing* about the friend who said it was a favor for letting her sleep there. *Nothing* about her interest in Doe the next year. *Nothing* about her consensually kissing him on February 7.

The panel's reasons for finding Roe credible as to the second incident were even stranger. As to the change in the very heart of her story, the panel found that it *bolstered* her credibility, because Roe explained it by saying she had memory impairment, *id.* ¶233—even though she gave that excuse only *after* realizing the contradiction and being offered a lifeline. It found that the testimony of her friends—who contradicted her repeatedly—*bolstered* her credibility simply

because she'd generically told them the incident was nonconsensual, and said it was simply disregarding Student H's testimony—even though he was the only witness in the whole case who'd taken *contemporaneous notes*. *Id.* ¶225. It credited Roe's risible claim that her "celibacy pledge" referred only to *kissing*. *Id.* ¶232. It found her "not credible" as to only one thing: her claim that she gave Doe hickeys because she just "kept going" so she could leave.  *Id.* ¶222.

The panel did the opposite with Doe: It found him largely *not* credible based on peripheral testimony that had absolutely nothing to do with what happened in that room. *Id.* ¶240-42. They also found him "not credible" based on two things that showed overt gender bias. First, they found it implausible that Roe, as a virgin, would have helped Doe put a condom on or have been upset when he said he wanted to stop having sex. *Id.* ¶236. The panel never explained why it thought someone wouldn't have been upset to have their partner suddenly stop *in the middle of their first time having sex*; that "logic" only made sense on the archaic assumption that only women (but not men) are sometimes conflicted about losing their virginity. Second, they concluded that Doe's story about an aggressive Roe was "completely contradictory to her words and actions in the following days." *Id.* ¶237. It never addressed the flip side: that the story of a passive Roe was also "completely contradictory to [*Doe's*] words and actions" to multiple friends "in the following days," suggesting that the tie went to Roe because of the archaic assumption that women usually aren't sexually aggressive. The panel then made the following findings: (1) Roe said no "ten or more times" to kissing and foreplay; (2) within a "few minutes" of that, Doe forced her to perform oral sex; (3) he then forced her to perform vaginal sex; (4) he then asked for "a" hickey, and Roe complied "ardent[ly]."  *Id.*  ¶303.

5.      **Appeal and Remand**

Doe appealed, documenting the many things showing Roe was not credible. *Id.* ¶¶248-49.  The matter was remanded to the *same panel* for further investigation into the "procedural unfairness" he had identified, despite the evident bias in its work. *Id.* ¶251. It responded by concocting even more excuses for Roe and thinking up creative ways to discredit Doe.

On remand, Roe contradicted her earlier testimony on absolutely critical points, saying:

- That Doe had, as it happened, *not* physically forced her to perform oral sex during the first incident, but that it was "more of a suggestion because he thought he was teaching me," *id.* ¶253—a 180 from the wall-to-wall abuse she'd alleged in her first interview.

- That she *never* told Doe she wanted to leave his room (as she'd claimed before). *Id.* ¶258.

- That she may have told Doe she was a virgin during the second incident—something she *expressly denied* telling him in her pre-remand interviews. *Id.* ¶259.

- That she *did* actually ask him to get a condom, and that he complied. *Id.* ¶261.

- That she "maybe" gave him hickeys on his bed before any sex—another 180. *Id.* ¶264.

Roe also further undermined her credibility by admitting:

- That she deleted relevant text message evidence *during the investigation*. *Id.* ¶254.

- That she couldn't explain why Student H—her "best friend" who'd taken contemporaneous notes—completely contradicted her story to Princeton. *Id.* ¶255.

The panel failed on remand to pursue witnesses who might further undermine Roe. It did not speak again with Student H despite his explosive testimony and status as Roe's "best friend." And when Roe claimed that she'd reported Doe when she did after she'd heard Student GG say concerning things about him, it never bothered to check that story with Student GG. *Id.* ¶291. Instead, the panel spoke to multiple witnesses to try to undermine *Doe* on the same peripheral topics. *Id.* ¶¶268-75. It failed. Student D confirmed that Doe had merely *suspected* he'd been rejected from that eating club (only because he'd been accepted into another) but didn't learn for

sure until the following day. *Id.* ¶268. Student L continued to insist he'd seen Doe and Roe when they got back—something Doe twice told the panel he couldn't remember either way. *Id.* ¶¶274-75. By the end of the remand, the panel had spoken to 17 Roe witnesses and nine Doe witnesses. *Id*. ¶278. They asked seven of those nine (78%) whether Doe or his advisor had contacted them or influenced them; they didn't ask that same question of *any* of Roe's 17. *Id.* ¶279.

### 6.      The Second Decision

The panel's decision on remand was deeply cynical—a transparent effort to throw Roe a bone and find Doe responsible for *something*, despite overwhelming evidence that Roe was not credible and Doe was innocent. They again found Doe largely not credible based on peripheral reasons (the eating club rejection and whether he'd helped a drunken student in the past), ignoring the evidence that showed the opposite. *Id.* ¶296. The panel went to even greater lengths to find Roe as credible as they could. They again praised her for being "candid" about her memory impairment, even though she'd invoked it primarily to explain away contradictions. *Id.* ¶286. They again found that Students H and I *bolstered* her credibility, despite the completely different stories they told and despite not bothering to speak to them on remand about the discrepancies between their statements and Roe's versions of events. *Id.* They credited Roe's claim that she reported when she did because of Student GG's concerns, despite not trying to talk to Student GG and despite Student R reporting that Student GG described *positive* interactions with Doe. *Id.* And they said nothing—literally nothing—about the enormous new contradictions Roe told on remand, including the complete 180 she did as to the first incident.

Instead, the panel announced a novel and completely unexplained credibility standard—it would choose to credit Roe on anything she claimed to "clearly and consistently recall[]," as though each of her statements existed in a complete vacuum. *Id.* ¶282. *Yet the panel never*

14

*explained why it would not apply the same standard to Doe.* It then concluded that since Roe never contradicted her statement about telling Doe "no" "ten or more times," she must be telling the truth about it. *Id.* ¶299. Which meant that the kissing and foreplay were *not* consensual.

But the hickeys were a problem. Roe had given them "ardent[ly]," as the panel was forced to admit given the pictures. So they couldn't have come right after the "ten or more" "no's"—it would be "implausible" for her to do something so affirmative so soon after saying "no," reasoned the panel. Significant *time* had to pass. But since Roe *herself* had admitted that they "maybe" came before oral sex, the panel had a problem: In its first decision, it had found that only a "few minutes" passed between the "no's" and the oral sex—which now meant that, in those "few minutes," all of the following had to happen: 1) some time had to pass, 2) Roe had to have time to give several "ardent" hickeys, 3) the parties had to take their clothes off, and 4) the oral sex had to begin. On remand, even the panel knew that compressed timeline didn't make sense. So *it tried to hide that impossible timeline* by omitting the "few minutes" finding *entirely*.

The panel then found that since the hickeys "maybe" came before the oral sex, and since oral sex is *active*, Doe could have thought the oral sex was consensual. *Id.* In turn, since the *oral sex* might have seemed consensual, and since Roe was on *top* for the *vaginal* sex (never mind what she'd told Students H and I), the *vaginal sex* could have seemed consensual, too. *Id.* **To find Doe responsible for *something*, the panel thus concluded that hickeys—which are essentially just long kisses—were evidence of consent to *oral sex*, but not to *kissing*.** Doe appealed that absurd ruling; it was denied in boilerplate fashion. *Id.* ¶313. This lawsuit followed.

## STANDARD OF REVIEW

"On a motion to dismiss, a court must accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Princeton III*, 30 F.4th at 340

(citation and quotation marks omitted). A complaint survives a motion to dismiss when the pleaded facts "support a plausible inference" of a legal wrong. *Id.* at 343. "The plausibility standard is not akin to a 'probability requirement,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), nor must legal wrongdoing be "the only plausible explanation . . . or even the most plausible . . . to survive a Rule 12(b)(6) motion to dismiss," *Princeton III*, 30 F.4th at 344. A complaint states a plausible claim when there is "more than a sheer possibility" of a legal violation, even if other explanations are plausible. *Iqbal*, 556 U.S. at 678. "There is no heightened pleading standard for Title IX claims." *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020)

## ARGUMENT

Princeton's motion is an exercise in willful amnesia: Nearly all of its arguments are foreclosed by the Third Circuit's decision just last year in *Princeton III*. Princeton flees from that decision in head-scratching ways. It relies heavily, for example, on an unpublished district court decision that dismissed a Title IX claim—only to *reinstate* it in a subsequent decision that Princeton entirely fails to mention, once the plaintiff added precisely the kinds of facts Doe alleges here.[4] And it takes a "siloing" approach to bias allegations that *Princeton III* expressly rejected. *Compare* Mot. at 14-16, 20, with *Princeton III*, 30 F.4th at 345. Princeton's Motion should be denied under a straightforward application of *Princeton III.*

---

[4] *Compare* Mot. at iii (noting heavy reliance on dismissal of complaint in *Doe v. Rider Univ.*, No. 3:16-cv-4882, 2018 WL 466225 (D.N.J. Jan. 17, 2018)) (*Rider I*) with *Doe v. Rider Univ.*, No. 3:16-CV-4882, 2020 WL 634172 (D.N.J. Feb. 4, 2020) (*Rider II*) (allowing amended Title IX claim to proceed after plaintiff added allegations that the university "accepted inconsistent female testimony over [the male student's] during [the] investigation"; that "a gender stereotype adverse to males charged with sexual assaults existed at Rider"; and that "in addition to the external pressures applied to colleges and universities since the 2011 Dear Colleague Letter, Plaintiff alleges and has provided evidence that Defendant's officials and student body has demonstrated concerns for protecting female victims of sexual assault."). *Rider II* at *10.

I.       **THE COMPLAINT AMPLY STATES A TITLE IX CLAIM.**

Title IX "is a broadly written general prohibition on discrimination." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 175 (2005). Among other things, it "bar[s] the imposition of university discipline when sex is a motivating factor in the decision to discipline." *Doe v. Univ. of the Sciences*, 961 F.3d 203, 209 (3d Cir. 2020) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). As in related contexts, sex bias is a "motivating factor" when it is responsible for a decision "at least in part." *Columbia Univ.*, 831 F.3d at 56 (plaintiff stated Title IX claim where allegations made it plausible to infer that "biased attitudes were, at least in part, adopted to refute criticisms . . . that Columbia was turning a blind eye to female students' charges of sexual assaults"); *cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (Equal Protection Clause "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes"). And as in other contexts, the question under Title IX is not whether a single factor, standing alone, is sufficient to support an inference of discriminatory bias, but whether "the total mix of information" does. *Princeton III*, 30 F.4th at 345; *Univ. of the Sciences*, 961 F.3d at 211 (allegations of nationwide pressure under DCL regime "combined with" allegations of procedural irregularities "state[] a plausible claim of sex discrimination"); *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018) (combination of disparate impact evidence and generic nationwide pressure supported inference of gender bias).[5] When procedural irregularities are extreme or a disciplinary outcome seems inexplicable, even minimal evidence of sex-based influence is enough to state a claim. *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020) ("But when the degree of doubt [about

---

[5] *See also Doe v. The George Washington University*, 366 F. Supp. 3d 1, 3 (D.D.C. 2018) ("combination of" evidence sufficed "to avoid dismissal at this point in the litigation"); *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 608 (S.D. Miss. 2019).

an outcome] passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias."); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination") (emphasis in original).

A. **The Complaint Readily Pleads a Title IX Claim Under the Third Circuit's Decisions in *U. Sciences* and *Princeton III*.**

Twice in three years, the Third Circuit has reinstated Title IX claims when male plaintiffs alleged the conjunction of two things: (1) the application of different standards of analysis to them than to female complainants; and (2) the existence, at the time of that differential treatment, of pressure on the school to aggressively enforce Title IX. First, in *Doe v. University of the Sciences*, a male college student who was charged with assaulting two intoxicated female students alleged that they (and one female witness) should have been charged as well because he was as intoxicated as they were at the time of their sexual activity. *Univ. of the Sciences*, 961 F.3d at 210-11. The court found that the school's application of one charging standard to the plaintiff and another to the female students plausibly stated a Title IX claim when "combined with" nothing more than allegations about the DCL regime's nationwide pressure on schools (not, as here, additional allegations of targeted pressure at the time of the proceeding). *Id.* at 211.

Even more on point is *Princeton III*, which held that Princeton's application of different standards of treatment to a female complainant and a male respondent, combined with nothing more than the pressure on Princeton in 2019 "to respond aggressively and 'over-correct' by favoring protection of female accusers at the expense of finding male respondents guilty," sufficed to state a claim for gender bias. 30 F.4th at 344-45. The different standards consisted of

18

(1) the claim that Princeton encouraged the female complainant to file a report but steered the male respondent toward counseling services based on similar conduct; and (2) the claim that respondent's violation of a no-contact order during the proceeding was dealt with more harshly than the complainant's violation of the order on a different occasion. *Id.* at 344. Unlike in *U. Sciences*, the differential treatment did not involve multiple female comparators; it concerned only the differential treatment between the complainant and the respondent.

Doe amply states a Title IX claim under *U. Sciences* and *Princeton III*, which is presumably why Princeton spends so much time arguing from nonbinding district court opinions and out-of-circuit precedent.[6]

### 1. The Pressure on Princeton During Doe's Proceeding Was Exactly the Same Pressure Found in *Princeton III*.

Given that Doe's proceeding occurred at the exact same time as the one in *Princeton III*, the Third Circuit has already held that the kind of pressure Princeton was under back then supplies evidence of gender bias. Doe, in any event, amply pleads evidence of that pressure. He alleges facts supporting the plausible inference that the DCL regime was geared towards protecting female complainants. Compl. ¶¶57-58. That is not a controversial position: courts across the country have repeatedly said that regime supplies evidence of *gender* bias, even years

---

[6] In the Title IX section of its brief, Princeton most frequently cites not to *U. Sciences* or *Princeton III*, but instead to two district court cases (*Rider I* and *Gendia v. Drexel University*) and an out-of-circuit appellate decision (*Samford*) that expressly "modifi[ed]" the plausibility standard that *U. Sciences* adopted for *this* circuit. *Doe v. Samford Univ.*, 29 F.4th 675, 687 (11th Cir. 2022). As already noted, Princeton ignores that the *Rider* court reinstated the accused student's Title IX claim precisely when allegations like Doe's were added. The *Gendia* plaintiff alleged no gender-based pressure of *any* type—not from the federal government or on campus. *See* Complaint, *Gendia v. Drexel Univ.*, No. 2:20-cv-01104 (E.D. Pa..), ECF 1. And *Samford*, besides adopting a different pleading standard for that circuit, involved a case with *no* allegations that the DCL regime's pressure continued after the DCL's rescission (unlike here), *no* allegations of any other gender-based pressure on the school (unlike here), and a rationale that was entirely explicable (unlike here). *Samford Univ.*, 29 F.4th at 691.

19

after it was withdrawn. *See, e.g.*, *Doe v. Regents of the Univ. of Cal.,* 23 F.4th 930, 937 (9th Cir. 2022); *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106 (2d Cir. 2022).[7] He then explains how Princeton students demanded that that regime persist even when the DCL was withdrawn, how they did so in ways showing they understood its purpose as the protection of women, and how Princeton indicated its desire to comply. Compl. ¶¶65, 67-71. And just months before his proceeding in 2019, there was an eruption of pressure on campus to *exceed* those parts of the DCL regime and to blame sexual assault on things like "toxic masculinity." *Id*. ¶¶73-77. Finally, Doe explains how Princeton caved to that pressure and commissioned two studies of its Title IX process that—just *weeks* before his proceeding began—issued reports likewise stating that Princeton needed to respond to sexual assault by confronting such things as (yes) "toxic masculinity." *Id*. ¶78. That pressure far exceeds the kind of targeted pressure on a school that courts routinely find shows evidence of gender bias.[8] It is why *Princeton III* found a claim to be stated based on nothing more than that pressure and the differential treatment of the parties.

Princeton offers a number of half-hearted responses that run headlong into *Princeton III.* They insist that the pressure on Princeton in 2019 was merely "pro-complainant" pressure, not pro-woman or anti-man. Mot. at 24. They argued the same thing in *Princeton III*;[9] the court concluded otherwise. *Princeton III*, 30 F.4th at 345. And Doe's allegations are replete with

---

[7] *See also Collick v. William Paterson Univ.*, No. 16-471 (KM) (JBC), 2016 WL 6824374, at *12 (D.N.J. Nov. 17, 2016), adhered to on denial of reconsideration, No. CV 16-471 (KM) (JBC), 2017 WL 1508177 (D.N.J. Apr. 25, 2017), and aff'd in part, remanded in part, 699 F. App'x 129 (3d Cir. 2017) (when analyzing the impact of the Dear Colleague letter, "it is no more than a commonsense inference that the public's and the policymakers' attention to the issue of campus sexual assault may have caused a university to believe it was in the spotlight").
[8] *See, e.g.*, *Doe v. Regents of the Univ. of Minn.*, 999 F.3d 571, 578-579 (8th Cir. 2021); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. February 28, 2017).
[9] *Doe v. Princeton Univ.*, No. 21-1458, ECF No. 27 at 30 (3d Cir. June 17, 2021) (arguing that the 2019 student protests at Princeton showed only "bias in favor of victims or complainants").

references to Princeton's protecting *women* and attacking *masculinity*, making gender bias a plausible inference, even if pro-complainant bias is also plausible.[10] Princeton also notes that the DCL was rescinded before Doe's proceeding took place, Mot. at 26—but that, again, was also true in *Princeton III*, and Doe in any event pleads how students and administrators picked up the mantle for the DCL regime after the government dropped it. Princeton further argues that Doe doesn't explain how this pressure connected to his specific proceeding. Mot. at 28. But neither did the plaintiffs in *Princeton III* or *U. Sciences*, and courts have repeatedly rejected that argument at the pleading stage when schools (understandably) push it. *See, e.g.*, *Oberlin Coll.*, 963 F.3d at 586. Princeton's reliance on an unpublished district court decision that *predates Princeton III* on this point, Mot. at 28 (citing *Verdu v. Trs. of Princeton Univ.*, No. 19-12484, 2020 WL 1502849 (D.N.J. Mar. 30, 2020)), when *Princeton III* held the opposite, is telling.[11]

### 2. Doe Pleads Greater Evidence of Differential Treatment Than What the Court Relied on in *Princeton III*.

Doe also pleads more evidence of differential treatment than the *Princeton III* court relied on in reinstating that Title IX claim. He alleges differential treatment not only about the decision to *charge* him, but regarding the far more consequential decision to *find him responsible*:

---

[10] *See Regents of the Univ. of Minn.* at 579 ("While the circumstances here also give rise to a plausible inference of bias in favor of sexual assault victims rather than against males, '[s]ex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed" (citing *Schwake*, 967 F.3d at 948 and *Columbia Univ.*, 831 F.3d at 57); *Doe v. Dordt Univ.*, No. 19-CV-4082 CJW-KEM, 2022 WL 2833987, at *17 (N.D. Iowa July 20, 2022) (rejecting the pro-complainant argument at summary judgment); *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 823-24 (E.D. Pa. September 13, 2017).

[11] Princeton also fails to mention that in affirming *Verdu*, the Third Circuit *refused to rely* on *Verdu's* loose language about when pressure can supply evidence of gender bias. *See Verdu v. Trs. of Princeton Univ.*, 2022 WL 4482457, at *3 (3d Cir. Sept. 27, 2022).

- Applied a credibility standard to Roe (credible as to any discrete, non-contradicted item) that it did not apply to Doe, even though they both were found "not credible" as to certain items of testimony and Roe's contradictions were far more numerous and material.

- Applied different standards of questioning to the parties, aggressively questioning Doe on minor discrepancies but doing the opposite regarding Roe's major ones.[12]

- Applied different standards to their re-investigation on remand, aggressively pursuing witnesses they thought would undermine only Doe (Student L and the campus safety officer) but not witnesses that could undermine only Roe (Students H and GG).[13]

- Approached Doe's witnesses with a skepticism they did not apply to Roe's, probing them (but not Roe's) on whether they'd been unduly influenced.

- Applied a different standard to each party's supporting witnesses—finding that Roe's friends *all* bolstered her credibility (even those that contradicted her) while refusing to do the same for Doe's.

That differential treatment could hardly have been more consequential. Even if there were no other evidence of gender bias in his proceeding, that evidence would already exceed what *Princeton III* found sufficient to state a Title IX claim there.

Princeton's only effort to distinguish Doe's case from *Princeton III* on this point is to note that there, the differential standard involved whether to *initiate* a formal disciplinary process. Mot. at 19. That is a factual difference without legal significance: Title IX "'bar[s] the imposition of university discipline when sex is a motivating factor in the decision ***to discipline***,'" not simply the decision *to charge. Princeton III*, 30 F.4th at 343 (emphasis added) (quoting *U.*

_____

[12] Courts widely recognize accusatory or imbalanced questioning as evidence of gender bias. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (citing "the panel members' hostility toward John" as "further support[ ] . . . that Jane's allegation was all they needed to hear to make their decision"); *Doe v. Columbia Univ.*, 831 F.3d at 49 (allegation that investigator showed "hostility" to respondent supported plaintiff's Title IX claim).

[13] Princeton implicitly acknowledges that "fail[ing] to gather potentially exculpatory evidence" is a traditional source of gender-bias evidence but claims that did not happen here. Mot. at 19. That's simply false: Doe specifically alleges that the panel failed to interview Student GG after hearing (from Student R) that Student GG said the exact opposite about her interactions with Doe than Roe claimed, Compl. ¶291, and also failed to re-interview Student H after Roe denied telling him what he testified to (*and took notes about*), *id.* ¶¶257, 267.

*Sciences*, 961 F.3d at 209). To be sure, differential treatment about whether to charge someone is strong evidence of bias—but differential treatment regarding how the evidence is then collected and evaluated, how credibility is determined, and how responsibility is determined, is far worse. And the stronger the evidence of bias, the less additional evidence a plaintiff needs to plausibly suggest that the bias was due to sex. *See Menaker*, 935 F.3d at 33 (in presence of clear procedural irregularities, only "minimal" evidence of sex-based influence is required). In *Princeton III*, where the differential treatment relied on by the Court pertained only to the decision to *charge* the plaintiff, the plaintiff still stated a claim because of the unique pressure Princeton was under in 2019. All the more does Doe state a claim here.

### B. The Complaint Pleads Sources of Gender Bias Even Beyond What Existed in *U. Sciences* and *Princeton III*.

Doe also pleads other facts widely recognized as supplying evidence of gender bias.

1. An "inexplicable" rationale. Multiple courts of appeals have recognized that when the rationale for disciplining a student is irrational, illogical, or departs significantly from the evidence before the decisionmaker, the rationale itself supplies evidence of gender bias. *See, e.g.*, *Oberlin Coll.*, 963 F.3d at 587 (as a "matter of common sense," the "merits of [a] decision itself," when it is "arguably inexplicable," is strong evidence of bias).[14] That is the norm in anti-discrimination contexts.[15]

---

[14] *See also Doe v. Univ. of Ark.*, 974 F.3d 858, 864 (8th Cir. 2020) (outcome "against the substantial weight of the evidence set forth in the complaint" is evidence of gender bias); *Purdue Univ.*, 928 F.3d at 669 ("perplexing" decision is evidence of gender bias); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 587 (E.D. Va. 2018) (crediting complainant's testimony given contrary evidence is evidence of gender bias); *Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016).
[15] *See, e.g.*, *Vill. of Arlington Heights*, 429 U.S. at 267 (factors to consider in determining whether "discriminatory purpose was a motivating factor" under Equal Protection Clause include "[s]ubstantive departures" from the evidence, "particularly if factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached").

23

And Princeton's rationale truly *was* inexplicable. For example:

- It found Roe credible even though she contradicted her story about the first incident (which the panel never even mentioned[16]), flipped the order of oral and vaginal sex in the second incident (which the panel said somehow *bolstered* her credibility), lied about the number of hickeys and why she gave them, lied to the only two friends with whom she shared details, and destroyed evidence during the proceeding.

- It found Doe *less* credible than Roe based on "discrepancies" that were not discrepancies at all,[17] and which, even if they were, were on peripheral issues.

- It found Roe, despite her proven contradictions on *central* topics, credible as to any discrete item she "consistently" recalled. Compl. ¶282. Doe, despite his (purported) contradictions on *peripheral* topics, was not given that courtesy, without explanation.

- It found that Doe's *kissing* Roe was nonconsensual, based purely on that made-up credibility standard. But it then found that *Roe's* kissing *Doe* was reasonable evidence of consent to *oral sex*, but not to the prior *kissing*.

- For that to even theoretically make sense, Roe's kissing (the hickeys) had to reasonably seem consensual to Doe. Which means a substantial amount of time would had to have passed from Roe saying "no" "ten or more times" to her starting to give those *consensual* hickeys. And the hickeys themselves—being long, dark, and numerous—would take a long time to give. Plus, the parties' clothes had to come off before they could have oral sex. *But the panel, in its first decision, concluded that only a "few minutes" passed from the "no's" to the oral sex*, leaving *no room at all* for this contrived timeline to take place.

- So the panel, in its *second* decision, *took out the "few minutes" finding*, recognizing that its new decision was impossible to square with that timeline.

In sum, Princeton concluded that: (1) shortly after saying no "ten or more times" to Doe kissing *her*, Roe *consensually* kissed *Doe*; and (2) that kissing was evidence of consent to something far more intimate—oral sex—but not to *kissing*. And to make room for that finding, it deleted one of

---

[16] *See Oberlin Coll.*, 963 F.3d at 587 ("the failure of the hearing panel even to comment on the flat contradiction" by complainant was a "[p]rocedural irregularit[y]" that "provide[d] strong support for Doe's claim of bias").

[17] *See, e.g.*, Compl. ¶268 (explaining evidence showing Doe did not know of eating club rejection until following day); *id.* ¶242 (explaining third-party evidence showing he helped Student Y); *id.* ¶206 (explaining Doe didn't claim to remember seeing Student L and conceded Student L "*likely was not there*"); ECF No. 24-5 at 6 (panel falsely claiming Doe thought he had a "specific recollection[]" of Student L being there).

its earlier findings *sub silentio*. **Because the truth is that, for Roe to have given hickeys in the "few minutes" before the oral sex, she would had to have started *right at the beginning— just as Doe consistently testified.*** Every step in that rationale is inexplicable, departs radically from the evidence before the panel, and supplies additional evidence of gender bias.

   2. <u>Archaic assumptions about gender.</u>  Courts also recognize that reasoning that seems to rely on archaic assumptions about how men and women behave also supplies evidence of gender bias.  *See Marymount*, 297 F. Supp. 3d at 586; *Doe v. Washington & Lee Univ.*, 2021 WL 1520001, at *14 (W.D. Va. Apr. 17, 2021); *Doe v. Grinnell College*, 473 F. Supp. 3d 909, 927-29 (S.D. Iowa July 9, 2019). The panel's reasoning betrayed precisely that when it concluded that because Roe was a virgin, she would not have been upset when Doe said he wanted to stop having sex.  Compl. ¶236. Only two things can possibly explain that conclusion: (1) the panel thought that virgins *in general* do not get upset when their partner wants to stop when they're in the middle of losing their virginity; or (2) the panel thought that *female* virgins in particular tend to react that way. The first—that *most* virgins, in taking the momentous step of deciding to have sex for the first time, would not be upset at their partner's stopping it mid-way—is nonsensical. The second plays into antiquated tropes about female virginity and women's sexual desires. Even if it is plausible to infer that the panel somehow held the first explanation, it is also plausible (if not likely) that they held the second. That is enough at this stage.  *Princeton III*, 30 F.4th at 344.

   The panel's conclusion that Roe's words and actions in the days after the second incident "completely contradict[]" Doe's story, and thus prove Roe had not been sexually aggressive, are also plausibly based on archaic ideas about female sexuality. *Id.* ¶237. Doe's immediately and consistently telling friends about an aggressive Roe who gave him hickeys he didn't want just as "completely contradict[s]" Roe's version of events. Especially in light of the idea that Roe, as a

female virgin, was okay with the sex stopping, it is at least plausible to infer that this tie went to Roe because of the archaic view that women are not usually sexually aggressive.

Princeton makes zero effort in its Motion to address these facts. It tries to dodge the matter by falsely claiming that the Complaint does not "explain how" those facts betray archaic assumptions. *Compare* Mot. at 21 with Compl. ¶¶ 236, 319. But even if it didn't, there's no requirement that it do so; a complaint need only "allege facts *that* . . . support a plausible inference," *Princeton III*, 30 F.4th at 343 (emphasis added), not explain how they do so.

## II.   THE COMPLAINT STATES CLAIMS FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT.

Princeton's amnesia is just as strong when it comes to Doe's breach of contract and breach of the implied covenant claims.  *Princeton III* allowed such claims to proceed based on the exact same allegations about the exact same Policy that Doe makes here.

### A.   Doe's Breach of Contract Allegations Mirror Those in *Princeton III.*

First, after a lengthy analysis of how New Jersey contract law requires that private universities provide "fundamentally fair" proceedings to students, *see Princeton III*, 30 F.4th at 345-47, *Princeton III* found that the plaintiff there adequately alleged violations of the Policy's promises to determine responsibility "by a preponderance of the evidence" and to provide "impartial and unbiased panelists." *Princeton III*, 30 F.4th at 347. The former, the court held, was satisfied by the plaintiff's allegations that Princeton, while *claiming* to apply the preponderance standard, in fact "disregard[ed] evidence that tended to inculpate Roe and exculpate Doe." *Id.* Doe exhaustively alleges that Princeton did exactly that here. *See, e.g.*, Complaint ¶¶282-86 (panel created credibility standard for Roe that defied the evidence); *id.* ¶296 (panel found Doe not credible based on peripheral "inconsistencies"); ECF No.24-5 (second panel decision) at 5-6 (panel said literally nothing about Roe's massive contradiction on

26

remand about the first incident); Compl. ¶¶267, 284 (panel disregarded Student H's damning

testimony without explanation and failed to re-interview him); *id.* ¶232 (panel credited Roe's

nonsensical explanation about her "celibacy pledge"); *id.* ¶195-96, 319 (panel aggressively

questioned Doe about minor apparent discrepancies while offering lifelines to Roe when she

made critical contradictions); *id.* ¶¶290-91 (panel refused to interview Student GG despite Roe's

claim about why she reported Doe and Student R's conflicting testimony). His Complaint

overwhelmingly states a breach of this provision.

As to the second contract claim in *Princeton III*—failure to provide "impartial and

unbiased" panelists—the court first examined the ordinary meaning of those terms, then

concluded the plaintiff met his burden by alleging that his panel did the following three things:

1. "applied inconsistent standards to assess [Roe]'s and [Doe]'s credibility";

2. "overlooked or minimized glaring and substantial factors that would tend to undermine [Roe]'s veracity . . . including . . . her motivations to lie"; and

3. "disregarded compelling exculpatory evidence which contradicted [Roe]'s allegations."

*Princeton III*, 30 F.4th at 347. As illustrated immediately above and more fully in the Complaint,

Doe alleges all of those things as well.  And like the plaintiff in *Princeton III*, he also alleges that

Princeton's process of entrusting both investigation and adjudication to the same body is

fundamentally unfair, which the *Princeton III* court concluded was further evidence of a breach

of contract. *Id.* at 348. Doe's contract claim is on all fours with the plaintiff's in *Princeton III*—a

plaintiff who, again, was litigating the same Policy as Doe, in a proceeding run by two-thirds of

Doe's own panelists, and at the same time.  Princeton's Motion simply ignores all of that.

**B.    Doe's Breach of the Implied Covenant Claim Also Mirrors *Princeton III*.**

Princeton similarly tilts at windmills in opposing Doe's breach of the implied covenant

claim. *Princeton III* allowed that kind of claim to proceed based on allegations that Princeton

27

"[s]ubject[ed] [Doe] to a discriminatory disciplinary process," "[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against [Roe]," and "constru[ed] all discrepancies and inconsistencies in [Roe's] favor." *Princeton III*, 30 F.4th at 348. As explained above, Doe amply pleads facts showing those same things.

Princeton's response is to raise three arguments that ask the Court to overrule *Princeton III.* It first argues that the implied covenant claim fails because the Policy "is not a traditional 'contract.'" Mot. at 34. But the Third Circuit has already held that contractual principles govern the 2019 Policy's application and allowed such a claim to proceed. *Princeton III*, 30 F.4th at 348. Princeton's second argument—that Doe's allegations, even if they show error, do not show Princeton acted in bad faith—runs up against *Princeton III's holding* that the kinds of allegations at issue here "suggest[] the University acted in bad faith." *Id.* And finally, Princeton's argument that the factual overlap between Doe's contract and covenant claims is fatal to the latter, *see* Mot. at 35-36, was also expressly rejected by *Princeton III*. *See Princeton III*, 30 F.4th at 348 ("[F]actual overlap is not fatal"; court must "view the pleadings with liberality at this stage"). *Princeton III* held that the contract and covenant allegations in that case did not warrant dismissal of either due to their overlap. *Id.* The same is true for Doe's parallel allegations.

## III.   THE COMPLAINT STATES A CLAIM FOR NEGLIGENCE.

Finally, as to Doe's negligence claim, Princeton argues that it is barred by New Jersey's Charitable Immunity Act, which insulates non-profits like Princeton from liability for negligent conduct.  Mot. at 36-37. But the statute "immunizes simple negligence only, and not . . . grossly negligent behavior." *Hardwicke v. Am. Boychoir Sch.*, 188 N.J. 69, 97, 902 A.2d 900, 917 (2006) (internal quotation marks omitted); N.J. Stat. Ann. § 2A:53A-7(c). It is well-settled in New Jersey that "the difference between negligence and gross negligence is a matter of degree,"

not kind, and that the term "gross negligence" simply "denotes the upper reaches of negligent conduct." *Steinberg v. Sahara Sam's Oasis, LLC*, 226 N.J. 344, 363, 364 (2016). That the cause of action is styled "Negligence" rather than "Gross Negligence" is of no legal consequence. *See Draney v. Bachman*, 138 N.J. Super. 503, 510 (Law. Div. 1976)).

Because they differ only in degree, "the aggregation of alleged negligent acts or omissions may be considered in determining whether [a defendant's] conduct reached the level of gross negligence." *Steinberg*, 226 N.J. at 363. The Complaint identifies a host of acts—such as the rejection of live hearings (even after the DCL was rescinded), the use of biased and improperly trained panelists, and the decision to remand to the same panel—that a factfinder could find to have shown a willful disregard for the foreseeable consequences of Princeton's disciplinary process. *Steinberg*, 226 N.J. at 364 (defining "gross negligence" as "the failure to exercise slight care or diligence"). Whether they rise to that level is a task for the factfinder. *Stuyvesant Assocs. v. Doe,* 221 N.J. Super. 340, 344, 534 A.2d 448 (Law Div. 1987) ("difference between negligence and gross negligence . . . must be determined by the finders of fact").

Princeton also argues that Doe's negligence claim should be dismissed because there is no underlying duty of care. Mot. at 37-40. Princeton failed to give notice of this basis of dismissal in seeking to waive the prehearing conference. *See* ECF. No. 17 at 2-3 (identifying the Charitable Immunity Act as the only contemplated basis for seeking dismissal of Doe's negligence claim). The Court should therefore disregard it. *See* ECF No. 23 (Text Order, Dec. 17, 2022) (stating that Princeton's motion shall be "limited to the bases articulated in its letter"). The argument also fails on its merits—courts across the country have recognized that private universities have common law duties of care in disciplining students that pre-date (and survive) whatever contractual promises they may also make. *See, e.g., Papelino v. Albany Coll. of*

29

Case 3:22-cv-05887-ZNQ-DEA   Document 26   Filed 01/23/23   Page 35 of 37 PageID: 526

*Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (denying college's summary judgment motion as to negligence and breach of contract claims because college "had a duty to administer the Honor Code proceedings in a fair and impartial manner" and reasonable jury "could conclude . . . that the College was negligent in its handling of the proceedings").[18] What they reject are negligence claims based on rights that exist *solely* by virtue of contract.

Even still, Princeton's primary argument why no duty of care exists—that "duty" requires a "special relationship" between the parties—misstates New Jersey law. Mot. at 37-38 (quoting *State v. Lisa*, 919 A.2d 145, 158 (N.J. Super. Ct. App. Div. 2007)). *Lisa* held that a "special relationship" is required for there to be an *affirmative duty to come to another's aid*, not for the existence of duty generally. *Lisa*, 919 A.2d at 158. The "indispensable cornerstone" of duty in New Jersey continues to be "foreseeable risk," and "[u]ltimately, whether a duty exists is a matter of fairness." *Dunphy v. Gregor*, 136 N.J. 99, 108 (1994). To state the obvious, it is eminently foreseeable that erroneous discipline poses substantial risks to students, and eminently fair to require schools to exercise reasonable care when disciplining them. For the reasons stated above, the Court should reserve full consideration of the "duty of care" question for a later time.

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that Princeton's Motion to Dismiss be denied in its entirety.

---

[18] *See also Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Docket No. 13 (D.S.D. June 16, 2016) (denying university's motion to dismiss negligence and breach of contract claims by student disciplined for sexual misconduct); *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104 at *21 (E.D. Tenn. March 31, 2011) (denying motion to dismiss negligence and breach of contract claims, holding that university owed common law duty to student disciplined for sexual misconduct "especially" because "the harm was severe: a wrongful conviction by a disciplinary committee").

Dated: January 23, 2023

Respectfully submitted,

KAISERDILLON PLLC

/s/ Justin Dillon
Justin Dillon (*pro hac vice*)
Christopher C. Muha (*pro hac vice*)
1099 14th St. N.W. - 8th Floor West
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

WARREN LAW GROUP

By: */s/ Jon-Jorge Aras*
Jon-Jorge Aras, Esq.
jj@warren.law
14 Penn Plaza, 9th Floor
New York, NY 10122
(212) 580-2303

*Counsel for Plaintiff John Doe*

31

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 23, 2023, I caused the foregoing to be served upon

counsel for the Defendant through the Court's CM/ECF system.


By: <u>*/s/ Jon-Jorge Aras*</u>
Jon-Jorge Aras, Esq.