UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHN DOE,

    Plaintiff,

       v.

PRINCETON UNIVERSITY,

    Defendant.

Civil Action No. 22-5887 (RK) (DEA)

**OPINION**

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon the Motion to Dismiss filed by Defendant Princeton University, (ECF No. 24),[1] seeking dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) of Plaintiff John Doe's Complaint. (ECF No. 1.)[2] Plaintiff filed a brief in opposition, (ECF No. 26), and Defendant filed a brief in reply, (ECF No. 32). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion to Dismiss, (ECF No. 24), is **GRANTED** in part and **DENIED** in part.

---

[1] Plaintiff named "Princeton University" as the Defendant in his Complaint. (*See* ECF No. 1.) Defendant notes in its Motion to Dismiss that the proper Defendant in the matter is actually "The Trustees of Princeton University." (ECF No. 24-1 at 1 n.1.)

[2] The Honorable Douglas E. Arpert granted Plaintiff's request to proceed under the pseudonym "John Doe." (ECF No. 38.) Further, the Complaint refers to the female complainant as "Jane Roe" in order to protect her identity, and the Court therefore refers to her as same throughout the Opinion.

## I.   **BACKGROUND**

This matter arises from Princeton University's ("Princeton" or the "University") investigation and sanction of a male student, John Doe's, alleged sexual misconduct against a female student, Jane Roe, on two occasions: once in October of 2017 and again in February of 2019. Following Roe's complaint against him, the University conducted a thorough investigation, interviewed both Doe and Roe multiple times, gathered evidence, and weighed testimony from a myriad of witnesses. Following an appeal and additional investigation on remand, ultimately, Princeton found Doe in violation of the University's sexual misconduct policy and sanctioned Doe to four months' probation and a mark on his permanent school records. Doe brings this suit, claiming, *inter alia*, that Princeton's investigation was permeated with gender bias against him in violation of Title IX.

### A.   FACTUAL HISTORY

#### 1.  The October 2017 Interaction

On October 14, 2017, Plaintiff, a Princeton student, met Jane Roe, a senior in high school, who was on Princeton's campus attending a prospective student's weekend. ("Compl.", ECF No. 1. ¶ 109) Plaintiff and Roe "immediately hit it off," and Plaintiff gave Roe a walking tour of campus. (*Id.* ¶ 111.) Following this walk, during which the parties consensually kissed, Roe asked Plaintiff if "she could stay the night in his room," as the student she was visiting was allegedly angry with her. (*Id.* ¶¶ 110–13.) Plaintiff agreed. (*Id.* ¶ 114.) Upon returning to Plaintiff's dormitory room, "Roe told Doe she did not want to have vaginal sex," but she agreed to give Plaintiff oral sex at his request. (*Id.* ¶¶ 116–17.) Afterwards, Doe and Roe exchanged contact information, and Roe slept on a couch in the common room in Plaintiff's dormitory room. (*Id.* ¶ 120.) Roe left the dormitory before Plaintiff awoke the next morning. (*Id.* ¶ 121.)

## 2. The February 2019 Interaction

Plaintiff and Roe stayed friendly following their initial meeting: they would "periodically exchange friendly messages," and Roe informed Plaintiff that she had been accepted to Princeton. (*Id.* ¶ 122.) Roe matriculated at Princeton in the Fall of 2018. (*Id.* ¶ 123.) When she "arrived at Princeton that fall, the dynamic between them changed . . . [as] Roe become bolder with respect to her feelings about Doe," telling him she was "[g]rateful to have [Plaintiff] in [her] life" and asking him on a date. (*Id.* ¶¶ 123–24.) On February 7, 2019, Plaintiff and Roe separately attended the same event at "a campus eating club called Quadrangle." (*Id.* ¶ 125.) Later that night, after briefly speaking earlier, Plaintiff "re-engaged [Roe] in conversation," and the two "wound up kissing for about five minutes." (*Id.* ¶ 126.)

During the evening, Roe sent a text message to a friend that she was "tempted to break a celibacy pledge she'd made." (*Id.* ¶ 128.) Roe followed this first text, which was riddled with typos, with "several coherent, nearly-typo free texts" to the same friend. (¶ 129.) Plaintiff alleges that one of Roe's friends asked if she wanted to leave, but Roe told him she wanted to stay. (*Id.*) Roe, who Plaintiff claims "showed no signs of severe intoxication," asked to go to Plaintiff's room. (*Id.* ¶ 127.) At 1:35 am, on the way to Plaintiff's room, Roe texted two friends, asking each to call her, even requesting one friend "insist I come back." (*Id.* ¶ 130.)[3]

Plaintiff alleges that upon reaching his dorm room, "Roe then became aggressive," "push[ing] [Plaintiff] down on the bed with both hands," "suck[ing] on [Plaintiff's] neck," and "aggressively perform[ing] oral sex on him." (*Id.* ¶ 131.) The parties then "decided to have sex," even though "Roe was a virgin, and Doe had only had sex with one girl." (*Id.* ¶ 132.) Roe assisted

---

[3] The Court notes that this asserted fact, in Plaintiff's own Complaint, appears to be cognizant that on the way to Plaintiff's dormitory, in real time, Roe exhibited some trepidation towards accompanying Plaintiff to his room and sought to make arrangements out of the situation.

Plaintiff in putting on a condom. (*Id.*) The parties then engaged in sexual intercourse. (*Id.*) At some point during the sexual encounter, Roe "chose not to answer or respond to" her friends who had texted her as she had asked. (*Id.* ¶ 133.) Shortly thereafter, Plaintiff "grew unnerved at how things had quickly progressed" and told Roe that "it wasn't a good idea to continue." (*Id.* ¶ 134.) Plaintiff and Roe heard laughter from the common area outside Plaintiff's room, and "Roe grew visibly disturbed" that others were just outside Plaintiff's room. (*Id.* ¶ 135.) Roe "quickly left," immediately called a friend, and began crying, "presumably upset at how she'd lost her virginity, culminating in the boys seemingly laughing at her." (*Id.* ¶ 136.) When Plaintiff rejoined his friends in the common room, he learned "that he had a large number of big, darkly colored hickeys on both sides of his neck." (*Id.* ¶ 137.) Plaintiff "texted a video of his neck," covered in hickeys, to a female friend asking for her help covering the blemishes. (*Id.*)

Following this interaction, Plaintiff and Roe had limited communications aside from Plaintiff "occasionally see[ing] things she posted on Instagram." (*Id.* ¶ 139.) In October 2019, Plaintiff had a relationship with another student, "someone Roe knew." (*Id.* ¶ 140.) After this relationship concluded, "and more than eight months after the second incident [between Plaintiff and Roe]—Roe filed a complaint with Princeton's Title IX office. (*Id.*) On October 27, 2019, Roe "alleged that Doe had physically forced her to perform oral sex on him in October 2017; had physically forced her to perform vaginal and oral sex in [February 2019]; and . . . had made her give him a hickey . . . in [February 2019] before allowing her to leave his room." (*Id.* ¶¶ 1, 140.)

### 3. Princeton's Policy

Princeton's code of student conduct is relevant to Roe's complaint, to Princeton's Title XI office, and to the instant litigation. Plaintiff and the University were bound to follow "Princeton's

4

code of student conduct entitled 'Rights, Rules, Responsibilities'" (the "Policy" or the "RRR"), to which Plaintiff had agreed upon enrolling at Princeton. (*Id.* ¶ 39; *see* ECF No. 24, Ex. 6 at 17.)

Section 1.3 of the Policy is entitled "Sex Discrimination and Sexual Misconduct." (*Id.* ¶ 41; *see* ECF No. 24, Ex. 6.) It "proscribed certain conduct by students at the University and established procedures for investigating and resolving claims of proscribed conduct." (Compl. ¶ 41.) This Policy prohibited, *inter alia*, "Non-Consensual Sexual Penetration;" "Non-Consensual Sexual Contact;" and "Sexual Harassment." (ECF No. 24, Ex. 6 at 18.) According to the Policy, consent was defined as "as the voluntary, informed, un-coerced agreement through words and actions freely given, which a reasonable person would interpret as a willingness to participate in mutually agreed-upon sexual acts." (*Id.* at 20.) Consent, however, could not be given when "a person is incapable of making an intentional decision to participate in a sexual act, which could include instances in which the person is in a state of incapacitation." (*Id.*) Incapacitation was defined, in the Policy, as "the state in which a person's perception or judgment is so impaired that the person lacks the cognitive capacity to make or act on conscious decisions," which could be caused by alcohol. (*Id.* at 21.)

The Policy prescribed that "[w]hen the Title IX Coordinator receives a complaint or report alleging that a student violated this policy, the Title IX Coordinator will appoint a three-person investigative panel of University administrators and/or investigators." (*Id.* at 34.) Following the panel's investigation, they will "determine, by a preponderance of the evidence, whether this policy was violated." (*Id.*) The Policy further stated that the "panelists will have training in investigating and evaluating" sexual misconduct allegations and will "be impartial and unbiased." (*Id.*)

At the conclusion of their investigation, the panelists would issue their report, and if the student under investigation (the "respondent") is found in violation, the "dean of undergraduate students and the deputy dean for academic affairs of the Graduate school [would] jointly determine the penalty." (*Id.* at 35.) The Policy sought "to complete the investigation and any resulting disciplinary process and provide notice of the outcome within 60 calendar days after the investigative panel's first interview of the complainant." (*Id.* at 32.) Both parties had the opportunity to appeal to the five-member appellate board, consisting of "the dean of the college, the dean of the Graduate School, the vice president for campus life, the chair of the Judicial Committee of the Council of the Princeton University Community, and another faculty member appointed by the president." (*Id.* at 35.)

### 4. Princeton's Investigation

Following Roe's Title IX complaint, Princeton began its investigation. (*Id.* ¶ 141.) It selected three panelists: "Associate Dean of Undergraduate Students Joyce Chen Smith, and investigators Randy Hubert and Walter Wright." (*Id.*) The panelists first interviewed Roe on November 26, 2019. (*Id.* ¶ 142.) Plaintiff's and Roe's description of their sexual encounters differed significantly. (*Id.*)

Regarding the October 2017 night, Roe stated she consumed copious amounts of alcohol rapidly; and "when her host stopped answering her texts, [Plaintiff] offered his couch for her to sleep on." (*Id.* ¶ 143.) Plaintiff, Roe claimed, became physical with her on the walk back to his dorm and then physically forced her to perform oral sex. (*Id.* ¶¶ 144–45.) Following the incident, Roe claimed she was "friendly" with Plaintiff "so it wouldn't be awkward" once she matriculated at Princeton. (*Id.* ¶ 146.) With respect to Plaintiff's and Roe's second encounter in February 2019, Roe "admitted that she kissed [Plaintiff]" consensually, and stated that "she asked [Plaintiff] to

take her home," to which he agreed to do, but only after they "check[ed] on his sick roommate." (*Id.* ¶¶ 148, 151.) Roe stated that once they reached Plaintiff's dorm room: "she said 'no' to kissing [Plaintiff]"; Plaintiff "ignored her 'no's' and then took her clothes off"; Plaintiff "then had vaginal sex with her, but that she was on top of him"; Plaintiff forced her to "perform oral sex on him"; and Plaintiff "made her give him a hickey" following the oral sex. (*Id.* ¶¶ 153–54.)

The panel interviewed Plaintiff on December 13, 2019. (*Id.* ¶ 158.) Plaintiff's recounting to the panel largely mirrors his recitation of facts contained in the Complaint here. Again, his account of their encounters differed greatly from Roe's. (*See id.* ¶¶ 159–65.)

After hearing from Plaintiff and Roe, the panel interviewed "a large number of witnesses," including those friendly to Plaintiff and Roe. (*Id.* ¶ 166.) Plaintiff alleges these witness interviews "undermined Roe's stories and confirmed Doe's." (*Id.*) For example, regarding the October incident, one of Roe's friends stated that Roe told her "she went to Doe's room only after trying to climb into her host's dorm window and finding it was locked." (*Id.* ¶ 167.) Other witnesses corroborated Plaintiff's February 2019 account, testifying that Plaintiff had told him Roe "had been 'really aggressive'" and "had thrown him on the bed" before performing oral sex on Plaintiff. (*Id.* ¶ 176.) On the other hand, a different witness told the panel that Roe had told her that Plaintiff "had literally pinned her to the bed," "that she said no and was *sobbing* as he did that," and "that [Plaintiff] forcibly raped her." (*Id.* ¶ 185 (emphasis in original).) Plaintiff also alleges that the panel "uncovered a large amount of documentary evidence undermining Roe's claims and corroborating Doe's," including Roe's text messages to friends asking them to call her and texts that confirmed Roe "had sent [Plaintiff] flirty texts before the second incident and had asked him on a date." (*Id.* ¶ 193.)

The panel interviewed Plaintiff and Roe for a second time in January 2020. (*Id.* ¶¶ 194, 200.) Plaintiff alleges that Roe's second interview "consisted mostly of the panel asking Roe to repeat or clarify parts of her stories" without meaningfully pressing her on witness testimony that rebuffed her story. (*Id.* ¶¶ 194–95.) In addition, Plaintiff claims that Roe contradicted her own original story by, for example, testifying that "Doe had first made her perform oral sex on the night of the second incident, and only afterwards made her have vaginal sex," which flips the events in her original interview. (*Id.* ¶ 196.) When presented with this inconsistent testimony, Plaintiff alleges the panel presented Roe a way out, by asking her "if she really didn't remember the order that things happened on Respondent's bed." (*Id.*) In addition, when confronted regarding the image of the many hickeys on Plaintiff's face, Roe testified that she "just kept going because I wanted to leave." (*Id.* ¶ 198.) Plaintiff alleges that "[i]n stark contrast with Roe's interviews," during his second interview the panel was highly "confrontational . . . pressing [Plaintiff] on perceived inconsistencies . . . on the most peripheral of topics." (*Id.* ¶ 200.) Thereafter, on February 6, 2020, Plaintiff was sent "official notice of the allegations against him," to which he was able to submit a written response. (*Id.* ¶ 208.) Plaintiff alleges his response "identified dozens of inconsistencies, contradictions, and implausibilities told by Roe and ways her testimony was [contradicted] by the evidence." (*Id.* ¶ 209.)

Notwithstanding Plaintiff's contentions, on March 20, 2020, the panel issued its decision, which Plaintiff alleges went to "extraordinary lengths to downplay exculpatory evidence, to find Roe credible, and to find some basis on which to find Doe less than fully credible." (*Id.* ¶ 214.) The panel held Plaintiff "not responsible" for the first encounter due to "insufficient evidence to convict." (*Id.* ¶ 216.) Regarding the second incident, "the panel found Doe responsible for nonconsensual conduct and [sexual] penetration for nearly all of the activity that Roe said

occurred: kissing, touching her breasts, oral sex, and vaginal sex." (*Id.* ¶ 221.) Plaintiff also claimed the panel's "findings defied logic and the evidence, in obvious and straightforward ways." (*Id.*) For example, Plaintiff alleges that in order to find him responsible, the panel "found Roe credible even though it expressly concluded that her claim about why she gave Doe so many hickeys 'was implausible.'" (*Id.* ¶ 222.) In addition, the panel credited Roe's testimony because "it believed she had 'no apparent reason' to falsify her claims," despite her celibacy pledge, her embarrassment following "people laughing in [Plaintiff's dormitory common room], which she wrongly assumed was about her," and the fact that she "had filed her report soon after learning Doe had ended a brief relationship with someone she knew." (*Id.* ¶ 223.) Moreover, the panel did not credit the testimony of Roe's friend, who claimed Roe told her Plaintiff had "forcibly raped her." (*Id.* ¶ 227.) Following the panel's decision, Plaintiff was issued a two-year suspension. (*Id.* ¶ 247.)

On April 13, 2020, Plaintiff appealed to the five-member appellate board established by the University, citing "procedural unfairness" in the panel's decision. (*Id.* ¶ 249.) His appeal was granted on May 4, 2020 on the "grounds of 'possible procedural unfairness' identified by Doe" relating to credibility determinations and "related to the finding of non-consensual sexual penetration," and the matter was remanded to the same panel for further investigation. (*Id.* ¶ 250.)

On remand, the panel interviewed Roe a third time on May 13, 2020. (*Id.* ¶¶ 251–52.) In this interview, Plaintiff alleges that the panel challenged Roe on inconsistencies in her testimony but failed to incorporate these discrepancies in assessing Roe's ultimate credibility, "[d]espite Roe's being unable to explain them." (*Id.* ¶ 252.) Throughout the panel's second investigation, Plaintiff alleges that it "search[ed] for evidence to gin up an adverse credibility finding against" him. (*Id.* ¶ 266.) In support, Plaintiff points to the fact that the panel failed to reinterview any "non-

party witness[es] who might have challenged Roe's credibility," and instead interviewed one of Plaintiff's friends on peripheral issues. (*Id.* ¶¶ 267–68.) The panel also interviewed Plaintiff for a third time on May 22, 2020. (*Id.* ¶ 272.) On June 23, 2020, the panel issued its second decision. (*Id.* ¶ 280.) It found Plaintiff "not responsible for all of Roe's allegations except one: the allegation that Doe had kissed her and touched her breasts without consent at the *beginning* of the encounter." (*Id.* ¶ 299 (emphasis in original).) Plaintiff was "sanctioned with 'censure' and 48 months of disciplinary probation," a punishment that would be noted in his student records. (*Id.* ¶ 311.)

On July 13, 2020, Plaintiff appealed the panel's second decision, which was denied on August 3, 2020. (*Id.* ¶¶ 312–13.)

## B.   PROCEDURAL HISTORY

On October 5, 2022, Plaintiff brought suit in federal court against Defendant, alleging claims for violation of Title IX (Count One); breach of contract (Count Two); breach of the duty of good faith and fair dealing (Count Three); and negligence (Count Four). The crux of Plaintiff's Complaint is his allegation that Princeton's process for investigating and disciplining allegations of sexual misconduct is gender biased against male students like Plaintiff in favor of female complainants and that their decision sanctioning Plaintiff was internally inconsistent and resulted from a procedurally deficient process embedded with gender bias. (Compl. ¶¶ 17, 30.) Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that the Complaint fails to allege any evidence of gender bias or that the University violated its own Policy in investigating Roe's complaint against Plaintiff. ("MTD", ECF No. 24.) Plaintiff filed a brief in opposition, ("Pl. Opp'n," ECF No. 26), and Defendant filed a brief in reply, ("Reply," ECF No. 32).

## II.   **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). However, the Court "need not credit bald assertions or legal conclusions" or allegations "involv[ing] fantastic factual scenarios lacking any arguable factual or legal basis" or that "surpass all credulity." *Degrazia v. F.B.I.*, No. 08-1009, 2008 WL 2456489, at *3 (D.N.J. June 13, 2008), *aff'd*, 316 F. App'x 172 (3d Cir. 2009) (citations and quotation marks omitted).

A court must only consider "the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).[4] "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Furthermore, "[a] pleading that offers labels and conclusions or a formulistic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted). "Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth." *Valentine v. Unifund CCR, Inc.*, No. 20-5024, 2021 WL

---

[4] The Third Circuit has explained that "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022). As such, the Court only relies on exhibits submitted with Defendant's Motion to Dismiss where the facts in those documents are not contested by Plaintiff.

912854, at *1 (D.N.J. Mar. 10, 2021) (citing *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011)).

## III.   DISCUSSION

### A. TITLE IX

Count One of Plaintiff's Complaint alleges a Title IX claim against Defendant. (*See* Compl. ¶¶ 315–321.) Plaintiff alleges that Defendant unlawfully discriminated against him because "the finding and sanction against [Plaintiff] were the product of gender bias." (*Id.* ¶ 319.) In support, Plaintiff points to alleged "extreme . . . gender-biased pressure" on Defendant to enforce Title IX protections, "[t]he statements and actions of a biased panel," and "[a]n incoherent and unsupported rationale that calls the decision against [Plaintiff] into grave doubt." (*Id.*) Defendant argues on its Motion to Dismiss that Plaintiff's claim of gender bias is speculative and unsupported by factual allegations in the Complaint, and that his contention of pressure on Princeton to investigate more thoroughly and punish sexual misconduct on campus does not give rise to a Title IX claim. (MTD at 11–28.) Plaintiff responds that his Complaint adequately alleges a Title IX claim through his pleading of (1) the external pressures on Princeton and (2) procedural flaws in Princeton's investigation and sanction, including the "differential treatment" levied upon him versus Roe, the "inexplicable rationale" of Princeton's decision, and "archaic assumptions about gender" underlying the Panel's decision. (Pl. Opp'n at 19, 21–25.)

Title IX of the Education Amendment Act of 1972 states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

assistance." 20 U.S.C. § 1681(a).[5] The Third Circuit has explained that Title IX "bar[s] the imposition of university discipline [when sex] is a motivating factor in the decision to discipline." *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). In *University of Sciences*, the Third Circuit adopted a "straightforward pleading standard" for Title IX claims. 961 F.3d at 209. The Court held that "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Id.*; *see also Doe v. Princeton Univ.* ("*Princeton III*"),[6] 30 F.4th 335, 343 (3d Cir. 2022) (applying the standard from *University of Sciences*). Plaintiffs remain "free to characterize their claims however they wish," using any indicia of discrimination to support their allegations. *Univ. of Scis.*, 961 F.3d at 209.

In *Princeton III*, the Third Circuit discussed the "external pressure" facing Princeton, 30 F.4th at 345, which Plaintiff cites and alleges the University faced ahead of his hearing. Following the Department of Education's ("DOE") Dear Colleague Letter in 2011 ("2011 DCL"), and an investigation by the Office of Civil Rights into Princeton's Title IX procedures, colleges and universities "ushered in a more rigorous approach to campus sexual misconduct allegations." *Princeton III*, 30 F.4th at 345 (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019)); *see also Univ. of Scis.*, 961 F.3d at 210. While "'pressure from [the DOE] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination,' it factors into the total mix of information supporting a plausible Title IX discrimination claim." *Princeton III,* 30 F.4th at 345 (quoting *Univ. of Scis.*, 961 F.3d at 210); s*ee also Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("[E]xternal pressure alone is not enough to state a claim that the university

---

[5] The parties do not dispute that Princeton receives federal funds and is therefore subject to Title IX's strictures.

[6] As the parties refer to the Third Circuit's decision here as "Princeton III," the Court will do the same.

acted with bias in this particular case."); *Doe v. Univ. of Denver*, 952 F.3d 1182, 1193 (10th Cir. 2020) (noting that "evidence of the DCL and the pressure [the University] felt to comply with its guidance" must be "combined with a 'particularized something more' . . . that would indicate that [the University's] decision in [the plaintiff's] particular case was based on his gender" (quoting *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 856 (7th Cir. 2019))).

Like the plaintiff in in *University of Sciences* and *Princeton III*, Plaintiff here catalogs numerous external pressures on Princeton. (*See, e.g.*, Compl. ¶¶ 56–60 (detailing DCL letter and the three investigations by the DEO's Office of Civil Rights ("OCR") between 2010 and 2014); ¶ 63 (OCR claim filed against Princeton in 2016 "alleging Princeton failed to adequately respond to a female student's claims of sexual misconduct by a male"); ¶ 64 (noting "Princeton received widespread attention and pressure when it initially declined to terminate or suspend a male faculty member accused of sexual misconduct by a female graduate student); ¶¶ 76–80 (numerous articles in student newspaper calling for increased scrutiny of Princeton's sexual assault polices).) The Court finds that these pressures are a relevant "factor into the total mix of information," *see Princeton III*, 30 F.4th at 345, but consistent with Third Circuit caselaw, on its own, insufficient to meet Plaintiff's pleading burden. The Court next turns to Plaintiff's specific allegations of gender bias in Princeton's investigation in his case.

As Plaintiff claims that his case is factually similar to *Princeton III* and *University of Sciences*, the Court begins its analysis there. In *Princeton III*, the Third Circuit pointed to two allegations that provided a sufficient inference of gender discrimination for the complaint to survive dismissal. First, Princeton initially encouraged the plaintiff to seek "mental health services" after complaining that Jane Roe, his ex-girlfriend, was "harass[ing]" and "spreading false information" about him. *Id.* at 340 (citations omitted). In contrast, when Roe complained to the

school about the plaintiff subjecting her to "Intimate Relationship Violence" under the Policy, Princeton "encouraged Roe to file a formal Title IX complaint." *Id.* at 340, 344. Second, Princeton treated the students differently when they violated a no-contact order Princeton had implemented between them. *Id.* at 340–41. The plaintiff's violation "was met with formal disciplinary process" while Roe's violation "was dismissed as minor." *Id.* at 344. The Third Circuit found that "anti-male bias" plausibly explained the school's differential treatment of the two students and that therefore "the Complaint state[d] a plausible claim of sex discrimination." *Id.* at 345.

In *University of Sciences*, the plaintiff cited allegations beyond "the external pressure" facing the university following the DCL letter. *Univ. of Scis.*, 961 F.3d at 209–10. There, the male plaintiff alleged that the University "permitted and encouraged" two female students "to disclose confidential informational . . . to find other women willing to make a complaint against him," in clear violation of their written policies. *Id.* at 207–08 (citations and quotation marks omitted). In addition, the university "[e]ngaged in selective investigation and enforcement of [its] policies by failing to consider [Doe's] alcohol consumption and whether [Roe] should have been charged with violations of [the Policy] if [Doe] was intoxicated when they had sex[.]" *Id.* at 210. The university failed to investigate the female complainants even though, the plaintiff alleged, the university "knew. . . [the two female complainants] violated the Policy." *Id.* at 211. Based on these allegations, combined with external pressure facing the school, the Third Circuit held the plaintiff had adequately pled a Title IX claim. *Id.*

In similar situations, courts within and without the Third Circuit have found male plaintiffs sufficiently pled Title IX claims to survive a motion to dismiss. *See Doe v. Univ. of Denver*, 1 F.4th 822, 832, 835 (10th Cir. 2021) (university interviewed eleven of female complainant's witnesses but none of the male plaintiff's witnesses and failed to formally investigate any of the

twenty-one sexual misconduct complaints brought by men while investigating fourteen complaints by women during the same period); *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018) (plaintiff alleged "external pressure on Miami University" and allegations that "every male student accused of sexual misconduct in the Fall 2013 and Spring 2014 semesters was found responsible for the alleged violation"); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (panelists never interviewed male respondent's witnesses); *Doe v. Princeton Univ.*, No. 19-7853, 2023 WL 1778832, at *7 (D.N.J. Feb. 6, 2023) (university failed to investigate plaintiff's claim that he had been assaulted by female complainant); *Abraham v. Thomas Jefferson Univ.*, No. 20-2967, 2021 WL 4132566, at *6 (E.D. Pa. Sept. 10, 2021) (supervisor "told [plaintiff] that a man cannot be sexually assaulted by a woman, and discouraged Plaintiff from making such a claim" (quotation marks omitted)).

On the other hand, courts have granted motions to dismiss Title IX claims that lack allegations and evidence of gender bias in the investigations and demonstrate a thorough investigation. *See Verdu v. Trustees of Princeton Univ.*, No. 20-1724, 2022 WL 4482457, at *4–5 (3d Cir. Sept. 27, 2022) (plaintiff failed to show Title IX violation where he admitted to violation of University's policies and "failed to allege that he received different treatment by Princeton than a similarly situated female"); *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774–75 (3d Cir. 2020) (noting panel's investigation, which failed to question Roe's credibility or memory, may have been "shoddy," but did not give rise to gender bias where "allegations" did not "relate to bias on account of sex" (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016)); *Doe v. Princeton Univ.* ("*Princeton II*"),[7] 790 F. App'x 379, 384 (3d Cir. 2019) (affirming dismissal of Title IX claim where plaintiff pled conclusory statements that Princeton would have treated him differently if he

---

[7] As the parties do in their briefing, the Court refers to this case as *Princeton II*.

were a female, failed to plead facts "reflecting that the disciplinary process and results for female victims are different from men," and found his "many grievances about how the process was conducted and how he was treated" did not show "unfavorable treatment due to his sex"); *Gendia v. Drexel Univ.*, No. 20-1104, 2020 WL 5258315, at *3 (E.D. Pa. Sept. 2, 2020) (no Title IX allegations where investigator "assumed Roe's truthfulness" and made evidentiary determinations that favored Roe over plaintiff); *Saravanan v. Drexel Univ.*, No. 17-3409, 2017 WL 4532243, at *4 (E.D. Pa. Oct. 10, 2017) (holding that plaintiff's complaint did not demonstrate Title IX claim where plaintiff alleged "an adverse and erroneous outcome" and "blanket allegations of discrimination" (citations omitted)).

Even where there are allegations of bias in favor of sexual assault victims, without further allegations specifically regarding gender, courts have held these claims have failed to adequately plead a Title IX claim. *See Univ. of Denver*, 952 F.3d at 1197 (no Title IX claim where the "evidence demonstrates at most that [university] had an anti-respondent or pro-complainant bias, which is insufficient to create an inference of anti-male bias."); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); *Haley v. Virginia Com. Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) ("[A]llegations at best reflect a bias against people accused of sexual harassment and in favor of victims and indicate nothing about gender discrimination.").

Here, Plaintiff's allegations do not give rise to a Title IX claim. The Complaint is devoid of allegations that Princeton had a history of only investigating female complainants and ignoring male student complaints. Nor does Plaintiff allege that he lodged his own complaints of sexual harassment or assault with the University that were ignored. Plaintiff does not allege that the

University, in investigating Roe's complaint, failed to interview him or his witnesses. In fact, Princeton interviewed twenty-six (26) witnesses in total, including "nine connected to" Plaintiff, and interviewed Plaintiff and Roe on repeated occasions. (Compl. ¶¶ 252, 272, 280; *see also id.* ¶ 166 ("Following their interviews of Plaintiff and Roe, the panel interviewed "a large number of witnesses . . . both those friendly to [Plaintiff]" and Roe.).) Furthermore, the Complaint does not allege that any investigator, or any University personnel at all, made comments during the investigation suggesting they were treating him differently than another respondent based on his and the complainant's gender.[8]

At most, Plaintiff alleges that Princeton demonstrated gender bias when it chose to believe Roe's story over his due to "archaic assumptions," including that the panel failed to believe that Roe could be the aggressor as a woman. (Compl. ¶ 319.) Such conclusory statements cannot serve as the basis for a complaint to survive dismissal. *See Degrazia*, 2008 WL 2456489, at *3. Moreover, to the extent Plaintiff attempts to proceed under an "archaic assumption" theory, this theory is not available in suits concerning sexual assault allegations. *See Baum*, 903 F.3d at 587–88 (noting "archaic assumptions about the sexes" do not "appl[y] in the context of university of disciplinary proceedings" but rather only potentially in cases involving allegations of equal opportunity in student athletics); *Saravanan*, 2017 WL 4532243, at *7 (same).

Lastly, the Court is loathe to accept the assertion that the panel chose to believe Roe's account over Plaintiff's as evidence of gender bias given the Supreme Court's admonition that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

---

[8] Plaintiff states that the panel asked his witnesses "whether they had spoken to Doe or his lawyers about their testimony, or whether Doe had otherwise influenced their testimony" but did not ask any of Roe's witnesses this question. (Compl. ¶ 280.) This single question to Plaintiff's witnesses does not demonstrate gender bias.

Princeton, here, conducted a thorough investigation, which included granting Plaintiff's first appeal, and then in large measure found in his favor on a number of the most egregious allegations which resulted in a significantly reduced sanction. While Plaintiff may have disagreed with the outcome of the second decision on remand, he has not connected the unfavorable decision to any indicia of gender bias. As such, the Court grants Plaintiff's motion to dismiss the Title IX claim and dismisses Plaintiff's Count One claim.

## B. BREACH OF CONTRACT[9]

In Count Two, Plaintiff asserts a breach of contract claim. (*See* Compl. ¶¶ 322–37.) Plaintiff alleges that he and Princeton were parties to a contract, which included the University's RRR. (*Id.* ¶ 323.) Plaintiff alleges that Princeton breached this contract by failing to apply the preponderance of the evidence standard to its decision to discipline Plaintiff and failed to provide "an impartial, unbiased, and adequately trained panel." (*Id.* ¶¶ 327–37.) Defendant contends that the RRR is not subject to a pure contract analysis, but rather is at most a "quasi-contract." (Pl. Opp'n at 28–29.) To maintain a breach of contract "in the student disciplinary context," Defendant argues that a plaintiff must show a "substantial" departure from the University's

---

[9] The Court finds, at this stage of the ligation, that diversity jurisdiction is satisfied such that the Court has jurisdiction to hear Plaintiff's state law claims. Under 28 U.S.C. § 1332, "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." However, in order for the federal court to have diversity jurisdiction, there must be "'complete diversity' of all the parties, meaning that 'in cases with multiple plaintiffs or multiple defendants, no plaintiff [can] be a citizen of the same state as any defendant.'" *Ibrahim*, 2020 WL 4251477, at *2 (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010)) (alteration in original). Here, Plaintiff alleges that Defendant is deemed a citizen of New Jersey, whereas Plaintiff "is a citizen of a State other than New Jersey." (Compl. ¶ 34; *see Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107–10 (3d Cir. 2015) (holding that a party may establish diversity jurisdiction in its complaint by alleging that plaintiff and defendant are citizens of different states)). Moreover, Plaintiff avers the amount in controversy exceeds $75,000. (*Id.*) As such, the requirements for diversity jurisdiction are satisfied.

policies. (*Id.* at 29.) Defendant asserts that it afforded Plaintiff the requirements under the RRR, and Plaintiff's disagreement with its outcome cannot sustain a claim for breach. (*Id.* at 30–33.)

The Third Circuit's Opinion in *Princeton III* dictates the outcome here. 30 F.4th at 335. There, the Third Circuit discussed the very Princeton policies at issues here. *Id.* at 346. The Court concluded that "New Jersey law requires at least that the school 'follow its own established procedures' and that those procedures be 'fundamentally fair.'" *Id.* (quoting *Hernandez v. Don Bosco Preparatory High*, 730 A.2d 365, 376 (N.J. Super. Ct. App. Div. 1999)). The Court held that "the Princeton Policy guarantees that, after considering the '"totality of the facts and circumstances' . . . '[t]he investigative panel will . . . determine, by a preponderance of the evidence, whether [the] policy was violated.'" *Id.* at 347 (citations omitted). This standard, as the Third Circuit explained, "requires proof by the 'greater weight of the evidence.'" *Id.* (quoting Preponderance of the Evidence, Black's Law Dictionary (11th ed. 2019)). The Third Circuit also concluded that Princeton's Policy that "[t]he panelists will . . . be impartial and unbiased" merely required that the adjudicators "do[] *not* favor one side or the other" and approach the matter "*without* a prejudice or inclination in favor of one party." *Id.* (citations omitted and emphasis in original).

Applying this standard to the complaint in *Princeton III*, the Third Circuit held that the plaintiff adequality pled facts to support his breach of contract claim as the "facts suggest that Princeton failed to provide [the plaintiff] the promised and fair impartial proceeding." *Id.* at 348. The Third Circuit cited to allegations in the complaint that Princeton:

> failed to 'consider[] the entirety of the evidence with a
> neutral gaze,' 'disregarded exculpatory evidence . . . and rendered
> inconsistent and skewed credibility determinations[,] 'applied
> inconsistent standards to assess [the parties'] credibility,'
> 'overlooked or minimized glaring and substantial factors that would
> tend to undermine [complainant's] veracity . . . including . . . her

motivations to lie,' and 'disregarded compelling exculpatory evidence which contradicted [complainant's] allegations.'

*Id.* at 347–48 (citations omitted).

Guided by the Third Circuit's analysis, the Court reaches a similar conclusion here. At this stage in the litigation, and accepting the allegations in the Complaint as true, Plaintiff argues that Princeton violated its own policies and thus breached its contract with Plaintiff. (Compl. ¶¶ 327–37.) Plaintiff alleges that Defendant "was aware of a large amount of evidence that called Roe's credibility into question and undermined her claim . . . [and] was further aware that she changed her story;" however, the panel "still found against Doe, based on a rationale that was incoherent and unsupported by the evidence." (*Id.* ¶¶ 328–30.) Moreover, the Complaint alleges that Defendant "flipped the burden of proof" and thus, the panel's findings, according to Plaintiff, "were arbitrary and capricious, without reasoned basis, ignored contrary evidence, and were the products of pre-determined bias in favor of Roe." (*Id.* ¶¶ 330–31.) For these reasons, Plaintiff claims that Defendant failed to apply the preponderance of the evidence standard. (*Id.*)

In addition, Plaintiff alleges, *inter alia*, that Princeton failed to interview a witness whose statement would allegedly have undermined Roe's motivation, applied inconsistent credibility determinations, and "remanded the matter to th[e] same hearing panel [notwithstanding] . . . that it had unfairly collected and analyzed the evidence." (*Id.* ¶¶ 290–99, 333–34.) Accepting these allegations as true, the Court finds that Plaintiff alleges Defendant failed to provide an impartial, unbiased, and adequality trained panel. Therefore, at this early pre-discovery posture, the Court denies Defendant's Motion to Dismiss Plaintiff's breach of contract claim.[10]

---

[10] The Court does not read *Princeton III* as narrowly as Defendant contends, namely that the Third Circuit's analysis focuses on the penalty and the school's investigation into the conduct. (*See* Reply at 11–22.) Defendant is correct that the penalty in *Princeton III* was more severe than the case at bar because that plaintiff was expelled. 30 F.4th at 346. However, as the Third Circuit has explained, "'students have a

## C. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

In Count Three, Plaintiff asserts a claim for breach of the implied covenant of good faith and fair dealing. (Compl. ¶¶ 338–43.) Defendant moves to dismiss this Count, arguing that Princeton's Policy is not a "traditional contract," and therefore, "[a] good faith and fair dealing claim, which requires performing the contract's literal terms (even while destroying the benefit of the bargain) is thus misplaced." (MTD at 34.) Defendant contends that moreover, Plaintiff fails to demonstrate that Defendant acted in "bad faith" and cannot bring both a breach of contract and good fair and fair dealing claim on the same conduct. (*Id.* at 35–36.)

In New Jersey, the implied covenant of good faith and fair dealing is a "component of every contract" that requires both parties to a contract act in "good faith . . . [by] adher[ing] to community standards of decency, fairness, or reasonableness." *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007) (citations and quotation marks omitted); *see Kenny v. Onward Search*, No. 15-456, 2015 WL 1799593, at *3 (D.N.J. Apr. 15, 2015) ("[A] contract[] include[s] an implied covenant that the parties to the contract will act in good faith."). This directive requires that "neither party shall do anything which will have the effect of destroying or injuring the right of

---

substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct,' . . . because the consequences are potentially dire and permanent: '[a] finding of responsibility for a sexual offense can have a lasting impact on a student's personal life, in addition to his educational and employment opportunities, especially when the disciplinary action involves a long-term suspension.'" *Univ. of Scis.*, 961 F.3d at 213 (first quoting *Baum*, 903 F.3d at 582, then quoting *Miami Univ.*, 882 F.3d at 600) (citations and quotations omitted). A school's punishment, even falling short off expulsion, can still have long lasting implications. In this case, Plaintiff alleges that he is subject to a permanent reprimand because the censure sanction will appear on Plaintiff's school records. (Compl. ¶ 311.)

In any event, the outcome in *Princeton III* did not turn on the punishment but rather the plaintiff's allegations that Princeton had failed to apply the proper standards in its investigation and adjudication. 30 F.4th at 346–48. In addition, Princeton's treatment of the no-contact orders, as discussed above, in part led the Third Circuit to deny the Title IX claim; however, the Third Circuit did not rely on that allegation to deny the breach of contract claim. *See Id.*

the other party to receive the fruits of the contract." *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) (citations and quotation marks omitted).

The Court again turns to *Princeton III*. There, the Third Circuit held that the plaintiff adequately pled a breach of good faith and fair dealing claim where the Complaint alleged that "Princeton '[s]ubject[ed] [Doe] to a discriminatory disciplinary process,' '[d]isregard[ed] exculpatory evidence for [Doe] and incriminating evidence against [Roe],' 'constru[ed] all discrepancies and inconsistencies in [Roe's] favor,' and "ignor[ed] evidence corroborative of [Doe's] counter claims.'" *Princeton III*, 30 F.4th at 348 (citations omitted). While this claim and plaintiff's breach of contract claim "share[d] some events and circumstances," the Court held they were not "redundant" and thus both claims could proceed. *Id.* (quoting *Berlin Med. Assocs., P.A. v. CMI N.J. Operating Corp.*, No. A-3034-04T5 2006 WL 2162435, at *10 (N.J. Super. Ct. App. Div. Aug. 3, 2006)). However, while the Third Circuit explained that "factual overlap is not fatal," *Princeton III*, 30 F.4th at 348, it also clarified that certain of the plaintiff's allegations "would fail because [the plaintiff] pleads the same fact in support of his contract claim." *Id.* at 348 n.16; *see also Ohm Systems, Inc., v. Senergene Solutions, LLC*, No. 23-1340, 2023 WL 8437279, at *3 (D.N.J. Dec. 5, 2023) (denying breach of good faith claim where "Plaintiff [did] not plead any additional facts to distinguish the claim from its breach of contract claim"); *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 463 (D.N.J. 2020) ("The plaintiff cannot maintain a breach of the implied covenant of good faith and fair dealing claim that is duplicative of its breach of contract claim.").

While the Court is mindful that "factual overlap is not fatal," and, at the motion to dismiss posture, the Court "views[s] the pleadings with liberality," *Princeton III*, 30 F.4th at 348 (citations omitted), Plaintiff's Complaint on Count Three seeks clearly foreclosed relief. Of the 112-page

complaint, consisting of 350 paragraphs, the Complaint dedicates just six (6) numbered paragraphs

to Count Three, which do not allege any additional or new facts and explicitly concede that this

cause of action is premised on the identical facts which premise the breach of contract claim. (*See*

Compl. ¶ 338 ("Mr. Doe incorporates by reference all of the preceding paragraphs of this

Complaint as though fully set forth herein."); (*Id.* ¶ 340 ("For all the reasons stated in Count II,

the University breached the covenant of good faith and fair dealing.").) Thus, by Plaintiff's own

acknowledgment, Plaintiff "pleads the same fact[s] in support of his contract claim." *Princeton*

*III*, 30 F.4th at 348 n.16. Accordingly, the Court grants Defendant's Motion to Dismiss the breach

of the covenant of good faith and fair dealing claim and dismisses Plaintiff's Count III.

### D. NEGLIGENCE

Plaintiff asserts a claim for negligence in Count Four. (Compl. ¶¶ 344–50.) Defendant

moved to dismiss on the grounds that Plaintiff's claim is barred by the New Jersey Charitable

Immunity Act ("NJCIA"), and that even if it were not, Plaintiff failed to allege both a duty of care

and a breach of same. (MTD at 36–37.) In opposition, Plaintiff contends that the NJCIA only bars

simple negligence, rather than gross negligence claims. (Pl. Opp'n at 28.)

The NJCIA states that:

> No nonprofit corporation, society or association organized
> exclusively for religious, charitable or educational purposes . . . shall
> . . . be liable to respond in damages to any person who shall suffer
> damage from the negligence of any agent or servant of such
> corporation, society or association, where such person is a
> beneficiary, to whatever degree, of the works of such nonprofit
> corporation . . .

N.J. Stat. Ann. § 2A:53A-7(a). Numerous courts have held that Princeton is entitled to immunity

from negligence claims under the NJCIA. *See Shaw v. Femenella & Assocs.*, No. 03-5895, 2005

WL 3320757, at *4 (D.N.J. Dec. 7, 2005) ("It is undisputed that Princeton is a non-profit

24

corporation organized exclusively for educational purposes."); *Lax v. Princeton Univ.*, 779 A.2d 449, 452 (N.J. Super. Ct. App. Div. 2001) (holding Princeton entitled to immunity under the NJCIA).

The Third Circuit also has had the opportunity to consider a negligence claim against Princeton University stemming from its investigation into allegations of sexual assault. *See Princeton II*, 790 F. App'x at 386. The Third Circuit explained that "an entity qualifies for charitable immunity when it . . . was promoting [religious, charitable, or educational] objectives and [for non-profit] purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." *Id.* at 386 (quoting *O'Connell v. State*, 795 A.2d 857, 860 (N.J. 2002)).

Moreover, in *Princeton II*, the Third Circuit held that "Princeton recognizes the harm of sexual misconduct, and, to further its educational mission, Princeton prohibits sexual misconduct within its community, investigates the claims, and disciplines violators. As a student, Doe is a beneficiary of these protections and procedures." *Id.* at 387. Therefore, the Third Circuit held that Princeton was immune from a negligence claim "arising from its investigation and adjudication of [the plaintiff's] sexual assault complaint." *Id.* Applying *Princeton II* here, the Court finds that Plaintiff's negligence claim is barred by the NJCIA.

In his opposition brief, Plaintiff contends, for the first time, that Defendant is liable for gross negligence through its investigation. (*See* Pl. Opp'n at 28–29.) However, gross negligence is not pled in the negligence count of Plaintiff's Complaint. (*See* Compl. ¶¶ 344-50.) A plaintiff cannot adequately allege gross negligence simply by invoking the phrase "gross negligence" in his opposition brief. *See Doe v. Princeton Univ.*, No. 19-7853, 2020 WL 7383192, at *7 (D.N.J. Dec. 16, 2020) (citing *Lindstrom v. St. Joseph's Sch. for the Blind, Inc.*, No. CV 15-8084, 2016 WL 5723658, at *10 (D.N.J. Sept. 30, 2016)). Further, "it is axiomatic that the complaint may not

be amended by the briefs in opposition to a motion to dismiss." *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). As such, Plaintiff cannot raise a new claim in his opposition brief to amend his complaint. Therefore, the Court grants Defendant's Motion to Dismiss the simple and gross negligence claims and dismisses Defendant's Count Four.[11]

---

[11] To the extent the Court construes Plaintiff's Complaint as asserting a gross negligence claim, this claim still fails. "The essential elements to state a claim for negligence and gross negligence are identical: (1) the existence of a duty owed by Defendants towards Plaintiffs; (2) a breach of that duty by Defendants; (3) that Defendants' breach caused Plaintiffs' injuries; and (4) that Plaintiffs suffered damages as a result." *Powell v. Seton Hall Univ.*, No. 21-13709, 2022 WL 1224959, at *4 (D.N.J. Apr. 26, 2022) (citing *Sines v. Darling Ingredients Inc.*, No. 19-19121, 2020 WL 5015488, at *5 (D.N.J. Aug. 25, 2020)). The Court agrees with the recent holding by the Honorable Claire C. Cecchi that there is no "authority indicating that a private university or its employees owe a certain duty of care to its students under New Jersey law when carrying out disciplinary procedures." *Donohue v. Capella Univ., LLC*, No. CV 22-5634, 2023 WL 5425503, at *7 (D.N.J. Aug. 22, 2023). Because the University owes Plaintiff no duty of care under New Jersey law, his gross negligence claim must fail.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED** in part, and **DENIED** in part. An appropriate Order will accompany this Opinion.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

<u>Dated</u>: December 19, 2023