IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

JOHN DOE,

        Plaintiff,

v.

PRINCETON UNIVERSITY,

        Defendant.

**Civil Action No. 3:22-cv-05887-RK-DEA**

# JOHN DOE'S MOTION FOR PARTIAL RECONSIDERATION

DILLON PLLC

Justin Dillon (*pro hac vice*)
Christopher C. Muha (*pro hac vice*)
1717 K Street NW, Suite 900
Washington, D.C. 20005
Phone: (202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com

SCARINCI HOLLENBECK

Jon-Jorge Aras, Esq.
jjaras@sh-law.com
519 8th Avenue
25th Floor
New York, NY 10018
(212) 286-0747

January 16, 2024

*Counsel for Plaintiff John Doe*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................ 1

I. The Opinion Contravened Third Circuit Precedent in Holding That "Archaic Assumptions" Are Not Evidence of Gender Bias In Sexual Misconduct Cases ............................................. ..1

    A.    In the Third Circuit, "Archaic Assumptions" are Evidence of Gender Bias ........ ..1

    B.    Mr. Doe Pled Concrete Allegations Plausibly Showing "Archaic Assumptions" In His Decision Letter Itself .................................................................................. ..5

II. The Opinion Also Erred in Concluding That the Many Ways Princeton Treated Mr. Doe Worse Than Ms. Roe Were Not Evidence of Gender Bias ........................................... ..8

III. The Panel's Rationale Supplies Still Move Evidence of Gender Bias ................................... 11

CONCLUSION .................................................................................................................. 12

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ........................................................................................................... 6

*Doe v. Baum*,
  903 F.3d 575 (6th Cir. 2018) ............................................................................................. 2

*Doe v. Coll. of New Jersey*,
  2023 WL 2812362 (D.N.J. April 5, 2023) ......................................................................... 6

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016) ............................................................................. ……………10

*Doe v. Grinnell College*,
  473 F. Supp. 3d 909 (S.D. Iowa July 9, 2019) ................................................................... 4

*Doe v. Marymount Univ.*,
  297 F. Supp. 3d 573 (E.D. Va. 2018) ......................................................................... …4, 7

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) ............................................................................................. 2

*Doe v. Oberlin Coll.*,
  963 F.3d 580 (6th Cir. 2020) ....................................................................... ……………..11

*Doe v. Princeton Univ.*,
  2023 WL 1778832 (D.N.J. Feb. 6, 2023) .......................................................................... 6

*\*Doe v. Princeton Univ.*,
  30 F.4th 335 (3d Cir. 2022) ..................................................................................... *passim*

*Doe v. Princeton Univ.*,
  No. 3:20-cv-4352-MAS, 2021 WL 194806 (Jan. 20, 2021) .............................................. 8

*\*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ................................................................................... *passim*

*Doe v. Regents of the Univ. of Cal.*,
  23 F.4th 930 (9th Cir. 2022) ........................................................................................ 8-9

*Doe v. Univ. of Ark. – Fayetteville*,
  974 F.3d 858 (8th Cir. 2020) .................................................................................. 11

\**Doe v. Univ. of the Sciences*,
  961 F.3d 203 (3d Cir. 2020) ............................................................................ *passim*

*Doe v. Washington & Lee Univ.*,
  No. 6:19-cv-00023, 2021 WL 1520001 (W.D. Va. April 17, 2021) ......................... ..5

*Doe v. William Marsh Rice Univ.*,
  67 F.4th 702 (5th Cir. 2023) ............................................................................... 3, 7

*Mallory v. Ohio Univ.*,
  76 Fed. App'x 634 (6th Cir. 2003) ........................................................................ 2

*Menaker v. Hofstra Univ.*,
  935 F.3d 20 (2d Cir. 2019) ................................................................................... 9

*Saravanan v. Drexel Univ.*,
  2017 WL 5659821 (E.D. Pa. Nov. 24, 2017) ......................................................... 6

*Schwake v. Arizona Bd. of Regents*,
  967 F.3d 940 (9th Cir. 2020) .............................................................................. 10

*Vengalatorre v. Cornell Univ.*,
  36 F.4th 87 (2d Cir. 2022) .................................................................................. 10

*Yusuf v. Vassar Coll.*,
  35 F.3d 709 (2d Cir. 1994) ............................................................................... 2, 8

iii

**INTRODUCTION**

Pursuant to Local Civil Rule 7.1(i), John Doe respectfully moves for partial reconsideration of this Court's December 19, 2023 order granting in part and denying in part Princeton's motion to dismiss. *See* Dkt. Nos. 39-40. Mr. Doe moves only for reconsideration of the dismissal of his Title IX claim. As explained below, Mr. Doe respectfully submits that the dismissal of that claim was the result of three clear legal errors.

As a preliminary matter, Mr. Doe understands that the Court has expressed skepticism regarding the value of this motion; he thus appreciates its willingness to grant him extra time to draft it, given the holidays. Mr. Doe can also now confirm what his counsel stated during the telephone conference held on December 22, 2023, *see* Dkt. No. 43, namely that he will not be filing an amended complaint. To be clear, Mr. Doe has repeatedly sought to push this matter towards speedy resolution.[1] As he noted when this matter was before Judge Quraishi, "[T]ime is on Princeton's side here; it is not on Mr. Doe's." Dkt. No. 28 at 2. He files this motion only because he genuinely believes that his Title IX claim was erroneously dismissed and hopes that, after taking another look, this Court will agree with him and revive it.

**I. The Opinion Contravened Third Circuit Precedent in Holding That "Archaic Assumptions" Are Not Evidence of Gender Bias in Sexual Misconduct Cases.**

**A. In the Third Circuit, "Archaic Assumptions" Are Evidence of Gender Bias.**

The opinion first erred in holding that "archaic assumptions" cannot supply evidence of gender bias "in suits concerning sexual assault allegations." Slip Op. at 18. But in *Doe v. University of the Sciences*, which was a sexual-assault case, the Third Circuit held quite clearly that they can: "archaic assumptions" are one of several "ways in which a plaintiff might show

---

[1] *See, e.g.*, Dkt. Nos. 27-30 (letters concerning Mr. Doe's opposition to Princeton's second request for extension of its briefing deadlines, after consenting to the first).

that sex was a motivating factor in a university's decision to discipline a student." *Doe v. Univ. of Scis.*, 961 F.3d 652, 667 (3d Cir. 2020). In holding to the contrary, this Court relied on *Doe v. Baum*, a decision from the Sixth Circuit. Slip Op. at 18 (citing *Doe v. Baum*, 903 F.3d 575, 587-88 (6th Cir. 2018)). But *University of the Sciences* expressly rejected the artificial framework through which the Sixth Circuit and other courts had come to analyze Title IX claims.

That artificial framework had its origins in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), a case decided long before the Education Department's 2011 Dear Colleague Letter sparked the recent wave of Title IX litigation. *Yusuf* held that Title IX claims based on student discipline "can be expected to fall generally within two categories": claims that a plaintiff "was innocent and wrongly found to have committed an offense" (now commonly referred to as erroneous outcome claims), and "selective enforcement" (a claim that "the severity of the penalty and/or the decision to initiate the proceeding" was affected by gender bias). *Id.* at 715. The *Yusuf* court cited nothing in the text or structure of Title IX that supported such a framework. *Id.*

When Title IX misconduct cases became more prevalent, courts searched for precedent on how to analyze those claims. Because *Yusuf* was the only game in town, many courts just rotely applied its framework. The Sixth Circuit did so in unpublished opinions stretching as far back as 2003, *see Mallory v. Ohio Univ.*, 76 Fed. App'x 634, 638 (6th Cir. 2003), and in a published decision in 2018, *see Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018).

In 2019, however, the Seventh Circuit questioned the wisdom of "superimpos[ing] doctrinal tests on the [Title IX] statute." *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (Barrett, J.). It held that *Yusuf*'s categories of "erroneous outcome" and "selective enforcement," along with two other categories offered at times in the Sixth Circuit but never accepted there ("'deliberate indifference'" and "'archaic assumptions'"), "[a]ll . . . simply describe ways in

which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Purdue Univ.*, 928 F.3d at 667. It then chose to "ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex'?" *Id.* at 667-68 (quoting Title IX).

*University of the Sciences* adopted that reasoning the following year. It identified the same four theories of relief: "erroneous outcome and selective enforcement" and "deliberate indifference and archaic assumptions." *Univ. of Scis.*, 961 F.3d at 209. It then quoted the Seventh Circuit's language that "'[a]ll of these [theories] simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student.'" *Id.* (quoting *Purdue Univ.*, 928 F.3d at 667). And it then held that it would not impose doctrinal tests on Title IX, but would simply ask whether the allegations, of whatever kind, "raise a plausible inference that the university discriminated against [the student] 'on the basis of sex'?" *Id.* (quoting *Purdue Univ.*, 928 F.3d at 667-68).

Courts that have adopted *Purdue* have thus unsurprisingly held that "archaic assumptions" are indeed evidence of gender bias in student discipline cases. *See, e.g.*, *Doe v. William Marsh Rice Univ.*, 67 F.4th 702, 706 (5th Cir. 2023). In fact, "archaic assumptions" evidence is so potent that it often suffices, by itself, to push a Title IX claim past a motion to dismiss, and even past a motion for summary judgment. In *Rice University*, for instance, a male student who affirmatively told a sexual partner he had herpes was found responsible for sexual misconduct for failing additionally "to adequately notify [Roe] of the fact that she was at risk of contracting HSV-1 from [him] if the two of [them] engaged in unprotected sex." *Id*. at 706. He was found responsible, in other words, for failing to tell her "the details of the disease" and "how it is spread." *Id.* at 713. The Fifth Circuit, applying the *Purdue* framework, *id.* at 709, held that

3

"a rational jury could find" that the school's decision to place that burden on the male "arose from the view" that in sexual matters, men are the "knowledgeable" ones and women the "unwitting" ones. *Id.* Although the school's holding might *also* be explainable by non-discriminatory reasons, "a material fact issue remains as to whether the University acted on archaic assumptions in its investigation against Doe." *Id.* That was true even though no potential external or campus pressure on the school to act in gender-biased ways factored into the mix, as this Court found it did here. *See* Slip Op. at 14 (finding that external pressure to act in gender-biased ways "factor[s] into the total mix" here).

So, too, in *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018), another case where a female student accused a male of sexual misconduct. The adjudicator, while serving as an investigator in a prior case, had reacted skeptically when the male told him he had not been aroused by unwanted touching he had reported. *Id.* at 585-86. That reaction made it plausible to infer—even if there were other possibilities—"that [the adjudicator]'s decision-making was infected with impermissible gender bias, namely [the adjudicator]'s discriminatory view that males will always enjoy sexual contact even when that contact is not consensual." *Marymount Univ.*, 297 F. Supp. at 585–86 (E.D. Va. 2018). And "[i]f [the adjudicator] possessed [such] outdated and discriminatory views of gender and sexuality," they "would have naturally infected the outcome of Doe's Title IX disciplinary proceedings." *Id.* at 586. "Therefore," the court held, "*this allegation alone* is sufficient to satisfy Doe's burden to plead a fact that creates an inference of gender discrimination in Marymount's disciplinary proceedings." *Id.* (emphasis added). Other courts have held the same.[2]

---

[2] *See, e.g.*, *Doe v. Grinnell College*, 473 F. Supp. 3d 909, 927 (S.D. Iowa 2019) (denying summary judgment on a male student's Title IX claim because a rational jury could conclude that school's decision "was influenced by the gendered assumption that a woman would not

4

### B. Mr. Doe Pled Concrete Allegations Plausibly Showing "Archaic Assumptions" in His Decision Letter Itself.

As explained in his Opposition to Princeton's Motion to Dismiss, Mr. Doe pled two sets of allegations showing that archaic assumptions poisoned the panel's credibility findings. *See* Dkt. No. 26 at 12, 25-26. But the opinion ignored the first (and stronger) set altogether and gave little attention to the second, undoubtedly because it believed (as it stated) that "archaic assumptions" evidence was not permitted. Slip Op. at 18. Those allegations suffice by themselves to state a Title IX claim; they do so even more in combination with the external and campus pressure Princeton was under and the other sources of gender bias pled in the Complaint.

*First*, Mr. Doe testified from the beginning that when he made up an excuse for he and Ms. Roe to stop having sex, she became upset. Compl. ¶236. The panel deemed this "not credible" because they thought it implausible that Ms. Roe, as a virgin, would be upset at the idea of stopping. *Id.* That means the panel thought one of two things: (1) *all* virgins (both male and female), upon taking the momentous step of losing their virginity, typically wouldn't be upset if their partner suddenly stopped before it was even over; or (2) *female* virgins generally wouldn't get upset if their male partners suddenly wanted to stop. The first is hard to believe: It's highly unlikely that the panel believed that people *in general* are ambivalent about losing their virginity and wouldn't be upset if it were awkwardly cut off midway through. What's far more likely is that the panel was influenced by archaic views of how *women* experience losing their virginity—as something they do hesitantly, even reluctantly, in an experience often characterized more by physical pain and confusion than enjoyment or excitement. But the Court

---

consent to sex she felt was meaningless"); *Doe v. Washington & Lee Univ.*, No. 6:19-CV-00023, 2021 WL 1520001, at *14 (W.D. Va. Apr. 17, 2021) ("panel's starkly different treatment of these portions of Roe's and Doe's testimony and its credibility determinations could lead a reasonable jury to find" that assumptions about gender influenced the outcome).

5

doesn't have to decide what the panel's most *likely* assumption was here; all that matters is that the latter is at least plausible. *Princeton III*, 30 F. 4th at 345 (even if non-discriminatory reason plausibly explained school's decision, Title IX claim survived because "anti-male bias is still a plausible explanation").³ And since the panel literally used this "Roe-wouldn't-have-been-upset" logic to discredit Mr. Doe and his story, it suffices to state a claim here.

*Second*, Mr. Doe pled that Princeton's application of different standards to the parties' conduct after the incident plausibly betrayed archaic assumptions. The panel discredited Mr. Doe's story of an aggressive Ms. Roe because her words and actions to her friends "completely contradict[ed]" that story. Compl. ¶237. But Mr. Doe's words and actions to *his* friends—both the story he consistently told and his frantic efforts to hide the massive number of hickeys she'd *provably* given him, *id.*—likewise completely contradicted *Ms. Roe*'s story of her passive and unwilling participation. Yet her story was not similarly discredited on that basis—even though pictures all but proved she'd been aggressive. So, on the question whether Ms. Roe had been the aggressor, the panel applied this "we'll-discredit-you-if-the-other-party's-actions-contradict-you" standard *only* to Doe, even though it applied equally to Roe—and gave *no* explanation as to why.

It's at least plausible that the reason they did so was because the question at issue was whether Ms. Roe had been the aggressor, a role that is archaically viewed as played by the man.

---

³ The Court's opinion quoted *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999), for the proposition that "'courts should refrain from second-guessing the disciplinary decisions made by school administrators.'" Slip Op. at 18. That maxim cannot trump a court's obligation (1) to "[d]raw[] all inferences in the light most favorable to Doe," not the university, *Univ. of Scis.*, 961 F.3d at 201; or (2) to allow Mr. Doe's claim to proceed so long as gender discrimination is a plausible explanation, even if other plausible explanations would exonerate Princeton, *Princeton III*, 30 F. 4th at 345. It also predates the modern era of Title IX litigation, in which courts—including the Third Circuit and district courts therein—second-guess schools all the time. *See, e.g., Doe v. Coll. of New Jersey*, 2023 WL 2812362, at *6-7 (D.N.J. April 5, 2023); *Doe v. Princeton Univ.*, 2023 WL 1778832, at *7 (D.N.J. February 6, 2023); *Saravanan v. Drexel Univ.*, 2017 WL 5659821, at *5 (E.D. Pa. November 24, 2017).

It's plausible to infer that the evidentiary standard the panel developed was applied to discredit only Mr. Doe because of the panel's assumption that men typically are the aggressors, and thus that less evidence is required to believe a woman who says she was passive than to believe a man who says she was aggressive. That would be a plausible inference even if this evidence existed in isolation; it's even more plausible against the backdrop of the panel's apparent belief that female virgins would rarely be upset at their partners' abruptly ending things midway through.

The Court's opinion did briefly address this second set of "archaic assumptions" allegations. It stated that "[a]t most, Plaintiff alleges that Princeton demonstrated gender bias when it chose to believe Roe's story over his due to 'archaic assumptions,' including that the panel failed to believe that Roe could be the aggressor as a woman. (Compl. ¶319.)." Slip Op. at 18. "Such conclusory statements," the Court continued, "cannot serve as the basis for a complaint to survive dismissal." *Id*. But Mr. Doe did not allege, in conclusory fashion, that since the panel didn't believe him, it must therefore be the case that the panel used archaic assumptions. He did not cry "archaic assumptions" simply because he lost a swearing contest. He instead pointed to the two concrete statements discussed above, from the panel's rationale itself, that plausibly revealed those assumptions. Compl. ¶¶236-37.

Those allegations, by themselves, suffice to state a Title IX claim. Like the allegations in *Rice University* and *Marymount University*, they are evidence that come from the mouths of the adjudicators themselves and plausibly suggest that their thinking was influenced *at least in part* by outdated gender bias. As in those cases, there may very well be innocent, non-discriminatory explanations for the panel's statements. But "though anti-male bias is not the only plausible explanation for the university's conduct, or even the most plausible, alternative explanations are not fatal to Doe's ability to survive a Rule 12(b)(6) motion to dismiss." *Princeton III*, 30 F.4th at

7

344 (emphasis added). It is at least plausible, and indeed likely, that outdated notions of how men and women behave in sexual encounters explain the panel's reasoning.

II. **The Opinion Also Erred in Concluding That the Many Ways Princeton Treated Mr. Doe Worse Than Ms. Roe Were Not Evidence of Gender Bias.**

In *Princeton III*, the Third Circuit held that external pressure on Princeton, combined with two ways in which the parties there were treated unequally, sufficed to state a Title IX claim. *Princeton III*, 30 F.4th at 344-45 (discussing higher threshold applied to male for initiating formal action and greater sanction given to him for similar infraction). Here, Mr. Doe described several important ways in which Princeton treated Ms. Roe more favorably than he or applied different standards to them. *See, e.g.*, Compl. ¶319 (summarizing ways). The Court rejected these as evidence of bias because they were not the *same kinds* of uneven treatment alleged in *Princeton III*.[4] That was error. *Princeton III* never said that those two types of uneven treatment are the only ones that can supply evidence of gender bias. The reason they were the focus in *Princeton III* was because that plaintiff had brought a classic "selective enforcement" claim (one of the doctrinal tests that *Yusuf* had superimposed on the statute) and thus argued from the two types of uneven treatment relevant to *that kind of claim*. *See Doe v. Princeton Univ.*, No. 320-cv-4352-BRM-TJB, 2021 WL 194806, at *3 (D.N.J. Jan. 20, 2021), *vacated and remanded*, 30 F.4th 335 (3d Cir. 2022). He did so because he filed his complaint before *University of the Sciences* rejected the *Yusuf* framework. Other Circuits applying the *Purdue* standard have found that differential treatment other than "selective enforcement" supplies evidence of gender bias. *See, e.g.*, *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 940 (9th

---

[4] Slip Op. at 17-18 ("Plaintiff's allegations do not give rise to a Title IX claim. The Complaint is devoid of allegations that Princeton had a history of only investigating female complainants and ignoring male student complaints. Nor does Plaintiff allege that he lodged his own complaints of sexual harassment or assault with the University that were ignored.").

8

Cir. 2022) (harsher treatment of male respondent's fact witnesses was evidence of gender bias). Reading *Princeton III* as holding that *only* those two types of uneven treatment can show gender bias is in direct conflict with *University of the Sciences*'s rejection of the *Yusuf* framework.

It also doesn't make sense as a logical matter. Giving a party a harsher sanction is no more inherently gendered than questioning them more harshly (Compl. ¶200), approaching only their witnesses with skepticism (Compl. ¶279), or judging their credibility by a different analytical standard (Compl. ¶104). All of those things can be done equally to both males and females. If giving a male a harsher sanction than a female can be evidence of gender bias (as *Princeton III* indisputably held), then questioning a male more harshly than a female can also be evidence of gender bias, as can setting a higher credibility bar for the male. All of these simply describe different procedural irregularities, and "procedural irregularity alone *already* suggests bias" of some sort. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 n.48 (2d Cir. 2019) (emphasis in original). The only question is whether there is anything that makes it plausible to infer that the kind of bias at issue is *gender* bias. And here, as this Court recognized, there is: the exact same external gender-based pressure that was at issue in *Princeton III*. Slip Op. at 14 (crediting allegations of gender-based external pressure). That pressure makes it plausible to infer that the bias against Mr. Doe that permeated his proceeding wasn't just anti-respondent bias, or anti-Mr. Doe bias, but gender bias. As the Second Circuit has put it, "It is precisely because procedural irregularity alone *already* suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias **on account of sex**." *Hofstra Univ.*, 935 F.3d at 33 n.48 (latter emphasis added). Mr. Doe's allegations of thoroughgoing bias show just how deeply bias affected his proceeding, and his allegations of external and campus pressure (and, additionally, archaic assumptions) make it at least plausible to infer that the bias was gender-based.

9

The opinion also erred in concluding that, unless a school conducts a *completely* one-sided investigation, where it examines *none* of a respondent's witnesses, the investigation cannot be evidence of gender bias.[5]  That is a standard that applies in no other anti-discrimination context, and "[t]here is no heightened pleading standard for Title IX claims," *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020).  Courts routinely find that a school's refusal to interview some, but not all, of a party's witnesses can supply evidence of gender bias.[6]  Refusing to interview 100% of a party's witnesses certainly is *stronger* evidence of bias, but a less-than-fully-one-sided investigation is still evidence of bias.

Mr. Doe, moreover, pled that *highly relevant* witnesses were ignored, especially on remand.  The whole point of remand was to remedy "'possible procedural unfairness'" "'related to [Roe's] credibility.'"  Compl. ¶249.  Yet the panel on remand did not interview "a single non-party witness who might have challenged Roe's credibility."  *Id.* ¶267.  Instead, *all three* of the non-party witnesses who were interviewed were used to challenge Mr. Doe's credibility.  *Id.* ¶268 (Student D), ¶269 (Student L), ¶271 (campus security officer).  The panel refused to re-interview Student H, whom Ms. Roe had effectively accused of lying about the story she had told him, and which he took *contemporaneous notes of*.  *Id.* ¶257.  And it refused to interview

---

[5] *See* Slip Op. at 18 (citing cases in which gender bias was found where zero respondent-side witnesses were interviewed); *id*. at 17-18 ("Plaintiff does not allege that the University . . . failed to interview him or his witnesses.  In fact, Princeton interviewed twenty-six (26) witnesses in total, including 'nine connected to' Plaintiff.").

[6] *See, e.g.*, *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107 (2d Cir. 2022) (lopsided investigation supported inference of gender bias where school failed to "interview *certain* witnesses or ask *certain* questions that could have produced information favorable to" male respondent) (emphasis added); *Hofstra Univ.*, 935 F.3d at 34 (citing complaint's allegation that school "did not in fact interview each" witness plaintiff offered (2:17-cv-05562-DRH-AYS (Nov. 24, 2017), at ¶¶32, 39) and holding that it supplied evidence of gender bias); *Doe v. Columbia Univ.*, 831 F.3d 46, 49 n.3 (2d Cir. 2016) (school interviewed "at least one witness identified by Doe," yet investigation deemed lopsided and supplied evidence of gender bias).

Student GG, a female student whom Student R had said had evidence of Ms. Roe's true motives for filing when she did. *Id.* ¶¶290-91. It won't do to say that, *overall*, Princeton "interviewed twenty-six (26) witnesses in total, including 'nine connected to' Plaintiff." Slip Op. at 18. Most of those were interviewed during the initial investigation, which Princeton conceded was "procedural[ly] unfair[]" in granting Mr. Doe's appeal. Compl. ¶249. The remand investigation was supposed to correct that unfairness, yet that investigation was completely one-sided against Mr. Doe. Even if it were true that only a completely one-sided investigation could serve as evidence of bias, the remand investigation would qualify.

Allowing schools to escape Title IX liability simply by interviewing *some* witnesses for one side, no matter the quality of those interviews, would elevate form over substance in an extreme way. It is not the law in this context or any other.

### III. The Panel's Rationale Supplies Still More Evidence of Gender Bias.

Finally, multiple circuits—including the *Purdue* court—have held that when an adjudicator's rationale is "inexplicable," "perplexing," or "against the substantial weight of the evidence," it is evidence of bias.[7] The panel's rationale was just that, as Mr. Doe pled, yet the opinion did not even address that argument. Ms. Roe said only "a few minutes" passed between the time they started kissing and the time they had sex. Compl. ¶153. The panel credited that. *Id.* ¶303. But Ms. Roe provably covered Mr. Doe's neck in hickeys—after initially lying about it. That would have taken several minutes. The panel agreed that Ms. Roe's story about supposedly doing so *after sex* didn't make sense. *Id.* ¶222. Which means she only could have done so before sex. And since only a "few minutes" passed before they had sex, she would have

---

[7] *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020) ("inexplicable"); *Purdue Univ.*, 928 F.3d at 689 ("perplexing"); *Doe v. Univ. of Arkansas*, 974 F.3d 858, 864 (8th Cir. 2020) ("against the substantial weight of the evidence set forth in the complaint").

11

been giving him hickeys from the very start.  *Which means she would have been doing so exactly when Mr. Doe supposedly was kissing and touching her non-consensually*.  That rationale makes zero sense and is still more evidence of bias.

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that his Motion for Partial Reconsideration be granted and that his Title IX claim be reinstated.  And he again thanks the Court for granting him the extra time needed to file this motion.

Dated: January 16, 2024

Respectfully submitted,

DILLON PLLC

*/s/ Justin Dillon*
Justin Dillon (*pro hac vice*)
Christopher C. Muha (*pro hac vice*)
171 K Street N.W., Suite 900
Washington, D.C. 20006
Phone: (202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com

SCARINCI HOLLENBECK

By: */s/ Jon-Jorge Aras*
Jon-Jorge Aras, Esq.
jjaras@sh-law.com
519 8th Avenue, 25th Floor
New York, NY 10018
212-286-0747

*Counsel for Plaintiff John Doe*

12

**CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2024, I caused the foregoing John Doe's Motion for Partial Reconsideration to be served upon counsel of record for Princeton University through the Court's CM/ECF system.

/s/ Jon-Jorge Aras
Jon-Jorge Aras