# EXHIBIT B

1    REALTIME AND INTERACTIVE REALTIME TRANSCRIPT

2       ROUGH DRAFT DISCLAIMER

3      - - - - -

4      IMPORTANT NOTICE:

5      AGREEMENT OF PARTIES

6      - - - - -

7    We, the party working with real-time and

8   rough draft transcripts, understand that if we

9   choose to use the real time rough draft screen or

10  the printout, that we are doing so with the

11  understanding that the rough draft is a

12  non-certified copy.

13    We further agree not to share, give, copy,

14  scan, fax or in any way distribute this realtime

15  rough draft in any form (written or computerized)

16  to any party.  However, your own experts,

17  co-counsel and staff may have limited internal

18  use of same with the understanding that we agree

19  to destroy your real time rough draft and/or any

20  computerized form, if any, and replace it with

21  the final transcript upon its complete.

22     CASE:  John Doe V. Princeton

23

24     DATE:  November 26, 2024

25

1    Reporter's note:  Since this proceeding has

2  been real-timed and is in rough draft form,

3  please be aware that there may be a discrepancy

4  regarding page and line number when comparing the

5  realtime screen, the rough draft, rough draft

6  disk, and the final transcript.

7    Also please be aware that the realtime

8  screen and the non-certified rough draft

9  transcript may contain untranslated steno,

10  reporter's note in double parenthesis, misspelled

11  proper names, incorrect or missing Q/A symbols or

12  punctuation, and/or nonsensical English work

13  combinations.  All such entries will be correct

14  on the final certified transcript.

15    COURT REPORTER'S NAME:  Melissa Lumi.

16    FIRM NAME:  Veritext

17

18

19

20

21

22

23

24

25

1       UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW JERSEY

2

3  X---------------------------X
    JOHN DOE,         :  REMOTE
4               : VIDEOTAPED
        Plaintiff,   : DEPOSITION OF:
5               :
      vs.        :
6              :
   PRINCETON UNIVERSITY,    : MICHELE MINTER
7              :
       Defendant.   :
8              :
  X---------------------------X
9

10  C O M P U T E R I Z E D  T R A N S C R I P T
    of the stenographic notes of the proceedings in
11  the above-entitled matter as taken by and before
    MELISSA J. LUMI, a Certified Court Reporter, No.
12  30X100237000, and Notary Public of the State of
    New Jersey, taken remotely, on November 26, 2024
13  commencing at 9:30 in the forenoon.

14

15

16

17

18

19

20

21

22

23

24

25

1  A P P E A R A N C E S :

2

3  DILLON PLLC
   BY:  JUSTIN DILLON, ESQ.
4      CHRISTOPHER C. MUHA, ESQ.
       1717 K Street NW - Suite 900
5      Washington DC  20006
       Jdillon@dillonpllc.com
6      Cmuha@dillonpllc.com
   Attorneys for the Plaintiff.
7

8
   CROWELL & MORING, LLP
9  BY:  AMANDA BERMAN, ESQ.
       DERRICK DAILEY, ESQ.
10     1001 Pennsylvania Avenue NW
       Washington, DC  20004
11     Aberman@crowell.com
       Ddaily@crowell.com
12  Attorneys for the Defendant.

13
   ALSO PRESENT:
14     Thea Popko - videotape Operator

15

16

17

18

19

20

21

22

23

24

25

5

8   consolidated all of that into one policy and

9   handled it all out of my office as of 2014.

10      Q.    Okay.  So were there different --

11  before then, were there different -- well let me

12  sort of separately distinguish sort of policies

13  which may define sexual conduct is, sort of set

14  the rules that students have to follow versus

15  sort of the procedures that would be used to

16  investigate claims of a policy violation.  So

17  prior to this time were there different policies

18  within the school, in terms of, like, what

19  constituted sexual harassment or sexual

20  misconduct?

21      A.    In terms of the definitions of

22  policy violations, no.  They all worked from the

23  same set of definitions, which they had slightly

24  different procedures that they would have used,

25  you know, faculty had slightly different rights

                         21

1   under -- for appeal, for example, and so on.  So

2   -- and each handled their own -- handled the

3   investigations in their own process.  So, yes, I

4   would say there were some procedural different

5   but the underlying principals were the same.

6       Q.    Okay.  Okay.  And then -- but so

7   after 2014, the investigations were all conducted

8   essentially by this -- by would you call it the

9    title the office or -- what would you call it?

10        A.    Well, its precise name is the

11    Office of Gender Equity and Title IX

12    administration.  Shorthand you can call it the

13    Title IX office.

14        Q.    All right.  Okay.  I'll do that

15    today, but understanding that it has a longer

16    title.  Okay.  Okay.  So they were all run

17    centrally after 2014.  And I understand that one

18    of the other changes that came about in 2014 was

19    the change in the standard of proof for Title IX

20    cases.  Was that part of the resolution agreement

21    as well?

22        A.    Yes, it was.

23        Q.    Okay.  And so what was it before

24    the resolution agreement went into effect?

25        Q.    It was largely clear and

                              22

1    convincing, which was the standard for -- well,

2    and let me be more precise about that.  It

3    depended.  For students, it was clear and

4    convincing.  For employees and -- which includes

5    faculty, it was already preponderance?

6        Q.    Okay.  All right.  And so part of

7    the resolution agreement was requiring that

8    preponderance be used for undergraduate students

9   as well.  Basically for everybody.

10        A.    Yes, for undergraduate and

11   graduate students, yes.

12        Q.    And what had been the reason for

13   having a different burden of proof for

14   undergraduate students before 2014?

15        MS. BERMAN:  Objection.  Form.

16   Foundation.

17        Q.    So she'll -- for record keeping

18   purposes, we make objections as we go so that

19   down the road we can say, oh, I think this

20   question was unclear, for instance, or whatever,

21   but as long as she tells you -- as long as she

22   doesn't say don't answer that question, after she

23   makes the objection you go ahead and answer, and

24   -- yeah.

25        A.    Okay.  Now I've -- could you state

                              23

1   the question again?

2        Q.    Yeah, yeah, yeah.  Sure.  No

3   problem at all.  Just what the reason was for

4   having the different standard of proof for

5   undergraduate students compared to the rest of

6   the community.

7        A.    To be clear, it was for all

8   students, undergraduates and graduate students.

9        Q.    Okay.  Got it.

10      A.    This predates me, but because the

11   standard of proof in other disciplinary matters

12   for all knowledge graduate matters was clear and

13   convincing, there was a consensus at that time

14   that that was the appropriate standard to use,

15   and that it would be challenging to maintain two

16   different standards in one disciplinary system.

17      Q.    Okay.  Okay.  Okay.  And were

18   there other changes that Princeton made, I guess

19   to the way it resolved student cases as a result

20   of the 2014 resolution agreement?

21      A.    Well, there were -- I mean, there

22   were fairly significant shifts in the process,

23   right, there was a completely new policy drafted,

24   things were moved to another office.  The

25   investigators -- the previous process had used a

                        24

1   kind of committee structure, the committee on

2   discipline to handle these cases.  So it was a

3   fairly dramatic procedural shift in the process.

4      Q.    Yeah.  And so the committee

5   system, that's a -- I'm just a little familiar

6   with it, but that's basically like a live hearing

7   structure into -- for adjudicating cases?

8      A.    Yes, yes, so that used a live

9   hearing, it involved faculty and students as the

10  hearing panel.  It's quite a different structure.

11       Q.    I see.  Okay.  And so part of the

12  resolution agreement was moving away from that

13  structure to the structure that we had in the

14  case that we're dealing with here, where the --

15  and I'll just summarize it as I guess the

16  investigators conduct the investigation and then

17  also make a determination on responsibility or

18  not.

19       A.    Correct.

20       Q.    Okay.  So that was part of this

21  change in 2014.

22       A.    Yes.

23       Q.    Okay.  Okay.  And then you said

24  that the makeup of the adjudicators, that's --

25  that was another change that occurred that was

                          25


1  part of this resolution agreement?

2       A.    Yes.  The resolution agreement

3  required us to put a new policy in place and OCR

4  approved that policy.  So, yes, it was part of

5  the new policy.

6       Q.    Right.  Okay.  And did they

7  specifically say you can't have -- I think you

8  said for the committees structure, the panels are

9  mixes of administrators and students.

10       A.    Yes.

11    Q.    Okay.  Did they say that that's --

12    you guys can't do that for Title IX?  You have to

13    only have -- you cannot have students on these --

14    your Title IX panels.

15    A.    I don't remember whether that was

16    a requirement.

17    Q.    Okay.  Do you recall any

18    discussions about why, like -- were you involved

19    in these -- I assume that as the head of this

20    office you were involved in the discussions with

21    OCR for the back and forth that led to the

22    resolution agreement?

23    A.    Yes.

24    Q.    Yeah.  What was -- what was OCR's

25    reason for insisting that you -- Princeton not

                          26

1    use a live hearing to to resolve sexual

2    misconduct claims?

3          MS. BERMAN:  Objection.  Form.

4    Foundation.

5    A.    OCR did not require that.  I mean,

6    so it wasn't OCR saying that we couldn't use a

7    live hearing.  OCR provided guidance and there

8    were a range of options as to how colleges and

9    universities could meet that guidance.  So it was

10    not a requirement of OCR that we not have a live

11  hearing.

12      Q.    Okay.  Well, you had had a live

13  hearing for, I guess for as long as you had been

14  there starting in 2011, and it was only in

15  response to this OCR investigation that Princeton

16  changed its structure.  But you're saying that

17  was -- it had nothing to do with any preference

18  from OCR about how they wanted Princeton to

19  structure its Title IX office?

20      A.    Correct.  OCR did not tell us how

21  we should comply.  There is still significant

22  deference under the guidance to -- to appropriate

23  institutional models.  That -- you know, it was

24  Princeton that made a decision about what it

25  believed to be the right way to structure its

                          27

1   procedures.  We weren't -- we were not mandated

2   to do that by OCR.

3       Q.    Yeah, but, like, I mean, did you

4   feel some level of pressure?   I mean, did you

5   get the sense that OCR preferred the system that

6   Princeton would adopt over something like a live

7   hearing?

8       A.    No.

9       Q.    So was it just coincidence that

10  Princeton made this change while they were under

11  OCR investigation?

12          MS. BERMAN:  Objection.  Form.

13  Foundation.

14      A.    It wasn't a coincidence.  At the

15  time, given that we were going to be entering

16  into a resolution agreement and were going to

17  revise our policies and create a new office, we

18  took it as an opportunity to try and develop what

19  we believed would be a good best practice model

20  for -- for -- for doing the work.

21      Q.    So what was it that -- what was it

22  that OCR said Princeton was doing wrong that sort

23  of occasioned the hole investigation?

24          MS. BERMAN:  Objection.  Form.

25  Foundation.

28

1       A.    OCR's judgment was that Princeton

2   should have shifted its undergraduate cases to

3   the preponderance standard.

4       Q.    Okay.  So they didn't care as much

5   about the structure so much, they were more

6   concerned about the burden of proof?

7       A.    Yes.

8       Q.    And OCR was telling you that the

9   burden of proof was contrary -- was like illegal

10  or was somehow, like, contrary to Title IX?

11      A.     Well, at the time, OCR was putting

12  out guidance, it did not issue regulations.  But

13  it was treating its guidance as extremely

14  serious, and so its position was that Princeton

15  should have adjusted to its guidance.

16      Q.    Okay.

17      A.    Regarding that matter.

18      Q.    Right.  Right.  So kind of telling

19  you, like, well this is -- this is just guidance,

20  guys, but we're going to conduct a big -- I mean

21  like how -- my understanding is that they are

22  fairly, like -- this is like a like have probing

23  into your affairs, like they would look at three

24  years worth of data, you know, obviously you have

25  to have counsel to kind of guide you through all

                          29

1  of this.  Like this is a pretty big hassle slash

2  undertaking to be under OCR investigation.  Is

3  that -- that seems fair, I would think.  I can

4  see you nodding.

5      A.    It's a lot of work.  They have a

6  job to do, and it's appropriate that they do it

7  but it is a lot of work, yes.

8      Q.    Yeah.  Yeah.  Right.  And, I mean,

9  do you recall at the time that the head of OCR

10  making statements about, you know, we --

11  essentially saying we are willing to go after

12  school's federal funding if we feel like they're

13   not in compliance with Title IX?

14        A.    Yes.  Catherine Laaman, who was

15   leading OCR at that point, did make some very

16   strong statements about her intention to hold

17   schools accountable.

18        Q.    Yeah.  Yeah.  And do you recall

19   OCR stating that -- I think a direct quote was

20   that they, quote, strongly discouraged life cross

21   examination in Title IX proceedings?

22        A.    I don't remember that quote

23   specifically.

24        Q.    Okay.  All right.  Do you remember

25   -- so there was a 2011 "Dear Colleague" letter

                              30


1   and then there was also -- do you recall that in

2   2014, there was a -- they published something

3   called a questions and answers on Title IX?

4        A.    Yes, I remember that.

5        Q.    Okay.  Great.  And I see you

6   nodding but, like, for the -- they'll tell you

7   they need like a verbal answer, which is why I'm

8   waiting to he -- in normal conversation I would

9   just keep going, but, yeah, okay.  I'll just

10   represent to you that in one of those documents

11   and as we sit here I frankly don't remember which

12   of the two it is, but that in one of those two

13  OCRs said that they, quote, strongly discouraged

14  schools from using live cross examination in

15  Title IX cases.

16              So, you know, given the way they

17  had been treating their guidance, I mean, I think

18  as you sort of suggested, it was guidance in name

19  but they were strongly suggesting to you that you

20  should get rid of the preponderance of evidence

21  standard.  So it would make sense that at that

22  time, and maybe you don't specifically remember

23  it, but it would make sense they would also

24  strongly suggest you should get rid of live cross

25  examination, too.  Like would that make sense?

                          31

1              MS. BERMAN:  Objection.  Form.

2       A.    Just to correct, you said they

3   were encouraging us to get rid of the

4   preponderance standard.  They were encouraging us

5   to use the preponderance standard.

6       Q.    I'm sorry, yes.

7       A.    Yes, I don't recall the substance

8   of that FAQ very well, after this amount of time,

9   but, yes, they -- we certainly took seriously

10  their guidance.

11      Q.    Yeah.  So if they had said -- and

12  again just for purposes of the question I'll just

13  ask you to assume it because I don't remember

14   which document it's in, that they strongly

15   discouraged live cross examination.  So that

16   would be -- that would weigh into your

17   consideration about should we continue with a

18   process that has live cross examination or should

19   we adopt a process that they're more comfortable

20   with.

21        A.    Yes, I'm sure that that would have

22   been a consideration.

23        Q.    Okay.  To date, do you recall any

24   explanation about why they -- and this might be

25   getting too far into the weeds from something

                              32

1   that was ten years ago, but do you recall any of

2   there explanation about why a clear and

3   convincing evidence standard was not consistent

4   with Title IX in their view?

5        A.    My recollection is that there was

6   concern that it would be chilling, that it would

7   cause complainants to be less willing to come

8   forward.  Hard stop.  I think that was the reason

9   that I -- that they were expressing.

10        Q.    Okay.  And so in response -- so

11   when you -- after the resolution agreement was

12   entered into, did Princeton -- Princeton did -- I

13   mean I think I know the answer to this, did

14  Princeton change the burden of proof that it used

15  in other student discipline matters or did it

16  leave that at the clear and convincing evidence

17  standard?

18       A.    For other matters it kept the

19  clear and convincing standard.  Yes.

20       Q.    So then I guess jumping forward,

21  as you I'm sure recall in 2017, the "Dear

22  Colleague" letter, the 2011 "Dear Colleague"

23  letter was rescinded and government announced it

24  would be going through like a formal rule making

25  process for Title IX matters.  Do you recall that

33

1  time?

2       A.    Yes.

3       Q.    Okay.  Yeah, more than I want to

4  probably.  And, you know, part of what was

5  announced there was that schools would now have

6  the option of using the preponderance of the

7  evidence standard but would not be required to

8  use it.  They could also use the clear and

9  convincing evidence standard.  Were there

10  discussions at Princeton about whether you should

11  revert back to the standard that Princeton had

12  used before that resolution agreement and was

13  continuing to use in any other kind of student

14  discipline matter?

15          MS. BERMAN:  Objection.  Form.

16     A.    My recollection is that they gave

17  us the option but that we had to be consistent

18  across matters.  So we couldn't use -- if we were

19  going -- let me just stop there.  We -- we did

20  look at it briefly, but our sense was that the

21  process was working fairly and appropriately and

22  that the swinging back and forth of the policy

23  and the framework was challenging for the

24  community to understand and -- and of course then

25  you would have to retrain everyone who was

                        34

1  involved.  So our goal was to minimize those kind

2  of shifts.  We had -- I had switched to

3  preponderance as we had be required to, it was

4  working well, we felt that the system was fair.

5  So we decided to stay with it.

6     Q.    I guess my question is just about

7  that -- that change.  You know, since that was

8  the one that had occasioned the OCR

9  investigation, was like they were basically

10  saying this is the problem that you guys need to

11  fix.

12     A.    Uh-huh.

13     Q.    After the "Dear Colleague" letter

14  was rescinded and especially after the new regs

15  were put in place giving schools permission to

16  use a different standard, I guess Princeton could

17  have just changed that part of the policy if it

18  had wanted to.  Like it wouldn't mean to have,

19  like, wholesale adopted its pre-2014 system at

20  that point.  Right?

21      A.    Correct.

22      Q.    So was there a discussion about

23  changing just the burden of proof back to the old

24  burden of proof before OCR swooped in and the one

25  that Princeton continued to use in all of the

                              35

1  other student discipline cases?

2          MS. BERMAN:  Objection.  Form.

3      A.    There was discussion, as I said,

4  but there was a decision that we should stick

5  with the preponderance standard, it was working

6  well, we believed it was producing fair outcomes,

7  the community understood it, and it was actually,

8  although it was not consistent with other student

9  disciplinary cases, it allowed for a consistent

10  policy across all campus populations because that

11  had been the standard always used for faculty and

12  staff.  So it allowed this policy to be

13  consistent and coherent and given that we

14  believed it was producing fair outcomes, we

15  didn't see a reason to switch back.

16      Q.    And you said the community

17  understood it as one of the reasons you thought

18  it was better to just kind of keep it in place,

19  but they also would have understood the clear and

20  convincing evidence standard since it was being

21  used in a bunch of other areas, too.  Correct?

22      A.    Yes.

23      Q.    All right.  And so then I guess

24  maybe the other point then you said was that you

25  thought it was producing fair outcomes.  How did

36

1  you guys -- how do you -- how do you arrive at

2  that determination that we think this is

3  producing fair outcomes?

4      A.    That's a judgment call, of course.

5  Basically, you know, that's -- part of the

6  process is that there is a right of appeal.  If

7  the appeals committee is generally upholding the

8  outcomes, it suggests that the cases are making

9  sense to them as they're -- as they are reviewing

10  them, and so that's one of our tests is the --

11  and of course the appeals committee will have

12  moments when it remands something or it raises a

13  question.  That's also an appropriate part of the

14  process, but, in general, it appears -- my

15  feeling was that the cases were going -- were --

16  the process was being followed properly, that the

17  appeals committee was generally comfortable with

18  the way the process was taking place, but it's a

19  judgment call.

20      Q.    Okay.  And I know there were, like

21  -- like, for instance, into '19 there were large

22  demonstrations on campus, I refer to them as the

23  PIXR process, I don't know if that's a formal

24  name, but if I say that --

25      A.    I know.

                          37

1       Q.     -- you know what I'm talking

2   about.  Okay.  Great.  So there have been --

3   there and I imagine you've seen in the daily

4   Princetonian a lot of voices advocating for ways

5   to make the systems more, I don't know what the

6   -- like more appropriate and easier for parties

7   to go through, you know, asking Princeton is

8   there any more cognizant of the difficulty of

9   going through -- of reporting sexual misconduct

10  of going through a Title IX process, and did you

11  have discussions, like, around that time with,

12  like I representatives of those groups?   I know

13  they were sort of calling for some pretty serious

14  changes, as I discussed a little bit with Regan,

15  she was specifically called out for that, but do

16  you recall sort of around this time having

17    discussions with them about -- about the process

18    what the most appropriate ways to support

19    complainants consistent with the policies that

20    were in place?

21        A.    Yes.  There was a committee put in

22    place that met a number of times with activists

23    in order to understand there concerns, they also

24    wrote demands and so on.  So I didn't meet with

25    them one-on-one, but there was a committee

38

1    structure that was put in place in order to try

2    and understand their concerns and think about

3    what would be appropriate in terms of

4    institutional response.

5        Q.    Okay.  But that committee would --

6    you would -- would they report up to you, sort of

7    say like this is what we're hearing from them,

8    these are the changes they want, and, I mean, is

9    this part of the -- I guess I'm just sort of

10    globally getting a sense of like when you say we

11    just had a sense or had to make a judgment call,

12    you know, like what the sources of information

13    were that you were hearing and maybe, you know,

14    filtering out, agreeing with part of it, not

15    agreeing, like these streams of information

16    coming at you is what I'm wanting to learn about.

17    MS. BERMAN:  Objection.  Form.

18    Michele, try to let me remember to object before

19    you --

20         THE WITNESS:  Oh, sorry.  Thank

21    you.

22         A.    So the -- that committee that

23    worked in response to that specific period of

24    activism was sort of a combination of two

25    standing committees.  One which was convened by

                          39

1    my office and another which was convened by

2    campus life which worked together so it was

3    referred to as the joint committees.  Princeton

4    uses a lot of governance structures in order to

5    do its work.  So it convenes, working groups or

6    committees who are actually appointed to act as

7    representatives of the community.  So there is a

8    lot of feedback from the community in order to

9    make decisions and to do the discernment around

10    exactly how -- how Princeton policies should be

11    structured and how they should work, and to

12    create accountability, if there were some concern

13    rage.  So in that case, the two committees

14    jointly met and worked, they were chaired by

15    Rochelle -- by Rochelle Calhoun, I think the vice

16    president for campus life, and then I'm

17    remembering correctly a graduate student and an

18   undergraduate student.  I think that's correct.

19   So there were three co-chairs.  So they were

20   working together to respond to the concerns that

21   were being raised.  I was involved, I provided

22   information to them, Regan Crotty provided

23   information, they could gather information

24   independently as well.

25        Q.    Okay.  And did these groups -- I

                              40

1    mean, it's hard to know, I guess, at some level,

2    but did they feel like they had be heard and that

3    you were considering that Princeton was

4    considering giving due consideration to the

5    requests that they had and the concerns that they

6    were raising?

7         A.    You mean the activists?

8         Q.    Yes.  Yes.

9         A.    I think they felt heard.  I'm not

10   convinced that they thought they had gotten

11   everything they wanted, but I -- I believe they

12   felt heard, yes.

13        Q.    Yeah, well, Ms. Crotty remained

14   employed, so they certainly didn't get everything

15   they wanted.  Okay.  But did you, for your part,

16   you know, give consideration to the concerns they

17   had raised as you decided, you know, how do we

18  move forward with our Title IX regime?

19      A.    Yes.  Certainly.  I did not agree

20  with some of the things that the activists

21  expressed.  I don't -- I think there were

22  misunderstandings in there understanding of how

23  the policies work and so on, and some

24  misrepresentations that they made along the way.

25  But I believe they were acting in good faith, and

41

1  I think there are always opportunities in a

2  moment of activism to think about what can be

3  learned, and we did make some adjustments,

4  particularly in our materials for the benefit of

5  both parties, complainants and respondents, to

6  help them have greater clarity around the pathway

7  through the process just to make things a little

8  more transparent for them and so on.  So we did

9  add some additional materials on the web, some

10  additional FAQs and so on in order to help make

11  the process for all parties easier to understand.

12  That was one of the lessons, WAS that they were

13  -- it's a demanding process and they were

14  struggling to understand it.

15      Q.    Okay.  So do you think their

16  concerns were fundamentally disrooted and

17  misunderstandings about how the process worked or

18  did they actually have, like, any substantive

19  criticisms of the process that you thought, yeah,

20  you know what, they're actually right about that,

21  maybe we should change that?

22      A.    I think it was the former.  Yeah.

23  I would say the former.

24      Q.    Okay.  So just some very serious

25  well-intentioned but ultimately just genuine

42

1  misunderstandings about how the process worked,

2  not any valid criticisms of the -- if they had

3  understood it their criticisms wouldn't have been

4  valid.

5      A.    I'm not quite prepared to say

6  that.  I think that they were -- there were some

7  misunderstandings, but I also think there

8  critique of -- the difficulties that they were

9  expressing in understanding certain aspects of

10  the process; for example, their claims this that

11  they -- yes, they were told things and they could

12  read them in the policy but they didn't really

13  understand them, I think those were valid, and

14  expressed in good faith, and sometimes it takes

15  more than one way to express things in order to

16  help, you know, people understand complicated

17  things.  So adding in additional resources, for

18  example, is valid.

19      Q.    Yeah.  One of the -- well, and

20  then the -- okay.  And I think at the end of the

21  process there were -- well, there were two

22  different reports or like studies that Princeton

23  commissioned.  Is that what you're referring to

24  when you say that there were two committees who

25  sort of met with the students and filtered

                          43

1  information up to you?   Are those the same

2  groups that produced the reports, or is that,

3  like, a separate thing?

4      A.    There were two completely separate

5  processes.  So there were two campus committees

6  that worked together to create the joint

7  committee that may issue one of the reports.

8  There was also an external review which was

9  commissioned by the provost at my request which

10  did a privileged review of our program.  So

11  that's a separate report.

12      Q.    And what -- like how did those

13  reports factor into your sense of what's

14  appropriate in our process and whether we should

15  make any changes to our process?

16      A.    Uh-huh.  I found both of the

17  reports to be helpful.  It is good to have

18  feedback about how people are experiencing

19  things, and as I said, I requested the external

20  review, I think it's fine and appropriate best

21  practice to get an external perspective

22  periodically in one's program.  So I think those

23  -- those insights were informative for us.

24      Q.    And did you talk -- in making

25  these decisions about, you know, once the old --

                            44

1  the "Dear Colleague" letter is gone, the new

2  regulations are coming out, did you talk to any,

3  I'll call them pro-respondent groups as you

4  weighed how Princeton should move forward and

5  what kind of system it should use to resolve

6  Title IX claims?

7      A.    Umm...we did not have a

8  pro-respondent group on campus.

9      A.    So, no, we did not talk to

10  activists on campus who were kind of organized as

11  a pro-respondent group.  We certainly followed

12  the national conversation closely and there were

13  a number of national organizations that had a

14  pro-respondent stance, and we read all of the

15  material, all of the back and forth going on in

16  the national conversation about that, but we

17  didn't have a group on campus advocating

18  specifically in a pro-respondent way.

19      Q.    Okay.  Did you solicit any

20  information from the community about whether

21  there are -- I guess I understand there wasn't a

22  group sort of coming to you in the way that,

23  like, PIXR was protesting, you know, for the -- I

24  guess the pro complainant side of things.  Did

25  you solicit this kind of information from the

45

1  community as you guys were weighing the path

2  forward?

3        A.    We routine -- I would say once a

4  year or so would meet with the undergraduate

5  student government, the USG, and the graduate

6  student government, the GSG, and at least once a

7  year with the council of the Princeton University

8  community which was the CPUC.  Those are all

9  bodies which involve students who are elected as

10  representatives.  So we certainly were hearing

11  from them and eliciting their opinions, and there

12  were, during those years, there was a climate

13  survey specifically focused on sexual misconduct,

14  and each time the survey results were released,

15  we would hold town halls so that people could,

16  you know, ask questions, express whatever they

17  were feeling.  So I think we had a number of

18  mechanisms by which we were eliciting student

19  input, but it wasn't specific to saying we want

20  to hear from respondents.

21     Q.    Uh-huh.  From like a

22  pro-respondent side of things.

23     A.    Correct.

24     Q.    Do you recall that one of PIXR's

25  demands was the, quote, medicine

                            46

1   departmentalization of the program and gender and

2   sexuality studies, as a, quote, key step in

3   challenging dominant paradigms of toxic

4   masculinity, homophobia, transphobia and

5   gender-based violence on campus?

6      A.    I do recall that.

7      Q.    Okay.  And what weight did you

8   give to the idea that toxic masculinity was one

9   factor that was affecting Princeton's

10  implementation of its Title IX policy?

11          MS. BERMAN:  Objection.  Form.

12  Foundation.

13     A.    None.  That's -- our process is --

14  treats both parties in the same way.  It doesn't

15  make any presumptions about who is the

16  complainant, the gender of the complainant or the

17  gender of the responsible department.  You know,

18  that's -- student activists is a what they want

19  to say but that doesn't have any relevance in our

20  process.

21      Q.    Right.  So apart from it affecting

22   the implementation of the process, like, did you

23   agree with them that, like, toxic masculinity was

24   one of the root causes of sexual misconduct that

25   the policy had to address?

                              47

1       A.    No.  No.  We don't -- it is not

2   our role under the policy to, you know, make kind

3   of sociological determinations about the

4   underlying causes of sexual misconduct.  And

5   again, our policy is gender neutral.  It does not

6   -- we don't talk about concepts like toxic

7   masculinity in our process.  It's just not --

8   it's not our framework.

9       Q.    So do you believe -- what do you

10   understand by the phrase "toxic masculinity"?

11           MS. BERMAN:  Objection.  Form.

12      A.    What do I understand is intended

13   by that statement?

14      Q.    Yeah, like we've been using it but

15   what's your understanding of what toxic

16   masculinity is?

17      A.    I understand it to be a theory

18   that -- it's pretty unclear, I think to some of

19   us what is intended by it.  I think it could mean

20   lots of things, but I understand it to mean that

21   those who use it mean that there is something

22  inherently or the -- that men are socialized to

23  behave in ways that could be problematic or toxic

24  and that that is bad.

25      Q.    And doesn't a -- I mean, doesn't a

                          48

1   Title IX office should -- it's concerned with not

2   just resolving claims of sexual misconduct but in

3   trying to minimize the occurrence of sexual

4   misconduct on campuses as well.  Right?

5       A.    Yes.

6       Q.    Okay.  So in order to do that,

7   don't you have to sort of consider what you think

8   the root causes of sexual misconduct are in the

9   first place?

10      A.    Yes.  But our role in that is --

11  is to -- we focused in much more on information

12  that is identified through our data at a more

13  tactical and logistical level.  So what does our

14  data show about the relationship between alcohol

15  use and incidence of sexual misconduct, what does

16  our data show about it locations in which -- or

17  the times of year in which sexual misconduct

18  takes place.  We are far more focused on those

19  kind of preventive measures and helping students

20  develop good judgment and so on.  We don't focus

21  in on the sort of theories about why people

22    behave the way they behave.

23         Q.    Well, if certain views of

24    masculinity or the way that men should -- can and

25    should relate to women are a part of what lead to

                                49

1    sexual misconduct in some cases, why wouldn't it

2    be appropriate to address that through training

3    sessions or in some other way with students?

4         MS. BERMAN:  Objection.  Form.

5    Foundation.

6         A.    To be clear, the Title IX offices

7    is -- focuses in on preventing sexual misconduct

8    in fairly tactical ways.  The share office, which

9    is a completely independent office, is more

10   focused -- and also there's a sexual health

11   office connected to the university health

12   services, they are more likely to be focused on

13   helping to develop healthy norms on campus and so

14   on.  And I'm not saying that they focus on things

15   like toxic masculinity.  I'm saying but they are

16   the offices that work with students around

17   developing healthy norms, developing healthy

18   understandings of their own sexual behavior and

19   so on.  We don't do that kind of training in the

20   Title IX office.  That is -- is not our role.

21        Q.    Do you recall that the

22   recommendation of one of the reports that was

23  commissioned, you know, like you mentioned there

24  was an external report and there was an internal

25  report in response to the PIXR protests, that one

50

1  of the recommendations was to hold training

2  sessions for students on, quote, toxic

3  masculinity?

4      A.    Are you saying one of the

5  recommendations made by the activists or one of

6  the recommendations made by the report?

7      Q.    By the reports.

8      A.    I don't remember that.

9      Q.    Okay.  But that would suggest that

10  one of the things you can -- you testified

11  earlier, you know, obviously you considered these

12  reports as you thought about the way forward and

13  picking the right system for Princeton.  Doesn't

14  that suggest that, like, these ideas do influence

15  the kind of structure that the school should

16  adopt?

17       A.    I don't think that our process is

18  -- is influenced by those kind of consents.  Our

19  process is designed to be scrupulously equal to

20  both parties, and it doesn't make any assumption

21  about the gender of the parties.  I would view

22  that recommendation -- which I don't remember, I

23  haven't read that report in a few years, as being

24  something that might have been taken up by one of

25  the other offices that works on sort of questions

                              51

1  of social norming, for example.  Like the share

2  office, but I don't believe that it had an -- I

3  don't see how it would have affected our process.

4  Our process is not designed in that way.

5          Q.    Well, if there's a belief that men

6  intend to be brought up with certain views of how

7  to relate to women sexually, why wouldn't that

8  affect for instance an investigator's view of a

9  male student's testimony when he's talking about

10  why he thought certain external actions by the

11  female student indicated consent to him?

12          MS. BERMAN:  Objection.  Form.

13  Foundation.

14       A.    So our investigators are trained

15  to be really attentive to those kind of sex

16  stereotypes.  They are -- they're not appropriate

17  in our process.  They are trained on unconscious

18  bias.  So we would not want those kind of

19  theoretical frameworks influencing our

20  investigators.  That would undermine their

21  objectivity.

22       Q.    Okay.  So your view, if an

23  investigator believed in toxic masculinity or

24   believed that toxic masculinity was prevalent and

25   was likely to influence the thinking of a male

52

1   respondent, their training would be that you need

2   to disregard that -- even if they think it's

3   actually true, you need to disregard that belief

4   in order to fairly judge the case in front of

5   you.  Do you agree with that?

6        A.    Yes.  The instructions and the

7   training of the panels are to focus on the facts

8   before them and they are trained to do that in a

9   way that avoids that kind of sex stereotyping.

10       Q.    Okay.  Can you elaborate on that?

11   Like how does the training help the investigators

12   and decision makers to root out sort of

13   unconscious bias or unconscious sex stereo

14   typing?

15       A.    So to be clear, I do not

16   participate often in the training.  So there are

17   others, the Title IX coordinator, who could

18   provide much more detail about exactly how the

19   trainings unfold, but in general, if you want to

20   avoid unconscious bias or indulging in those kind

21   of sex stereotypes, the process is to slow down,

22   be very clear about -- so that you're avoiding

23   kind of the cognitive short cutting that can