# EXHIBIT C

```
                                                           Page 1

 1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2
                 Civil Action No. 3:22-5887 (RK)(JTQ)
 3

 4     JOHN DOE,

            Plaintiff,                    REMOTE VIDEOTAPED
 5                                        DEPOSITION OF:
          vs.                             REGAN CROTTY
 6
       PRINCETON UNIVERSITY,
 7
            Defendants.
 8     _____
 9          TRANSCRIPT of the stenographic notes of the
10     proceedings in the above-entitled matter, as
11     taken by and before RITA GARDNER, a Notary
12     Public and Certified Court Reporter of the State
13     of New Jersey, held REMOTELY VIA ZOOM, on
14     Monday, November 11, 2024, commencing at 9:38
15     a.m.
16
17
18
19
20
21
22
23
24
25
```

```
                                                         Page 2

 1      A P P E A R A N C E S :
 2          DILLON PLLC (DC)
            By:  CHRISTOPHER C. MUHA, ESQUIRE
 3          And  KIMBERLY BLASEY, ESQUIRE
            1717 K Street NW Ste 900
 4          Washington, DC 20006
            Cmuha@dillonpllc.com
 5          Kblasey@dillonpllc.com
            (202) 787-5871
 6          Attorneys for the Plaintiff
 7          CROWELL & MORING LLP
            By:  ELI BERNS-ZIEVE , ESQUIRE
 8          And  JAMIE ZEEVI, ESQUIRE
            1001 Pennsylvania Ave NW
 9          Washington, DC 20004
            Eberns-Zieve@crowell.com
10          Jzeevi@crowell.com
            (202) 624-2500
11          Attorneys for Defendant Princeton University
12
        A L S O   P R E S E N T :
13
            VERITEXT LEGAL SOLUTIONS
14          By:  NATHANIEL ARMSTRONG, VIDEOGRAPHER
15
16
17
18
19
20
21
22
23
24
25
```

```
 1      each of those separately.
 2           A.    I really was not very involved while
 3      the protests were happening.  I mean, other
 4      people were involved with that.  With the
 5      reviews, I was interviewed by kind of the various
 6      bodies, but they -- that was the extent of it.
 7      They wrote reports that I ultimately saw copies
 8      of.
 9           Q.    Were you asked to sort of weigh in
10      on, you know, what changes the school should or
11      shouldn't make?
12           A.    I think it was more -- I mean,
13      especially with the external reviewing body was
14      Title IX people and general counsel.  People from
15      other offices, I think they came up with their
16      own recommendations, the internal body was
17      faculty, staff, and students.  They may have
18      asked me, you know, what was feasible or
19      something like that, but I -- I think I, you
20      know, intentionally was viewed as kind of a
21      witness, not a participant in those processes.
22           Q.    Got you.  Changing to another topic.
23                 So you've -- I think you said early
24      on that you were involved in some non-Title IX
25      stuff as an investigator, that as a live hearing.
```

1    And obviously, more recently, schools were
2    required for hold live hearings for -- for Title
3    IX matters.
4                Given your personal choice between
5    the two, so like, if you had to choose a system
6    that looked more like what it did in this case,
7    like the -- we can call this the single
8    investigator model, where the investigators, both
9    investigating and decide a case, or a system that
10   has live hearings, which do you think is a better
11   way of resolving Title IX claims?
12               MR. BERNS-ZIEVE:  Objection.  Form.
13       A.    You know, I have experience in both,
14   I think they'd both work.  I think they are both
15   reasonable.
16   BY MR. MUHA:
17       Q.    And which one do you think is
18   better?
19               MR. BERNS-ZIEVE:  Objection.  Form.
20       A.    I mean, I don't think I have a
21   preference for either one of them.  The -- I
22   think that even prior to 2014, we saw that, you
23   know, hearings had worked prior to 2014, hearings
24   had worked post-2020, and I think the
25   2014-to-2020 process worked as well.

1   BY MR. MUHA:
2           Q.    And I understand that you think both
3   are good systems, but if you had -- if you were,
4   you know, setting up from scratch, the system
5   there, and had the freedom to select either kind
6   of system, which -- which one would you
7   personally choose?
8           A.    I mean, obviously there is
9   regulatory issues, but I think, you know -- I
10  think probably given that we've seen that
11  hearings have been successful and that -- I think
12  it would be hard to switch back from hearings.
13  You know, I think that we probably -- would
14  probably get less litigation.
15                You know, I think -- like there's
16  different Bar associations -- not Bar
17  associations, but there are different legal
18  groups that have weighed in with a preference
19  around hearings, and so I think that that is
20  probably the way most -- or at least some schools
21  would set up their systems now, even if they had
22  the freedom to do whatever they wanted.
23          Q.    Okay.  And when you say less
24  litigation, you mean you think there would be
25  less litigation if schools had live hearings at

1    -- at the school level?
2         A.    I think now there would be, because
3    I think that's a source of litigation that
4    schools didn't have live hearings.
5         Q.    Right, right, right. Okay. And you
6    found that schools have been able to -- I guess
7    one of the -- when people talk about -- like when
8    you think of the pros and cons of each, what are
9    the -- what are the pros and cons of live
10   hearings and what are the pros and cons of the
11   single investigative model?
12        A.    I think that the live hearings are
13   more stressful for the students, for both parties
14   involved. That would be my biggest concern. But
15   I think that we've seen that you can mitigate
16   that. I think the students involved in live
17   hearings, I think it's -- it's stressful, but
18   it's manageable. But I think that is one of the
19   kind of big concerns around that.
20        Q.    So stress is a potential downside,
21   but one that you think schools can mitigate, or
22   that Princeton, you feel, has learned to
23   mitigate?
24        A.    Correct.
25        Q.    Yeah. And then what would be the

1   pros of the live hearing approach, besides less
2   litigation?
3           A.   I think there is a belief by some
4   that it is important to be able to cross-examine
5   parties.  I think that there is a way to do
6   cross-examination in writing and to offer
7   questions that reaches a good outcome, but I
8   think that for some people they would identify
9   that as something important.
10          Q.   And that's -- and you are in the
11  camp that agrees that some level of live
12  cross-examination is important for this process?
13          A.   I think the way that we had our
14  process, where people could submit questions,
15  worked equally as well.  But I think that --
16  again, I think that the process worked equally as
17  well between 2014 and 2020, but I think that
18  communities might prefer having live hearings.
19          Q.   And is that your personal
20  preference?
21          A.   I don't know if I have a personal
22  preference.  I think it would -- I would be fine
23  with either one.
24          Q.   Yeah.  And it may be a small
25  preference, but would you lean toward choosing

1  it, choosing the live hearing approach?
2        A.    I can't tell you.  I really don't --
3  I think they have both worked.
4        Q.    Yes.  And so what are the pros and
5  cons of the live hearing?  What are the pros and
6  cons of the single investigative model?
7        A.    I think that we were able to, under
8  the prior process, move more quickly, and I think
9  it is really difficult for the parties to have
10 these extend for a long period of time.  And I
11 think that the prior model, we were able to move
12 more quickly.
13       Q.    Okay.  So that would be a pro of
14 that approach.  Yeah.
15       A.    Uh-huh.
16       Q.    What are the cons of that approach?
17       A.    I think -- you know, as I explained
18 before, I think there are some people that, you
19 know, feel that the hearing is important.  And so
20 it would be a community issue.  I want people to
21 have -- you know, I want people to feel that it
22 is a good system.
23             So I think having seen that hearings
24 work fine -- going back, I think people would
25 struggle with -- the community might struggle

```
 1        with because it has turned out that hearings have
 2        worked.
 3               Q.    Yeah.  And in terms of that, you
 4        mean like that as an understanding, that each
 5        system has to satisfy different needs, but like
 6        the truth-seeking function, is that what you are
 7        talking about in terms of the benefit of live
 8        hearings?
 9               A.    I think that is some people's
10        perception.  I think the truth-seeking works
11        equally well, but I think that there is a
12        perception by some that the truth-seeking is
13        better than a live hearing.
14               Q.    Okay.  But that is not your view?
15        Your view is that the single investigative model
16        is just as good at the truth-seeking part of it
17        as a live hearing with cross-examination?
18               A.    I do.  I think we have had equally
19        fair outcomes in both systems.
20               Q.    Uh-huh.  I mean, do you think that,
21        you know, obviously you practiced as a lawyer for
22        a while, like, you know the importance of
23        cross-examination in civil and criminal
24        litigation; you don't think it has that same
25        value at a campus hearing?
```

1    A.   I think they are, you know, vastly
2    different processes.  Right.  There is different
3    evidentiary standards.  So again, having seen --
4    I have confidence in the process we use without a
5    live hearing.  So I've seen that I believe that
6    it is fair.
7        Q.   Uh-huh.  I understand you think it
8    is fair, and you think it's a good process
9    overall.  But do you really believe that, for
10   whatever the down sides might be, that a live
11   hearing with cross-examination is a powerful tool
12   for arriving at the truth of what happened in any
13   instance?
14       A.   I think it is a powerful tool, but I
15   also think that there are other systems that can
16   arrive at equally good answers.
17       Q.   Okay.  But again, like --
18   cross-examination has sort of been like the
19   bedrock procedural protection in civil and
20   criminal jurisprudence for -- I don't know how
21   long.  You don't think it is sort of a -- and
22   again, there might be like reasons, besides the
23   truth-seeking function, to opt away from it.  But
24   you don't think of it as sort of a uniquely
25   powerful tool for truth-seeking?

1       A.      I don't think I have seen a
2   difference in hearing cases versus investigator
3   model cases in terms of what I believe was the
4   truth-seeking.
5       Q.      Okay.  During the investigation
6   process in this case, did -- or just in general,
7   do you text with the hearing panelists or appeal
8   panelists or do you communicate with anyone else
9   in the process over text message?
10      A.      I wouldn't text -- you mean about
11  the -- about the case?
12      Q.      Yeah, about the work.  Like, as
13  opposed to sending an e-mail.
14      A.      The only time I could think that I
15  would text would be with the -- the investigative
16  panel members, but -- if I was trying to get
17  their attention to figure out if I could schedule
18  something.  I wouldn't text about substantive
19  issues.
20      Q.      Okay.  And have you had any
21  communications with Jane Roe since the time of
22  proceeding here?
23      A.      No.  I am trying to think if there
24  was ever any situation -- whether there was a
25  situation early on when I was asked to