## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN DOE**, <br> Plaintiff, <br><br> -vs- <br><br> **PRINCETON UNIVERSITY**, <br> Defendant. | **Civil Action No. 22-5887 (RK) (JTQ)** <br><br> **Hon. Robert Kirsch, U.S.D.J.** <br><br><br> *Oral Argument Requested* |

---

## PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON HIS BREACH-OF-CONTRACT CLAIM

**DYNAMIS LLP**
Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
JSolano@dynamisllp.com

**DILLON PLLC**
Justin Dillon. Esq. (*pro hac vice*)
Christopher C. Muha. Esq. (*pro hac vice*)
Kimberly Blasey, Esq. (*pro hac vice*)
1717 K Street NW, Suite 900
Washington, D.C. 20005
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

*Counsel for John Doe*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................. ii

INTRODUCTION ..............................................................................................1

MATERIAL FACTUAL BACKGROUND............................................................4

I. The First Incident – October 2017 ...............................................................4

II. The Second Incident – February 2019 .........................................................5

III. The First Decision. .....................................................................................8

IV. Appeal and Remand. ...................................................................................9

V. The Second Decision....................................................................................10

LEGAL STANDARDS......................................................................................11

ARGUMENT ....................................................................................................13

I. Regan Crotty Rewrote the Decision to Change the Outcome............................13

II. The Panel's Jerry-Rigged Credibility Standard Fails ........................................17

III. Crotty Also Rewrote the Second Case Summary.............................................21

IV. The Panel Repeatedly Refused to Pursue Evidence That Could Undermine Jane...................................................................................................................23

    A. Refusing to Pursue Evidence of Jane's Sexual Aggression—Then Affirmatively Finding Jane Was Unlikely to Be the Aggressor .............23

    B. Intentionally Suppressing Jane's Intake Interview.................................26

    C. Other Efforts to Artificially Curate the Available Evidence.................29

V. Princeton Failed to Provide an Impartial and Unbiased Panel...........................31

VI. Princeton Failed to Provide an Adequately Trained Panel ...............................34

VII. John Suffered Multiple Forms of Damage .....................................................37

CONCLUSION .................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................12

*Collick v. William Paterson Univ.*,
    No. 16-471, 2016 WL 6824374 (D.N.J. Nov. 17, 2016) .............................31

*Doe v. Dordt Univ.*,
    616 F. Supp. 3d 872 (N.D. Iowa 2022) .........................................................37

*Doe v. Johnson & Wales Univ.*,
    425 F. Supp. 3d 108, 114 (D.R.I. 2019) .......................................................29

*Doe v. Princeton Univ.* ("*Princeton III*"),
    30 F.4th 335 (3d Cir. 2022) ................................................................ *passim*

*Doe v. Rochester Inst. of Tech.*,
    2024 WL 1051953 (W.D.N.Y. Mar. 11, 2024) .....................................10, 32

*Doe v. Siena Coll.*,
    2023 WL 197461 (N.D.N.Y. Jan. 17, 2023) .................................................29

*Doe v. Syracuse Univ.*,
    440 F. Supp. 3d 158 (N.D.N.Y. 2020) .........................................................23

*Ferguson v. Jonah*,
    445 N.J. Super. 129 (N.J. 2014) ..................................................................40

*Harris v. New Jersey*,
    No. CV 18-0707 (RK) (JBD), 2025 WL 957777 (D.N.J. Mar. 31, 2025)....12

*Montague v. Yale Univ.*,
    Case No. 3:16-cv-00885, Doc. 177 (D. Conn. Mar. 29, 2019) .............. 34-35

*Osama El-Helw v. Fairleigh Dickson Univ.*,
    2025 WL 2588375 (N.J. Super. Ct. App. Div. Sept. 8, 2025) .....................12

*Pickett v. Lloyd's*,
    621 A.2d 445 (N.J. 1993) .............................................................................37

*Totaro, Duffy, Cannova & Co.*, *L.L.C. v. Lane, Middleton & Co., L.L.C.*,
    921 A.2d 1100 (N.J. 2007)..............................................................................37

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................11

# INTRODUCTION

Princeton found that Jane Roe didn't consent to foreplay but did consent to the sex that came right after it. That never made any sense, which is why John Doe sued—despite having only been placed on probation. His innocence was simply that obvious, and he was determined to clear his name.

Discovery has now made clear that John never had a chance and that Princeton breached its contractual promise to treat him fairly. For example:

- Regan Crotty, then the Director of Gender Equity and Title IX Administration, whose job was just to supervise the hearing process but who played no formal role in it, literally *rewrote an outcome letter* that was going to find John *not* responsible and made it come out the other way. Her sublimely Orwellian term for this was "potential alternate outcome." *See* Argument Section I, *infra.*

- Crotty later rewrote a *second* outcome letter just hours before it was released, removing a line that had been in *nine previous versions* of the draft—namely, that Jane had actually *kissed John consensually* in his room before (as she would go on to say) she said "no" ten times. Crotty's deletion made the decision read as if Jane had said "no" from the start, which was provably false. *See* Argument Section III, *infra.*

- Princeton *intentionally suppressed an entire interview Crotty conducted with Jane*, even though the hearing panel had Crotty's notes from that interview and directly questioned Jane about it. And when what Jane told the panel differed from what she'd told Crotty, the panel just pretended the interview hadn't happened—never mentioning it anywhere in its decision. John would learn about it only through discovery. *See* Argument Section IV.B, *infra.*

- Panelist Walter Wright fundamentally misunderstood Princeton's definition of consent, saying that "sexual assault is based on the victim's point of view of being coerced, not the assaulter's." *See* Argument Section VI, *infra.*

Interfering with the process, conducting secret interviews, hiding evidence, and redefining "consent" weren't the only ways that Princeton put the fix in. It also let a clearly biased panelist (Wright) stay on the case—a panelist whose bias against John was *so* obvious that even Michele Minter—the Vice Provost for Institutional Equity and Diversity and Crotty's boss—would later admit under oath that he was letting his emotions "dictate his view of the case." Ex. 1 at 8 (Minter Dep. at 190:3-12). Ms. Minter also said that she would have expected Crotty to intervene and do something about that—which Crotty never did.

Finally, discovery showed that the credibility standard that the panel *claimed* it was applying—crediting claims by Jane that were made "consistently and clearly"—was not actually the standard it applied. Its treatment of the hickey evidence is the best example of that. Jane had covered John's neck with unwanted hickeys while they were making out. Indeed, he was so concerned about them that he later texted a picture of them to a friend and said, "HELP":



Jane, however, "consistently and clearly" claimed that she gave John at least one hickey at the end of the encounter, and only because he demanded it. So under the panel's purported standard, it would have to believe her. But the "he demanded it" claim was plainly belied by John's literal cry for "HELP" and other evidence discussed below. (Indeed, one of the panelists would later admit under oath that Jane's testimony about the hickeys was "likely" a *conscious lie*. Ex. 2 at 14 (Hubert Dep. at 237: 8-15).) So the panel selectively abandoned its "consistently and clearly" standard and refused to make any finding about the hickeys *at all*. And in so doing, it tipped its hand: it did not, as it claimed, decide the case by applying the "consistently and clearly" standard to Jane's testimony. Rather, it picked the outcome it wanted (victory for Jane), reasoned backwards, and ignored the evidence that contradicted its "standard."

The panel did what Crotty had encouraged it to do from the start: it chose an outcome based on what it *thought* must have happened, regardless of whether the evidence actually supported that, and jerry-rigged a "rationale" from the universe of evidence it had artificially curated. It was not a decision based on a preponderance of all of the available evidence, nor was it handed down by an impartial and unbiased panel. Summary judgment is therefore warranted.

## MATERIAL FACTUAL BACKGROUND

### I.    The First Incident—October 2017

On November 12, 2019, Jane told Princeton that John had assaulted her

on two occasions: the first time more than *two years* earlier, in October of

2017, and the second time *nine months* earlier, in February of 2019. Her

original story about the first incident was a tale of physical abuse from start to

finish. She said that John was rough and pushed her against the wall on the way

to his room, then pushed her head and shoulders down to make her perform oral

sex on him once they got there, even after she expressly said no. Ex. 7 at 5. She

said she gagged and that John *continued* pressing her head down to force her to

keep going. *Id*. But the few witnesses she identified about the incident

contradicted her: Her friend Student I said Jane told her she "hooked up" with

John "as a favor" for letting her sleep there. Ex. 4 at 11. Her friend Student P

said Jane told him they'd "hooked up" and made it sound consensual. *Id.* Jane

even sent John an excited video when she was later admitted to Princeton and

said she was "thankful" he was in her life. Ex. 3 at 4. Finally, John produced

text messages showing that after arriving at Princeton, Jane had flirted with him

and asked him on a date. Ex. 5 at 8-10, 14-15.

John told a much different story that was too weird to make up. He said,

among other things, that after he ejaculated into some paper towels, Jane

resumed oral sex, and he had to tell her she could stop. Ex. 3 at 3. He said he

made a bed for her and offered her some of his grandmother's cookies. *Id.* at

14. And he said everything that happened was consensual. *Id.* at 9-10, 20.

## II.    The Second Incident—February 2019

Jane admitted that on the night of February 7, 2019, she consensually

made out with John even though he had supposedly assaulted her 16 months

earlier. She texted a friend that she was tempted to break her "celibacy pledge."

Ex. 6 at 1. As she walked back to John's dorm, she texted that friend and

another and asked them to call her in five minutes. Ex. 7 at 7. She said she

turned her phone volume to high so she would hear when one of them

responded. *Id.* John would later testify—before seeing *any* of the evidence—

that Jane's friends "had been calling and/or texting" around the time he got up

to get a condom but Jane said, "No it's fine, don't worry about it." Ex. 3 at 7.

Although Jane denied hearing her phone go off, Ex. 8 at 10, Student F's texts

proved he in fact texted her while she was in John's room. Ex. 4 at 14.

Jane then claimed that when they got to John's room, she said no "ten or

more times" as John kissed and touched her. Ex. 7 at 8. She said John then

forced her to have sex. In her first interview, she said it was first vaginal, then

oral. *Id.* at 8. In her second interview, she said it was first oral, then vaginal.

Ex. 8 at 9. She never explained, and was never asked, how John managed to

get her clothes off. Ex. 7 at 7-8. And she weirdly claimed—in all three of her interviews—that after the sex, John made her give him "a" hickey so that people would see it the next day at an eating club event. *Id*. at 8; Ex. 8 at 8; Ex. 10 at 5. In her first interview, she said she gave him "one" hickey. Ex. 7 at 8. When confronted in her second interview with the above photo showing it was a lot more than "one," she implausibly claimed that she "just kept going" because she wanted to get out of there. Ex. 8 at 11. (Instead of just… leaving.) Finally, in her third interview, she claimed that she *could* have given John many of the hickeys at other points of the night. Ex. 10 at 5-6.

What Jane told her friends contradicted what she told Princeton. She told Student H, one of her "best friends," Ex. 7 at 7, that John had pinned her to the bed and forcibly raped her as she begged for him to stop, until she finally ran out of the room sobbing—*all* of which completely contradicted Jane's story to Princeton. Ex. 4 at 19. Student H even produced notes he took contemporaneously while Jane told him that story. Ex. 11 at 1. Jane told Student I that John was on top during sex and wouldn't let her leave, both of which also contradicted her story to Princeton. Ex. 4 at 18. Jane told Student F that the vaginal sex came first, then the oral sex. *Id.* And Jane told Student G that they "'initially started kissing'" in his room and that Jane only became uncomfortable "'when he pressured her for sex.'" *Id.*

6

Once again, John's version of events was too weird to make up and was supported by overwhelming evidence. He said that Jane was very aggressive in his room, pushing him down on the bed with both hands and giving him multiple hickeys as he touched her vagina. Ex. 3 at 6-7. She then said, "It's my turn," took off his pants and underwear, told him she'd "learned so much since last time," and aggressively performed oral sex. *Id.* He said that Jane's phone had gone off multiple times but that Jane had said to ignore it. *Id.* at 7, 20. He said Jane asked for a condom and helped him put it on, since he'd never used one before. *Id.* at 7. He said Jane got back on top of him and they had sex, but he grew uncomfortable and couldn't keep an erection. *Id.* He told Jane as a pretext that he wanted to fix the condom, then told her after they'd stopped that he'd grown uncomfortable. *Id.* Jane then heard laughing from the next room—where four of John's roommates were— and left embarrassed. *Id.* When John later joined those friends, they told him that his neck was covered in hickeys. *Id.* at 19. John produced pictures of them and a Snap message he sent to a female friend desperately asking for "HELP." *Id.* at 7-8.

Unlike Jane's witnesses, John's witnesses corroborated him. Student C said that John had told him shortly afterwards that Jane had been peculiarly aggressive. Ex. 4 at 20. Students D and L both said that John had told them shortly afterwards that Jane had asked for a condom and John was embarrassed that he couldn't stay erect. *Id.* Student D said John had made up an excuse to stop. *Id.* at 5. Student D

7

said John was shocked when he saw the hickeys, Ex. 12 at 3, and Student W said that John had even tried to hide them with makeup, Ex. 13 at 2.

### III.    The First Decision

The panel's first decision found John not responsible for the first incident and responsible for everything but the hickey in the second. Ex. 4 at 23-24, 28-33. To insulate Jane's obvious lies about the first incident from the second, it said it was conducting "independent credibility assessments" for each incident, *despite the fact she had reported them simultaneously*. *Id.* at 20. It also found that Jane had been largely credible as to that first incident while saying *nothing* about the multiple friends who said she described it as a hook-up, *nothing* about the friend who said it was a favor for letting her sleep there, *nothing* about her interest in John the next year, and *nothing* about her consensually kissing him on February 7. *Id.* at 21-22.

The panel also found Jane credible as to the second incident. *Id*. at 24-25. As to the change at the heart of her story (reversing the order of the oral and vaginal sex), the panel somehow found that it *bolstered* her credibility, because Jane explained it by saying she had memory impairment. *Id.* at 25; Ex. 8 at 9. It also said that the testimony of her friends *bolstered* her credibility simply because she'd *told* them it was nonconsensual—while failing to mention that they all contradicted her on the details. Ex. 4 at 25. It said it was simply disregarding Student H's

8

testimony—even though he was the only witness in the whole case who'd taken *contemporaneous notes*. Ex. 11 at 1. And it credited Jane's risible claim that her "celibacy pledge" referred only to *kissing*. Ex. 4 at 25-26.

The panel did the opposite with John: It found him largely *not* credible based on testimony about irrelevant things like his admission to an eating club. *Id.* at 26-27. It also found him "not credible" because it did not believe Jane, as a virgin, would have helped John put on a condom or been upset when he said he wanted to stop. *Id.* at 26. And it made the following findings: (1) Jane said no "ten or more times" to kissing and foreplay; (2) within a "few minutes" of that, John made her perform oral sex; (3) he made her perform vaginal sex; and (4) he asked for "a" hickey, and Jane "ardent[ly]" complied. *Id.* at 28-33.

## IV.    Appeal and Remand

John successfully appealed, and the matter was remanded to the panel to correct "procedural unfairness" to John. Ex. 14 at 2. But the only thing the panel did on remand from John's side of things was re-interview Jane. Besides changing her testimony about the hickeys, she now said that during the first incident, John had *not* physically forced her to perform oral sex while she gagged, but that it was "more of a suggestion because he thought he was teaching me." Ex. 10 at 7. It asked her, for the first time, which of her memories of the incident were "vivid."

9

*Id.* at 3. She listed them and claimed she had memory gaps of "maybe like a minute" between the vivid memories. *Id.* at 6.

The panel did not re-interview Student H to seek clarity on the explosive story one of his best friends (Jane) had told him. Instead, it conducted multiple follow-up interviews drilling further into the irrelevant issues it had used to discount *John's* credibility: when he had learned of his acceptance into his eating club and whether Student L was there when John and Jane returned. *See* Exs. 15, 16. One-sided investigations on remand are proof of a school's failure to apply the preponderance standard. *See Doe v. Rochester Inst. of Tech.*, No. 21-CV-6761, 2024 WL 1051953, at *8 (W.D.N.Y. Mar. 11, 2024) (failure on remand to adequately challenge complainant's credibility, when remand was ordered "for the express purpose of considering additional evidence bearing on Roe's credibility," was evidence panel had not applied preponderance of evidence standard).

## V.    The Second Decision

The panel's credibility findings in its second decision largely tracked those in its first. It said literally nothing about the complete 180 Jane did as to the first incident. Ex. 17 at 5-6. It simply pronounced that it would credit Jane on those things she "consistently and clearly recalled," as if each of her statements existed in a complete vacuum. *Id.* at 10. It then said that, since Jane had clearly and consistently claimed she said "no" "ten or more times" during

10

the kissing and fondling, those acts had to be nonconsensual. *Id.* at 11. But since Jane had admitted on remand that it was possible she gave John hickeys while they were on his bed, those hickeys could have happened after the "ten or more" no's but before the oral sex. *Id.* at 11. And those hickeys may have suggested to John that Jane consented—not to *the kissing that immediately preceded them*, but to the oral sex that followed. *Id.* at 11-12.

That made no sense on its face. But it's even worse given Jane's claim—which the second decision acknowledged—that only "maybe like a minute" passed between her "vivid" memories. *Id.* at 7. That means that, for the panel's rationale to work, Jane went from saying no "ten or more times," to giving John a hickey, to performing oral sex, ***all within "maybe like a minute"***—and that someone in John's shoes would reasonably perceive that 60-second change not as giving in to pressure, but as *consent*. Again, that makes no sense: people don't go from "'no' ten or more times" to "consensual oral sex" within 60 seconds. It was a transparent effort to find a rationale that would let the panel convict John of *something*, even though the evidence did not support it.

## LEGAL STANDARDS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect

11

the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Harris v. New Jersey*, No. CV 18-0707 (RK) (JBD), 2025 WL 957777, at *8–9 (D.N.J. Mar. 31, 2025) (Kirsch, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

> A plaintiff bringing a breach-of-contract claim must show that:
>
> (1) the parties entered into a contract containing certain terms; (2) the plaintiff fulfilled its obligations under the contract; (3) the defendant failed to perform its obligations under the contract, defined as a breach of the contract; and (4) the plaintiff sustained damages as a result.

*Osama El-Helw v. Fairleigh Dickson University*, No. A-2550-23, 2025 WL 2588375, at *8 (N.J. Super. Ct. App. Div. Sept. 8, 2025) (internal quotations omitted). Where the breach-of-contract claim involves a private university's failure to follow its own procedures in connection with disciplinary proceedings, "New Jersey law requires at least that the school follow its own established procedures, and that those procedures be fundamentally fair." *Doe v. Princeton Univ.*, 30 F.4th 335, 346–47 (3d Cir. 2022) (internal citations omitted) (hereafter "*Princeton III*"). Further, given the greater harms that befall a university student, "the procedural rights of a private university student will be more aggressively protected by the courts[.]" *Id.* at 346.

In *Princeton III*, the Court articulated non-exhaustive standards by which the same contract provisions at issue here—Princeton's promises to apply a "preponderance of the evidence" standard and to provide "impartial and unbiased"

12

panelists who are adequately trained—are violated. *See* Ex. 18 (Princeton's Rights,
Rules & Responsibilities, hereafter "RRR") at 21-23, 26-28. A plaintiff can
establish a breach of the RRR's "preponderance" promise by showing that
Princeton, while claiming to apply that standard, in fact "disregard[ed] evidence
that tended to . . . exculpate Doe." *Princeton III,* 30 F.4th at 347. And a plaintiff
can show a breach of Princeton's "impartial and unbiased panelists" promise by
establishing that Princeton:

1. "applied inconsistent standards to assess [Jane]'s and [John]'s
   credibility";
2. "overlooked or minimized glaring and substantial factors that
   would tend to undermine [Jane]'s veracity"; and
3. "disregarded compelling exculpatory evidence which contradicted
   [Jane]'s allegations."

*See id.* at 347. Princeton did each of those three things, and more.

## ARGUMENT

The above already shows that the finding against John was not based on a
preponderance of the actual evidence. Discovery confirmed all the more that
Princeton did not give John anything close to the fair process it promised him.

### I.    Regan Crotty Rewrote the Decision to Change the Outcome

Perhaps the biggest surprise of discovery was that Regan Crotty, the
panelists' supervisor and someone with no "formal role in the process," *see* Ex. 1
at 5 (Minter Dep. at 148:16-19), rewrote the panel's first decision to flip the
findings on the most serious charges against John. Though that decision was later

13

overturned on appeal, her actions exemplify the corruption of Princeton's process.

The panel had finished deliberating the first time around no later than February 20, 2020. By that date, Randy Hubert began drafting the first case summary, which would contain the panel's findings and its rationale. Ex. 2 at 15-16 (Hubert Dep. at 21:5-22:2). The panel's ultimate decision the first time around would be to find John responsible for everything except demanding a hickey. But initially, the panel had actually voted to find John *not responsible* for almost everything—the oral sex, the vaginal sex, and demanding a hickey—and responsible only for nonconsensual kissing and breast fondling. That was the panel's consistent position as Hubert spent the next nine days drafting the first case summary. And it was *still* the panel's position when Hubert sent the completed draft to Crotty on March 1. *Id.* at 4-5 (Hubert Dep. at 29:25-30:1-3).

Even though the RRR gave Crotty no formal role in the process, including no authority to "deliberate with the panel," "tell investigators who they're supposed to interview," or any other role that the RRR "grants . . . to the investigators," Ex. 1 at 2 (Minter Dep. at 68:13-69:10), Hubert sent the completed draft to Crotty alone, not the other panelists. Crotty then made substantive edits and sent it to Minter. Ex. 19, 1. She told Minter that Wright and Chen "have not reviewed it yet" and said that "[b]efore they do," she wanted to get Minter's opinion on "the current outcome"—not rationale, *outcome*—"on the second

14

incident." *Id.* She and Minter spoke the next day, Ex. 20 at 7-8 (Crotty Dep. at 96:25-97:8); the following day, Crotty finally responded to Hubert and the panel.

Crotty's email attached a draft that completely changed the outcome—now finding John *responsible* for the oral and vaginal sex. Ex. 21 at 26. As Wright candidly acknowledged, "suggestions" from Crotty were more than that:

> Well, again, she was my boss. So, you know, if she suggested that I talk to someone, I pretty much interpreted it that I probably should go talk to them.

Ex. 22 at 23 (Wright Dep. at 240:16-19). Crotty explained that "sometimes when we see it written out, it doesn't work as well as it seemed to in theory." Ex. 21 at 1. She then made what was arguably her most consequential statement about the case:

> [Minter] also said that if you think that this happened (which I feel like is where you are), you should write that memo, and we will defend it.

*Id.* But Crotty already knew what Hubert thought *the evidence supported*—it's what Hubert had put in her draft. She was telling Hubert to vote based not on the evidence, but on what she *thought* happened (which is a much different thing)— and then make up a rationale to support it, which Crotty said she'd back. Sure enough, Hubert switched her vote. Ex. 2 at 7 (Hubert Dep. at 45:17-19).

At her deposition, Hubert claimed to have *no idea* what Crotty had meant in that email: "You would have to ask Regan what she meant when she wrote that email," she said. *Id.* at 5 (Hubert Dep. at 30:14-16). And incredibly, she added that

15

what "happened" couldn't refer to the underlying events because "[t]here was no dispute about what happened," *id.* at 6 (38:12-13), which obviously wasn't true.

But Wright—who was also on that email—understood immediately that Crotty was telling Hubert to base her vote on what she *thought* must have occurred, as opposed to what the *evidence supported*:

> Q.    And what is -- when you say, "What you really believe," what is -- can you elaborate on that?
>
> A.    That whether or not she believed an – a sexual assault **occurred or did not occur**, that, you know, she shouldn't feel peer -- peer pressure from either Joyce or from myself, but that, you know, based on her own belief **about what she believed occurred**.

Ex. 22 at 22 (Wright Dep. at 233:2-8) (emphasis added). Even Crotty herself, after a lot of dodging, grudgingly admitted the same in her deposition:

> Q.    Okay. So whatever you are referring to, say, like, whatever you think that this happened, that absolutely cannot refer to the rationale and what she thinks the evidence shows, because she had just sent that to you on March 1st and it made very clear what she thought the evidence showed on March 1st, right?
>
> A.    I assume -- she wrote the memo based on the deliberations from the Panel, **yes.**
>
> Q.    Right. So if -- if there is something different that she, quote, thinks that happened, it is not the rationale. That is referring to the underlying acts. Right?
>
> A.    **Right**, I mean, if she had -- **if she thought the evidence supported a different outcome based on the facts, then she, you know, would write that memo**.

Ex. 20 at 9-10 (Crotty Dep. at 109:11-110:2) (emphasis added). Crotty's rewritten

16

findings showed all the more that the panel, with her enthusiastic support, jumped to a conclusion then reasoned backwards to cherry-pick the evidence.

After Hubert had spent more than a week writing up what she believed the *evidence* supported, Crotty suggested she instead vote based on what Hubert *thought* happened*,* and she obliged. That is not applying a preponderance of the *evidence* standard; it's applying a preponderance of a *what-you-thought-happened* standard, then fitting the analysis to the desired outcome. *Princeton III*, 30 F.4th at 347 ("preponderance of the evidence requires proof by the 'greater weight of the *evidence*'") (emphasis added, quoting *Preponderance of the Evidence*, Black's Law Dictionary, (11th ed. 2019)). And it's a window into everything the panel did, including in the Second Case Summary.

## II.    The Panel's Jerry-Rigged Credibility Standard Fails

Just as Crotty and the panel rigged the analysis to fit what it thought "happened" the first time around, they crafted a credibility standard on remand that they thought would fit their desired outcome. The credibility standard that the panel adopted, and according to which it resolved the case, was that Jane would be credited on "those elements that she consistently and clearly recalled." Ex. 17 at 10. The panel didn't explain how it arrived at that very specific credibility standard, which isn't in the RRR; it just listed a bunch of things that, in its view, cut for or against Jane's credibility, then pronounced that it would credit her on

17

anything she recalled consistently and clearly. *Id.* at 6-7. Based on that standard, it concluded that Jane had said "no" to John ten or more times during the kissing and fondling, since that was something she said she vividly remembered. *Id.* at 11.

But the "consistently and clearly" standard, if applied equitably, would have required the panel to find something else: that Jane gave John a hickey at the end of the encounter because he demanded it, which is something she claimed in all three of her interviews and that Wright and Chen both remembered when asked. Ex. 22 at 11 (Wright Dep. at 204:12-18); Ex. 23 at 2 (Chen Dep. at 256:5-9).

But the panel did *not* find that. *See, e.g.*, Ex. 17 at 13 n.19 ("The panel therefore did not credit either party's account with respect to the precise timing of the hickeys, other than to agree that they may have occurred at several points during their encounter."). Hubert confirmed this meant that the panel could not determine the timing of *any* of the hickeys, including whether one occurred at the end. Ex. 2 at 8-9 (Hubert Dep. at 78:24-79:1) ("we can't make a finding with respect to the timing of the hickeys, including at the end").

The hickey dodge reveals the hypocrisy of the panel's credibility "standard." If the panel had developed a genuine credibility standard and equitably applied it to the evidence, it would have had to find that Jane had given John one hickey at the very end of the encounter at his request. It's the simplest of syllogisms: If you credit Jane when she's clear and consistent, and she was clear and consistent on

giving a hickey at the end, then you have to credit it. After repeatedly dodging the

implications of that syllogism, *see* Ex. 22 at 12-19 (Wright Dep. at 205-12),

Wright eventually admitted it in his deposition:

> Q.   With that assumption, the panel's credibility standard would
> require them to conclude she gave John Doe at least one hickey
> at the end.
>
> A.   It seems like that – that could be a reasonable conclusion.

*Id*. at 20 (Wright Dep. at 213:2-6). Rochelle Calhoun, one of the appeals officers

charged with reviewing the panel's reasoning, also confirmed it:

> Q.   So by -- by the standard that the Panel is adopting, shouldn't
> they have had to conclude that -- that the evidence shows Jane
> Roe gave John Doe a hickey, at least one of the hickeys at the
> end of the encounter, since she has clearly -- like consistently
> and clearly testified to that?
>
> MS. BERMAN: Objection to form.
>
> A.   Yes, I agree with that.

Ex. 24 at 2-3 (Calhoun Dep. at 78:19-79:2); *see id.* at 4 (84:14-22).

But if the panel wanted to find John responsible (which it did, per Crotty's

earlier intervention), it *couldn't* find that Jane gave John a hickey at the end of the

encounter—*because her story made absolutely no sense and was contradicted by

the hickey/"HELP" photo*. Jane's consistent story was that John demanded the

hickey because he wanted to have one for his eating club event the next day. But

the hickey/"HELP" photo and John's subsequent borrowing of concealer from

19

Student M proves that he did *not* want a hickey so he could show the club. Ex. 4 at 19. And in the Second Case Summary, the panel itself said that it was "more plausible" that Jane had given John some hickeys before the oral sex, meaning he would not have needed to demand one at the end. Ex. 17 at 6 n. 9.

Even Calhoun agreed that the evidence about whether and why Jane gave John a hickey at the end "does make his account more plausible than her account." Ex. 24 at 5 (Calhoun Dep. at 97:10-23). And she came diplomatically close to admitting that Jane was lying about this. *Id.* at 6 (103:8-20). Hubert went even further—she conceded that it was "not likely" that Jane was just "honestly mistaken" about John demanding this hickey:

> Q.    You think it is possible that Jane Roe was honestly mistaken in thinking that he demanded a hickey at the end of the sexual encounter? Do you think she could be, like, genuinely honestly mistaken about that?
>
> A.    I -- I don't know. I mean, I think that is possible and -- and ***probably not likely***, but -- but possible.

Ex. 2 at 14 (Hubert Dep. at 237:8-15) (emphasis added).

Hubert's guarded concession betrays the unmistakable conclusion: Jane invented an entire conversation about how John demanded a hickey *after oral sex and vaginal sex*, and that he did so for the weird reason of wanting people to see it the next day at an eating club event. This wasn't a throwaway allegation—it was one of the nonconsensual sexual acts that formed the basis of her charges against

20

John. Ex. 17 at 3 (referring to the "Non-Consensual Sexual Contact charges . . . related to the hickeys"). And it is the story that the panel's "consistently and clearly" credibility standard, if it had been *applied* consistently, would have required the panel to credit. But it didn't—to do so would have been to credit a preposterous claim that was contradicted by other evidence (the hickey/"HELP" photo and the concealer testimony) and by sheer common sense. The inconsistent application of that credibility "standard" is a clear breach of the contract. *Princeton III*, 30 F.4th at 347 ("*inconsistent* and skewed credibility determinations" show breach of contractual promise to apply "preponderance of the evidence" standard) (emphasis added); *id.* ("appl[ying] inconsistent standards to assess . . . credibility" shows breach of promise to provide "impartial and unbiased" panelists).

## III.    Crotty Also Rewrote the Second Case Summary

To make the panel's credibility standard seem more plausible, Crotty also rewrote the Second Case Summary in the same way she rewrote the first: by burying evidence that would undermine the panel's outcome-oriented rationale. Through at least *nine* drafts of that case summary, spanning 11 days, the panelists edited and commented on a draft finding that Jane had consensually kissed John on his bed *before anything nonconsensual happened.* In a June 11 draft, Chen inserted in redline an edit stating that Jane could have given John the hickeys "at Quad, ***in his room before she expressed discomfort***, or in his room after repeatedly saying

21

'no' to him." Ex. 25 at 37 (emphasis added). That edit had been accepted by the next day, in a draft circulated on June 12. Ex. 26 at 32. It was still in the draft on June 18, when it was reworded to say that she may have given him hickeys "prior to expressing discomfort in his room (action which may have reasonably indicated to him that she was interested in further sexual activity[.]" Ex. 27 at 13. When Wright circulated comments to the draft on June 19, including comments about the treatment of Jane's hickey testimony, he did not dispute this part of it. Ex. 28 at 13. And it was still in a draft circulated at 5:23 p.m. on June 22. Ex. 29 at 10.

There was ample evidence for that finding. John, of course, had testified to it. Ex. 3 at 7. Student G—one of Jane's friends—had testified that Jane told her she and John "initially started kissing, but she **became** uncomfortable when he pressured her for sex," Ex. 4 at 18, meaning that at least some amount of kissing was consensual. And Jane herself, when "[a]sked if she kissed his neck when they were first on the bed," did not outright deny it: she said only that "she didn't remember, but didn't think so." Ex. 8 at 9.

But despite that, and despite its presence in multiple drafts spanning 11 days, **Crotty removed it in a draft she sent to the panel on June 23 at 1:24 p.m.** Ex. 30 at 11-12. She then asked the panelists to "review today." *Id.* at 1. None of the panelists pushed back on that change, and the Second Case Summary was finalized just a few hours later. Ex. 31 at 1.

The import of that change is obvious: if Jane had given John hickeys (or even just consensually kissed him) *in his room at the beginning*, the panel's rationale becomes even less plausible. That would mean Jane *consensually* kissed John, then suddenly said no *ten or more times*, then "about a minute" later was back to consensually kissing him. Crotty once again improperly inserted herself into the panel's deliberations and curated the evidence the panel would cite in its rationale in order to fit her desired outcome. *Princeton III*, 30 F.4th at 347 (failure to "consider[] the entirety of the evidence with a neutral gaze" shows breach of preponderance standard); *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 179 (N.D.N.Y. 2020) (plaintiff plausibly alleged that "result-driven determination" violated promise to apply preponderance of evidence standard).

## IV.    The Panel Repeatedly Refused to Pursue Evidence That Could Undermine Jane

The panel also refused, on numerous occasions, to pursue evidence that could undermine Jane's credibility.

### A.    Refusing to Pursue Evidence of Jane's Sexual Aggression—Then Affirmatively Finding Jane Was Unlikely to Be the Aggressor

John said from the start that Jane was the aggressor during the second encounter, by pushing him down on the bed and pulling his pants off. Ex. 3 at 7-8. Jane claimed she was completely passive and did neither of those things. Ex. 8 at 8-9. Part of the panel's credibility finding was that it was "dubious" that Jane

would have been the aggressor because at the time she was a virgin. Ex. 17 at 8. So on the disputed credibility point of how likely it was that Jane had been the aggressor, the panel found in her favor based on her lack of sexual history.

Within the first few weeks of the investigation, however, John had offered the panel evidence of Jane's sexual aggressiveness—which it refused to pursue. He said that at an eating club event, Jane had "stuck her hands down [another student's] pants (which he did not want) and then still asked a friend of [that student] for his phone number afterward." Ex. 32 at 1. The panel refused to pursue the evidence on the pretext that it was (in Wright's words) "both irrelevant and could easily be seen as an attack on the ***victim's*** character." *Id.* (emphasis added).

During his deposition, however, Wright admitted that since the panel relied on Jane's virginity to find in her favor on this credibility point, evidence of her sexual aggressiveness would have also been "relevant" for the same reason:

> Q.    Right. But if the panel is saying, "We don't think Jane Roe would have been sexually aggressive by taking off his pants or pushing him down and the reason is because she's never done this one particular sexual activity [i.e., had sexual intercourse]," then it'd be relevant if he could show, oh, no, wait, but she has done other sexual activities that are actually closer to what's being described here."
>
> A.    Seems like it -- it would -- it would be relevant if he brought in other evidence.

Ex. 22 at 3-4 (Wright Dep. at 104:18-105:2). That is *precisely* what John had done—he'd offered a witness who would testify that Jane had put her hands down

his pants without asking and then had still asked for his phone number when he made clear he didn't want that. Not surprisingly, Wright tried to walk back his answer when John's counsel then showed him how he (Wright) had actually refused to pursue precisely the kind of evidence he had just admitted would be relevant. He claimed it wasn't relevant because Jane had been sexually aggressive *in public*, whereas the second encounter had happened *in private*:

> Well, again, we're talking about two separate incidents. One incident involves a sexual encounter in a room and another alleged incident involves a sexual related activity in a public place. And in my mind, it's sort of like apples and oranges.

*Id*. at 5 (Wright Dep. at 110:11-16). This makes absolutely no sense. And when asked the obvious question—whether someone who is willing to be sexually aggressive in public would likely be even *more* willing to be sexually aggressive in private—Wright implausibly answered "maybe" two separate times (*id.* at 6 (Wright Dep. at 111:5, 14-15)) before finally admitting, "I believe people are more likely to be more sexually aggressive in private" (*id.* (Wright Dep. at 111:23-24)).

By his own (reluctant) admission, the panel refused to pursue relevant evidence on a disputed point between the parties, then found Jane more credible on that point based on the exact kind of evidence—Jane's sexual history—that it refused to pursue for John. *Princeton III*, 30 F.4th at 347 ("overlook[ing] . . . substantial factors that would tend to undermine [Roe]'s veracity" and "disregard[ing] . . . evidence which contradicted [Roe]'s allegations" breaches

25

promise to provide "impartial and unbiased" panelists).

### B.    Intentionally Suppressing Jane's Intake Interview

Princeton intentionally suppressed the notes that Crotty took during Jane's intake meeting—even though Jane would later contradict what she told Crotty. Indeed, it went so far as to remove all references to the intake interview from Jane's first interview summary, so John would never find out about it.

Crotty conducted the intake interview on November 12, 2019. Ex. 33 at 1. Jane said there that the oral sex *preceded* the vaginal sex, *id.*—the opposite of what she would say in her first interview exactly two weeks later. Ex. 7 at 8. She also claimed to have said "no" many times when John tried to initiate the vaginal sex, Ex. 33 at 1—also the opposite of what she'd later claim in her interviews. Crotty sent her notes from the intake interview to Michele Minter *and to the panel*, *see id.*; Ex. 34 at 1, but never shared them with John. **They were deliberately excluded from the evidence that Princeton shared with the parties.** Ex. 1 at 32 (Minter Dep. at 249:8-17). John had no idea the intake interview had even taken place until the notes were disclosed in discovery.

In a draft of Jane's first interview summary circulated on January 6, Hubert noted in a comment bubble that she had "a distinct memory" of Jane making a statement that contradicted the intake notes, of Hubert asking her a question about that, and of Jane responding by claiming the intake notes were inaccurate. Ex. 35

26

at 4. Hubert knew that was important, because it "goes to whether or not her retelling to Regan at intake and at the interview is consistent or not." *Id.* But her exchange with Jane about this wasn't in the interview summary, so Hubert asked if anyone had "notes about or a memory of this." *Id.* In an email chain, Carol Hsu (the designated notetaker for the interviews) responded that Hubert's "recollection of her question and of [Jane's] response is accurate." Ex. 36 at 1. Crotty then responded that she would "finalize" the memo, *id.*—but did not change it to reflect that Hubert had asked Jane about the intake notes or Jane's response that the notes supposedly were inaccurate. *See* Ex. 7 at 4. Despite the fact that those notes contained *statements by Jane about the incidents*, and despite the fact that Jane was *literally questioned about them at her interview*, **John had no idea they existed until this litigation**. **Princeton intentionally suppressed a hugely material prior inconsistent statement made by the complainant**. Just as this Court would never tolerate that kind of behavior in a criminal case, it should not tolerate it here.

When asked why the intake notes were never shared with John, Minter said they are not part of the investigation. Ex. 1 at 25-26 (Minter Dep. at 238:22-239:20). That may be a reason, but it is not an excuse. When asked to distinguish a complainant's intake statements from other pre-investigation statements that she agreed were "highly relevant" (such as in conversations or texts with friends, *id.* at 26-27 (239:21-240:8)), Minter couldn't. "I'm taking time. I'm trying to make sure

I understand the question," she first answered. *Id.* at 240:16-17. She then said that intake conversations can be "quite informal" (*id.* at 27 (240:23-25)), but that is also true of conversations and texts with friends. When pressed that intake statements are just "a Complainant's statements about the events[, j]ust like it could be done in a text message," she responded simply with, "We just don't consider it to be part of the investigation." *Id.* at 29 (242:3-12).[1] She then said that texts are different because they can be requested from the parties by the investigators—but then admitted, as she had to, that the investigators could also request the intake notes. *Id.* at 20-31 (233:23-244:24). Indeed, as shown above, the investigators *already had them **and** questioned Jane about them*. Minter went on to say that no matter how badly a complainant might later contradict what she said in her intake interview, the intake would never be shared with the respondent:

> Q.    And no matter how much the Complainant later contradicts what she says in that intake statement, no matter how much she contradicts it later, it will never be shared with the Respondent.

MS. BERMAN: Objection. Form.

> A.    That's a very hypothetical. We -- it has not been an issue.
> Q.    Uh-huh. But if someone did contradict what was said there, it would never be shared with the respondent. Right?
> A.    Yes. I think I've said that several times now.

---

[1] *Cf.* Lewis Carroll, *Through the Looking Glass*, Chapter VI ("'When *I* use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'")

*Id.* at 33-34 (250:14-251:1). Suppressing a prior inconsistent statement simply by deeming it "not part of the investigation" is not "procedural [] fairness." Ex. 18 at 27 (allowing appeals for "procedural unfairness"). It is not basing a decision on a preponderance of *all* of the evidence collected. *Doe v. Siena Coll.*, No. 1:22-CV-1115, 2023 WL 197461, at *18 (N.D.N.Y. Jan. 17, 2023) (failure "to assess the entirety of the record" supported claim that decision was not actually based on preponderance of the evidence); *Doe v. Johnson & Wales Univ.*, 425 F. Supp. 3d 108, 114 (D.R.I. 2019) (because students "rely entirely on what is told to them to inform their understanding of what they are up against… [a] reasonable juror could decide that it is not 'fair' to require a student who knows little or nothing to figure out what s/he does not know in order to ask productive questions").

### C.    Other Efforts to Artificially Curate the Available Evidence

The panel—often at Crotty's recommendation—also curated the evidence in other ways that consistently favored Jane. For example:

1. <u>Consciously Ignoring Jane's Contradictions.</u> In a draft of the first decision letter, Dean Chen asked if it would be wise to add a perceived contradiction by John to the credibility section, regarding whether he approached Jane or she approached him on the night of the second incident. Ex. 37 at 25. Crotty said the panel should exclude it because "we are giving him a hard time for a changing account on a minor issue, whereas she changed on some more significant issues."

29

*Id.* She wasn't saying that it should give him a pass just to give him a pass—rather, she was saying that because it was giving Jane a much *bigger* pass, not giving John a smaller one would risk highlighting the differential treatment in a way that would hurt Jane's case. That isn't applying an evidentiary standard evenly; it's choosing which evidence to acknowledge based on a predetermined outcome. *Princeton III*, 30 F.4th at 347 ("overlook[ing] or minimiz[ing] glaring and substantial factors that would tend to undermine [Roe]'s veracity" breaches promise to provide "impartial and unbiased" panelists); *id.* ("disregard[ing] exculpatory evidence" breaches promise to decide case based on preponderance of evidence standard).

2. <u>Refusing to Follow Up with Jane.</u> In that same draft, Chen noted in a comment bubble the discrepancy that Jane claimed to have prevented John from removing her clothes during the first incident but not the second. Ex. 37. at 7. She asked whether the panel thought this was "because she was more intoxicated the second time or because of some other factor? (trauma?)," *id.*, neither of which Jane herself had claimed as a reason. Crotty implausibly responded that since the panel wasn't crediting her story about the first incident, "I don't think we need to address this." *Id.* Whether her first story was *true* had no bearing on whether the two stories *contradicted each other*. But once again, the panel refused to follow up.

3. <u>Refusing to Follow Up with Jane's Witnesses.</u> In a draft of John's second-interview summary, Dean Chen highlighted where John had said that Jane asked to

30

go back to his room because she didn't want to kiss in public. Ex. 38 at 8. She noted in a comment bubble that that was "the opposite" of what Jane had claimed—"that she's more comfortable making out" in public, and asked if the panel "should have tried to corroborate this" by questioning Jane's friends. *Id.* Crotty responded: "I think it would be weird to ask her friends that. Or we could do it and include it in the second round of interviews." *Id.* Crotty implausibly maintained at her deposition that she didn't say "it would be weird" to deter the panelists from following up as Chen suggested, but that it was just "an observation I offered." Ex. 20 at 12 (Crotty Dep. at 146:14-15). Of course, the panel never did follow up, which was yet another violation of the preponderance standard. *Collick v. William Paterson Univ.*, Civ. No. 16-471, 2016 WL 6824374, at *23 (D.N.J. Nov. 17, 2016) (failure to "sp[eak] to witnesses" was evidence school failed to apply "preponderance of the evidence" standard).

## V.    Princeton Failed to Provide an Impartial and Unbiased Panel

Discovery also confirmed what John had long suspected: panelist Walter Wright's overt bias against him.[2] On January 16, 2020—early in the investigation and before the panel had heard John's response to any of the evidence—Mr.

---

[2] *See* Ex. 39 at 1 (John May 16 Journal Entry): "had heated argument with Walter"; *id.* (John May 18 Journal Entry): "Walter's after me and he's not gonna change his mind. He asked [redacted] if I told him to say he was there! How insane! He doesn't investigate any of her shit and only mine."

Wright openly badmouthed John's character in an email to the other panelists. John had emailed Crotty earlier that day to confirm that he did not intend to file a countercomplaint against Jane. Ex. 40 at 1-2. He had explained that, even though he'd been intoxicated, and even though Jane was the aggressor, he did not believe her conduct rose to the level of a policy violation. *Id.* He said he was a "decent young adult" who would not file a countercomplaint out of anger. *Id.*

John never thought Crotty would forward his response to the panel—after all, she wasn't on the panel, she played no role in the investigation, and John's telling her that he was *not* filing a complaint was not relevant evidence for the panel to consider. But Crotty did forward it. And when she did, Wright hit "reply all" to the group, put John's response in scare quotes, and said: **"Wow, what a magnanimous 'decent young adult.' Thanks, Regan."** Ex. 40 at 1. Before Wright had heard John's response to any of the evidence, he was so biased against him that literally any statement from John, even one that was not directed to the panel and not intended as evidence, was met with instant scorn. And as noted above, as early as December 17—just weeks into the investigation—he was already referring to Jane as a "victim" and saying the panel shouldn't pursue evidence of her sexual aggression. Ex. 32 at 1. All of that is evidence of Wright's bias and shows that his conclusions were not based on a preponderance of the evidence. *Rochester Inst. of Tech.*, 2024 WL 1051953, at *8 (comments that

seemed to "disclose RIT officials' bias, unprofessionalism, and result-driven predisposition" were evidence decision not based on preponderance of evidence).

When asked at her deposition whether it was "appropriate" for Mr. Wright to express such views "about John Doe and his character in the middle of an investigation," Michele Minter—the Princeton administrator charged with overseeing Title IX—responded simply that it was "not great" but "happens in moments of weakness." Ex. 1 at 5 (Minter Dep. at 188:1-8). When pressed, she agreed that "draft[ing] an email about it and feel[ing] comfortable expressing that to your fellow panelists," as Mr. Wright had done, is "a step up from simply having a flash of feeling and telling yourself to disregard it." *Id.* at 7 (Minter Dep. at 189:14-22). She then agreed that it suggested his emotions may be "dictat[ing] his view of the case." *Id.* at 7 (Minter Dep. at 190:3-12). She said she "imagine[d]" that "the other panelists or Regan [Crotty] would be reminding Walter to both check his reactions and to think about what he's putting in writing." *Id.* at 6 (Minter Dep. at 188:16-21). And she said that it would be a ***"pretty significant oversight"*** if Crotty had not. *Id.* at 9 (Minter Dep. at 191:3-8) (emphasis added).

**But that never happened**: Wright testified that he recalled no one saying anything to him about that comment after he sent it. Ex. 22 at 8 (Wright Dep. at 174:21-23). He said he "thought it was appropriate" to say what he said. *Id.* at 7 (173:15-16). And he said he was not worried then—and is not worried now—that

the other panelists or Crotty would find his comment offensive or inappropriate, *id.* at 9 (175:8-17), a view seemingly confirmed by their lack of response. He saw no problem having or expressing that view of John in the middle of the investigation:

> Q.   That's the problem, sir, is that you haven't even spoken to him again yet and you've already concluded that he's probably – there's probably a pattern of lying and you're not even able to hold in your feelings about it when you're communicating with the panel.
>
> A.   Well, maybe it's a problem for you –
>
> MR. BERNS-ZIEVE: Objection. Form.
>
> A.   I was going to say maybe it's – it's a problem for you, but at this point, I didn't see it as a problem.
>
> Q.   Do you see it as a problem now in hindsight?
>
> A.   No.

*Id.* at 10 (177:10-23).

Crotty—who should have intervened but didn't, and whom Wright perceived would find his remark appropriate—was predictably less forthright than Minter when asked about this, conceding only that she "wouldn't have sent it." Ex. 20 at 13 (Crotty Dep. at 205:14-20). She said nothing to Wright because she agreed with him and was willing to let it sit with the other panelists, too. Wright's clear but unaddressed bias violated Princeton's obligation to impartially apply the preponderance standard. *See Montague v. Yale Univ.*, Case No. 3:16-cv-00885, Doc. 177 (Dist. Ct. March 29, 2019), at 41-43 (denying summary judgment on bias

grounds and the failure to apply the preponderance standard due to a "genuine issue of material fact with respect to the impartiality of the hearing").

## VI.    Princeton Failed to Provide an Adequately Trained Panel

Wright also betrayed—at the very end of the process—a shocking ignorance of the Policy's definition of "consent." The Policy defines "consent" as "the voluntary, informed, un-coerced agreement through words and actions freely given, *which a reasonable person would interpret as a willingness to participate in mutually agreed-upon sexual acts*." Ex. 18 at 8 (emphasis added). In a June 19 draft of the second case summary (just four days before it was finalized), the panel addressed the italicized part of that definition:

> However, the panel recognized that individuals in Jane Roe's position do have the right to change their mind, and that University policy requires an assessment of whether a reasonable person in John's position would have interpreted Jane Roe's actions as a willingness to participate in mutually agreed upon sexual acts. Thus, the panel carefully considered whether Jane Roe's subsequent actions affirmatively made clear that she negated her previous direct indications of non-consent.

Ex. 28 at 12 (emphasis added). Wright added this comment to that part of the draft:

> This is illogical and needs clearer justification. **A sexual assault is based on the victim's point of view of being coerced, not the assaulter's**, especially after we already acknowledged the encounter began non-consensually.

*Id*. (emphasis added). **It is hard to imagine a clearer or more material misstatement of how Princeton—or for that matter, *any* college or *any***

**law—defines consent.** When asked to explain what this comment meant, he

meandered before doubling down on his understanding:

> Q.    So you -- what you wrote is, quote, "a sexual assault is based
> on the victim's point of view of being coerced, not the
> assaulter's." So according to you, what matters is what's in her
> head, not what's in his head.
>
> A.    Well, again, I think what's in both their heads matters, but
> again, *as far as whether or not it's an assault,* it seems like
> what's in her head is what determines whether or not it's - it's
> plain that it was -- it was consensual or it was non-consensual –
> what's in her head.
>
> Q.    Yeah. What's in her head determines whether it was
> consensual. Does it also determine whether it was an assault?
>
> A.    Well, if it's non-consensual, by definition, I think it's an
> assault. If it's non-consensual.

Ex. 22 at 21 (Wright Dep. at 225:9-24) (emphasis added). Whether John

reasonably thought Jane was consenting—which was part of Princeton's policy—

had no place in Wright's analysis: consent, to him, was just "what's in her head,"

and if she wasn't internally consenting, then "by definition, I think it's an assault."

To her credit, Minter admitted that Wright did not understand the definition

of consent and was at a loss to explain how someone who'd been an investigator

for so long could so badly misunderstand it:

> Q.    And the reason you would not agree with that is because, as
> you understand it, that is – that's contrary to Princeton's policy.
>
> A.    Our policy says that the reasonable person, in the point of view
> of the respondent, would have to have interpreted the actions as

36

willingness to participate. So, yes.

Q.    Right. That's just like part of the actual definition. It's like right there in the definition of consent. Right?

A.    Yes.

Q.    Yeah. Okay. So how does someone in Walter's position, who I think I'll represent to you has been an investigator for multiple years at the time he's doing this, how does he -- how does he have this incorrect view of consent when we're, you know, almost at the end of this investigation?

A.    I don't have the answer to that question.

Ex. 1 at 4 (Minter Dep. at 147:5-25). This is a manifest breach of the RRR's promise to provide panelists with adequate "training in investigating and evaluating conduct prohibited under the policy." Ex. 18 at 26.

## VII.  John Suffered Multiple Forms of Damage

Princeton's breach damaged John in multiple ways. First, he must live with the stigma of being branded a sexual offender by Princeton. *Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 915 (N.D. Iowa 2022) ("a reasonable jury could find Doe suffered damages in the form of being found to have committed sexual assault when the promised process would not have resulted in such a finding," especially given "the serious and stigmatizing nature of a sexual assault finding"). He has also lost out on educational and job opportunities. *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 921 A.2d 1100, 1107-08 (N.J. 2007) ("'Under contract law, a party who breaches a contract is liable for all of the

natural and probable consequences of the breach of that contract.'") (*quoting Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993)). John used to want to be a public official, but cannot now because he knows a prior finding that he sexually assaulted someone in college, even if erroneous, would be too big a scandal. Ex. 42 at 17 (John Dep. at 100:10-19). He also had an interest in working at the FBI or CIA, but knew those jobs required extensive background checks, so he avoided applying there after graduation, too. *Id.* at 16 (John Dep. at 98:7-23).

John avoided applying to any job where he would have to disclose his disciplinary history, *id.* at 6 (John Dep. at 65:5-6), despite his 3.7 GPA, Ex. 39 at 56. He took a job at a consulting firm where he did not have to disclose it. Ex. 41 at 4 (John Dep. at 26:9-13). Nevertheless, the *first* person he met on his *first* day said he knew about John's case from connections at Princeton, *id.* at 9 (John Dep. at 68:5-7)—proof that the case could follow him even to jobs that did not require its disclosure. John grew paranoid that everyone at the company would find out about his past and think he was a predator. Ex. 39 at 43. He had to avoid projects that required a security clearance. Ex. 41 at 16 (John Dep. at 98:8-10). He struggled with the fear that people would find out about his past and fire him, and his first year was thus very "bumpy." *Id.* at 10, 18 (John Dep. at 70:6-8, 105:17-23). It is a fear he will have to endure for as long as Princeton's finding stands. John's only other post-Princeton job has been at a small company where he had

family connections to its founder. *Id.* at 3 (John Dep. at 24:10-16). He endured still more lost opportunities when he applied to business school, having to forgo his top choice in lieu of a school (to be sure, a good one) at which he had some family connections, again because he thought that would give him a chance to explain his situation. *Id.* at 21-23 (John Dep. at 104:8-105:3, 124:19-125:6).

John has also suffered emotional harm from Princeton's breach. When still in school, he could "barely walk outside" without receiving dirty looks or being called "the Title IX guy" by strangers, and he was even assaulted in public by people who approached him screaming. *Id.* at 5 (John Dep. at 61:1-8); Ex. 39 at 44. He lived in perpetual fear. *Id.* at 5 (John Dep. at 61:8). The biased nature of the case "fundamentally made his life worse," *Id.* at 7 (John Dep. at 66:23-25), and "forever scarred him," *Id.* at 8 (John Dep. at 67:24; Ex. 39 at 5, 45-46, 48, 49, 53-54, 55). His friends saw him crying regularly during the investigation, *id.* at 11 (John Dep. at 77:15-16), Ex. 39 at 52, and he contemplated transferring, Ex. 39 at 50-51. He thought (correctly) that one of the investigators was "after [him]," and the process made him less trusting of people. *Id.* at 1; Ex. 41 at 8-9 (John Dep. at 67:18-25; 68: 1-8). He had trouble sleeping, maintaining healthy routines, attending classes, and doing his school work. Ex. 39 at 10.

John sought out support groups for people accused of Title IX violations, and he had to attend therapy for "extreme stress and anxiety" over how Princeton

handled the case; he went to more therapy for his disciplinary case than he had gone to for anything else. Ex. 39 at 10, Ex. 41 at 12-15, 19 (John Dep. at 79:21-25; 80:1-2 84:24-25; 85:1-9, 111:1-3). He incurred monetary damages from his therapy sessions. Ex. 39 at 7-9, 12-19, 20-26; *see, e.g., Ferguson v. Jonah*, 445 N.J. Super 129, 141-142 (N.J. 2014) (plaintiff permitted to seek damages for counseling expenses). He also began taking an SSRI he had previously used after he began attending therapy for this case. Ex. 39 at 6, 37, 39. He is still on medication. Ex. 41 at 14 (John Dep. at 84: 6-7).

## CONCLUSION

Discovery has shown that John never had a chance. If a Title IX coordinator is going to rewrite two different decisions so they come out against you, intentionally suppress exculpatory evidence, and oversee a process that includes a panelist who's decided you're guilty before seeing all of your evidence and doesn't even understand how Princeton defines consent, there's not much you can do. John has no doubt that Princeton will respond to this filing in the way that all schools do—invariably contending that he just disagrees with the outcome and wants a do-over. But this Court should not fall for that familiar dodge. Princeton promised John a fair process, *Princeton III* held that he was entitled to a fair process, and it could not be clearer that he did not get a fair process. For those reasons and many more, he respectfully asks this Court to enter summary judgment in his favor.

Dated: October 6, 2025

Respectfully submitted,

By: */s/ Jamie Hoxie Solano*
Jamie Hoxie Solano, Esq.
DYNAMIS LLP
200 Connell Drive
Berkeley Heights, NJ 07922
973-295-5495
JSolano@dynamisllp.com

Justin Dillon, Esq. (*pro hac vice*)
Christopher C. Muha, Esq. (*pro hac vice*)
Kimberly Blasey, Esq. (*pro hac vice*)
DILLON PLLC
1717 K Street NW, Suite 900
Washington, D.C. 20005
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

*Counsel for John Doe*