# JD EXHIBIT 1

Page 1

1        UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY

2

3    X----------------------------X
      JOHN DOE,                        :     REMOTE
4                                      :  VIDEOTAPED
                 Plaintiff,     : DEPOSITION OF:
5                                      :
                 vs.                   :
6                                      :
      PRINCETON UNIVERSITY,      : MICHELE MINTER
7                                      :
                 Defendant.      :
8                                      :
     X----------------------------X
9

10    C O M P U T E R I Z E D   T R A N S C R I P T
      of the stenographic notes of the proceedings in
11    the above-entitled matter as taken by and before
      MELISSA J. LUMI, a Certified Court Reporter, No.
12    30X100237000, and Notary Public of the State of
      New Jersey, taken remotely, on November 26, 2024
13    commencing at 9:30 in the forenoon.

14

15

16

17

18

19

20

21

22

23

24

25

Page 68

```
 1    who the panelists -- you know, that there are
 2    panelists and that they have a job to do.
 3                 My oversight of the implementation
 4    of the policy does not grant me the right to step
 5    outside of my role.  So, no, I -- I don't believe
 6    I have that authority.
 7         Q.    Okay.  But just because the
 8    policy, like, grants certain roles to the
 9    investigators, are you sort of saying that, like,
10    by implication it means those aren't your -- you
11    don't have the power to do what's being granted
12    to them?
13         A.    That is what I would say.  The
14    policy defines roles, and I -- you know, I
15    don't -- I don't step into roles that are not my
16    assigned role in the policy.  It is intended to
17    set up roles for individuals.  So, I -- no, I
18    don't -- I wouldn't have that authority.
19         Q.    Okay.  I mean, could you sit in
20    on -- okay, well, so, like you wouldn't vote --
21    you wouldn't -- you wouldn't deliberate with the
22    panel?
23         A.    No.
24         Q.    Okay.  Well, I mean, could you --
25    could you conduct interviews of parties?
```

Page 69

1           A.      No.

2           Q.      Okay.  Could you, like -- well, I

3    mean, could you tell investigators who they're

4    supposed to interview?

5           A.      No.  That's not my role.  Their

6    job is to develop an investigation plan and

7    conduct it.  If they want to ask me a procedural

8    question, I could offer advice, but ultimately,

9    their -- they are responsible for the

10   investigation.

11          Q.      Sorry.  Just give me one second.

12   I mean, would it be appropriate to, like, sit in

13   on deliberations?   And maybe you're not going to

14   cast a vote, but to, like, try to get the

15   panelists to go with your view of the case?

16          A.      No, it would not be appropriate.

17   And to be clear, I -- I really don't have a view

18   of the case.  I'm not -- I'm not part of the

19   interviews, I -- you know, that is not the role

20   that I play.  My role is procedural.

21          Q.      Okay.  Sorry.  I'm just making a

22   note for myself.  Okay.

23                  So the way that the investigation

24   works is there -- you know, parties are

25   interviewed, obviously, and again, we're talking

1    those parts would be required.  So I would not

2    agree with what I think Walter is saying here,

3    but this is Walter writing, this is not -- not

4    me.

5           Q.    Yeah.  Right.  Right.  And the

6    reason you would not agree with that is because,

7    as you understand it, that is -- that's contrary

8    to Princeton's policy.

9           A.    Our policy says that the

10   reasonable person, in the point of view of the

11   respondent, would have to have interpreted the

12   actions as willingness to participate.  So, yes.

13          Q.    Right.  That's just like part of

14   the actual definition.  It's like right there in

15   the definition of consent.  Right?

16          A.    Yes.

17          Q.    Yeah.  Okay.  So how does someone

18   in Walter's position, who I think I'll represent

19   to you has been an investigator for multiple

20   years at the time he's doing this, how does he --

21   how does he have this incorrect view of consent

22   when we're, you know, almost at the end of this

23   investigation?

24          A.    I don't have the answer to that

25   question.

Page 148

1          Q.     Okay.  What should -- what would

2     you have expected the other two panelists to have

3     done when they saw him express this comment?

4                 MS. BERMAN:  Objection.  Form.

5          A.     The panelists' job is to

6     deliberate.  So I presume that they would have

7     had back and forth about this point and others.

8          Q.     And what should -- what should

9     Regan have done at this point when she saw this?

10                MS. BERMAN:  Objection.  Form.

11         A.     What should Regan have done?

12    Regan is not required to do anything specific,

13    but she might have asked them a question or asked

14    them to look carefully at that point.  She isn't

15    required to do something.

16         Q.     Uh-huh.  Well, right, and you're

17    saying she's not required because she doesn't

18    have a formal role in the process?

19         A.     Correct.

20         Q.     Okay.  What would you have done if

21    you were in that situation, you know, and I'll

22    just sort of -- to situate it, like, again,

23    there's been a first investigation, a finding

24    against John Doe, an appeal, a remand, a

25    second -- you know, a remand investigation and

Page 188

1          So my question is, is it
2    appropriate for Walter to be saying comments like
3    that about John Doe and his character in the
4    middle of an investigation?
5          A.     It's not great.  I think we would
6    prefer that people not express personal opinions,
7    but I can believe that it happens in moments of
8    weakness.
9          Q.     And what should the response --
10   you talked earlier about how, you know, panelists
11   have to look out for each other.  What would you
12   have expected the panelists, or Regan, you know,
13   she's -- the response is directly to her.  What
14   would you have expected them to do in response to
15   this?
16         A.     I would imagine -- I don't know
17   what she did, but that would typically be the
18   sort of thing where either the other panelists or
19   Regan would be reminding Walter to both check his
20   reactions and to think about what he's putting in
21   writing.
22         Q.     Uh-huh.  Yeah.  And again, this is
23   sort of like the middle of an investigation.
24   Right?  So this is when a -- you know, panelists
25   need to be able to sort of put their feelings

Page 189

1    aside and just focus objectively on the process
2    in front of them.  Right?
3            A.    Yes.
4            Q.    Yeah.  I mean, what's more
5    concerning about this, the fact that he has a
6    feeling about it or the fact that he put it into
7    writing?
8            A.    Well, obviously the most important
9    thing is not that he put it into writing, so --
10   but it would be the sentiments, and that's where
11   it would be inappropriate to provide him with
12   some feedback about that to remind him of the
13   process.
14           Q.    Uh-huh.  Yeah, because he sort of
15   takes like an extra level of -- it's one thing to
16   have a feeling, right, but to then draft an
17   e-mail about it and feel comfortable expressing
18   that to your fellow panelists is sort of
19   another -- it's a step up from simply having a
20   flash of feeling and telling yourself to
21   disregard it.  Right?
22           A.    Yes.
23           Q.    Yeah.  And are you aware that, you
24   know, Walter was the only panelist to vote,
25   responsible for John Doe, as to every single

Page 190

1    charge that Jane Roe brought against him?

2           A.    Yes.

3           Q.    Okay.  And so given that he's

4    expressing this view of John in the middle of the

5    investigation, and the fact of his voting

6    pattern, which was unique among the panelists,

7    does that raise any concern that he was allowing

8    his -- his emotions to dictate his view of the

9    case?

10                MS. BERMAN:  Objection.  Form.

11   Foundation.

12          A.    I suppose.  However, the process

13   is designed to try to make sure that -- I mean,

14   that's -- that's why there are three panelists.

15   That's why there's an appeal.  So they work

16   together to reach the determination.

17          Q.    But this e-mail isn't something

18   that -- that John would have had access to during

19   the investigation.  So he couldn't -- he couldn't

20   base an appeal on this.  Right?

21          A.    Correct.

22          Q.    Would it have been a pretty big

23   oversight by Ms. Crotty if she did not address

24   this with -- with Walter Wright?

25                MS. BERMAN:  Objection.  Form.

Page 191

1          A.      I have no idea whether Regan

2      addressed it.

3          Q.      Yup.  I'm saying if she did not

4      address it, would that have been a pretty

5      significant oversight?

6          A.      I think -- pretty significant, I

7      think it was something that should have

8      appropriately been addressed.

9          Q.      Just -- I don't want to jump into

10     something that will take us past 3:00 topic wise.

11              Let me -- I'll put up -- I don't

12     know if you have a copy of the second decision,

13     but I'll pull it up here, too.  Would you like me

14     to share my screen?

15         A.      Um, sure.  I do have a copy, but

16     yes, sure.

17         Q.      Okay.  Hold on one second.

18              (Second Case Summary is received

19     and marked as Exhibit Mint-7 for identification.)

20         Q.      Okay.  Why don't we do this here.

21     Okay.  So this is the second decision, the second

22     panel memo, and this is in the credibility

23     section with respect to John Doe.  And it's

24     listing a number of reasons that -- a number of

25     factors the panel considered in weighing his

Page 205

1    Page 8 and goes to Page 9, involves -- so John
2    Doe had given testimony that about a year before
3    the second incident he had been at a party where
4    Jane Roe was and he saw a female student that he
5    thought was fairly intoxicated and that there was
6    a -- in his view, was being pursued by a male
7    student, and that he asked Jane Roe to go speak
8    to the female student to try to get a sense of
9    whether -- you know, how intoxicated she was, and
10   he then, himself, after that, went and escorted
11   the female student home.  She texted him the next
12   day and thanked him, and this ends up being
13   used -- being analyzed in the credibility section
14   here as one of the factors that went into the
15   panel's decision not to find John Doe credible.
16   Does that summary, does that all ring true for
17   you?
18            A.    Yes.  I'm just trying to put my
19   hands on the exact text so that I have it in
20   front of me.
21            Q.    Sure.  So if you go to the bottom
22   of Page 8, to the top of Page 9.  The bullet
23   point that starts at the bottom of Page 8?
24            A.    Footnote 12.
25            Q.    Yeah, it's right above that.

Page 206

1          A.    I'm sorry, I'm just having

2    trouble.  Is this in the first memo or the second

3    memo?  What are we looking at?

4          Q.    It's in the second memo.  I think

5    it's in both, but I'm looking at it in the second

6    memo.

7          A.    Okay.  Well, I don't want us to

8    get bogged down.  For some reason my footnotes

9    aren't matching up here.

10         Q.    Okay.  I said Page 8, not footnote

11   eight.  Maybe that's the confusion.  If you look

12   at my screen here, it's the bullet point that

13   starts right here.

14         A.    Uh-huh.

15         Q.    Okay.

16         A.    Yeah.

17         Q.    All right.  So maybe the question

18   makes more sense with respect to this, and I

19   guess -- well let me just ask you first, are you

20   generally familiar with this incident after my

21   description and after seeing this bullet point?

22         A.    Yes.

23         Q.    Okay.  And I'll represent to you

24   that where it says here that it was in September

25   of 2019, that it actually was -- that's just a

Page 207

1    typo, it actually was September of 2018.  So I'll

2    just represent that as true to you, and your

3    answers, the validity will just depend on if

4    I'm -- you know, to the extent that I'm accurate

5    about that.

6                    Okay.  So I guess my question is

7    just given that the alleged assault and this

8    September 2018 incident involved two distinct

9    incidents but different circumstances and

10   different degrees of corroboration, shouldn't

11   here the panel have done sort of independent

12   credibility assessments rather than use the --

13   John Doe's credibility on the one against him in

14   the other?

15            A.    Um, I don't think that's the

16   way -- there's no "should" in -- the panel has to

17   make their own deal situations about what they

18   think is relevant.

19                    I -- I don't think there is any

20   requirement that the -- that there be separate

21   credibility assessments regarding things which

22   are not under investigation.  That it's -- this

23   is all -- everything that the parties offer and

24   say is subject to the panel's assessment of how

25   relevant it is to their credibility assessment,

Page 208

1    or to their findings.  So they're going to weigh

2    those things and they're going to consider, you

3    know, what their implications are.  So, no, I

4    don't see why they would do a separate

5    credibility assessment regarding -- regarding

6    that part of the Respondent's allegations.

7              Q.    So the fact -- so if he's lying or

8    being dishonest in testifying about one incident,

9    the panel should consider that in weighing his

10   overall credibility with respect to the other

11   incidents that he's testifying about?

12             A.    I think they can, yes.  That's --

13   that's a determination for them to make, is to --

14   how they view the relevance of various

15   statements, but I think they can, yes.

16             Q.    And maybe the answer is probably

17   obvious, but like what is the -- what's the

18   reason for what?  What's the -- what's the

19   justification for that?

20             A.    Well, I think if the panel reaches

21   a conclusion that there are -- for either of the

22   parties, that there are things which they find

23   not credible because they believe they are

24   dishonest or disingenuous in some way, then that

25   is -- goes to the person's general credibility,

1    just as they need to also look at, you know,

2    things that people don't remember.  Like they

3    have to look at all of these factors in their

4    credibility assessment and holistically think

5    about how they weigh them.

6            Q.    Okay.  And that can be true even

7    if the two incidents are separate in time and

8    involve different circumstances.

9            A.    Well, it's the Respondent who

10   brought this up.  So, yes, I think once the

11   Respondent has offered this information and has

12   given it to the panel, then they are responsible

13   for assessing what they -- what meaning they

14   assign to it.  They didn't go looking for that

15   information, he gave it to them.

16           Q.    Right.  And then, as here, they

17   can use it against his credibility if they

18   conclude he's not being honest about it.

19           A.    Yes.  I think they can make those

20   kind of determinations.  It's part of the

21   process.

22           Q.    Okay.  And that would be -- doing

23   that -- I mean, that's -- you said they could do

24   that, but would you say that that's a proper

25   thing or a -- that's something that is logical

Page 210

1     for them to do?

2          A.    Yes.  I think they should be

3     looking at the information that is presented to

4     them and deciding whether it's -- to what degree

5     it's relevant and to what degree that it

6     therefore weighs into their considerations.

7          Q.    Right.  Yeah, yeah, yeah.

8     Totally.  But if they conclude that they're being

9     lied to, you know, during the investigation, even

10    if the lie is about a separate incident, it's

11    logical for them to factor that into the person's

12    overall credibility.

13         A.    I think that can be logical.  It

14    depends on the facts, but yes.

15         Q.    Uh-huh.  Okay.  All right.  Let's

16    see -- okay.  I'm going to go back to the policy,

17    so that's Exhibit 1, but I think you have a copy,

18    too, but I wanted to go to -- on my version it's

19    on the 21st page.  It's in -- it's the section on

20    sexual history.  So it's about - I'm guessing

21    your copy is about 32 pages.  It's about

22    two-thirds of the way into it.

23         A.    I can find it.  Yeah, I can find

24    it.  I've got it.

25         Q.    Okay.  All right.  Okay.  So my

Page 211

1    question is just going back to the evidence that

2    we looked at about who was the aggressor and how

3    the panel analyzed that question and how they

4    relied on Jane Roe's testimony that she was a

5    virgin at the time.  I guess I wanted to ask how

6    that's proper given that the policy generally

7    forbids the use of prior sexual history in these

8    types of cases.

9         A.    Well, it says, for example, if

10   consent is at issue, the sexual history between

11   the parties may be relevant to determining

12   whether consent was sought or given during the

13   incident.

14              So, you know, I think that in a

15   case where it really is a consent matter, there

16   could be some relevance.  I mean, the intent of

17   this caution, I wouldn't call it prohibition on

18   sexual history, on engaging in sexual history, is

19   intended, and I think the investigators are all

20   trained on this, to avoid the kind of

21   stereotyping or bias that could occur if what

22   becomes at issue is, well, one person has had a

23   lot of sex, or both people have had a lot of sex,

24   or they've had lots of sexual partners, or --

25   like that kind of information is not necessarily

1    relevant to what happens between these two people

2    on that specific occasion.  But it doesn't rule

3    out the possibility, as it says here, that there

4    could be relevance in a matter of consent as

5    to -- sort of understanding their sexual history

6    to understanding how they interacted in the room.

7              Q.    Uh-huh.  Okay.  Doesn't it sort of

8    put a respondent at an unfair advantage if the

9    panel is allowed to rely on a complainant saying

10   I have no prior history of sexual intercourse, at

11   least, I'm a virgin, if they can rely on that but

12   then a respondent is not allowed to say,

13   actually, I think that statement is untrue, I

14   would like to introduce evidence to rebut it?

15   Isn't that kind of like a --

16             A.    Yeah, I don't -- the policy worked

17   exactly the same way for both parties.  So I

18   don't think that there's -- in any way that that

19   puts one of the parties at a disadvantage.

20             Q.    Well, so, okay, I mean, like is a

21   respondent allowed -- well, like here, like if

22   the panel is saying, you know, Jane Roe, like one

23   reason we think -- I know this is only part of

24   the reason, but one of the reasons we think she

25   wasn't the aggressor is because she's not had

1    a -- she's not had intercourse before.  I mean,

2    like John Doe, is he allowed to say, actually,

3    no, guys, I have evidence that she's been

4    sexually aggressive in other ways, I would like

5    to rebut this point that you're making?  I mean,

6    would he be allowed to do that?

7         A.    Yes, if that -- if it's a

8    credibility -- I mean, that goes to credibility.

9    If one party is saying this is my history and the

10   other party is saying I have direct relevant

11   evidence that this person is lying about that,

12   then that could be relevant.  That's not about

13   their sexual history.  That's about whether they

14   are lying or being dishonest.

15        Q.    Yeah.

16        A.    And that would apply to any kind

17   of information that the parties provide.

18        Q.    Okay.  So -- so -- so he would

19   have -- I mean, if he could have had this

20   evidence, like if he had evidence, like, no,

21   like, look, here's evidence that she's been

22   aggressive, maybe not that she's had sexual

23   intercourse before, but that she's been

24   aggressive before, however he might find that

25   evidence, I don't know, but he would have been

Page 218

1    several points", and then it explains in here

2    down through here his reasons for sending it

3    back.

4              So that is -- it looks like --

5    would you agree with me that's four medium to

6    long paragraphs?

7         A.    Yes.

8         Q.    Okay.  So what's the purpose of

9    sending this much longer explanation to you but

10   not to the parties?

11        A.    These are really the instructions

12   back to the panel.  So they -- they write to me

13   and then it is just forwarded to the panel.  So

14   they are providing detailed instructions about

15   what they want the panel to address.

16             Why they handled it the way they

17   did with the -- and didn't provide this detail to

18   the -- to the parties, I can't answer.  I'm not

19   involved in the appeal process.

20        Q.    Okay.  So do you know whether this

21   was standard procedure, to send a longer letter

22   to you and a shorter letter to the panel -- I'm

23   sorry, to the parties?

24        A.    I don't.

25        Q.    How often do you recall, in this

Page 233

1                    All right.  So with that

2      representation, and with my characterization that

3      they focused primarily on John Doe's credibility

4      on remand, I'm just going to ask, would that,

5      assuming all of that is true, is that consistent

6      with the panel's instructions for remand?

7                    MS. BERMAN:  Objection.  Form.

8      Foundation.

9              A.     My interpretation of what the

10     appeals panel said was we are not convinced by

11     your credibility assessments, and the appeals

12     committee -- oh, I'm sorry, the investigative

13     panel went back and made alterations to the

14     Complainant's -- their assessment of the

15     Complainant's credibility and added additional

16     precision to it.  And, so, you know, I think they

17     felt that that was asking these questions and

18     seeking additional clarification around certain

19     points was a useful part of their process.

20                    I don't believe that they are

21     limited to only answering exactly the questions

22     which the appeals committee has raised, because

23     what they're doing is more holistic than that.

24             Q.     In your experience, when an

25     appeals panel sends something back with

Page 234

1    instructions, is it common for the investigative

2    panel to primarily focus on other areas?

3          A.    I'm not -- I'm not sure that I

4    agree that they are "other areas".  It is the

5    responsibility of the panel to decide how they

6    want to respond to the appeals committee's

7    concerns.  That is their job.  So ultimately they

8    are accountable for the way they make those

9    decisions and then the appeals committee will

10   review it again and decide whether they think

11   their concerns have been adequately addressed.

12         Q.    Okay.  But earlier you said that

13   what the appeals panel is sending in this letter

14   are, quote, "detailed instructions for remand".

15   So are you saying now that they're -- they're not

16   instructions, they're just recommendations?

17         A.    I'm not sure that the correct word

18   would be either recommendations or instructions.

19   I might have used one of those words.  I would

20   say the appeals committee lays out its concerns

21   and makes -- and by implication, therefore, they

22   will expect to see those concerns addressed in a

23   revised determination, and they will decide

24   whether they believe they have been addressed.

25   But I wouldn't say that the appeals committee is

Page 235

1      giving instructions to the -- to the panel in the

2      sense of you must do this or you must make this

3      finding.  That's -- that is -- that isn't their

4      role, as they say.

5              Q.      That is not their role.

6              A.      It is not their role to substitute

7      their judgment for the panel.  They expressed

8      their concerns and then the panel must address

9      them.

10             Q.      Uh-huh.  Yeah.  Right.  But what

11     they're giving on remand are instructions to the

12     hearing panel on how to conduct the remand.

13                     MS. BERMAN:  Objection.  Form.

14             A.      I don't see anywhere in this where

15     they say we are giving instructions.  What I see

16     them is them making statements about their

17     concerns.

18             Q.      Right.  I'm asking -- you said

19     that the reason there's this longer explanation

20     was -- these are, quote, "instructions back to

21     the panel".  They are, quote, "detailed

22     instructions".  So I guess are you walking that

23     back now?  You're saying that they're not

24     actually -- now you want to say they're not

25     instructions to the panel?

Page 236

1                MS. BERMAN:  Objection.  Form.

2      Foundation.

3                A.    I'm willing to correct myself

4      there, if you're focused in intensely on the

5      notion that these are instructions.  I do not

6      believe that anywhere in this document they are

7      giving instructions to the investigators as to

8      exactly what they should look at or how they

9      should look at it.  I believe they are

10     identifying their areas of concern.

11               Q.    But the panel is supposed to

12     address those areas of concern.  Right?

13               A.    Well, if they don't, then the

14     appeal is going to fail again.  Right?  That's --

15               Q.    Yeah, no, then that might be a

16     natural practical consequence, but as a matter of

17     duty, the panel is supposed to address those

18     concerns.  Right?

19               A.    Yes.

20               Q.    Okay.  Have you ever -- do you

21     recall a time in your, you know, tenure there

22     where a second appeal has been granted by a party

23     in a case?

24               A.    I don't.

25               Q.    Just one minute, please.  My last,

Page 237

1    I think, set of questions are about the initial

2    assessment that you conduct.

3                 Can you just sort of, like,

4    mechanically walk me through what you do?   My

5    understanding is that the intake typically is

6    done by Regan and then she will send you

7    information and then you'll make the assessment.

8    But just kind of walk me through, like,

9    mechanically how that works.

10                A.    Sure.  The intake is either in the

11   form of a conversation with the Title IX director

12   or the party has an option to send a written

13   description, which they do in some cases.  And

14   for our records, we always have an official sort

15   of written version of the initial assessment, but

16   the Title IX director would also attach whatever

17   the -- if there was written information that was

18   submitted, I would also read that.  And sometimes

19   the initial assessment would be quite short

20   because it would say read this, you know, which

21   is the statement of the allegations.

22                What the initial assessment does

23   is it is my determination as to whether, based on

24   the allegations, if they were to be substantiated

25   by the evidence, the policy would be implicated.

Page 238

1    It does not suggest that there would be a finding

2    of responsibility.  There is no evidence

3    collected.  It is simply a determination of

4    whether, if substantiated by the evidence, the

5    policy would be implicated.

6          Q.    Okay.  Got it.  So a part of that,

7    I mean the heart of it, and again, this might

8    just be obvious, but the Complainant comes in and

9    makes some sort of statement about what happened,

10   what the allegations are about.  You have to have

11   enough factual information, in other words, to

12   know -- to assess whether this violates --

13   potentially violates a policy if it's true.

14         A.    Yes.

15         Q.    Yeah.  Okay.  So as a statement by

16   a party, by the Complainant about what happened,

17   this should -- this is something that should

18   eventually be shared with the Respondent, just

19   like any other statement that you have by the

20   Complainant about her allegations, would also

21   be -- become part of the evidence in a case.

22         A.    We do not consider the -- sort of

23   the -- the initial assessment is not part of the

24   investigation.  It will inform the -- you know,

25   the decision to launch an investigation, but we

Page 239

1    don't consider it part of the investigation in a

2    substantive way.  It is not the -- first of all,

3    the mini initial assessments don't result in an

4    investigation, but it's also -- we take very

5    seriously the protections that are built into the

6    process.  So the Complainant and the Respondent

7    both, but the Complainant in this case, should be

8    interviewed by the panelists, should have an

9    advisor present, there should be, you know,

10   formal notes taken and read back to the

11   Complainant, just as what happened in the

12   Respondent's interview.  So we do -- we do take

13   that process seriously.

14              And so, no, we would not normally

15   consider the Complainant's initial description of

16   the events which may or may not be fulsome, may

17   or may not be -- you know, they're not being --

18   they're not being asked questions in a systematic

19   way.  We don't consider that to be part of the

20   investigation file.

21       Q.     Uh-huh.  Okay.  But during an

22   investigation, for instance, it would be common

23   for investigators to say, do you have any text

24   messages where you discuss the incident with

25   friends, and if so, can you please submit those

Page 240

1    to us.  Right?

2              A.    Yes.

3              Q.    Okay.  And that's -- I would think

4    you would agree that's pretty highly relevant

5    evidence, because it's what the Complainant has

6    said at some point in time supposedly happened

7    during the incident.  Right?

8              A.    Yes.

9              Q.    Okay.  So why is the initial

10   assessment any different than that?   Not the

11   assessment, but the Complainant's version of

12   events that are reported in the initial

13   assessment, why is it any different than -- or

14   any less relevant than what she might share in a

15   text message with a friend?

16             A.    I'm taking time.  I'm trying to

17   make sure I understand the question.

18             Q.    Ma'am, can I ask you, while you

19   think, are you reading any words off of a screen

20   from anyone when you look to the side?

21             A.    No.

22             Q.    Okay.

23             A.    Hmm.  We simply don't view an

24   intake conversation, which can be quite informal

25   and which may not be leading anywhere, that can

Page 241

1    vary wildly, as part of the formal process.  We

2    expect that the investigators will circle back

3    and -- or will ask the questions that they think

4    are appropriate.  It is their investigation, and

5    the initial assessment is preliminary to that.

6            Q.    Sure.  But why is it -- why is it

7    any different than the Complainant's disclosure

8    in a text message about what happened to her?

9            A.    Well, because the investigators

10   would have asked for that information and

11   gathered it from the Complainant in the course of

12   the investigation with an advisor present.  Once

13   the Complainant understood fully the process that

14   they were engaged in and had made a decision that

15   they wanted to proceed in this matter, that is

16   not -- those things are not in place at the time

17   of potential initial assessment.

18           Q.    But once a decision is made to

19   move forward with a case, the investigators --

20   again, they're asking for any statements she may

21   have made in the past, whether there was an

22   advisor present or not.  That's what -- a text

23   message would be an example of that.  Right?

24           A.    There are different types of

25   statements.  You know, a text message is -- is --

Page 242

1    could be significant corroborating evidence.  The

2    initial assessment simply doesn't fill that role.

3            Q.    But it's a -- it's Complainant's

4    statement about the events.  Just like it could

5    be done in a text message, in a phone call with a

6    friend or in any number of ways.  Right?

7            A.    Yes, but we don't consider that to

8    be a part of the investigation record.  It is --

9    it is a distinct, often incomplete process that

10   is preliminary to the investigation.  We just

11   don't consider it to be part of the

12   investigation.

13           Q.    Well, I understand that you don't

14   consider it.  The question is sort of just

15   getting at whether that's appropriate, I suppose,

16   or whether there's a basis for treating it

17   differently than a text.

18                 So, for instance, if the

19   Complainant gives a version of events in an

20   initial -- in her intake that is different from

21   what she said in a text message before, or is

22   different than what she says in a later

23   interview, a Respondent would have the right to

24   say this story is inconsistent and that's one

25   reason to not credit it.  Right?

Page 243

1          A.    We just -- it's -- that is not the

2    appropriate use of an initial assessment, from my

3    point of view.  That is not the purpose of it

4    and -- it's just not the purpose of it.

5          Q.    I understand that, but why -- why

6    is it not appropriate?

7          A.    Because materials gathered during

8    an investigation are handled in consistent ways,

9    in ways that create sort of appropriate levels of

10   protections for both parties, and an initial

11   assessment is -- is not that.  It's -- it is a

12   relatively informal conversation in which

13   individuals are thinking through what they want

14   to do about a matter, they are asking for

15   information in order to understand their options,

16   they may or may not provide very much detail.

17               It's just -- we just don't -- I

18   just don't view it as appropriate.  That is not

19   the purpose of initial assessment.  It is not

20   part of the investigation and it is not -- it is

21   not being conducted under the procedures of the

22   investigation.

23          Q.    Okay.  But then all of those

24   things would be true of text messages that the

25   Complainant sends to her friends before the

Page 244

1    intake.  Right?

2            A.    To the degree that investigators

3    ask for materials or the Complainant provides

4    those materials, they are part of the

5    investigation.

6            Q.    Right.  And so the initial

7    assessment, that version of her story, the intake

8    version, could, at that same time, also be

9    collected and made part of the investigation just

10   like the text messages could, too.  Right?

11           A.    The investigators ask their

12   questions directly, they don't ask -- I mean,

13   they don't ask the party, the Complainant, for

14   the initial assessment.  That's something that I

15   conduct.

16           Q.    They could ask for that version

17   that's given in the initial intake.  They could

18   ask for that during the course of an

19   investigation, just like they ask for text

20   message evidence, just like they ask for any

21   other kind of evidence that they're going to

22   collect.  Right?

23           A.    They would be collecting that from

24   me.

25           Q.    Right.

Page 249

1        conversations about her allegations, and if so,

2        can you please tell me what she said.

3                A.      Yes.

4                Q.      Okay.  Even though those

5        conversations happened before the investigation

6        started.

7                A.      Yes.

8                Q.      Okay.  So the only conversation

9        that you're saying -- there's only -- there's one

10       conversation that happens before an investigation

11       starts where the Complainant, without an advisor,

12       and informally, just like to her friends,

13       discusses the allegations, and you're saying that

14       that one is never going to be shared with the

15       Respondent, and that is the intake discussion.

16       That is Princeton's position.

17               A.      Yes.

18               Q.      And it doesn't matter how much

19       that initial intake discussion ends up

20       contradicting whatever she then says in the

21       investigation.

22               A.      It's not a point of reference in

23       the investigation, but the intake conversation

24       and the -- is for a specific purpose and it is

25       not considered part of the investigation.

Page 250

1          Q.     And it's not considered in the

2     investigation no matter how much a plaintiff -- a

3     Complainant contradicts it during an

4     investigation.

5          A.     It is the investigators' job to

6     ask the questions of the Complainant and the

7     Respondent and figure out where they believe

8     there are contradictions.

9               As I have said, this -- the

10    initial assessment intake is typically considered

11    a distinctive part of the process, and an

12    investigation, a good, thorough investigation

13    will follow.

14         Q.     And no matter how much the

15    Complainant later contradicts what she says in

16    that intake statement, no matter how much she

17    contradicts it later, it will never be shared

18    with the Respondent.

19               MS. BERMAN:  Objection.  Form.

20         A.     That's a very hypothetical.  We --

21    it has not been an issue.

22         Q.     Uh-huh.  But if someone did

23    contradict what was said there, it would never be

24    shared with the Respondent.  Right?

25         A.     Yes.  I think I've said that

Page 251

1    several times now.

2          Q.    All right.  Just give me - give me

3    like two minutes to look over my questions here.

4                Okay.  I don't have any more

5    questions.  I appreciate your time.  I may have

6    some follow-up if Amanda has some for you, but

7    thank you.

8                MS. BERMAN:  I don't have any

9    questions.

10               MR. MUHA:  Okay.

11               VIDEOTAPE OPERATOR:  Okay.  Then

12   we can go off the record at 4:32 p.m. --

13               MS. BERMAN:  Actually, wait a

14   minute.  I just want it on the record as to read

15   and sign.  And I don't know if this needs to be

16   on the record, but I did want to request a

17   rough -- a rough copy of the transcript when -- I

18   don't know how quickly that can be available.

19               COURT REPORTER:  I usually do it

20   the same night.  Would it be okay if I sent it in

21   the morning?

22               MS. BERMAN:  Yes.  Absolutely.

23               VIDEOTAPE OPERATOR:  Then we are

24   off -- I'm sorry, do you want to go off the

25   record now?

# JD EXHIBIT 2

Page 1

1          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2

          Civil Action No. 22-5887 (RK)(JTQ)
3

     JOHN DOE,
4
          Plaintiff,              REMOTE VIDEOTAPED
5                                 DEPOSITION OF:
          vs.                     RANDY K. HUBERT
6

     PRINCETON UNIVERSITY,
7
          Defendants.
8     _____
9          TRANSCRIPT of the stenographic notes of the
10    proceedings in the above-entitled matter, as
11    taken by and before RITA GARDNER, a Notary
12    Public and Certified Court Reporter of the State
13    of New Jersey, held REMOTELY VIA ZOOM, on
14    Wednesday, October 16, 2024, commencing at 9:38
15    a.m.
16
17
18
19
20
21
22
23
24
25

RANDY K. HUBERT

Page 17

1           You can answer.

2           A.    So I don't recall when relative,

3     sort of, to the deliberations, I started drafting

4     the first memorandum.  Sometimes I -- before we

5     are even done collecting information, start to go

6     through what I have and just start drafting a

7     fact section, just because sometimes that can be

8     helpful with deliberations.  I don't recall

9     exactly when I started drafting the first draft

10    of the -- of the fact section relative to when we

11    were done collecting information and

12    deliberations started.

13              But I do recall, with respect to the

14    first panel memorandum that, in deliberations,

15    early on, the Panel was -- it came to conclusions

16    that didn't change regarding both the 27 incident

17    as well as the allegations regarding

18    non-consensual kissing and fondling, as well as

19    the hickeys, with respect to the 2019 incident.

20              And I remember the allegations

21    regarding oral sex and vaginal intercourse were a

22    much closer decision, in my opinion, and that

23    there was more discussion and deliberation

24    regarding those allegations.  And initially, I

25    believe, the Panel was two to one that those --

RANDY K. HUBERT

Page 18

1    on those two allegations with respect to the oral

2    sex and the vaginal intercourse, that there would

3    be a finding of non-responsibility.

4                  And then upon further consideration

5    and thinking about it and talking through those

6    -- those issues, ultimately there was a finding

7    two to one on the Panel of responsibility in the

8    first memorandum for those two allegations.  But

9    those two were the -- were the allegations that,

10   in my opinion, were -- were a close call,

11   relative to the other allegations.

12   BY MR. MUHA:

13        Q.    Can you just -- can you be more

14   specific if you remember, like, who the -- who

15   was the two and who was the one initially, and

16   then who flipped their vote?

17        A.      Initially, the two were not -- who

18   were initially going to find that Respondent was

19   not responsible were Joyce and myself, and then

20   in the ultimate first panel memorandum, it was

21   myself and Walter who were the two that were in

22   the majority that found the Respondent was

23   responsible for those allegations.

24        Q.    Okay.  And I will share with you an

25   exhibit that I am marking.  Sorry, one second.

RANDY K. HUBERT

Page 29

1       that period.

2       BY MR. MUHA:

3              Q.      That is fine.  I am not -- I am not

4       -- and I am not asking you when you talked about

5       it.  I am just asking:  Did you talk about it

6       between the 1st and the 3rd?  Do you have a

7       memory of talking about it between the 1st and

8       the 3rd?

9                      MR. BERNS-ZIEVE:  Objection.  Form.

10             A.      I don't know how I can answer more

11      clearly.  I have a memory of those conversations

12      with Regan, and I don't recall the specific

13      timing of when they occurred.

14                     So I don't have -- I have a specific

15      recollection of the conversation, more than one

16      conversation, but in terms of the timing of those

17      conversations, I don't recall whether it occurred

18      prior to that time period, during that time

19      period, and/or after that time period.

20      BY MR. MUHA:

21             Q.      On the -- we saw that at least as of

22      February 20th, you -- you were voting for not

23      responsible on these charges, correct?

24             A.      Correct.

25             Q.      Okay.  And that on March 1st, you

RANDY K. HUBERT

Page 30

```
1        were still voting "not responsible" on these

2        charges, correct?

3                A.      The draft as of March 1st, yes.

4                Q.      Okay.  And I think you said --

5                A.      -- that.

6                Q.      Uh-huh, yeah.  Okay.

7                        So what does she mean when she says:

8        "If you think this happened, and I feel like that

9        is where you are, you should write that memo"?  I

10       guess what I am asking is:  Is she saying that

11       before this time, you were writing a memo for a

12       position that you didn't actually think happened?

13                       MR. BERNS-ZIEVE:  Objection.  Form.

14               A.      You would have to ask Regan what she

15       meant when she wrote that e-mail.

16       BY MR. MUHA:

17               Q.      Well, what do you -- what would you

18       -- reading it now, it was sent to you, like how

19       would you understand it knowing Regan and knowing

20       this process?

21               A.      I would understand her comment to

22       mean that based on our conversations about those

23       findings, because as I said, we had a number of

24       conversations and I had a number of conversations

25       with the other panelists about those findings,
```

RANDY K. HUBERT

Page 38

1    non-consensual kissing and fondling, followed

2    soon after by potentially consensual or

3    non-consensual oral sex and vaginal intercourse.

4        Q.    Okay, but you didn't -- she didn't

5    say to you, "If you think this was a reasonable

6    person's understanding, which I feel like is

7    where you are," she said to you, "If you think

8    that this happened."

9            So she is talking about the

10   underlying events, not what anyone -- a

11   reasonable person would understand, correct?

12        A.    No, that is not correct.  There was

13   no dispute about what happened.  There was no

14   dispute that oral sex happened or that vaginal

15   intercourse happened.  What she is talking about

16   is the allegations and whether or not there was a

17   policy violation, which includes what a

18   reasonable person would understand in those

19   unique circumstances as the crux of -- part of

20   whether or not it was consensual.

21            There was no -- dispute about what

22   happened.  So what she would be referring to as

23   to be whether or not there was a violation of our

24   policies in these circumstances.  And obviously,

25   there is -- the one sentence e-mail was not meant

RANDY K. HUBERT

Page 45

1          A.     No, I don't.  That was not my

2     understanding of what the e-mail said.  I have

3     already explained my understanding of what the

4     e-mail said.  You would have to ask Regan as to

5     what she intended, but I gave you my

6     understanding.

7     BY MR. MUHA:

8          Q.     So -- okay.  So is it fair to say

9     that your understanding of the facts did not

10    change between -- March 1st, when you were still

11    voting "not responsible" on the penetration

12    charges, and whatever time it came to where you

13    switched your vote?  Are you saying that that

14    wasn't based on -- that wasn't based on new

15    factual information you received; is that fair?

16                MR. BERNS-ZIEVE:  Objection.  Form.

17         A.     The change in my vote was -- I --

18    there was no new information collected during the

19    time that I changed my vote.  It was -- what

20    changed was my analysis of the information we

21    collected and whether or not that rose to the

22    level of substantiating, by a preponderance of

23    the evidence, a violation of the University's

24    sexual misconduct's policies.

25    BY MR. MUHA:

RANDY K. HUBERT

Page 78

```
 1      the -- of the hickeys, and I think Footnote 14
 2      [sic] makes that clear that they "did not credit
 3      either party's account with respect to the
 4      precise timing of the hickeys, other than to
 5      agree that they may have occurred at several
 6      points during their encounter."
 7              Q.      Right.
 8              A.      It is not -- there is no finding as
 9      to whether one of those points was at the end or
10      not.  We were unable to reach a conclusion by the
11      preponderance of the evidence as -- as to any
12      point in time when they occurred.
13              Q.      Okay.  Okay.  So the Panel is not
14      saying -- just making sure that I am
15      understanding.  The Panel is not saying, "At
16      least one hickey happened at the end, but we
17      can't -- we don't know about the rest."  You
18      know, the Panel is -- the Panel is simply saying,
19      "We don't know if one happened at the end, if
20      zero happened at the end, if two or three, we
21      simply can't say when any of these hickeys
22      happened," that is their conclusion?
23              A.      The conclusion as stated in Footnote
24      19 is that they can't -- we can't make a finding
25      with respect to the timing of the hickeys,
```

RANDY K. HUBERT

Page 79

1      including at the end or on the bed or at Quad

2      earlier, or at any point in time, other than

3      making a finding they may have occurred at

4      several points during their encounter.

5              Q.     But, Ma'am, the ambiguity that I am

6      generally not clear on, and I am trying to clear

7      up is, when it says that could not credit either

8      party's account "with respect to the precise

9      timing of the hickeys."  I initially read that to

10     mean, "We can't tell you, you know, the hickeys

11     definitely -- here are the five places where it

12     happened."

13              So, in other words, "We can't tell

14     you every -- we can't be precise about the

15     hickeys," which to me left open the possibility

16     the Panel was saying, "We can at least tell you

17     about one hickey."  Right.  "We think at least

18     one hickey happened at the end.  We just can't be

19     precise about all the hickeys."  That is the

20     ambiguity I am trying to clear up.

21              What I hear you to be saying is the

22     Panel is not saying -- is not confident about the

23     timing of even a single hickey.  Is that fair?

24              A.     So when the Panel says that they --

25     they don't credit either party's account with

RANDY K. HUBERT

Page 80

1        respect to the precise -- precise timing of the

2        hickeys, and they agree that they would have --

3        may have occurred at several points during their

4        encounter, if the Panel had credited that one or

5        more hickeys was given at the end, the Panel

6        would have included that in the memo.

7                    So what the Panel said in the memo

8        was they may have occurred at several points

9        during their encounter, and that they can't --

10       and that the Panel could not determine the

11       precise timing of any of the hickeys, the hickeys

12       at Quad, the hickeys on their bed, when they were

13       kissing, the hickeys during their encounter, the

14       hickeys at the end of -- just before Complainant

15       left Respondent's room.

16                   So they are not able to -- they may

17       have occurred at several points and they are not

18       able -- and the Panel was not able to

19       substantiate the timing of any of the hickeys.

20              Q.    Okay.  Thank you.  That does clear

21       it up.

22                   So explain to me, then, if you can,

23       how is that finding consistent with the Panel's

24       credibility determination, that it would credit

25       Jane Roe on everything she clearly and

RANDY K. HUBERT

Page 98

1        in the comment regarding the consistency of her

2        testimony about the hickeys?

3               A.     So from what I recall, she changed

4        her testimony about how many hickeys happened at

5        the end and why, the reasoning for why they

6        happened, but she did not change her testimony

7        that at least one hickey occurred at the end, at

8        [redacted]'s request, prior to her leaving -- I

9        am sorry, at Respondent's request, prior to

10       leaving Respondent's room.

11              Q.     Great, yes.  Okay.  Thank you.  You

12       can put that away.

13                     Did the Panel ever consider -- I

14       guess tell me what your thoughts were regarding

15       the finding that Jane Doe's reason for giving him

16       -- claiming to give him multiple hickeys at the

17       end of the night was deemed implausible.  Do you

18       recall that finding?

19              A.     I do recall that finding.

20              Q.     Okay.  So I guess talk me through,

21       like, what -- what did the Panel mean by that?

22              A.     Can we pull up, just to look at --

23       are you talking about with respect to the final

24       post-appeal panel memo?

25              Q.     I believe it is shared in the two,

RANDY K. HUBERT

Page 235

1           Q.      Okay.  So -- and if -- if John Doe

2     did want a hickey, he would have -- it is more

3     plausible that we would have had one already by

4     the end of the night than it is he would have

5     needed to request one from the Jane Roe, correct?

6           A.      Yes, it is more plausible that the

7     hickeys occurred prior to, or at least some of

8     them occurred prior to the -- when Complainant

9     was leaving Respondent's dorm room.

10          Q.      So he likely would have -- it is

11    more plausible that he already had a hickey

12    before the end of the night.  There's multiple

13    pieces of evidence showing that he didn't want a

14    hickey.  Why is that not enough to conclude that,

15    in fact, he did not want a hickey and would not

16    have requested a hickey from Jane Roe?  Or is it

17    enough to conclude that?

18          A.      So that is not an inclusion that the

19    Panel needed to make because it wasn't relevant

20    to the allegations.  The part of the hickeys that

21    were relevant to the allegations was the timing

22    of them because hickeys had occurred prior to the

23    oral sex and/or the vaginal intercourse were

24    relevant to the analysis of consent and what a

25    reasonable person would understand.

RANDY K. HUBERT

Page 236

```
 1                    And the -- whether or not there was

 2        already a finding, a unanimous finding by the

 3        Panel that the hickeys allegation was not

 4        substantiated, and that was true both in the

 5        first panel memorandum and in the second panel

 6        memoranda.  And in the credibility assessment, in

 7        the post-appeal memo, the fact that the

 8        Respondent's credibility was enhanced by the

 9        corroboration from the photographs of his

10        testimony about multiple hickeys that the

11        Complainant provided.

12             Q.    If the evidence showed that he would

13        not have requested a hickey, that means Jane Roe

14        made up a story about him supposedly requesting a

15        hickey at the end of the night, correct?

16             A.    If there was a finding that

17        Respondent did not request a hickey, then that

18        would be inconsistent with her statement that he

19        did.

20             Q.    And would you agree that her

21        testimony that at the end of the sexual encounter

22        he requested a hickey is an unusual claim?

23                    MR. BERNS-ZIEVE:  Objection.  Form.

24             A.    I don't know what you mean by

25        "unusual."
```

RANDY K. HUBERT

Page 237

1      BY MR. MUHA:

2           Q.    Okay.  Is it the kind of thing that

3      she could be mistaken about or -- or make up or

4      -- or just get wrong on accident?

5           A.    I have no idea if it was wrong, and

6      -- and the reasons that it would be wrong -- or

7      if in fact it was wrong.

8           Q.    You think it is possible that Jane

9      Roe was honestly mistaken in thinking that he

10     demanded a hickey at the end of the sexual

11     encounter?  Do you think she could be, like,

12     genuinely honestly mistaken about that?

13          A.    I -- I don't know.  I mean, I think

14     that is possible and -- and probably not likely,

15     but -- but possible.

16          Q.    Okay.  So it would be more likely

17     that she was fabricating it then, right?

18          A.    I -- the Panel didn't reach that --

19     didn't make any conclusion about that statement.

20     They made a conclusion about the number of

21     hickeys given and they -- they couldn't -- we

22     couldn't make a determination about the timing.

23          Q.    Right.  And I know you didn't make a

24     determination about it.  But if you had, you

25     agreed that the -- there is evidence there

RANDY K. HUBERT

Page 21

1              Q.      Next to that is a little arrow

2       pointing to the left.  That will just take you

3       back to the main folder.

4              A.      Okay.

5              Q.      So for here, you see this document

6       is dated February 20th?

7              A.      Yes.

8              Q.      Okay.  And if you would scroll to

9       the -- I guess the third page of the exhibit, do

10      you see a heading that says "February 2019

11      Incident"?

12             A.      Yes.

13             Q.      Okay.  And does this reflect --

14      (inaudible).

15                     (Discussion off the record.)

16                     THE VIDEOGRAPHER:  We are going off

17      the record.  The time is 10:02.

18                     (Remote videotaped deposition

19      recessed at 10:02 a.m. and resumed at 10:03 a.m.)

20                     THE VIDEOGRAPHER:  We are going back

21      on the record.  The time is 10:03.

22      BY MR. MUHA:

23             Q.      Ms. Hubert, does this exhibit

24      reflect that as of February 20th, the vote was

25      still to vote in favor of non-responsibility on

RANDY K. HUBERT

Page 22

1    the non-consensual penetration charges?

2          A.    Yes.

3          Q.    All right.  And then if you could go

4    to Exhibit 13 now.

5          A.    I don't have Exhibit 13, but under

6    Exhibit 12, it is PU0006458.

7                MR. BERNS-ZIEVE:  Try refreshing the

8    page -- that is what I had to do.

9                MR. MUHA:  Thank you.

10   BY MR. MUHA:

11         Q.    It will say Exhibit 13, and then it

12   is 6808.

13         A.    How do I refresh the page?

14         Q.    Without getting booted?

15         A.    Yeah.

16               MR. MUHA:  Eli, did you just do the

17   web browser refresh?

18               MR. BERNS-ZIEVE:  I just did the web

19   browser refresh, yeah.

20               MR. MUHA:  Okay.

21               THE WITNESS:  I am sorry, can you

22   just tell me --

23               MR. BERNS-ZIEVE:  In the upper left,

24   next to the back button that kept booting you,

25   there is the refresh button for the whole

# JD EXHIBIT 4

# EXHIBIT 1

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review



**Office of the Provost**
Three Nassau Hall
Princeton, NJ 08544-0015

## MEMORANDUM

**To:**    Kathleen Deignan, Dean of Undergraduate Students
Cole Crittenden, Associate Dean of the Graduate School

**Cc:**    Michele Minter, Title IX Coordinator, Vice Provost for Institutional Equity and Diversity

**From:** Randy Hubert, University Investigator
Joyce Chen Shueh, Senior Associate Dean of Undergraduate Students
Walter Wright, University Investigator

**Re:**    Respondent Respondent '21

**Date:** March 20, 2020

---

### I.    SUMMARY OF THE CASE

In her capacity as the University's Title IX Coordinator, Vice Provost Minter asked us to investigate and adjudicate allegations under Section 1.3 (Sex Discrimination and Sexual Misconduct) of *Rights, Rules, Responsibilities* related to Respondent Respondent (Respondent) '21.

Complainant Complainant '22 raised allegations related to two separate incidents involving Respondent:  the first incident occurred while she was visiting Princeton University in October 2017 as a senior in high school, prior to her admission.  The second incident occurred during her freshman year in February of 2019.

#### October 2017 Incident

With respect to the first incident, Respondent was charged with Non-Consensual Sexual Contact and/or Non-Consensual Sexual Penetration in that, on the night of October 14, 2017/early morning of October 15, 2017:

    a.  he allegedly non-consensually kissed Complainant outside of Charter Club;

    b.  he allegedly non-consensually kissed Complainant and put her hands on his crotch area (outside of his pants) outside of Murray Dodge;

    c.  he allegedly non-consensually touched Complainant's breasts both under and over her bra in his dormitory room;

    d.  he allegedly non-consensually touched Complainant's vagina over her underwear in his dormitory room;

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

    e.   he allegedly non-consensually put Complainant's hands on his bare penis in his dormitory room; and/or

    f.   he allegedly non-consensually pushed Complainant's head down and forced her to perform oral sex on him in his dormitory room.

Based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate the charges of Non-Consensual Sexual Contact and Non-Consensual Sexual Penetration with respect to these charges. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Contact and Non-Consensual Sexual Penetration with respect to these charges.

### February 2019 Incident

With respect to the second incident, Respondent was charged with Non-Consensual Sexual Contact and/or Non-Consensual Sexual Penetration in that, on the night of February 7, 2019/early morning of February 8, 2019 in his dormitory room:

    a.   he allegedly non-consensually kissed Complainant;
    b.   he allegedly non-consensually touched Complainant's bare breasts;
    c.   he allegedly non-consensually pushed Complainant's head down and forced her to perform oral sex on him;
    d.   he allegedly non-consensually engaged in sexual intercourse with Complainant;[1] and/or
    e.   he allegedly non-consensually had Complainant give him hickeys at his request.

Based on the information before us, and using the preponderance of the evidence standard, the panel unanimously found sufficient information to substantiate the charge of Non-Consensual Sexual Contact related to kissing Complainant and fondling her breasts. The panel therefore found Respondent *responsible* for Non-Consensual Sexual Contact with respect to this charge.

Based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found sufficient information to substantiate the charges of Non-Consensual Sexual Penetration related to the oral sex and the sexual intercourse. The panel therefore found Respondent *responsible* for Non-Consensual Sexual Penetration with respect to these charges.

Based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate that Respondent non-consensually had Complainant give him hickeys at his request. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Contact with respect to this charge.

### II.    PROCEDURAL OVERVIEW

On November 26, 2019, the panel met with Complainant; she was accompanied by her adviser, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On December 13, 2019, the panel met with Respondent; he was accompanied by his adviser, ▮▮▮▮▮▮▮▮▮▮. On January 13, 2020,

---

[1] Throughout this memorandum, when the phrase "sexual intercourse" is used, it refers to vaginal sexual intercourse.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

at the request of the panel, the panel met again with Complainant and ▮▮▮▮▮▮▮. On January 28, 2020, at the request of the panel, the panel met (via conference call) again with Respondent and ▮▮▮▮▮▮▮.

On February 6, 2020, the parties received charge letters and redacted case files containing the information that the panel had collected. The parties were given the opportunity to submit a written response to the panel, inform the panel that they would like to meet again with the panel, request that the panel consider the collection of other information, and/or identify individuals who may possess relevant information and request that such individuals be interviewed. Respondent provided additional written materials; Complainant did not do so.

In addition to the parties, the following 26 individuals were interviewed: Student BBB '21, Student X '22, Student N '21, Student H '22, Student W '21, Student K '20, Student Q '21, Student Y '22, Student U '22, Student T '22, Student G '22, Student R '22, Student F '22, Student S '22, Student M '21, Student I '22, Student D '21, Student A '22, Student O '19, Student L '21, Student P '22, Student B '21, Student J '22, Student C (Student C) '21, Student E '22 and Student Z '22. In addition, the panel reviewed all of the evidence provided by the parties and witnesses in connection with the investigation.

## III.   **REVIEW OF FACTS**

### A.  **October 2017 Incident**

During the fall of her senior year in high school, Complainant visited Princeton for a weekend (October 13-15, 2017) as part of the Creative Arts and Humanities Symposium ("Symposium").

*Interactions at Pregame Party*

Complainant's Account

On the second night of the Symposium (October 14, 2017), Complainant and several other high school participants attended a pregame party hosted by Student B in his dormitory room. According to Complainant, there were several male Princeton students, including Respondent, Student B, and Student C, who "encouraged [Complainant] to drink" by saying "drink, have fun." Complainant drank four or five shots of hard alcohol in approximately 30 minutes. Respondent, Student B, and Student C encouraged her to "just come with [them]" to the eating clubs on Prospect Avenue ("the Street"), and they kept complimenting her and telling her that she was "hot." Respondent, Student B and Student C all added her on Snapchat at that time.

According to Complainant, two high school students, Student P and Student A (who did not go to the Street) helped her down the stairs from the party. She felt that her judgment and decision-making was impaired, as she should have gone back with her fellow high school students. On a scale of zero to ten (with zero being sober and ten being passed out due to intoxication) ("intoxication scale"), Complainant thought that she was a "seven" at the time she left the pregame. She did not really remember walking to the Street, except she recalled "being out of it and not being able to walk straight." Complainant thought, but was not sure, that Respondent was one of

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

the students who walked to the Street with her.  She recalled that one of the male students walking her to the Street (she did not recall who) told her to lean on him, saying that they "would get [her] safely there."

## Respondent's Account

Respondent acknowledged attending the pregame at around 10 pm, during which he spoke with Complainant in a "circle of conversation" for two minutes.  Respondent denied encouraging Complainant to come out to the Street (as he knew that she could not get into eating clubs because she was not a Princeton student), denied telling her she was "hot" or to "drink and have fun," and denied walking to the Street with Complainant.  Respondent said that Complainant's speech and motor movements were normal at the pregame and that he saw "zero effects from alcohol." Respondent said that he did not really drink much during his freshman year and he would not have had more than one or two beers that night.

## Other Accounts

Others provided the following accounts:

- According to Student A, a high school student attending the Symposium, when he, Student P, and Complainant left the pregame together, Complainant was "pretty drunk."  She was "talking louder" and walking "differently."  Student A believed that he and Student P were "holding her up" as they walked.  Complainant left him and Student P to go out with a group of Princeton students, and Student A was concerned because she was intoxicated and going out "with a group of random people."  He was "not sure," but he may have texted her later that night to make sure she was okay.
- According to Student P, a high school student attending the Symposium, when Complainant left the pregame, she was "maybe a five" on the intoxication scale.  He and Student A did not need to assist her as she walked, as "she was walking on her own."
- According to Student B, Complainant seemed "sober" at the pregame.
- According to Student C, Complainant seemed "lightly buzzed or sober" at the pregame. Student C walked with Complainant from the pregame to Quadrangle Club ("Quad") and he did not recall her "leaning on anyone" for assistance.
- According to Student D, he saw Complainant at the pregame and she "didn't seem intoxicated."

## Interactions on the Street

## Complainant's Account

According to Complainant, at Charter Club ("Charter"),[2] she played beer pong with Student C and his roommate and "drank a lot of beer."  She was not "seeing straight" and "couldn't focus" while playing beer pong; she thought she also was slurring her words and "felt really dizzy" and nauseous, although she did not throw up.  It was "one of the drunkest" she had ever been.

---

[2] Student C stated that they went to Quad, not Charter.

4

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Student C's roommate was very drunk and kept "groping" her, so she and Student C walked the roommate back to his room, stopping along the way to get the roommate something to eat. Complainant "mostly just walked back with them," but "might have helped support the drunk roommate at one point." After Student C got his roommate into bed, he and Complainant stayed in his room for a while to make sure that the roommate was okay, talking about college essays and kissing for "a few minutes" (which Complainant said was consensual). Complainant drank water in Student C's room, and she "felt better after that."

They returned to Charter, at which point Student C went inside to get an ID for Complainant. He leaned Complainant against a wall because she couldn't stand straight. Respondent then found Complainant outside of Charter and "kept trying to kiss [her]." Complainant told Respondent that she had just kissed his friend [Student C]" and that she was "only 17" and "didn't want to do anything." Respondent replied, "It's okay" and kept complimenting her and telling her that she would be a student at Princeton next year anyway.

Respondent's Account

While he was at Ivy Club ("Ivy"), starting at 1:29 am, Respondent texted with Student C about meeting up on the Street. At 2:12 am, Student C texted Respondent that Student C was walking over to Ivy and that he "had to take care of a lot of drunk people." Respondent left Ivy and saw Student C and Complainant walking on the Street. Respondent asked Student C if Student C was done "hanging out with her" and Student C said that he was. Respondent and Complainant engaged in "flirtatious banter," touching each other's arms and looking at each other in the eyes. Complainant mentioned that she had kissed Student C and Respondent said to her, "Wonder who's a better kisser, me or Student C?" At 2:16 am, Respondent texted Student C, "can I get with her" and Student C replied, "Haha, of course." Respondent explained that he did so because he was not sure if Student C was in a relationship with Complainant (they both were from California), and by "get with her," he meant "kissing." Respondent and Complainant stopped on the sidewalk and kissed for a minute or two.

Other Accounts

According to Student C, Student C did not believe that Complainant drank any alcohol at Quad – they were talking by the beer pong table but not seriously playing beer pong. At around midnight, Student C decided to take his very drunk friend home; Complainant asked Student C if he needed her assistance and she accompanied them. After getting his friend into bed, Student C and Complainant sat on the friend's couch and talked. Student C asked if he could kiss Complainant, she said yes, and they kissed for 30 seconds. After they kissed, Complainant "kept asking" if she could spend the night in his room. Student C thought her request was odd and suggested that they go back to the Street. Student C and Complainant walked back to the Street and Complainant still seemed "buzzed." At 2:12 am, Student C texted "walking over" to Respondent, and Student C saw Respondent while Student C and Complainant were walking back to the Street. Respondent pulled Student C aside and said, "Are you done with her?" and Student C responded, "I'm no longer hanging out with her, you can hang with her." At 2:16 am, Respondent texted Student C, "can I get with her" and Student C replied "Haha of course."

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

_Interactions While Walking Around Campus_

Complainant's Account

According to Complainant, she felt "overwhelmed" and just wanted to go back to her host's room but didn't know how to get there and her host was not responding to texts. Complainant asked Respondent to walk her to her host's dorm, and Respondent told Complainant that he would give her a campus tour on their way.

In a stairwell outside of Murray Dodge, Respondent made out with her for between five and ten minutes. He was "rough" with her and pushed her against a wall. He tried to "guide [her] hands to his crotch," taking her hands and trying to make her give him a hand job over his pants. Complainant started to do so but would remove her hands once he let her hands go. Complainant "didn't really feel" that any of this was consensual and was uncomfortable that they were in public, but she "went along with it" because she just wanted to go back.

After they left Murray Dodge, Respondent walked Complainant to her host's dorm,[3] but he told her that he couldn't get her into the building (Complainant said that she now understands that he could have proxed her into the building). Complainant tried to call her host and other high school students being hosted there, but no one answered. Respondent told Complainant that she could sleep on his couch and he said that he "wouldn't try anything else."

On the intoxication scale, Complainant was "probably at a five" when walking around campus with Respondent, and "it was pretty obvious [she] was drunk." She was "coming down from the giddiness" and feeling "more like [she] wanted to throw up." There are "pieces of the night" that Complainant doesn't remember.

Respondent's Account

According to Respondent, he gave Complainant a tour of campus for 50-60 minutes; most of that time was walking and talking, but they stopped two or three times and kissed. During the walk, they engaged in "reciprocal flirtatious behavior" and were "kissing and making out."

At this point, Complainant was "100% sober" based on Respondent's observations – she walked around campus, including up and down stairs, for almost an hour and they had "normal and lucid" conversations about her family and high school debate. On the intoxication scale, Complainant was a maximum of "three," because even though she was acting "100% fine" and "walking perfectly straight and not slurring," he knew that she had been at a pregame so she could have drunk alcohol there several hours earlier.

During the walk, Complainant told Respondent that her host was "mad at her" because she didn't want Complainant making noise returning to the room so late. Respondent offered to walk

---

[3] Complainant indicated that her host lived in Mathey College, but records showed that her host lived in 1901/Laughlin Hall. In her second interview, Complainant stated that while she knew that she and Respondent were at Murray Dodge, outside her host's dorm, and Respondent's dorm, she did not know in what order they went to each location.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Complainant to her host's dorm, but Complainant said no.  When Respondent realized that Complainant had nowhere to stay, he offered to let Complainant sleep on his couch.

Respondent's prox records indicated that he was denied entry into Murray Dodge at 2:42 am.  He said that he and Complainant kissed in the stairwell outside of Murray Dodge; with respect to whether he placed Complainant's hand on his crotch area, Respondent said "in terms of hand placement, I don't think that happened."  Complainant then told him that she didn't want to kiss outside, and they started to walk back to Respondent's dorm.

Respondent initially told the panel that they went straight from Murray Dodge to his dormitory in Butler College.  Later in his interview, Respondent stated that he got a "shiver" that triggered a memory that maybe there was a chance that they went to the host's door, knocked, and no one answered.  However, he said that didn't seem possible unless the dorm was closer.  Respondent denied that he took Complainant to the host's dormitory but told her that he couldn't get her in, because that would have been a lie.

Beginning at 2:45 am, Respondent texted Student D, "I'm at Murray Dodge", "Hooking up", "I'm by wig and clio", "She needs to sleep somewhere", "I'm letting her sleep on the couch", and "Like nkt in a weird way but she actually had nowhere to go."  Beginning at 2:57 am, Respondent texted Student D, "Can u leave rn for 20 min", "if she goes straight to sleep I'll text u", "Get out now", and "Coming".  Respondent's prox records indicated that he proxed into his dormitory building at 3:03 am.  Respondent contended that, based on the timing of his text at 2:50 am[4] saying that they were near Whig and Clio and another text saying they were back in the room at 2:57 a.m., there would not have been enough time to walk from the Whig and Clio area to Mathey (where Complainant said that her host lived) or 1901/Laughlin Hall (where her host actually lived) and then to his dorm.

### *Interactions in Respondent's Dormitory Room*

Complainant's Account

According to Complainant, Respondent held Complainant's hand and led her into his room.  He asked her to get onto his bed, which was high, so he had to "hoist" her up by putting his hands under her shoulders.  It was difficult for her to get up onto his bed because of the height and because of her intoxication.  (Complainant agreed with Respondent's account that she told Respondent that she did not want to have sex, to which Respondent responded that there were other things they could do).

When she was on his bed, Respondent started kissing her, and he took off his shirt and pants.  Respondent tried to remove her shirt and pants, but Complainant "didn't really let him take her clothes off."  Respondent took off her cardigan and shirt; he kept trying to take off her bra but she moved his hands away.  Respondent touched her breasts over and under her bra; during her first interview, she said that her bra was removed, but in her second interview, she said that she "thinks" her bra came off.  When he touched her breasts, she moved his hands "multiple times" back to her

---

[4] In his interview, Respondent stated that he sent that text at 2:50 am; there was no time-stamp on that text, and it was several text messages after the text message that was time stamped 2:45 am.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

waist.  Complainant denied Respondent's account that she said anything about how this felt and did not think she told Respondent that it was the first time someone touched her breasts.

When Respondent tried to take off her pants, Complainant lied and told him that she was "on her period."  She did not let Respondent undo her pants, but he put his hands under her pants and touched her vagina[5] (without penetration).  Respondent took off his underwear and put Complainant's hand on his penis, trying to get her to give him a hand job.  Respondent then "pushed [her] head down" by putting his hands on her shoulders and pushing her down, saying, "You can at least do this."  Complainant told Respondent that she had never given a "blow job" before and that she didn't know how to and didn't want to.  Respondent said, "Come on, you're here, it's fine … C'mon, it's fun," and said that he would teach her.  Respondent told her what to do, saying things like "go up and down" and "suck harder."  While she was performing oral sex, Respondent's hand was pushing her head.  At some point, she started gagging and Respondent stopped for a moment and then went back to pushing her head down.  A few minutes into performing oral sex, Complainant asked him not to "come in her mouth."  Just before he ejaculated, Respondent let go of her, told her he was about to "come," and "finished himself in his hand."  Complainant denied that she continued performing oral sex after he ejaculated.  Complainant then rinsed her mouth out in the bathroom in Respondent's room and went to sleep on the couch in the common area.  Complainant said she was "not walking straight, leaning on him and feeling nauseous" (which she said was another reason that she did not want to engage in any sexual activity).

Complainant stated that she felt that everything that happened in Respondent's room was non-consensual because she "didn't want to be there and felt too drunk," and because Respondent "knew [she] didn't have the option of going elsewhere."  She felt fearful because Respondent had been rough with her and he was an "older man."  Complainant "just wanted to get it over with so it would stop and be done" and he would not be done "unless he got what he wanted."

Complainant got dressed and went to the common room, where she slept on the couch.  Respondent's roommate returned, and he and Respondent went into their bedroom and shut the door.

Respondent's account

According to Respondent, upon entering his room, they kissed and got onto his bed (which was only six inches higher than a regular bed, so did not require any special effort or hoisting in order to get into the bed).  Complainant told him, "Just so you know before we go further, I don't want to have sex," which made him "happy" because he was a virgin and was waiting to be in a three-month relationship before having sex.

Respondent then lay on his back and Complainant got on top of him and they started kissing again.  Respondent did not recall who removed Complainant's shirt, but Complainant helped Respondent unclasp her bra, as he had never before removed a bra.  Respondent touched her breasts and asked her if it felt good; Complainant said it felt good, but she didn't know how it was supposed to feel because it was the first time anyone had ever touched her breasts.  Respondent told her that it was

---

[5] Complainant did not specify whether Respondent touched her vagina over or under her underwear.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

only the second time he had touched a woman's breast. Respondent denied that Complainant removed his hands from her breasts and he denied putting his hands underneath Complainant's pants or touching her vagina (which he had never done previously).

Respondent thought that Complainant touched his penis (which was erect) over his shorts. He then unbuttoned and pulled his shorts down and asked Complainant if she would feel comfortable giving him a blow job; she said "yes," but said that she had never given one before. Respondent denied putting his hands on Complainant's shoulders to push her toward his crotch area. Complainant said once or twice "I'm sorry if this isn't good, I've never given a blow job before," and he told her that it was only the second time anyone had given him oral sex. Respondent did not tell Complainant how to perform oral sex because he wouldn't have known what to tell her. He didn't think that he told her to "go up and down" or "suck harder." Complainant asked him not to come in her mouth and he said "of course." Prior to ejaculation, Respondent told Complainant that he was about to come and she "moved away." Respondent asked Complainant if she could grab a paper towel from the dresser (which she did) and he ejaculated into the paper towels. After Respondent ejaculated, Complainant continued with oral sex and he asked her to stop.

They each went to the bathroom and then went to the common room. Respondent denied that Complainant leaned on him during that time. Respondent got Complainant sheets, a blanket, water, and cookies. Complainant asked Respondent for his Snapchat and they exchanged Snapchat usernames.

Respondent texted Student D "Come back now", "she's sleeping on the couch for 5 hours then leaving", "This is not ok", and "Her host ditched her"; the last of these texts was sent at 3:28 am. At 3:30 am, Student D texted Respondent "On my way!" and "meet outside in 2."

When Respondent woke up the next morning, Complainant was gone. Respondent Snapchatted Complainant thanking her for folding the sheets and asking if she got back okay; Complainant thanked him and said she had a good time.

Other Account

According to Student D, when he saw Complainant in the common room, he had a brief conversation with her and she "didn't seem intoxicated."

According to Student B, at approximately 3 am on the night of the incident, he saw Respondent outside between Wilson College and Frist.[6] Respondent told Student B that Student C was "hooking up with [Complainant] first" and then Respondent saw them "on the Street." Respondent

---

[6] During his first interview, Respondent said that he did not leave his room at any time that night after he and Complainant got back to his room. In his second interview, after being shown records indicating that he opened the door to his suite at 3:40 am, he stated that he "went to get Student D outside" to explain to him why there was someone sleeping on the couch. Student D said that they may have gone to Studio 34 to get something to eat, which appeared to the panel to be the more likely explanation for why Respondent met him outside, since Respondent had already explained why Complainant was sleeping on their couch via text messages.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

said that Complainant "started making out with him" and they went to his room. Respondent said that "he had been with Complainant" but "they didn't have sex" because "she didn't want to."

*Subsequent Communication*

Complainant's Account

According to Complainant, soon after the incident with Respondent, she told several friends that she had "been with" a college freshman. She specifically recalled telling Student A that "something happened" and telling some friends that "there was a college freshman." She told the panel that she "didn't really comprehend it [that the encounter was nonconsensual]" until later.

She did not want her experience at Princeton to be "clouded by a bad experience," so she acted normally and in a friendly manner toward Respondent. She occasionally communicated with Respondent over Snapchat; although she is "flirtatious" by nature, she wasn't "suggestive" with him.

Respondent's Account

According to Respondent, Complainant texted Respondent semi-flirtatious messages, including "Thankful today. Grateful to have you in my life [with a kissy face emoji]" on November 22, 2018. On January 24, 2019, Complainant told Respondent that she wanted to "go out," and he texted his friend Student M, "Complainant was flirting with me."

Other Accounts

Complainant subsequently communicated with others about the incident as follows:

- According to Student P, the next morning, Complainant mentioned to him that she had "slept somewhere else last night." Complainant did not seem upset and he assumed that "she had hooked up." In September 2018, Complainant mentioned that "something happened that night," and she "alluded" to having "hooked up."
- According to Student A, the next day Complainant sent him a message saying that she "ended up going back to [a male student's] room." Complainant told him "something about trying to climb back into her host's dorm window but it was locked," so she ended up staying in Respondent's room.
- According to Student I, in the fall of 2018, Complainant told her that [during the Symposium], she had "hooked up with a Princeton student" when the male student offered his room when she "didn't have a place to sleep." Complainant told Student I that she "felt pressured to do sexual acts with him" and "felt like she had to" because "he expected her to do it as a favor for giving her a place to stay."
- According to Student F, in September or October of 2018, Complainant told him that [during the Symposium], she had "hooked up" with a male student. Complainant said that she "felt weird about it" because the guy was older and that she "felt pressured to do things that she didn't want to."

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

- According to Student G, prior to February of 2019, Complainant told her that [during the Symposium], she "was locked out of her host's dorm room" and a student "took advantage of her" and "coerced her into oral sex." Complainant told her that she had concluded that the incident was "the reality of college life," but later realized "how wrong it was."

Respondent subsequently communicated with others about the incident as follows:

- According to Student D, the next morning, Respondent told him that Complainant "was very cool" and that he gave her a campus tour and they "started kissing." Respondent said that they went back to his room and "they had oral sex."
- According to Student C, the next week, Respondent told Student C that he gave Complainant a tour of campus and Complainant told him that she couldn't get into her host's room and asked if she could stay in his room. Respondent had offered to walk Complainant to her host's room, but she said that they had a fight and she wasn't comfortable returning. Respondent said that he and Complainant were "making out" and she "performed oral sex" and then slept on his couch.
- According to Student W, toward the end of the fall semester in 2017, Respondent and Student C told him that there was a high school student who had slept on Respondent's sofa because her host "abandoned her." Respondent and Student C said that Student C initially "hooked up with her" and then later Respondent "also hooked up with her."

## B. **February 2019 Incident**

*Interactions at Quad*

Complainant's Account

According to Complainant, on the night of February 7, 2019, she recalled laughing and dancing with friends on the dance floor at Quad. She was "really drunk" and "kept falling over." Complainant said that due to her intoxication, she did not remember where she was before Quad and did not remember what or how much she drank. It was "the drunkest [she has] ever been" and she was probably an "eight" or "nine" on the intoxication scale.

At 12:21 am, Complainant texted her friend Student E, "STUDENT E FO I BREAK MY CELIBACY IM SO TEMOTEF," to which he responded, "Are you ok?" and she responded "Yesssss."[7] They continued to text over the next 40 minutes, including Complainant writing (in response to Student E texting about his "Cos program" having a "bug,") "Im really sorry, want me to come back?", "Student E you got this, you're going to do a Zmaing at Cornell and cos will turn out alright", and "Okay, I don't mind so lmk. But I'm sorry you're stressed, :/ good luck with wevethubg [heart emoji], "Okay, I'm orry abgain remember I love you and you got this [two heart emojis]." Complainant explained to the panel that the "celibacy pledge" was not about sex and was only about "kissing people on the Street." She also said that when sober, she does not text with all capitalized letters or misspellings.

---

[7] Complainant's texts automatically delete after eight weeks but she provided these texts to the panel as screenshots of the text messages from Student E's cell phone; Student E also independently provided these text messages to the panel.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Around 1:00 am, Complainant was in a circle of friends dancing and Respondent came over and then led her to a side room where they talked about a class they had been in together.  Respondent talked about the time limit for the final, the difference between the final and the midterm, and how strange the professor was; Complainant remembered "trying to focus" during the conversation and trying not to slur her words.  Respondent started to kiss Complainant for five to ten minutes.  She said that although "consent is blurred" when she was kissing Respondent while intoxicated, she felt that it was consensual because she "was active" in it and "kissing him back."  She also noted that she was in a public place, her friends were there, and "kissing happens on the Street."

Complainant said that she did not recall the walk leaving Quad very vividly, primarily due to her intoxication.  She recalled asking Respondent to walk her to Terrace (where her friends were) and to her dorm.  She was clear with him that her roommate was there and nothing was going to happen, but she explained to the panel that she felt that she needed someone to walk her back to her dorm because she didn't feel like she could do it by herself.  At some point, Respondent said that his roommate was sick and he needed to check on him; Complainant thought that Respondent's room would just be a stop on the way to her dormitory.  On the walk to Respondent's room, Complainant texted Student E (at 1:35 am), "Call me in 5 and insist I come back", and she texted her friend Student F (at 1:40 am) "call me."[8]

Respondent's Account

According to Respondent, he drank one or two beers prior to arriving at Quad at around 1:00 am, after which he did not drink any more alcohol.

He and Complainant talked for a few minutes, and he "walked away" because he didn't want to talk to her.[9]  Later, Respondent initiated another conversation in which they were "flirty" and they kissed for maybe five minutes.  Complainant said she didn't want to hook up in public, so they both decided to go back to his room:  Respondent said, "Should we just go back then?" and she said, "Yeah."  Respondent denied that Complainant asked him to walk her to Terrace or to her dorm room or that he told Complainant that his roommate was sick or that he needed to "go check on him."  At 1:29 am, Respondent texted his roommate Student D, "Can I have the room for a little bit?", to which Student D responded that Respondent could have the room.

Respondent said that it did not seem like Complainant had been drinking, and she was no higher than a "three" on the intoxication scale.  They had a "clear conversation" for about 20 minutes at Quad, and on the walk to Respondent's dorm, she was walking "perfectly straight" and "her speech was perfectly normal."

---

[8] Complainant said that she remembered texting Student F first, and when he didn't answer, she texted Student E.

[9] Respondent explained that his perception of Complainant had soured after an incident on September 28, 2018 during which he and Student N saw Student Y, a very intoxicated female student (who was stumbling and slurring her words) at Charter with Student Z, a male student, who Respondent said was touching her butt.  Respondent saw Complainant and asked her to ask Student Y if she needed help; Complainant went up to Student Y and came back in ten seconds and said that Student Y was "fine."  Respondent thought that Student Y was not fine and he bought Student Y water.  He and Student N walked her back to her room.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

<u>Other Accounts</u>

According to Student H, at Quad, Complainant "stumbled" while they were dancing and was "pretty drunk" — "maybe a six" on the intoxication scale.

According to Student F, he and Complainant were dancing at Quad when Respondent "tapped her on the shoulder" and pulled her to an adjacent room. Student F was "pretty concerned," since Complainant was "pretty drunk" – a "seven and a half to eight" – and she and Respondent were "isolated." Student F knows Complainant's "drunk self," and she had "over exaggerated motions" and was "more open and energetic." Student F asked her if she would "hook up" with Respondent (by which he meant have sex) and she said no. After Complainant had been talking to Respondent for 20-30 minutes, Student F said to Complainant "Let's go," but she said that she was fine and would leave with Student I and Student H. At 1:40 am, Complainant texted Student F "call me"; he responded to the texts at 1:57 am and 1:58 am, but Complainant did not respond. Student F was worried because he believed that Complainant was "too drunk to hook up with Respondent."

According to Student E, Complainant's texts to him that night were "not coherent" and her spelling was "off," so he assumed she was intoxicated. Student E was concerned when he received the message about breaking her "celibacy pledge" (which referred to "kissing or any other physical interaction" short of intercourse), since she seemed intoxicated and "might not be able to give consent."

### <u>Interactions in Respondent's Dormitory Room</u>

Complainant's Account

According to Complainant, she was probably "a little less" intoxicated when she arrived at Respondent's room than when she was at Quad, but she was still feeling "incredibly drunk." Respondent sat on his bed and patted the space next to him and said he wanted to talk to Complainant; he said that "he was upset because he hadn't gotten into Ivy and his roommate had." She felt uncomfortable and had put her phone volume on high because she was waiting for her friends to text or call her, but she "didn't feel like" she could leave.

When Respondent started kissing Complainant, she was "very clear" and kept telling Respondent "I'm too drunk to do this. I don't want to do this." Respondent "kept kissing her and taking off articles of clothing." Complainant told Respondent, "This isn't a good idea"; Respondent replied, "It is [a good idea]." Respondent took off her shirt and bra, "fondled" her breasts, and took off his shirt. Complainant said "ten or more times" in an "exasperated" tone, "I'm too drunk; I don't want to do this," and Respondent kept saying, "It's fine." Every time she said it, Respondent tried to do something more. Respondent took off his pants, her pants, and his underwear. He then removed her underwear and put his hands on her waist, moving her so that she was on top of him while he was laying on his back, so that she was straddling him. Complainant did not remember whether she tried to stop Respondent from removing her clothing because there was a "patchiness" to her memory of that night; parts of the night "are just not there" and other parts she remembered "very, very vividly." Complainant denied Respondent's account that she pushed him down on the bed,

13

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

moaned aggressively (or made any sounds), took off Respondent's pants and underwear, said "Stop, it's my turn," or gave him hickeys (until he requested one at the end).

Complainant provided two different accounts regarding what transpired next: during her first interview, she reported that they had sexual intercourse followed by oral sex; during her second, she said that the oral sex preceded the sexual intercourse. During her first interview, she said that they were both naked when Respondent got a condom out, and when he did so, she said "no" again and told him, "I'm too drunk. I don't want to do this." Respondent had his hands on her waist and moved her to be on top of him, such that Complainant was sitting on top of him. He continued to try to insert his penis, but it "didn't fit" and it "hurt a lot" when he penetrated her with his penis. Respondent asked her if she was a virgin and she said no (which was not accurate) because she didn't want to seem too vulnerable. Complainant said that she had "just given up at this point," and she didn't think she said or did anything to object at this point. After a few minutes of trying to have sexual intercourse with her, Respondent removed the condom from his penis, and "pushed [her] head down," "mov[ing] [her] head toward his penis." She "just did it" [performed oral sex] because she thought that "if [she] got it over with, then [she] could leave". During the oral sex, Respondent kept apologizing and saying that he was "too drunk to come"; she did not recall whether he ejaculated.

During her second interview, when asked if she gave him oral sex before having sexual intercourse (if that was the order that things happened), Complainant said yes. After being told that Respondent reported having oral sex before the intercourse and that in her first interview she had said that they had oral sex after the intercourse, Complainant stated that she "d[id]n't really remember the order." She explained that she did not "remember the whole episode of what happened, but [she] remember[ed] certain details." She remembered Respondent pulling her up from performing oral sex and then he got a condom, which was the point at which she "gave up." When Complainant was asked if they had any discussion prior to the sexual intercourse, she said she did not think so. When asked if she told him that she would only have sex if he used a condom (which is what Respondent contended), she said, "I think so, but I don't remember how it happened." She said that it "was a stipulation [she] made – that if he was going to do it, then it had to be with a condom." She denied helping him put the condom on. His penis did not fit, so he used his hand to try to insert his penis into her vagina and "it hurt a lot." At that point, she had "just broke down or given up since he wasn't listening to [her]," as she kept saying she didn't want to do it, but he kept going. Complainant "wanted to get it over with" and she "didn't think [she] could leave at that point and just went along with it." She explained that she was "in that situation where it was happening" and "[she] didn't have clothing on and [she] didn't think there was a way for [her] to get out of the situation." She "just kind of pretended" by "moving on top of him." Respondent asked her "if it was in or not," and Complainant said no. Complainant said although his penis "didn't completely go in," she "just kind of moved around and pretended that it did."

After the sexual encounter, Complainant got off the bed and put her clothes on, wrapping her bra in her jacket so that she could leave more quickly. After they were both dressed, Respondent asked if she would give him a hickey, since people were coming the next morning to pick him up for an eating club. She "just did it" and "gave him one on his neck." When Complainant was shown pictures of several dark colored, large hickeys on both sides of Respondent's necks, Complainant stated that that she "just kept going because [she] wanted to leave." Before she left his room,

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Respondent said that a lot of his friends had been accused of sexual assault and he said to her, "You're not going to do that, right?"

Complainant left Respondent's bedroom, walking past his laughing friends in the common room. When she got outside, Complainant called Student F, crying and "a bit incoherent." He met her halfway to her room; once there, she showered and went to bed. Complainant thought that Respondent tried to Snapchat her that night or the next day, which is when she "blocked Respondent on all social media."

Following this incident, Complainant had nightmares for a while, didn't sleep well, and had panic attacks when she saw Respondent. She stayed in her room more and lost some friendships because she experienced bouts of depression.

## Respondent's Account

Prox records indicated that Respondent entered his dormitory building at 1:38 am.

In his first interview, Respondent denied that he had "any conversation with Complainant about eating clubs"; he denied saying that he was "upset that he didn't get into Ivy but his roommate did" and denied knowing whether he got into Tiger Inn eating club ("Tiger Inn") at the point in time when he was talking to Complainant during this night. In his second interview, Respondent stated that it was possible that he and Complainant talked about bicker and how he thought that he was getting into Tiger Inn and that Student D was getting into Ivy.

According to Respondent, they were on the bed kissing and Complainant was the "aggressor" and pushed him down and got on top of him. Respondent put his hand inside Complainant's pants and touched her vaginal area over her underwear. Complainant was "moaning aggressively and kissing [his] neck." She gave him the "craziest hickeys," "kissing" and "biting" his neck such that his neck had "black marks" and he had to buy concealer to hide them.[10] Respondent denied Complainant's account that he asked her to give him a hickey. Respondent "wasn't too into it [getting hickeys]." Complainant then said, "Stop, it's my turn," and she removed his pants and underwear and "very aggressively performed oral sex," with Respondent laying on his back and Complainant on top of him. While she was performing oral sex, she made two or three strange comments like, "I've learned so much since last time," "I'm so good now," and "I bet you won't be disappointed this time." Respondent denied Complainant's account that she said that she was "too drunk to do this" or "this isn't a good idea." Respondent did not remember how her shirt and bra came off and did not remember touching her breasts, but he recalled that Complainant removed her own pants and underwear (although he could not remember if she took them off before or after she performed oral sex).

Complainant checked her phone and may have responded to her friends (who had been texting or calling) in some way, but she told Respondent, "It's fine, don't worry about it."

---

[10] Later that night, at 2:51 am, Respondent took a selfie that showed (upon inspection by the panel), several large, dark hickeys on each side of his neck. Respondent explained that he took the selfie because he was "alarmed."

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Respondent did not recall who brought up having sexual intercourse, but he remembered "1000%" that Complainant said that she would have sex but only with a condom. Respondent had never used a condom before so Complainant helped him put the condom on. Complainant then got on top of Respondent and they started having sex; she was "moving her body around [him]"; Respondent denied that he put his hands on her waist and moved her on top of him. Respondent did not see any sign that Complainant was in discomfort or pain, and he denied asking her if she was a virgin. While they were having sex, Complainant was giving him hickeys on the other side of his neck; Respondent thought about telling Complainant he didn't want hickeys, but "just didn't say it." He "just really wanted to stop" doing anything sexual with Complainant, so he said, "Let me fix the condom." Complainant got off of him, and he "pretended to fix the condom." He noticed that his penis was not hard, which he explained was probably because he was "pretty nervous" and due to the side effects of a medication he was taking; Respondent denied saying to her that he was "too drunk to come," because he wasn't drunk. He genuinely didn't want to continue and said, "I don't think this is a good idea." Complainant said, "Why not?" and "Why don't you want to do this?"

They then heard laughter in the common room and Complainant got "kind of mad" and asked why there were people in the common room. Complainant seemed "embarrassed and upset," so at 2:32 am, Respondent texted Student D and his suitemate Student L, "Leaving rn", "Student D hey out", and "Let her leave in peace." Complainant opened the door to Respondent's bedroom and walked out. Respondent denied telling Complainant not to tell anyone what happened that night, or that he told her (regarding making a report about sexual assault), "You're not going to do that, right?"

Respondent subsequently apologized (either he followed her out or via Snapchat) that his friends were in the common room.

After that night, Complainant stopped reaching out to him, stopped liking his Instagram posts, and they have had "absolutely zero contact."

Other Accounts

According to Student L, when Respondent and Complainant entered the common room on the way into his bedroom, he didn't "have any indication" that she had been drinking alcohol.

According to Student D, Complainant left the bedroom "in a rush." She did not seem like she had been drinking; she "seemed very aware" and "not distraught." Soon after Complainant left, Student D noticed that Respondent had several "long" and "very dark" hickeys on his neck.

According to Student Q, when Complainant came out of Respondent's room and "quickly left," he did not recall her being upset or distraught. He only glimpsed her and would not have known whether she was intoxicated.

According to Student N, when Respondent and Complainant came out of Respondent's room, she "looked embarrassed" and "quickly left." She "seemed fine" and not intoxicated, but she seemed uncomfortable because there were four shirtless guys loudly laughing. He noticed that Respondent

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

"had a bunch of hickeys on his neck," and when Respondent saw them, he "got nervous" because eating club pickups were the next day and Respondent didn't want anyone to see them.

According to Student F, when Complainant called him, she "was sobbing"; he "couldn't understand what she was saying" but he knew that she said, "Can you help me?" Student F saw her cell phone's location and met her near Whitman College. She "stumbled," was "distraught," and he "couldn't understand her verbally." Student F asked her what happened, but she said that she just wanted to go home and "forget it." He could not discern whether Complainant was intoxicated, though he believed that she was probably "less intoxicated" than she was when he last saw her at Quad.

*Subsequent Communications regarding the Incident*

Other Accounts

Complainant subsequently communicated with others about the incident as follows:

- According to Student I, the next morning, Complainant was "in tears and very distraught." Complainant told her that Respondent had offered to walk her home, but instead walked her to his room. She had a sexual encounter with Respondent in which he was "on top of her" and "wouldn't let her leave." Complainant had said "no," but Respondent "still went through with it." Complainant told Student I that she was "very drunk" and repeatedly told him, "No, I don't want to do this." A few days later, Complainant told Student I that Respondent had texted her, "You're not going to tell anyone about this, right?" After this incident, Complainant was "afraid of Respondent," and if she saw him, she would "go the other way."

- According to Student F, Complainant texted him the next morning, "We just need to pretend that nothing happened last night. I'm fine." Later that week, Complainant told him that Respondent had been walking her to her dorm but said that he had to check on a roommate who was intoxicated, which was when Complainant sent Student F the "call me" text. Complainant said that Respondent talked to her about things in his life that weren't right, like that he didn't get into a particular eating club. Respondent then "tried to kiss her," but she said "no" and "she didn't want this." Respondent tried to have sexual intercourse with her, but "it didn't work." She said that Respondent "asked her to give him a blow job" and she performed oral sex because "she wanted to get out of there." After that night, Complainant would cry if she saw Respondent or even talked about seeing Respondent.

- According to Student G, the next morning at brunch, Complainant suddenly said, "I have to get out of here … this guy just came in and I can't see him, we have to leave." After they left, Complainant told her that the previous night, she saw a guy she knew from [the Symposium] and he "pressured her to stay at an eating club with him" when her friends were going to Terrace. Complainant said she and Respondent kept talking and Respondent said his roommate was "having an issue," so they went to his dorm room, but his roommate was not there. Complainant told her that "it was difficult to get out of the situation because she was intoxicated." Complainant said that "they initially started kissing, but she became uncomfortable when he pressured her for sex." Complainant said that she felt "trapped"

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

and believed that if she performed oral sex, Respondent would be "appeased" and she could leave. Complainant told her that Respondent "kept taking off her clothes," and Complainant kept saying "no," but he kept saying, "it's fine." When all of her clothes were off, she felt "scared and frozen." Complainant told Student I that she knew that Respondent penetrated her because it "really hurt." Student G told Complainant, "you said no and he kept going, it was rape." After that night, Complainant seemed more "anxious" and has had panic attacks related to the incident.

- According to Student H, the next day, Complainant told him that Respondent had asked her to help him find his roommate, so Complainant went back to Respondent's dorm room. In his room, Respondent "pinned her on the bed." She said, "I want to leave," and Respondent responded, "No, you're staying." Respondent held her against the bed, took off his pants, and "forcibly began to rape her" while Complainant was "sobbing" and "begging to leave." The sexual intercourse "hurt" since she was a virgin. When he finished, she put on her clothes and ran to Student F's room. A week later, Complainant told Student H that she saw Respondent and had a panic attack.

- According to Student E, during the next week, Complainant came to his room "very upset and sobbing." She told him that she had recently been sexually assaulted, but did not share details or the name. Over the next few weeks, Complainant "had trouble sleeping" and was having nightmares and "visualizing" the assault, so she slept in Student E's bed. During a conversation a few weeks after the incident, Complainant identified Respondent as the person who had assaulted her. Complainant later confided in Student E that she had a panic attack during the fall semester 2019 when she was in a dorm room that reminded her of Respondent's room.

- According to Student U, in February 2019, Complainant "seemed different" and Student U asked her if she was okay. Complainant told Student U that "she was raped" and that she was having trouble sleeping and was "always anxious." Student U observed that Complainant was "upset" and "sobbing" related to having been assaulted. In the spring of 2019, Complainant suddenly grabbed Student U's hand and "squeezed" when she was having a panic attack after noticing Respondent in line at Frist.

- According to Student R, in April or May 2019, she assisted Complainant when Complainant was "very drunk" and went to the ladies' room to vomit. Complainant was "very distraught and crying," and said, "Someone raped me." Several months later, Complainant told Student R that it was Respondent who had raped her.

- According to Student T, in October 2019, Complainant told her that she had been assaulted last year. Later, Complainant told Student T that she had just seen her assailant; Complainant was "really shaken up" and named Respondent as her assailant.

Respondent subsequently communicated with others about the incident as follows:

- According to Student M, the next day Respondent sent her a video of the hickeys on his neck with a caption "Help." During an in-person conversation about the hickeys that day, Respondent told Student M, "This was Complainant" and asked to borrow her concealer. During an in-person conversation a few days later, Respondent told Student M that Complainant "was the aggressor" and was "wild" during sex.

- According to Student N, the next day, Respondent told him that he had a sexual encounter with Complainant in which she "was really into it," "more into it than he was."

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

- According to Student L, the next day, Respondent told him and Student D that he had sex with Complainant the previous night, but that he had been "uncomfortable" because it was "the second or third time he had sex." Respondent told them that he had "trouble maintaining an erection" and was "nervous" since it was his first time using a condom. Respondent told them that prior to having sex, Complainant told Respondent, "If we're going to have sex, you should use a condom." Respondent also said that she seemed "very into it" and she only became uncomfortable "because he couldn't remain hard."

- According to Student D, within two or three days, Respondent told him that Respondent and Complainant had sexual intercourse and that Respondent "felt embarrassed" because he "couldn't keep an erection," which Respondent believed was due to medication. Respondent said that since he couldn't "keep the condom on," it "gave him an excuse to ask her to stop." Respondent said that "Complainant wanted more sex," but "he couldn't do it." Respondent said that he and Complainant had sex after she told him that "she would have sex if he had a condom." Respondent said that he had never been with someone "who was so direct" about wanting to have sex and that Complainant "took off his pants and underwear."

- According to Student C, during the spring 2019 semester, Respondent told him either in person or via text that he "got with Complainant the other night" and that it was "super weird" because she was "really aggressive." Respondent told Student C that she "threw him on the bed" and said, "I can't wait to blow you again, I've gotten much better at it."

- According to Student W, on January 9, 2020, Respondent told him that he had a second sexual encounter with Complainant. Respondent told Student W that he and Complainant were having sex when "he became uncomfortable and stopped," at which point Complainant became "upset or agitated."

## IV.  DELIBERATIONS AND DECISION

At the outset, the panel recognized that this case involves two distinct incidents, and the panel considered whether a preponderance of the evidence supported each specific charge related to each of the two incidents. At the same time, the panel noted that the two incidents involved different circumstances, occurred more than sixteen months apart, and had varying degrees of corroborating evidence. The panel therefore conducted independent credibility assessments for each of the two incidents.

### A.  University Policies

In deliberating, the panel considered the following University policies:

- Non-Consensual Sexual Penetration (commonly referred to as rape):  Any act of vaginal or anal penetration by a person's penis, finger, other body part, or an object, or oral penetration by a penis, without consent.

- Non-Consensual Sexual Contact (commonly referred to as sexual assault):  Any sexual touching other than non-consensual sexual penetration without consent. Examples of non-consensual sexual contact may include: genital-genital or oral-genital contact not involving

19

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

penetration; contact with breasts, buttocks, or genital area, including over clothing; removing the clothing of another person; and kissing.

- Consent and Incapacitation:  In reviewing possible violations of sexual misconduct, the University considers consent as the voluntary, informed, un-coerced agreement through words and actions freely given, which a reasonable person would interpret as a willingness to participate in mutually agreed-upon sexual acts.  Consensual sexual activity happens when each partner willingly and affirmatively chooses to participate.

  Indications that consent is not present include:  when physical force is used or there is a reasonable belief of the threat of physical force; when duress is present; when one person overcomes the physical limitations of another person; and when a person is incapable of making an intentional decision to participate in a sexual act, which could include instances in which the person is in a state of incapacitation.

  Important points regarding consent include:

  • Consent to one act does not constitute consent to another act.
  • Consent on a prior occasion does not constitute consent on a subsequent occasion.
  • The existence of a prior or current relationship does not, in itself, constitute consent.
  • Consent can be withdrawn or modified at any time.
  • Consent is not implicit in a person's manner of dress.
  • Accepting a meal, a gift, or an invitation for a date does not imply or constitute consent.
  • Silence, passivity, or lack of resistance does not necessarily constitute consent.
  • Initiation by someone who a reasonable person knows or should have known to be deemed incapacitated is not consent.

  *Rights, Rules, Responsibilities* section 1.3.3.

## B. October 2017 Incident

### 1. Credibility Assessment

The accounts provided by Complainant and Respondent regarding the October 2017 incident varied with respect to their descriptions of how Complainant responded to the sexual activity — that is, whether she continually tried to avert his advances (Complainant's account) or whether she actively engaged in the sexual activity, engaged in conversation about the sex acts, and provided clear verbal consent to the oral sex (Respondent's account).  In assessing the party's accounts, the panel first applied the EEOC's guidelines regarding credibility (none of which are determinative),[11] and then made additional observations regarding credibility, as appropriate.

*Complainant*

---

[11] Under University procedures, it is not the role of the panel to consider "past record," and thus this factor was not considered by the panel.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

- Inherent plausibility: The panel agreed that Complainant's account (when considered on its own) was believable on its face and made sense.
- Demeanor: Nothing in Complainant's demeanor impacted the panel's assessment of her credibility.
- Motive to falsify: The panel found no apparent reason for Complainant to lie about or falsify her account.
- Corroboration: Although Complainant discussed the incident with others, she did not describe the incident as problematic until her disclosures to Student I and Student F in the fall of 2018 (a year after the incident but more than a year before the initiation of this investigation). Although the panel noted that Complainant did not describe the incident as non-consensual to Student P and Student A the following day or to any friends from home within a year after the incident, the panel credited her explanation that she "didn't really comprehend" what had happened until later and further noted that she had just met Student P and Student A. There was no physical evidence corroborating Complainant's account.

In addition, the panel credited that Complainant was forthright in acknowledging that her memory was impaired due to her alcohol consumption and therefore she "did not really remember" certain parts of the night. The panel further credited that she was forthright with respect to some information that she may have believed would undermine her credibility (e.g., that she consensually kissed Student C before her interactions with Respondent). The panel noted that Complainant failed to mention during her first interview that she told Respondent that she didn't want to have sexual intercourse and he agreed to that, but the panel credited that she said that she recalled doing so when asked, and the panel did not find that she intentionally omitted this detail. Upon assessing all of these factors, the panel found Complainant's account of the October 2017 incident to be largely credible.

*Respondent*

- Inherent plausibility: The panel agreed that Respondent's account (when considered on its own) was believable on its face and made sense.
- Demeanor: Nothing in Respondent's demeanor impacted the panel's assessment of his credibility.
- Motive to falsify: The panel found no apparent reason for Respondent to lie about or falsify his account (other than the obvious incentive not to be held responsible, which the panel did not consider, as it would apply to all respondents).
- Corroboration: The panel credited that the details Respondent provided to others (including to Student B later that night) were consistent with the account he provided to the panel, and his account was consistent with his text messages from that evening. There was no physical evidence corroborating Respondent's account. However, the panel did not credit Respondent's assertion that Complainant was "100% sober" when they walked around campus and to his dormitory room, as his description was inconsistent with the accounts of other witnesses who interacted with Complainant in a meaningful manner, including Respondent's friend Student C, who described Complainant as "buzzed" during the time frame shortly before Complainant and Respondent met on the Street. The panel recognized that Student A and Student P saw Complainant earlier in the night; however, given their descriptions of her level of intoxication at the time of the pregame party, as well

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

as Complainant's description of how much she drank, it was implausible that she would have appeared to be "100% sober" just a couple of hours later.

Upon assessing all of these factors, the panel found Respondent's account of the October 2017 incident to be largely credible.

The panel found the witnesses' accounts with respect to the October 2017 incident to be credible.

2. **Findings**

With respect to the charges of Non-Consensual Sexual Contact and Non-Consensual Sexual Penetration against Respondent related to the October 2017 incident, the panel considered whether, using the preponderance of the evidence standard, there was sufficient evidence to substantiate that Respondent non-consensually (1) kissed Complainant outside of Charter; (2) kissed Complainant and put her hands on his crotch area (outside of his pants) outside of Murray Dodge; (3) touched Complainant's breasts both under and over her bra in his dormitory room; (4) touched Complainant's vagina over her underwear in his dormitory room; (5) put Complainant's hands on his bare penis in his dormitory room; and/or (6) pushed Complainant's head down and forced her to perform oral sex on him in his dormitory room.

*Incapacitation & Consent*

The panel first considered whether Complainant was incapable of making an intentional decision to participate in a sexual act due to incapacitation due to alcohol, and if so, whether Respondent knew or ought reasonably to have understood that Complainant was incapacitated. By Complainant's own admission, she was "probably at a five" on the intoxication scale when she was walking around campus with Respondent. Slightly before this time frame, Complainant said that she "might have helped support the drunk roommate," she discussed college essays with Student C, she consensually kissed Student C, and Student C described her as "buzzed" during this time frame. While the panel credited that Complainant was intoxicated and did not credit Respondent's assertion that Complainant was "100% sober," the panel unanimously agreed that these descriptions did not support that Complainant was incapacitated such that her perception or judgment was so impaired that she lacked the cognitive capacity to make or act on conscious decisions.

The panel next considered whether Complainant consented to the sexual activity with Respondent, and whether a reasonable person in Respondent's position would have interpreted her actions as consent. At the outset, the panel noted that the parties largely agreed on the sexual acts that occurred, but they disagreed regarding whether Complainant consented to said acts. In order to make this assessment, the panel first had to determine which party's account was substantiated by a preponderance of the evidence.

The panel acknowledged that because there was little corroborating evidence regarding this incident, its assessment regarding this interaction necessarily relied heavily on the credibility of the parties. And in this case, due to the panel's heavy reliance on its credibility assessment, the panel was unable to determine, using the preponderance of the evidence standard, which party provided a more accurate description of their interactions (specifically, whether Complainant's

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

actions indicated that she consented to the sexual activity), as the panel found both parties' accounts to be largely credible. Given the conflicting accounts from the parties and the lack of corroborating evidence, the majority of the panel found insufficient information to substantiate either party's account regarding this sexual activity.

Although the panel recognized that Complainant said that she felt pressured to engage in sexual conduct with which she was not comfortable, a majority of the panel found that it would have been reasonable that Respondent interpreted her actions as a willingness to participate in the sexual conduct. Complainant acknowledged that when she clearly communicated boundaries to Respondent, he did not cross those boundaries (Respondent tried to take her pants off and she "did not let him" undo her pants; Complainant told Respondent that she did not want to have sexual intercourse and Respondent agreed and they did not have sexual intercourse; Complainant told Respondent that she did not want him to ejaculate in her mouth and Respondent agreed and did not ejaculate in her mouth). Although Respondent clearly hoped that there would be further sexual contact after he and Complainant returned to his dormitory room (he texted his roommate Student D to "leave rn for 20 min"), Respondent also indicated an awareness that Complainant might not want to engage in any further sexual contact (Respondent texted Student D "if she goes straight to sleep I'll text u").

Having found insufficient information to substantiate either party's account regarding whether Complainant consented to the sexual activity, the panel did not further assess whether the sexual activity was consensual under University policy.

Therefore, based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate these charges of Non-Consensual Sexual Contact and Non-Consensual Sexual Penetration. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Contact or Non-Consensual Sexual Penetration with respect to these charges.

## C. February 2019 Incident

### 1. Credibility Assessment

The accounts provided by Complainant and Respondent regarding the February 2019 incident varied significantly with respect to their descriptions of how Complainant responded to the sexual activity — that is, whether she repeatedly said no (Complainant's account) or whether she initiated the sexual activity and behaved in a sexually aggressive manner (Respondent's account). In assessing the party's accounts, the panel made the following observations regarding their credibility. In assessing the party's accounts, the panel first applied the EEOC's guidelines regarding credibility (none of which are determinative),[12] and then made additional observations regarding credibility, as appropriate.

*Complainant*

---

[12] Under University procedures, it is not the role of the panel to consider "past record," and thus this factor was not considered by the panel.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

- Inherent plausibility: The panel agreed that Complainant's account (when considered on its own) was believable on its face and made sense, with the single exception of her behavior with respect to providing the hickeys to Respondent. The panel agreed that Complainant's explanation that she gave Respondent multiple hickeys on both sides of his neck because she "just kept going because [she] wanted to leave" was implausible, as her providing multiple hickeys would have prolonged her leaving his room.

- Demeanor: Nothing in Complainant's demeanor impacted the panel's assessment of her credibility.

- Motive to falsify: The panel found no apparent reason for Complainant to lie about or falsify her account.

- Corroboration: The panel agreed that Complainant's behavior immediately following the incident was consistent with her having just experienced trauma (according to Student F, she was "sobbing" and "distraught," asking "Can you help me?"). Additionally, within the following days, she described the incident as non-consensual (at times in a highly emotional manner) to Student I, Student F, Student G, Student H, and Student E.[13] In addition, the panel noted that Complainant had a visceral reaction to seeing Respondent after the incident, consistent with her having had a distressing experience with him.[14]

In addition, the panel credited that Complainant was forthright in acknowledging that her memory was impaired due to her alcohol consumption, and the panel credited her contention that while there were parts of the night that she did not recall, she remembered other parts "very, very vividly." The panel further found that she was forthright with respect to some highly relevant information that she may have believed would undermine her allegations (e.g., that she consensually kissed Respondent at Quad; that (in response to the panel's questioning), she told Respondent that she would only have sexual intercourse if he used a condom; that she "pretended" that she was having sexual intercourse with Respondent by "moving on top of him"; and that she did not say or do anything to object to performing oral sex and "just did it").

The panel noted that one may question why Complainant (even by her own account) consensually kissed Respondent at Quad and returned to his room, if she believed that he had previously (in October 2017) harmed her. However, the panel credited Complainant's explanation that because she did not want her experience at Princeton to be "clouded by a bad experience," she acted normally and in a friendly manner toward Respondent; the panel further acknowledged that individuals may have complicated relationships with those whom they feel harmed them. The panel also considered that Complainant told Student E (via text) that she was going to break her "celibacy pledge"; however, the panel credited her explanation that she was referring to kissing,

---

[13] The panel noted that Student I reported that Respondent "wouldn't let [Complainant] leave" and that Respondent texted Complainant, "You're not going to tell anyone about this, right?" The panel agreed that Student I's description, though discrepant from Complainant's, was not significantly inconsistent with Complainant reporting feeling like she was unable to leave Respondent's room or inconsistent with Complainant's report that Respondent said (rather than texted) to her, "You're not going to do that, right?" (by which, he meant that she was not going to report him). Further, the panel did not credit Student H's account, as it was inconsistent with every other account related to the incident. However, the panel agreed that the salient point with respect to Complainant's reports to her friends was that Complainant immediately described the incident as non-consensual.

[14] The panel agreed that Complainant's reactions upon seeing Respondent after the incident (crying, having panic attacks) were consistent with her account and not consistent with her simply being embarrassed due to his friends having been in the common room laughing when she came out of his bedroom.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

not sex. The panel noted that Complainant did not remember the order of the oral sex vis a vis the sexual intercourse. However, the panel recognized that due to her intoxication, Complainant's memory was impaired (which she was forthright in acknowledging), and the panel credited that she remembered certain parts of their interaction "very, very vividly," including specific details (such as that she repeatedly expressed lack of consent and that he pushed her head down prior to the oral sex) that were salient in assessing whether the sexual activity was consensual.

Upon assessing all of these factors, the panel found Complainant's account of the February 2019 incident to be largely credible.

*Respondent*

- Inherent plausibility: The panel agreed that Respondent's account (when considered on its own) was believable on its face and made sense in many respects. However, the panel found dubious certain aspects of Respondent's account, including that Complainant, who was a virgin at the time and had never engaged in sexual intercourse, helped him put the condom on (when he did not know how to do so) and was the one who questioned why he wanted to stop the sexual intercourse.
- Demeanor: Nothing in Respondent's demeanor impacted the panel's assessment of his credibility.
- Motive to falsify: The panel found no apparent reason for Respondent to lie about or falsify his account (other than the obvious incentive not to be held responsible, which the panel did not consider, as it would apply to all respondents).
- Corroboration:
  - The panel recognized that over the next several days, Respondent described the February 2019 sexual activity to friends in a manner that was consistent with his account to the panel (that Complainant was the "aggressor"), and that such evidence would generally be deemed to credit one's account. However, the panel noted that this account was completely contradictory to Complainant's words and actions in the following days, and the panel, for the reasons described herein, credited Complainant's account.
  - The panel noted that Respondent's assertions that "it did not seem like Complainant had been drinking" and she was "no higher than a three" on the intoxication scale were inconsistent with Complainant's account that she was "eight" or "nine" on the intoxication scale, as well as with her lack of memory regarding aspects of the night, and were inconsistent with Student F's account that Complainant was a "seven and a half to eight" on the intoxication scale and with the text messages that Complainant sent to Student E, which contained typos that were consistent with the typist being intoxicated.
  - The panel did not credit Respondent's denial that he told Complainant that his roommate was sick or that he needed to "go check on him," as Complainant mentioned this detail to Student G and to Student H the following morning and to Student F the week after the incident. The panel agreed that Complainant would not have mentioned this detail, which was secondary to the allegations, unless it had occurred.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

- The panel did not credit Respondent's narrative that Complainant was eager to return to his room to engage in further sexual activity, as on the walk to Respondent's room, she texted both Student E and Student F ("Call me in 5 and insist I come back" and "call me"), which suggested that she was not interested in being with Respondent in his room and/or was concerned about being alone in his room.

- The panel found troubling that Respondent initially lied to the panel when he denied having a conversation with Complainant about having not been accepted into Ivy. The panel considered whether Respondent initially simply misremembered this detail. However, the panel rejected this possibility, noting Respondent's emphatic assertions (during his first and second interviews) that he did not know until after Complainant left that he had been accepted to Tiger Inn and not accepted into Ivy were inconsistent with the account provided by Respondent's close friend Student D, who reported that prior to Respondent's interactions with Complainant, Respondent knew that he had been selected for Tiger Inn and that Student D was accepted to Ivy. It was also inconsistent with what Complainant reported to Student F the next morning (she told him that Respondent told her that he did not get into an eating club). Although their discussion about eating clubs was not directly related to the allegations, the panel felt that Respondent's misrepresentations to the panel were an attempt to undermine Complainant's credibility.

In addition:

- The panel did not credit Respondent's suggestion that Complainant was upset merely because she was embarrassed due to his friends having been in the common room laughing or because he had "rejected" her. Although Respondent did not witness her behavior after she left his room, Respondent's explanation did not explain why Complainant was, immediately upon leaving his room, "sobbing" and "distraught," or her ongoing highly distressed reactions to seeing him on campus.

- Although not directly related to the allegations, the panel found dubious Respondent's contention that he asked Complainant to intervene in a situation involving two other students (Student Z and Student Y) in September of 2019 and that she did not do so satisfactorily, given that in addition to Complainant denying involvement, four witnesses (Student Z, Student Y, Student X, and Student BBB) to the incident did not recall a female student intervening; Respondent's friend Student N was the only witness who recalled Respondent asking a female student to intervene. The panel believed that Respondent made this assertion (that Complainant failed to help an intoxicated female student) in an effort to paint Complainant in a negative light.

Upon assessing all of these factors, the panel agreed that it had significant concerns regarding the credibility of Respondent's account of the February 2019 incident.

As described above, the panel had concerns relating to Student H's account of what Complainant told him about the February 2019 incident with Respondent, and believed that Student H may have embellished on what she told him. The panel found the other accounts with respect to the February 2019 incident to be largely credible.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

## 2. **Findings**

With respect to the charges of Non-Consensual Sexual Contact and Non-Consensual Sexual Penetration against Respondent related to the February 2019 incident, the panel considered whether, using the preponderance of the evidence standard, there was sufficient evidence to substantiate that Respondent non-consensually (1) kissed Complainant; (2) touched Complainant's bare breasts; (3) pushed Complainant's head down and forced her to perform oral sex on him; (4) engaged in sexual intercourse with Complainant; and/or (5) had Complainant give him hickeys at his request.

*Incapacitation & Consent*

The panel first considered whether Complainant was incapable of making an intentional decision to participate in a sexual act due to incapacitation due to alcohol and if so, whether Respondent knew or ought reasonably to have understood that Complainant was incapacitated.

The panel agreed that Complainant was quite intoxicated when she was at Quad, based on her own description (that she was an "eight" or "nine" on the intoxication scale) as well as on the observations of Student F (that she was a "seven and a half to eight" and had "over exaggerated motions") and her 12:21 am text messages to Student E in all capital letters (which differed from her sober style of texting) and multiple unintelligible typos ("STUDENT E FO I BREAK MY CELIBACY IM SO TEMOTEF"). The panel further noted that she did not remember her whereabouts prior to being at Quad, which supported that she was very intoxicated at that stage of the night. However, even while at Quad, she recalled engaging in a detailed conversation with Respondent (about their mutual class), and she characterized her kissing with Respondent as consensual, describing herself as "active" and "kissing him back."

It appeared to the panel that Complainant grew less intoxicated over the next hour or two, and was not as highly intoxicated when the sexual contact occurred in Respondent's room.[15] This was evidenced by her increasingly coherent texts to Student E (though there were still some typos) over the next forty minutes, including asking him about a potential "bug" in his "Cos program" and offering to "come back" and using an emoji in her text, as well as based on her and Student F's[16] acknowledgements that she was less intoxicated than she had been at Quad (although she maintained that she was still "incredibly drunk"). In addition, Complainant was aware of her discomfort walking to Respondent's dormitory room, and she had the presence of mind to text Student E and Student F asking them to call her, as well as to put her phone volume on high so that she could hear if her phone rang. The panel also noted that Complainant recalled engaging in a detailed conversation in Respondent's room regarding Respondent being upset about not getting into Ivy. Although the panel recognized that Complainant was still intoxicated at the time of the sexual activity in Respondent's room, the panel agreed that the above factors did not support that

---

[15] To be clear, the panel did not credit Respondent's assertion that "it did not seem like Complainant had been drinking" or the accounts of his friends who only saw her fleetingly.

[16] The panel recognized that Student F described Complainant as stumbling when he met her after she left Respondent's room; however, he reported that he was unable to discern whether she was still intoxicated or was stumbling because she was emotionally distraught.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Complainant was incapacitated such that her perception or judgment was so impaired that she lacked the cognitive capacity to make or act on conscious decisions.

The panel next considered whether Complainant consented to the sexual activity with Respondent, and whether a reasonable person in Respondent's position would have interpreted her actions as consent. At the outset, the panel noted that the parties largely agreed on the sexual acts that occurred, but they disagreed regarding whether Complainant consented to said acts. In order to make this assessment, the panel first had to determine which party's account was accurate.

As described above, the panel found Complainant's account of the February 2019 incident to be credible and had significant concerns regarding Respondent's credibility regarding this incident. In addition, the panel noted that Complainant reported several specific details regarding the non-consensual nature of the sexual activity to friends the following day (Complainant told Student I that she repeatedly told Respondent, "No, I don't want to do this"; Complainant told Student F that Respondent tried to kiss her and she said "she didn't want this"; and Complainant told Student G that Respondent "kept taking off her clothes" and Complainant kept saying "no" and Respondent kept saying "it's fine"). For these reasons, where the parties provided different accounts of the interaction, the panel credited Complainant's account over Respondent's.[17] Specifically, the panel substantiated, using the preponderance of the evidence standard, that at the outset of the sexual activity in Respondent's room, Complainant repeatedly ("ten or more times") told him, "I'm too drunk to do this. I don't want to do this" and "This isn't a good idea." Despite this, Respondent continued to kiss Complainant, remove her clothes, and fondle her breasts. He then "pushed" her head down so that she would perform oral sex. He then pulled her up, and she told Respondent that she would only have sex if he used a condom. He attempted to have sexual intercourse with her (penetrating her vagina with his penis), and she "just kind of pretended" that she was having sex with him by "moving on top of him." After the sexual encounter, Respondent asked her to give him a hickey; she gave him multiple hickeys.[18]

Having substantiated Complainant's account regarding the sexual activity, the panel then assessed whether the sexual activity was consensual under University policy.

To reiterate, the University's Sex Discrimination and Sexual Misconduct policy states the following regarding consent:

> In reviewing possible violations of sexual misconduct, the University considers consent as the voluntary, informed, un-coerced agreement through words and actions freely given, which a reasonable person would interpret as a willingness to participate in mutually agreed-upon sexual acts. Consensual sexual activity

---

[17] As noted above, the panel recognized that consistent with her intoxication, Complainant's memory was imperfect with respect to aspects of their interaction—including regarding the chronology. However, the panel credited that she did not attempt to hide or minimize those gaps, which was a testament to her credibility (as was her acknowledgement of damaging information). Further, the panel credited her contention that she remembered certain aspects "very, very vividly" and those were details upon which the panel relied in reaching an outcome.

[18] Although the panel credited Complainant's account that Respondent made a comment related to her not reporting him/telling anyone as she was leaving his room, the panel noted that this was not central to Complainant's allegations (and in fact, she only mentioned it when asked about Student I's account that she had said something to that effect), and the panel did not rely on this detail in reaching its outcome.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

happens when each partner willingly and affirmatively chooses to participate …
Indications that consent is not present include: when physical force is used or there
is a reasonable belief of the threat of physical force; when duress is present; when
one person overcomes the physical limitations of another person; and when a
person is incapable of making an intentional decision to participate in a sexual act,
which could include instances in which the person is in a state of incapacitation.

*Kissing Complainant and Fondling of Her Breasts*

At the very outset of the sexual activity in Respondent's room (which was effectuated by
Respondent's false pretense that his roommate needed assistance),[19] Complainant clearly asserted
that she did not consent to sexual activity (while Respondent was kissing Complainant, removing
her clothes, and fondling her breasts). In repeatedly ("ten or more times") telling Respondent,
"I'm too drunk to do this. I don't want to do this," and "This isn't a good idea," Complainant
made clear that she did not willingly and affirmatively choose to participate in sexual activity with
him. The panel considered the information presented by the parties and witnesses, prior
interactions between the parties, the nature and circumstances of these acts, the corroborating
evidence, and the credibility of the parties' accounts. Based on this information, the panel agreed
that based on her repeated (not once or twice by *at least ten times*) assertions, a reasonable person
in Respondent's position should have understood that she was not consenting to the sexual activity
occurring at that time.

In summary, the panel unanimously agreed that with respect to the kissing and fondling,
Complainant did not provide voluntary, informed, un-coerced agreement through words and
actions freely given; she did not willingly and affirmatively choose to participate in the kissing
and fondling; and a reasonable person in Respondent's position would not have interpreted her
actions as a willingness to participate in mutually agreed-upon sexual acts.

For the reasons described above, based on the information before us, and using the preponderance
of the evidence standard, the panel unanimously found sufficient information to substantiate the
charge of Non-Consensual Sexual Contact with respect to the kissing and breast fondling. We
therefore found Respondent *responsible* for Non-Consensual Sexual Contact.

*Oral Sex*

The panel agreed that given Complainant's clear and repeated assertions that she did not want to
engage in sexual activity, in order for any subsequent sexual activity to be deemed consensual, it
would need to be unequivocal that Complainant had changed her mind and did in fact provide
"voluntary, informed, un-coerced agreement through words and actions freely given." In addition,
the panel noted that it would be highly unusual for consensual sexual activity of a more intimate
nature (oral sex and sexual intercourse) to follow less intimate non-consensual sexual activity
(kissing and breast fondling). However, the panel recognized that individuals do have the right to

---

[19] For the reasons set forth in the credibility analysis, the panel credited that Respondent told Complainant that his
roommate was sick or that he needed to "go check on him." The panel found this misleading (if not altogether false)
statement by Respondent to Complainant particularly troubling because he himself acknowledged that his roommate
(while possibly intoxicated) was not in need of assistance and was not in their room at the time. This suggested to the
panel that this was a pretense that Respondent used to get Complainant to return his dormitory room.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

change their mind, and thus the panel carefully considered whether Complainant's subsequent actions affirmatively made clear that she negated her previous direct indications of non-consent.

With respect to the oral sex, by Complainant's description, which the panel substantiated, Respondent "pushed" her head down, at which point she "just did it" because she thought "if [she] got it over with, then [she] could leave."[20]  Although the panel recognized that performing oral sex requires action on the part of the provider, a majority of the panel agreed that her acquiescence, after she had repeatedly objected to kissing and fondling and he had pushed her head down, did not indicate that Complainant willingly and affirmatively chose to participate in oral sex, and that a reasonable person in Respondent's position should have understood that her actions did not convey a willingness to participate in a mutually agreed-upon sexual act.  The panel further noted that nothing had occurred (e.g., a significant period of time had not passed, they did not have a conversation about the sexual activity, etc.) in the few minutes in between Complainant objecting to the kissing/breast fondling and the oral sex that would have led a reasonable person in Respondent's position to believe that she had changed her mind and all of a sudden consented to the much more intimate act of oral sex.

In summary, a majority of the panel agreed that with respect to the oral sex, Complainant did not provide voluntary, informed, un-coerced agreement through words and actions freely given; she did not willingly and affirmatively choose to participate in the oral sex; and a reasonable person in Respondent's position would not have interpreted her actions as a willingness to participate in mutually agreed-upon sexual acts.

For the reasons described above, based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found sufficient information to substantiate the charge of Non-Consensual Sexual Penetration with respect to the oral sex.  The panel therefore found Respondent *responsible* for Non-Consensual Sexual Contact with respect to this charge.[21]

*Sexual Intercourse*

Regarding the sexual intercourse, the panel substantiated Complainant's account that Respondent "pulled [Complainant] up" from performing oral sex to have sex with her and that she told him that she would only have sex if he used a condom.  The panel credited that Complainant did not want to have sexual intercourse with Respondent and that she "just went along with it" because she "wanted to get it over with," as she "didn't think there was a way for [her] to get out of the situation," which was why she "stipulat[ed]" that "if he was going to do it, then it had to be with a condom."   The panel recognized that Respondent could not have reasonably been expected to know what Complainant's internal motivation may have been.  However, a majority of the panel agreed that a reasonable person in Respondent's position would not have interpreted her verbal

---

[20] As described above, the panel recognized that Complainant was confused regarding the chronology of the oral sex/sexual intercourse, but was consistent and credible in describing Respondent pushing her head down.

[21] The panel recognized that its outcome with respect to the October 2017 oral sex allegation and the February 2019 oral sex allegation differed, despite somewhat similar accounts by Complainant.  However, as described above, the panel was unable to substantiate one party's account over the other with respect to the October 2017 incident, due to its assessment that both parties' accounts were largely credible and due to the lack of corroborative evidence, whereas the panel was able to substantiate one account (Complainant's) over the other with respect to the February 2019 incident.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

statement that she would only have sex on the condition that he use a condom — *after she objected to his kissing her and fondling her breasts more than ten times and after he "pushed" her head down so that she would perform oral sex and "pulled her up" to have intercourse*— to indicate that Complainant willingly and affirmatively chose to participate in sexual intercourse. The panel recognized that after Respondent moved her on top of him and penetrated Complainant's vagina with his penis (which a majority of the panel found to be non-consensual), Complainant was "moving on top of him" during sexual intercourse, which she explained was "pretend[ing]" because "[she] didn't think there was a way for [her] to get out of the situation." A majority of the panel agreed that by this point, the non-consensual sexual penetration had occurred, and any subsequent actions by Complainant did not negate that or change the trajectory of what was a non-consensual interaction.

In reaching its outcome regarding the oral sex and sexual intercourse, the panel credited that after expressing her lack of consent repeatedly, and having her clothing removed by Respondent, Complainant felt resigned to acquiesce in the oral sex and sexual intercourse in order "to get it over with." However, acquiescence, without other indicators of active consent (such as express verbal consent or physical action), does not meet the University standard of "voluntary, informed, un-coerced agreement through words and actions freely given." The panel carefully considered whether her stipulation regarding using the condom constituted "express verbal … action." A majority of the panel agreed that given her reasonable belief that Respondent was going to engage in sexual intercourse with her regardless of whether she willingly and affirmatively chose to participate (based on the fact that he had already done so with respect to the kissing, fondling, and oral sex), her attempt to protect herself from pregnancy and/or disease did not constitute "express verbal … action." This was not a situation in which Complainant expressly indicated that she wanted to engage in the sexual activity; rather, her verbal stipulation was an attempt to protect herself in a small way in a situation that was already non-consensual.

In summary, a majority of the panel agreed that with respect to the sexual intercourse, Complainant did not provide voluntary, informed, un-coerced agreement through words and actions freely given; she did not willingly and affirmatively choose to participate in the sexual intercourse; and a reasonable person in Respondent's position would not have interpreted her actions as a willingness to participate in mutually agreed-upon sexual acts.

For the reasons described above, based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found sufficient information to substantiate the charge of Non-Consensual Sexual Penetration with respect to the sexual intercourse. The panel therefore found Respondent *responsible* for Non-Consensual Sexual Penetration with respect to this charge.

*Hickeys*

Regarding the hickeys, the panel recognized that this was an odd situation in which Complainant acted in a confusing manner and that it would have been reasonable that Respondent interpreted her actions as a willingness to participate in the sexual contact. Complainant's explanation that she gave Respondent multiple hickeys on both sides of his neck because she "just kept going because [she] wanted to leave" was implausible, as her providing multiple hickeys would have

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

prolonged her leaving. A majority of the panel agreed that, whatever her internal motivation may have been in giving Respondent multiple hickeys, it was apparent that Complainant willingly and affirmatively chose to provide the hickeys in response to Respondent's query whether she would do so and a reasonable person in Respondent's position would have interpreted her actions as a willingness to participate in this mutually agreed-upon sexual act.

The panel recognized that Complainant provided the hickeys after she had previously objected multiple times to sexual activity. However, a majority of the panel agreed that the circumstances related to the hickeys differed from the circumstances related to the oral sex and sexual intercourse for several reasons: at this point, Complainant was fully dressed and standing up and had the ability to more easily exit the situation; Respondent specifically verbally asked her to perform this act and she complied (whereas with the oral sex, he physically pushed her head down, and with the sexual intercourse, he physically pulled her up, at which point it was clear to her that he intended to engage in sexual intercourse with her); the hickey marks (which were dark, long, and numerous) demonstrated that she complied in an ardent way; and in providing several hickeys to Respondent, she went beyond his request to give him "*a hickey*" — all of which would have led a reasonable person in Respondent's position to interpret her actions as a willingness to participate in giving him hickeys.

For the reasons described above, based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate the charge of Non-Consensual Sexual Contact related to the hickeys. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Contact with respect to this charge.

# JD EXHIBIT 14

# EXHIBIT 2



*PRINCETON*
*UNIVERSITY*

Student Appeals Committee
Princeton University
Princeton, NJ  08544

May 4, 2020

███████████ '21
*Via email*

Dear ██████,

  We have given careful consideration to your April 13, 2020 appeal of the Title IX panel's decision and the penalty imposed on you in the April 2, 2020 letter from Deans Crittenden and Deignan. According to Rights, Rules, Responsibilities, students in cases of alleged sexual misconduct may "file a written appeal on the grounds that: (1) there is substantial relevant information that was not presented, and reasonably could not have been presented during the investigation; (2) the imposed penalty does not fall within the range of penalties imposed for similar misconduct, or (3) there was procedural unfairness during the disciplinary process.  The purpose of an appeal is not to initiate a review of substantive issues of fact or a new determination of whether a violation of University rules has occurred. The appeal panel may decide to uphold the original decision of the investigative panel and/or the deans; to alter the imposed penalty; or to return the case to the investigative panel for additional proceedings or other action." [1.3.12 (3)]

  In terms of your allegations of procedural unfairness, we did not ask ourselves whether we would have reached the same conclusions as the adjudicating panel on the basis of the evidence they were presented. We asked only whether the procedures followed by the panel were unfair and if so whether the respect or respects in which they might be deemed unfair was material to the outcome of your case.  You raised several points in your appeal, and we identified two that constituted grounds of possible procedural unfairness related to credibility and related to the finding of non-consensual sexual penetration.

  Accordingly, we have returned the case to the investigative panel for additional proceedings to address these procedural concerns. The investigative panel will contact you shortly to inform you of next steps.

We recognize that our decision will extend a process which has been difficult for all involved, but we believe it is important for the University to resolve matters such as this in accordance with our policies.

Sincerely yours,

W. Rochelle Calhoun
Vice President for Campus Life

Sarah-Jane Leslie
Dean of the Graduate School

Nolan M. McCarty,
Susan Dod Brown Professor of
Politics and Public Affairs

# JD EXHIBIT 17

EXHIBIT 3

**Exhibit**
Crot 05

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review



**Office of the Provost**
Three Nassau Hall
Princeton, NJ 08544-0015

## MEMORANDUM

**To:**    Kathleen Deignan, Dean of Undergraduate Students
       Cole Crittenden, Deputy Dean of the Graduate School

**Cc:**    Michele Minter, Title IX Coordinator, Vice Provost for Institutional Equity and Diversity

**From:** Randy Hubert, University Investigator
        Joyce Chen Shueh, Senior Associate Dean of Undergraduate Students
        Walter Wright, University Investigator

**Re:**    Supplemental Memorandum regarding Respondent Respondent '21

**Date:**  June 23, 2020

---

### I.    SUMMARY

In a memorandum dated March 20, 2020 (attached as Exhibit A), this panel issued its initial decision in a matter involving Complainant Complainant '22 and Respondent Respondent (Respondent) '21, finding Respondent not responsible for certain conduct, and finding him responsible for certain other conduct. On April 2, 2020, the parties were notified that Dean of Undergraduate Students Kathleen Deignan and Deputy Dean of the Graduate School Cole Crittenden had assessed a penalty based on the panel's initial decision. Respondent appealed the outcome to the Student Appeals Committee.

On May 4, 2020, the Student Appeals Committee notified the parties that they had identified "two … grounds of possible procedural unfairness related to credibility and related to the finding of non-consensual sexual penetration," and that they "have returned the case to the investigative panel for additional proceedings to address these procedural concerns."

This present memorandum serves to supplement and replace portions of the March 20, 2020 memorandum, based on the instruction provided by the Student Appeals Committee. Where the panel has modified its original decision, such information has been stricken from the March 20, 2020 memorandum (see Exhibit A) and has been supplemented or replaced, as appropriate, in the present memorandum. For example, the present memorandum contains supplemental information based on additional investigation conducted by the panel following the appeal.[1] As such, the March 20, 2020 memorandum and the present memorandum must be considered in tandem.

---

[1] In the course of assessing the issues raised by the Student Appeal Committee, the panel collected a significant amount of additional information. While the panel carefully considered all of the collected information, this memorandum

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

Panel Findings and Decisions Unchanged Post-Appeal

The panel's decisions with respect to the October 2017 incident (finding Respondent not responsible on all counts) remain unchanged.

The panel's decisions with respect to the February 2019 Non-Consensual Sexual Contact charges (finding Respondent responsible related to the kissing and touching of Complainant's bare breasts) remain unchanged.

The panel's decision with respect to the February 2019 Non-Consensual Sexual Contact charges (finding Respondent not responsible related to the hickeys) remains unchanged.

Panel Findings and Decisions Changed Post-Appeal

The panel's findings of responsibility regarding the allegations of Non-Consensual Sexual Penetration with respect to the February 2019 incident have been changed as follows:

- Based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate the charges of Non-Consensual Sexual Penetration related to the oral sex and the sexual intercourse. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Penetration with respect to these charges.

## II.   **PROCEDURAL OVERVIEW**

Procedural History Subsequent to Appeal

On May 12, 2020 and again on May 22, 2020, the panel met with Respondent via Zoom; he was accompanied by his adviser, ████████████████. On May 13, 2020, the panel met with Complainant via Zoom; she was accompanied by her adviser, █████████████████████████ ██████████████.[2]

On May 28, 2020, the parties received supplemental redacted case files containing the additional information that the panel had collected. The parties were given the opportunity to submit a written response to the panel, and both submitted a written response; in addition, both submitted a significant amount of information that they had not previously submitted to the panel (despite the panel's previous requests to submit all relevant information).

In addition to the parties, the following individuals were interviewed again: Student D '21 and Student L '21.

---

references only that information that impacted its credibility assessment and/or its findings related to Non-Consensual Sexual Penetration, per the instructions of the Student Appeal Committee.

[2] Subsequent to her interview, Complainant indicated that ████████████ would be serving as her adviser.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

**III.**   **REVIEW OF FACTS**[3]

**B.**   **February 2019 Incident**

*Complainant's Accounts regarding Interactions in Respondent's Dormitory Room*

Complainant's Account

Complainant denied seeing Student L when she and Respondent entered his common room and in her post-appeal interview stated that she was "very certain" that she didn't see or speak to him on entering Respondent's room.

In her post-appeal interview, Complainant stated that while she "vividly" remembered giving Respondent hickeys while they were standing, it was "possible" that she also gave him hickeys while they were kissing at Quad; and it "may have happened" but she did not "think it did" that she also gave him hickeys while they were on the bed.[4]

Respondent's Account

In a post-appeal interview, Respondent said that although Student L texted Respondent and Student D at 1:44 am "where are you boys" and "I'm 5 mins from our dorm" and proxed into Butler at 1:48 am, Respondent "still think[s]" Student L was in their dormitory room when he and Complainant entered the room and he has an independent recollection of them exchanging hellos (although he was unsure whether this happened as he and Complainant entered the room or as Complainant was leaving the room).[5]

Other Information/Accounts

Prox records indicated that Respondent entered his dormitory building at 1:38 am and entered his dormitory room at 1:39 am.

According to Student L (in his initial interview) when Respondent and Complainant entered the common room on the way into Respondent's bedroom, Student L was in the common room and "exchanged hellos" with Complainant. Student L didn't "have any indication" that either Respondent or Complainant had been drinking alcohol. In his post-appeal interview, Student L

---

[3] This Review of Facts contains new factual information that was collected following the appeal and which the panel deemed relevant to its revised findings of responsibility. Factual information that was collected prior to the appeal is included in the March 20, 2020 memorandum.

[4] In her initial interview, Complainant said that after they were both dressed and standing by the bed, Respondent asked if she would give him a hickey, since people were coming the next morning to pick him up for an eating club. She "just did it" and "gave him one on his neck." When Complainant was shown pictures of several dark colored, large hickeys on both sides of Respondent's neck (during her second interview), Complainant stated that that she "just kept going because [she] wanted to leave."

[5] In his first interview, Respondent stated that when they entered his room, Student L was "alone on the couch" and Complainant "introduced herself" and "briefly talked" with Student L. In his second interview, Respondent stated that he hadn't been sure when he saw Student L in the common room that night and Student L had told Respondent (during a conversation about the investigation) that Student L was there when Respondent and Complainant entered the room.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

was told that prox records indicated that he proxed into Butler at 1:48 am, passed an entrance to Butler/Wilf Hall at 1:49 am and proxed into his dorm room at 2:31 am. During his post-appeal interview, in response to the panel's request, Student L provided text messages between him, Respondent and Student D. On February 8, 2019 at 1:44 am, Student L texted, "where are you boys"; Student D responded, "Respondent is with a girl in my room" and Student L texted "I'm 5 mins from our dorm." After reviewing those text messages and prox times, Student L believed that he was not in the room when Respondent and Complainant entered, stating, "[L]ooking back at the texts, I now believe when I did see [Complainant] it was likely when she was leaving."

According to Student T '22, (in her post-appeal written statement), Student T stated that there were "numerous moments" Student T witnessed Complainant "tremble[] with fear after seeing [Respondent]" resulting in her being unable to move for hours. Complainant told Student T that Complainant initiated this Title IX investigation because "she was concerned this might happen to someone else."

According to Student UUU '22 (in her post-appeal written statement), she witnessed Complainant "sit[] in bed physically shaking" after encountering Respondent. Complainant told Student UUU that Complainant initiated this investigation to "protect others."

According to Student YYY '21 (in his post-appeal written statement), during spring semester 2020, he witnessed Complainant "crying violently" and "completely inconsolable" for several hours after seeing Respondent at an eating club.

## IV.   DELIBERATIONS AND DECISION

### C.   February 2019 Incident

#### 1.   Credibility Assessment[6]

The accounts provided by Complainant and Respondent regarding the February 2019 incident varied significantly with respect to their descriptions of how Complainant responded to the sexual activity — that is, whether she repeatedly said no (Complainant's account) or whether she initiated the sexual activity and behaved in a sexually aggressive manner (Respondent's account). In assessing the party's accounts, the panel made the following observations regarding their credibility. In assessing the party's accounts, the panel first applied the EEOC's guidelines regarding credibility (none of which are determinative),[7] and then made additional observations regarding credibility, as appropriate.[8]

---

[6] This credibility assessment regarding the February 2019 incident is intended to fully replace the credibility assessment regarding the February 2019 incident contained in the March 20, 2020 memorandum.

[7] Under University procedures, it is not the role of the panel to consider "past record," and thus this factor was not considered by the panel. Consistent with our practice, the panel did not consider character evidence submitted by either party as it was not considered relevant to the charges at hand.

[8] With respect to other witnesses, as described above, the panel had concerns relating to Student H's initial account of what Complainant told him about the February 2019 incident with Respondent, and believed that Student H embellished on what she told him (which Student H acknowledged in his post-appeal statement). The panel found that the other witnesses' accounts with respect to the February 2019 incident were largely credible.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

*Complainant*

- Inherent plausibility:  The panel agreed that Complainant's account (when considered on its own) was largely believable on its face and made sense in most respects.  However, the panel found that Complainant's initial explanation that she gave Respondent multiple hickeys on both sides of his neck because she "just kept going because [she] wanted to leave" was implausible, as her providing multiple hickeys would have prolonged her leaving his room – which contrasts with her explanation that she was eager to leave.[9]
- Demeanor:  Nothing in Complainant's demeanor impacted the panel's assessment of her credibility.
- Motive to falsify:  The panel found no apparent reason for Complainant to lie about or falsify her account.  In contrast to Respondent's assertion (in his appeal) that Complainant was motivated to falsify her report because Respondent was dating Complainant's friend's friend, the panel credited Complainant's explanation that her report was prompted by an acquaintance (who was having a "mini-fling" with Respondent) reaching out to ask Complainant about her problematic interactions with Respondent, as well as several other friends sharing that they felt "uncomfortable" interacting with Respondent in social situations, so Complainant "did not want this to happen to anyone else."
- Corroboration:  The panel found that Complainant's behavior immediately following the incident was consistent with her having just experienced trauma (according to Student F, she was "sobbing" and "distraught," asking "Can you help me?").  Additionally, the panel noted that within the following days, she described the incident as non-consensual (to Student I, Student F, Student G, Student H, and Student E.[10]  In addition, witnesses confirmed that Complainant had visceral reactions to seeing Respondent after the incident, consistent with her having had a traumatic experience with him.[11]

The panel made the following additional observations regarding Complainant's credibility:

- The panel noted that Complainant shared certain information that she may have believed would undermine her allegations (e.g., that she consensually kissed Respondent at Quad; that (in response to the panel's questioning) she requested that Respondent use a condom; that she "pretended" that she was having sexual intercourse with Respondent by "moving

---

[9] The panel noted that in her post-appeal interview, Complainant for the first time acknowledged that it was "possible" that she gave Respondent hickeys while they were at Quad and/or while they were on his bed (in addition to immediately prior to leaving his room) – a more plausible explanation than she previously provided.

[10] The panel noted that the account that Student H provided was discrepant with every other account provided to the panel, and the panel therefore did not credit Student H's account.  In her post-appeal interview, Complainant said that she did not remember what she had told Student H, but she stated that she did not tell him that Respondent had "pinned" her on the bed or that Respondent had "held her against the bed" and "forcibly" raped her.  In his post-appeal written submission, Student H stated that the only thing he remembered from what Complainant had told him was that Respondent "forced himself" on her despite her repeatedly asking him to stop.  The panel agreed that the salient point with respect to Complainant's reports to her friends was that Complainant immediately described the incident as non-consensual.

[11] The panel agreed that Complainant's reactions upon seeing Respondent after the incident (crying, having lengthy panic attacks) were consistent with Complainant's account and were not consistent with her simply being embarrassed due to Respondent's stopping sex or his friends having been in the common room laughing when she came out of his bedroom.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

on top of him"; and that she did not say or do anything to object to performing oral sex and
"just did it"). The panel agreed that this lent credibility to Complainant's account.

- The panel noted that there were certain aspects of Complainant's sexual encounter with
  Respondent that she did not volunteer in her initial interview. In subsequent interviews,
  she acknowledged those points (e.g., stipulating that Respondent use a condom), and the
  panel did not believe that she was intentionally misrepresenting or omitting information.

- The panel noted that Complainant provided inconsistent accounts in different interviews,
  including regarding whether or not she told Respondent that she was a virgin and the
  chronology of oral sex and vaginal intercourse.

- The panel noted that Complainant was candid with respect to her memory impairment due
  to her alcohol consumption, her "putting memories in a box in [her] head and not reopening
  it" and the passage of time (as she explained in her post-appeal interview), and credited
  that there were parts of the night that she did not recall and other parts she remembered
  "vividly."

- The panel noted that in her post-appeal interview Complainant said that there could be
  "maybe like a minute in between the vivid memories" and she may have "filled in" some
  of the patchy parts by "loop[ing] it together." For this reason, the panel felt that her
  memory with respect to certain issues (e.g., the hickeys) was less reliable due to her trying
  to fill in details that she did not recall vividly.

- The panel considered why Complainant (by her own account) consensually kissed
  Respondent at Quad and returned to his room, if she believed that he had previously (in
  October 2017) harmed her. Complainant explained that because she did not want her
  experience at Princeton to be "clouded by a bad experience," she acted normally and in a
  friendly manner toward Respondent (including communicating with him via Snapchat) and
  further explained that she would not have returned to his room if her judgment had not
  been impaired by her intoxication (making her feel that she was unable to return to her
  room on her own) and the panel found these accounts credible.

- Complainant initially stated that she gave Respondent a hickey at the end of their
  encounter; when asked about this again in her post-appeal interview, Complainant
  acknowledged for the first time that it was "possible" that she gave Respondent hickeys
  at Quad or while they were on his bed. The panel did not credit her initial account (that
  she gave Respondent multiple hickeys at the end because she just "kept going") with
  respect to the timing of the hickeys.

- The panel noted that in her post-appeal interview, Complainant stated that she was "very
  certain" that she did not see or speak to Student L when she entered Respondent's room;
  at that point, the parties had reviewed the entire case file, and the only evidence relating to
  this issue were Student L's and Respondent's specific recollections that Student L was
  there and had a brief exchange with Complainant. Based on the additional text messages
  Student L provided during the post-appeal interview, the panel credited that Student L was
  not present, as it was implausible that Student L would text asking where Respondent and
  Student D were five minutes after seeing Respondent in their room or that Student L would
  text that he was five minutes from their dormitory five minutes after seeing Respondent in
  their room; moreover, in his post-appeal interview, Student L acknowledged that he
  "likely" was not in the room when Respondent and Complainant entered.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

## *Respondent*

- Inherent plausibility:  The panel agreed that Respondent's account (when considered on its own) was believable on its face and made sense in many respects.  However, the panel found dubious Respondent's contention that Complainant, who had never engaged in sexual intercourse and was "uncomfortable" walking back to Respondent's room (as evidenced by the texts she sent to two friends requesting that they call her, one of which directed her friend to insist that she leave), boasted about her sexual prowess (by his account, commenting to Respondent, "I've learned so much since last time," "I'm so good now," and "I bet you won't be disappointed this time"), pushed him down on the bed and "ripped off" his pants, and was the one who questioned his attempt to stop the sexual intercourse.

- Demeanor:  Nothing in Respondent's demeanor impacted the panel's assessment of his credibility.

- Motive to falsify:  The panel found no apparent reason for Respondent to lie about or falsify his account (other than the obvious incentive not to be held responsible, which the panel did not consider, as it would apply to all respondents).

- Corroboration:
  - The panel credited that over the next several days, Respondent described the February 2019 sexual activity to friends in a manner that was consistent with his account to the panel (that Complainant was the "aggressor"), and the panel agreed that these consistent accounts enhanced his credibility.
  - The panel noted that the photographs and video of the multiple dark hickeys on both sides of Respondent's neck was consistent with Respondent's account that Complainant willingly gave him multiple hickeys during their sexual encounter and enhanced his credibility.
  - The panel noted that Respondent's assertion that "it did not seem like Complainant had been drinking" and she was "no higher than a three" on the intoxication scale when she was at Quad was inconsistent with the accounts provided by Complainant and Student F, and text messages that Complainant sent to Student E from Quad, which contained typos consistent with the typist being intoxicated.
  - The panel did not credit Respondent's denial that he told Complainant that his roommate was sick or that he needed to "go check on him," as Complainant mentioned this detail (which was secondary to the allegations) to Student G and to Student H the following morning and to Student F the week after the incident.
  - The panel did not credit Respondent's narrative that Complainant was eager to return to his room to engage in further sexual activity, given that it was inconsistent with Complainant's account as well as with contemporaneous text messages Complainant sent on the walk to Respondent's room (she texted both Student E and Student F ("Call me in 5 and insist I come back" and "call me", respectively), which suggested that she was not interested in being with Respondent in his room and/or was concerned about being alone in his room.
  - The panel noted that Respondent initially (in his first interview) denied having a conversation with Complainant about having not been accepted to Ivy while his roommate Student D had been accepted to Ivy, but in subsequent interviews, Respondent acknowledged that such a discussion did occur.  The panel considered

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

whether Respondent initially simply misremembered this detail. However, the panel concluded otherwise, noting that Respondent's emphatic assertions (during his first interview) that he could not have said that to Complainant because he "didn't know the results" until after Complainant left and "[you] can get in a lot of trouble if [you] tell someone before the official notification goes out" were inconsistent with his own subsequent acknowledgement (corroborated by Student D) that prior to his interactions with Complainant, a friend "unofficially" told Respondent that he was being accepted to Tiger Inn (rather than Ivy), and that Student D was being accepted to Ivy. It was also inconsistent with what Complainant reported to Student F the next morning (that Respondent told her that he did not get into an eating club), which Complainant would not have known absent Respondent having discussed it with her. Although their discussion about eating clubs was not directly related to the allegations, the panel felt that Respondent's account to the panel was an attempt to undermine Complainant's credibility.

- The panel found that Student L was not present when Respondent and Complainant entered the room, as Respondent initially asserted to the panel as if that was his own independent recollection. The panel credited Respondent's assertion that Student L told Respondent (prior to their initial interviews[12]) that Student L recalled speaking to Respondent and Complainant when they entered the suite, and that Respondent assumed that Student L's recollection was accurate, but the panel found it misleading that Respondent repeated it to the panel as if it were his own independent recollection. The panel questioned why Respondent continued to contend that was possible even after being informed (in a post-appeal interview) that prox records showed Student L proxing into their dormitory nine minutes after Respondent and Complainant entered the dormitory room and reviewing Student L's texts to Respondent and Student D (in which Student L asked where Respondent and Student D were five minutes after prox records showed that Respondent and Complainant entered the room and Student L texted that he was five minutes away from the dorm five minutes after Respondent and Complainant entered the dorm room).[13]

The panel made the following additional observations regarding Respondent's credibility:

- The panel did not credit Respondent's speculation that Complainant was upset because she was embarrassed due to his friends having been in the common room laughing or because he had "rejected" her. Although Respondent did not witness her behavior after she left his room, Respondent's explanation was inconsistent with Complainant's actions.
- Although not directly related to the allegations, the panel did not credit Respondent's contention that he asked Complainant to intervene in a situation involving two other students (Student Z and Student Y) in September of 2019 and that she did not do so

---

[12] The panel noted that the consistency of Respondent's account with those of his friends' accounts may have in part been based on Respondent having had conversations with multiple friends/witnesses (Student L, Student D, Student Q, Student W) prior to their interviews with the panel during which they discussed their recollections.

[13] The panel rejected Respondent's suggestion that Student L could have entered their dorm room earlier that evening without a prox entry, given that they often left the door to their room propped open, as prox records (which would indicate if a door was propped open) showed that the door was not propped open at any point during that evening.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

satisfactorily, given that in addition to Complainant denying involvement, four witnesses (Student Z, Student Y, Student X, and Student BBB) to the incident did not recall a female student intervening; Respondent's friend Student N was the only witness who recalled Respondent asking a female student to intervene.

Upon assessing all of these factors, the panel determined that making credibility determinations was challenging in this case based on the fact that both of the parties provided inconsistent accounts at times, both parties provided implausible accounts at times, and Complainant had difficulty recalling certain events due to her intoxication. Given its difficulties with respect to assessing credibility, the panel found it appropriate to specifically identify those aspects of the parties' accounts where contemporaneous text messages, corroborating contemporaneous witness statements, and the like supported either party's accounts. As described above, the following aspects of Complainant's account were directly corroborated by additional evidence: her significant intoxication; her account that she only walked to Respondent's room with him (and was uncomfortable doing so) because he said he needed to check on his roommate; her consistent account of not interacting with Student L when she entered Respondent's room; her account that they discussed Respondent not getting into Ivy eating club; her distraught behavior immediately following the incident and in the following days; and her accounts to others in the following days that the encounter was non-consensual. The following aspects of Respondent's account were directly corroborated by additional evidence: that Complainant gave him multiple hickeys and his accounts to others in the following days that Complainant was the aggressor.

Based on this assessment, the panel refined its prior credibility assessment, in that it concluded that Complainant's account relating to the February 2019 incident was largely credible only with respect to those elements that she consistently and clearly recalled.

## 2. **Findings**[14]

Having substantiated Complainant's account that Respondent started to kiss her; that he continued to take off her shirt and bra and fondle her breasts while she "kept telling him to stop" and he "kept going further"; that he "pushed her head down" for her to give him oral sex; that he inserted his penis into her vagina to have vaginal sex; and that it was "painful", the panel then assessed whether the sexual activity was consensual under University policy.

The panel notes that in collecting additional information in order to re-assess and/or clarify its credibility assessment (per the instructions of the Student Appeals Committee), the panel obtained additional evidence that turned out to be material to its findings. Specifically, in her post-appeal interview, Complainant acknowledged that it was possible that she gave Respondent hickeys at Quad or while she was on his bed. The panel was therefore unable to substantiate at what points during their encounter Complainant gave Respondent the hickeys. The sections below explain how this new information related to the hickeys impacted the panel's findings with respect to the February 2019 encounter.

---

[14] The panel's prior assessment regarding incapacitation remains unchanged and thus is not addressed in the present memorandum.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

*Kissing Complainant and Fondling of Her Breasts*

As described in its March 20, 2020 memorandum, the panel substantiated that at the outset of the sexual activity in Respondent's room (which was effectuated by Respondent's false pretense that his roommate needed assistance), Complainant told him (while Respondent was kissing Complainant, removing her clothes, and fondling her breasts) "ten or more times" that "I'm too drunk to do this. I don't want to do this," and "This isn't a good idea." The panel agreed that in doing so, Complainant clearly asserted that she did not consent to sexual activity, making clear that she did not willingly and affirmatively choose to participate in sexual activity with him. The panel further agreed that based on her repeated (not once or twice by *at least ten times*) assertions, a reasonable person in Respondent's position should have understood that she was not consenting to the sexual activity occurring at that time.

As described above, the panel was unable to substantiate when Complainant gave Respondent the hickeys. However, the panel concluded that even if Complainant gave Respondent the hickeys at Quad or at some point when they were on the bed (action which may have reasonably indicated to him that she was interested in further sexual activity), it was implausible that Complainant gave Respondent hickeys at the same time that she repeatedly said no to his kissing her, removing her clothing and fondling her breasts. The panel agreed that her clear verbal indication of lack of consent at this juncture would not have negated any impression that Respondent had (from the hickeys) that she wanted to engage in further sexual activity at that moment. Therefore, the uncertainty surrounding the timing of the hickeys did not impact these particular findings.

Therefore, based on the information before us, and using the preponderance of the evidence standard, the panel unanimously found sufficient information to substantiate the charge of Non-Consensual Sexual Contact with respect to the kissing and breast fondling. We therefore found Respondent *responsible* for Non-Consensual Sexual Contact.

*Additional Sexual Activity*

The panel agreed that given Complainant's clear and repeated assertions that she did not want to engage in sexual activity, in order for any subsequent sexual activity to be deemed consensual, it would need to be unequivocal that Complainant had changed her mind and did in fact provide "voluntary, informed, un-coerced agreement through words and actions freely given." In addition, the panel noted that it would seem incongruent for consensual sexual activity of a more intimate nature (oral sex and sexual intercourse) to follow less intimate non-consensual sexual activity (kissing and breast fondling). However, the panel recognized that individuals in Complainant's position do have the right to change their mind, and that University policy requires an assessment of whether a reasonable person in Respondent's position would have interpreted Complainant's actions as a willingness to participate in mutually agreed-upon sexual acts. Thus the panel carefully considered whether Complainant's subsequent actions affirmatively made clear that she negated her previous direct indications of non-consent.

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

*Oral Sex*

The panel recognized that, with respect to oral sex,[15] by Complainant's description, which the panel substantiated, Respondent "pushed" her head down at which point she "just did it" because she thought "if [she] got it over with, then [she] could leave." Although the panel credited that Complainant did not feel that her engagement in the oral sex was voluntary, University policy requires the additional assessment of whether a reasonable person in Respondent's position would have interpreted Complainant's actions as a willingness to participate in mutually agreed-upon sexual acts. A majority of the panel agreed that the following factors, *considered collectively*, could have led a reasonable person in Respondent's position to believe that Complainant had changed her mind following the kissing and fondling (which the panel unanimously found to be non-consensual) and that she consented to the oral sex: Complainant actively performed oral sex (an act that requires active physical participation on the part of the provider); Complainant's own account that she "just did it"; and Complainant's acknowledgement that she may have given Respondent hickeys while they were on his bed and prior to performing oral sex (voluntary and active conduct that may reasonably have indicated to him that she was willingly engaged in the sexual activity).[16]

Therefore, based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate the charge of Non-Consensual Sexual Penetration with respect to the oral sex. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Penetration with respect to this charge.

*Sexual Intercourse*

Regarding the sexual intercourse, the panel substantiated the undisputed account that Complainant requested that Respondent use a condom and that Respondent then put on a condom and inserted his penis into Complainant's vagina while she was on top of him.[17] The panel credited that Complainant did not want to have sexual intercourse with Respondent and that she "just went along with it" because she "wanted to get it over with," as she "didn't think there was a way for [her] to get out of the situation," which was why she "stipulat[ed]" that "if he was going to do it, then it had to be with a condom." The panel further credited that she was moving around on top of Respondent and "pretend[ing]" because "[she] didn't think there was a way for [her] to get out of the situation." At the same time, the panel also recognized that Respondent could not reasonably have been expected to know what Complainant's internal motivation may have been, and therefore Respondent would necessarily have been guided by Complainant's external actions.

---

[15] The panel substantiated Respondent's account that the oral sex occurred prior to the sexual intercourse. Although Complainant was unsure regarding the chronology, she remembered that the last part of the sexual encounter on Respondent's bed was sexual intercourse, which ended at the time they heard Respondent's roommates in the common room.

[16] Although Complainant stated that Respondent "pushed" her head down, a majority of the panel agreed that such action could have been an attempt by Respondent to guide or move her head toward his penis to indicate that he wanted her to perform oral sex, and there was no indication that such action was violent.

[17] Despite Respondent's newfound assertion in his post-appeal interview that he was not certain whether penetration occurred, the panel found that penetration occurred, as Respondent and Complainant both agreed in all of their pre-appeal interviews that penetration occurred, and Complainant consistently remembered feeling pain when penetration occurred (and told Student G the next morning that the sexual intercourse had been painful).

Confidential: Title IX Case File
Shared with Parties and Advisers for Purposes of Title IX Review

A majority of the panel agreed that the following factors, *considered collectively*, could have led a reasonable person in Respondent's position to believe that Complainant had changed her mind following the kissing and fondling (which the panel unanimously previously found to be non-consensual) and that she consented to the sexual intercourse: Respondent's reasonable belief that she consented to the immediately prior oral sex; Complainant's verbal statement requesting that Respondent use a condom; and Complainant's acknowledgment that she may have given Respondent hickeys while they were on his bed and prior to the sexual intercourse (voluntary action that may reasonably have indicated to him that she was actively engaged in the sexual activity). Moreover, Respondent's reasonable belief would have been reinforced after the initial penetration when Complainant was "moving on top of him" during sexual intercourse.

Therefore, based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate the charge of Non-Consensual Sexual Penetration with respect to the sexual intercourse. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Penetration with respect to this charge.[18]

*Hickeys*

Regarding the hickeys, the panel substantiated that Complainant gave Respondent multiple dark, long hickeys (as evidenced by photographs and a videotape). However, as described above, the panel was unable to ascertain the precise timing as to when Complainant gave Respondent the hickeys[19] (and the timing would not have impacted this particular finding). Furthermore, the panel agreed that Complainant's initial explanation with respect to why she gave Respondent multiple hickeys just before leaving his room was implausible. A majority of the panel agreed that, whatever her internal motivation may have been in giving Respondent multiple hickeys, it was apparent that a reasonable person in Respondent's position would have interpreted her actions as a willingness to participate in this mutually agreed-upon sexual act.

Therefore, based on the information before us, and using the preponderance of the evidence standard, a majority of the panel found insufficient information to substantiate the charge of Non-Consensual Sexual Contact related to the hickeys. The panel therefore found Respondent *not responsible* for Non-Consensual Sexual Contact with respect to this charge.

---

[18] The panel recognizes that the outcomes described herein related to the oral sex and the sexual intercourse are revised from the outcomes the panel previously reached. This revision results from the panel's more focused credibility assessment and additional information collected regarding Complainant's description related to the hickeys. The panel notes that its revised outcomes are consistent with the direction provided by the Student Appeal Committee with respect to the findings related to non-consensual sexual penetration.

[19] Although the panel found implausible Complainant's initial explanation with respect to why she gave Respondent multiple hickeys, the panel also, as described above, had concerns related to the credibility of Respondent's account. The panel therefore did not credit either party's account with respect to the precise timing of the hickeys, other than to agree that they may have occurred at several points during their encounter

# JD EXHIBIT 18

# EXHIBIT 4

The Wayback Machine - https://web.archive.org/web/20190915224658/https://rrr.princeton....

PRINCETON UNIVERSITY

# Rights, Rules, Responsibilities 2019

# 1. University-wide Regulations

- 1.1 University Principles of General Conduct and Regulations
- 1.2 University-wide Conduct Regulations
- 1.3 Sex Discrimination and Sexual Misconduct
- 1.4 The University, the Law, and Property Rights
- 1.5 Guidelines Relating to the Tax-Exempt Status of the University and Political Activities
- 1.6 Health and Safety Policies
- 1.7 Resolution of Complaints against Members of the University Community
- 1.8 The Council of the Princeton University Community (CPUC)
- 1.9 The Judicial Committee of the Council of the Princeton University Community

## 1.1 University Principles of General Conduct and Regulations

### 1.1.1 Introduction

The central purposes of a university are the pursuit of truth, the discovery of new knowledge through scholarship and research, the teaching and general development of students, and the transmission of knowledge and learning to society at large. Free inquiry and free expression within the academic community are indispensable to the achievement of these goals. The freedom to teach and to learn depends upon the creation of appropriate conditions and opportunities on the campus as a whole as well as in classrooms and lecture halls. All members of the academic community share the responsibility for securing and sustaining the general conditions conducive to this freedom.

The primary purposes of regulations and discipline in a university are to protect the well-being of the community and to advance its educational mission by defining and establishing certain norms of behavior. At Princeton, disciplinary proceedings have a

request to authorized University representatives. TigerCards should not be lent or given to others even for short periods of time.

Possession, manufacture, sale, or transfer of false identification of any sort is a violation of the law and of University policy.

# 1.3 Sex Discrimination and Sexual Misconduct

Princeton University does not tolerate sex or gender discrimination, including sexual misconduct such as sexual harassment and sexual assault, stalking, and intimate partner violence. These behaviors are harmful to the well-being of our community members, the learning/working environment, and collegial relationships among our students, faculty, and staff. All forms of prohibited conduct under this policy are regarded as serious University offenses, and violations will result in discipline, including the possibility of separation from the University. State and federal laws also address conduct that may meet the University's definitions of prohibited conduct, and criminal prosecution may take place independently of any disciplinary action instituted by the University.

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex or gender in the University's programs and activities. The University will respond to complaints or reports about prohibited conduct with measures designed to stop the behavior, eliminate any such gender discrimination, prevent the recurrence of the prohibited conduct, and remediate any adverse effects of such conduct on campus or in University-related programs or activities.

The University has an obligation to make reasonable efforts to investigate and address complaints or reports of sex or gender discrimination, including sexual misconduct, whenever it becomes aware of such a complaint or report. Lack of a formal complaint does not diminish the University's obligation to respond to information suggestive of sex discrimination or sexual misconduct. If the complainant (i.e., an individual who has been subjected to prohibited conduct, according to the complaint or report) requests that the University not investigate, the University will consider the complainant's articulated concerns, the best interests of the University community, fair treatment of all individuals involved, and the University's obligations under Title IX. All individuals have access to Confidential Resources that they may use for support and guidance without initiating University action.

Retaliation against anyone involved in filing an internal complaint under this policy, filing an external complaint, participating in the internal disciplinary process, or

opposing in a reasonable manner an act believed to constitute a violation of this policy, is prohibited and will not be tolerated.

In light of these commitments, the University has adopted this policy, which includes investigation and disciplinary procedures that will be followed in response to allegations of sex or gender discrimination, including sexual misconduct such as sexual harassment and sexual assault, intimate partner violence, stalking, and related retaliation. In a case of alleged sex or gender discrimination or sexual misconduct, this policy supersedes policies and procedures for other forms of misconduct.

## 1.3.1 The University's Title IX Coordinator

The Vice Provost for Institutional Equity and Diversity serves as the Title IX Coordinator and coordinates the University's compliance with Title IX.

The Title IX Coordinator will be informed of all complaints or reports of violations of this policy, and oversees the University's centralized response to ensure compliance with Title IX and the 2013 Amendments to the Violence Against Women Act (VAWA). The Title IX Coordinator's activities include (but are not limited to):

- Communicating with all members of the University community regarding Title IX and VAWA, and providing information about how individuals may access their rights;
- Reviewing applicable University policies to ensure institutional compliance with Title IX and VAWA;
- Monitoring the University's administration of its own applicable policies, including record keeping, timeframes, and other procedural requirements;
- Conducting training regarding Title IX, VAWA, and prohibited conduct defined in this policy; and
- Responding to any complaint or report regarding conduct that violates this policy. In this capacity, the Title IX Coordinator oversees the investigation and resolution of such alleged misconduct, directs the provision of any remedial measures, and monitors the administration of any related appeal.

The Title IX Coordinator may delegate responsibilities under this policy to designated administrators, who will be appropriately trained.

The University Title IX Coordinator's contact information is as follows:

Michele Minter
Vice Provost for Institutional Equity and Diversity
205 Nassau Hall

Princeton, New Jersey 08544
[mminter@princeton.edu](mminter@princeton.edu)
< https://web.archive.org/web/20190915224658/mailto:mminter@princeton.edu>

609-258-6110

## 1.3.2 Scope of This Policy

This policy governs the conduct of: University students, regardless of enrollment status; faculty; staff; and third parties (i.e., non-members of the University community, such as vendors, alumni/ae, visitors, or local residents).

Third parties are both protected by and subject to this policy. A third party may make a complaint or report of a violation of this policy committed by a member of the University community. A third party may also be permanently barred from the University or subject to other restrictions for failing to comply with this policy.

This policy applies to conduct that occurs on University property (i.e., on campus) and in the local vicinity. All actions by a member of the University community that involve the use of the University's computing and network resources from a remote location, including but not limited to accessing email accounts, will be deemed to have occurred on campus. This policy also applies to conduct that occurs off University property (i.e., off campus) when the conduct is associated with a University-sponsored program or activity, such as travel, research, or internship programs or when such conduct may pose a safety risk on campus, have a continuing adverse effect or could create a hostile environment on campus. Judgments about these matters will depend on the facts of an individual case.

## 1.3.3 Prohibited Conduct

In determining whether alleged conduct violates this policy, the University will consider the totality of the facts and circumstances involved in the incident, including the nature of the alleged conduct and the context in which it occurred. Any of the prohibited conduct defined in this policy can be committed by individuals of any gender, and it can occur between individuals of the same gender or different genders. It can occur between strangers or acquaintances, as well as people involved in intimate or sexual relationships.

### 1. Sex Discrimination

Sex discrimination is adverse treatment of an individual based on sex or gender, rather than individual merit. Sex discrimination encompasses sexual misconduct but also

includes other discriminatory behavior that does not constitute sexual misconduct. Examples of conduct that can constitute sex discrimination because of sex, gender identity, or gender expression include but are not limited to:

- Singling out or targeting an individual for different or adverse treatment (e.g., more severe discipline, lower salary increase);
- Failing or refusing to hire or allow participation by an individual in a University activity; or
- Terminating or removing an individual from employment or an educational program.

## 2. Sexual Misconduct

The following behaviors constitute sexual misconduct and are prohibited under this policy. All forms of sexual misconduct are serious offenses and will result in University disciplinary consequences. Sexual misconduct involving force, duress, or inducement of incapacitation, or where the perpetrator has deliberately taken advantage of another person's state of incapacitation, will be deemed especially egregious and may result in expulsion, or termination of employment. The consumption of alcohol or the use of illegal substances does not constitute a mitigating circumstance when it contributes to a violation regarding sexual misconduct.

**Non-Consensual Sexual Penetration (commonly referred to as rape).** Any act of vaginal or anal penetration by a person's penis, finger, other body part, or an object, or oral penetration by a penis, without consent.

**Non-Consensual Sexual Contact (commonly referred to as sexual assault).** Any sexual touching other than non-consensual sexual penetration without consent. Examples of non-consensual sexual contact may include: genital-genital or oral-genital contact not involving penetration; contact with breasts, buttocks, or genital area, including over clothing; removing the clothing of another person; and kissing.

**Sexual Exploitation.** Any act whereby one person violates the sexual privacy of another or takes unjust or abusive sexual advantage of another who has not provided consent, and that does not constitute non-consensual sexual penetration or non-consensual sexual contact. Examples may include: recording, photographing, transmitting, viewing, or distributing intimate or sexual images or sexual information without the knowledge and consent of all parties involved; voyeurism (i.e., spying on others who are in intimate or sexual situations).

**Sexual Harassment.** Unwelcome verbal or physical behavior which is directed at a person based on sex, gender identity or gender expression, when these behaviors are sufficiently severe and/or pervasive to have the effect of unreasonably interfering with

an individual's educational experience, working conditions, or living conditions by creating an intimidating, hostile, or offensive environment. Examples of conduct that can constitute sexual harassment if based on an individual's sex, gender identity or gender expression include but are not limited to:

- Unwelcome jokes or comments (e.g., sexist jokes);
- Disparaging remarks about sex, gender identity, or gender expression (e.g., negative or offensive remarks or jokes about a person's self-presentation)
- Displaying negative or offensive posters or pictures about sex, gender, or gender expression;
- All communications, including those conveyed electronically, such as by e-mail, telephone or voicemail, text messaging, social media or other internet use, that violate this policy.

Sexual Harassment is deemed especially serious when submission to or rejection of such conduct is made implicitly or explicitly a term or condition of instruction, employment, or participation in any University activity or benefit; or submission to or rejection of these behaviors by an individual is used as a basis for evaluation in making academic or personnel decisions.

**Inappropriate Conduct Related to Sex, Gender Identity, or Gender Expression.** Unwelcome or inappropriate conduct that does not fall under other forms of sexual misconduct, but that is sexual and/or gender-based in nature. Examples may include public sex acts or flashing.

### 3. Other Prohibited Behaviors

The following behaviors are also prohibited under this policy.

**Intimate Relationship Violence (also known as dating violence or intimate partner violence).** Acts of violence, threat or intimidation that harm or injure a partner in a current or former intimate relationship (defined below). These acts may be physical, emotional/psychological, sexual, or economic in nature. Intimate relationship violence can be a single act or pattern of behavior.

**Domestic Violence in the Context of Intimate Relationships.** A particular type of intimate relationship violence that occurs when partners in a current or former intimate relationship are or have been cohabiting in the same space.

**Stalking.** A course of conduct (i.e., more than one act) that would cause a reasonable person to feel fear, to experience emotional distress, or to fear for the safety of a third person. Acts that together constitute stalking may be direct actions or may be communicated by a third party, and can include, but are not limited to: threats of harm

to self or others; pursuing or following; non-consensual (unwanted) communication by any means; unwanted gifts; trespassing; and surveillance or other types of observation.

**Retaliation.** Any attempt to seek retribution against an individual or group of individuals involved in filing a complaint or report under this policy, filing an external complaint, participating in a disciplinary process, or opposing in a reasonable manner an action or policy believed to constitute a violation of this policy. Retaliation can take many forms, including abuse or violence, threats, and intimidation. Actions in response to a good faith report or response under this policy are considered retaliatory if they have a materially adverse effect on the working, academic or University-controlled living environment of an individual; or if they hinder or prevent the individual from effectively carrying out their University responsibilities. Any individual or group of individuals can engage in retaliation and will be held accountable under this policy.

## 4. Terminology

The following definitions clarify key terminology as used throughout the policy.

**Intimate Relationship.** An intimate relationship is a short- or long-term relationship between persons of any gender that provides romantic and/or physical intimacy or emotional dependence. Intimate relationships may include (but are not limited to) marriages, civil unions, dating relationships, "hook-up" relationships, relationships in which partners are characterized as "girlfriends" or "boyfriends," and relationships between persons with a child in common.

**Consent and Incapacitation.** In reviewing possible violations of sexual misconduct, the University considers consent as the voluntary, informed, un-coerced agreement through words and actions freely given, which a reasonable person would interpret as a willingness to participate in mutually agreed-upon sexual acts. Consensual sexual activity happens when each partner willingly and affirmatively chooses to participate.

Indications that consent is not present include: when physical force is used or there is a reasonable belief of the threat of physical force; when duress is present; when one person overcomes the physical limitations of another person; and when a person is incapable of making an intentional decision to participate in a sexual act, which could include instances in which the person is in a state of incapacitation.

Important points regarding consent include:

- Consent to one act does not constitute consent to another act.
- Consent on a prior occasion does not constitute consent on a subsequent occasion.
- The existence of a prior or current relationship does not, in itself, constitute consent.

- Consent can be withdrawn or modified at any time.
- Consent is not implicit in a person's manner of dress.
- Accepting a meal, a gift, or an invitation for a date does not imply or constitute consent.
- Silence, passivity, or lack of resistance does not necessarily constitute consent.
- Initiation by someone who a reasonable person knows or should have known to be deemed incapacitated is not consent.

In the context of this policy, incapacitation is the state in which a person's perception or judgment is so impaired that the person lacks the cognitive capacity to make or act on conscious decisions. The use of drugs or alcohol can cause incapacitation. An individual who is incapacitated is unable to consent to a sexual activity. Engaging in sexual activity with an individual who is incapacitated (and therefore unable to consent), where a person knows or ought reasonably to have understood that the individual is incapacitated, constitutes sexual misconduct.

The term **complainant** refers to the individual(s) who has been the subject of prohibited conduct, regardless of whether that individual makes a complaint or seeks disciplinary action.

The term **respondent** refers to the individual(s) who has been accused of prohibited conduct.

The term **third party** refers to any individual who is not a University student, a faculty member, or a staff member (e.g., vendors, alumni/ae, or local residents).

## 1.3.4 Relationships between Individuals of Different University Status

A sexual or romantic relationship involving individuals of different University status is not, in and of itself, sexual misconduct as defined by this policy and will not be investigated or adjudicated under this policy. Such an interaction may be a violation of another University policy and subject to separate disciplinary procedures.

A sexual or romantic relationship between students and teachers, supervisors or mentors (faculty members, staff members, or other students) violates both University and professional standards (including the University's Consensual Relations with Students Policy), and potentially violates state and federal anti-discrimination laws. The University prohibits all sexual and romantic relationships between faculty members and students (both undergraduate and graduate students). See www.princeton.edu/dof/policies/publ/fac/rules_toc/chapter5/

<

https://web.archive.org/web/20190915224658/http://www.princeton.edu/dof/policies/publ/fac/rules_toc/chapter5/>

for more information.

A conflict of interest also exists if there is a consensual romantic or sexual relationship in the context of employment supervision or evaluation. Therefore, a supervisor may not influence, directly or indirectly, salary, promotion, performance appraisals, work assignments or other working conditions for an employee with whom such a relationship exists. Such actions violate the University's Nepotism and Personal Relationships in the Workplace Policy. See www.princeton.edu/hr/policies/conditions/5.2/5.2.2/

<

https://web.archive.org/web/20190915224658/http://www.princeton.edu/hr/policies/conditions/5.2/5.2.2
/>

.

## 1.3.5 Confidentiality, Privacy, and Related Responsibilities

Issues of privacy and confidentiality play important roles in this policy, and may affect individuals differently. Privacy and confidentiality are related but distinct terms that are defined below.

In some circumstances, the reporting responsibilities of University employees, or the University's responsibility to investigate, may conflict with the preferences of the complainant and/or respondent with regard to privacy and confidentiality. Therefore, all individuals are encouraged to familiarize themselves with their options and responsibilities, and make use of Confidential Resources, if applicable, in determining their preferred course of action.

Requests for confidentiality or use of anonymous reporting may limit the University's ability to conduct an investigation.

### 1. Confidentiality and Confidential Resources

The term "confidentiality" refers to the circumstances under which information will or will not be disclosed to others.

Several campus professionals are designated Confidential Resources. Confidential resources are not obligated to report information that is provided to them. This allows individuals to explore their options in a non-pressured environment while they make informed decisions. There may be exceptions in cases involving child abuse, imminent risk of serious harm, emergent hospitalization, or a court order. In addition, non-identifying information about violations of the Sex Discrimination and Sexual Misconduct policy may be submitted to the Department of Public Safety for purposes of the anonymous statistical reporting under the Clery Act.

An individual who is not prepared to make a report, or who may be unsure how to label what happened, but still seeks information and support, is strongly encouraged to contact a Confidential Resource. See section 1.3.6 #2 for a complete list of Confidential Resources on campus.

In particular, any individual who may have been subjected to a violation of this policy, or who is considering making a report under this policy, is encouraged to contact the University's Sexual Harassment/Assault Advising, Resources, and Education (SHARE) office. SHARE is a Confidential Resource that offers support and advocacy services, and provides information about the roles and reporting obligations of other offices at the University in order to empower persons to make informed decisions about their options.

In light of the University's obligation to make reasonable efforts to investigate and address conduct prohibited by this policy, University community members who are not designated Confidential Resources may be required to notify the Title IX Coordinator or the Department of Public Safety of suspected violations, and cannot guarantee the confidentiality of a complaint or report under this policy. See also section 1.3.5 #4.

## 2. Confidentiality Rights of Complainants and Respondents

Individuals involved in investigations or disciplinary proceedings under this policy are encouraged to exercise discretion in sharing information in order to safeguard the integrity of the process and to avoid the appearance of retaliation. While discretion regarding the process is important, complainants and respondents are not restricted from discussing and sharing information with others who may support or assist them in presenting their case.

Medical and counseling records are privileged and confidential documents that parties will not be required to disclose.

## 3. Privacy

The term "privacy" refers to the discretion that will be exercised by the University in the course of any investigation or disciplinary processes under this policy and, as detailed in section 1.3.12
, the parties will be informed of information relevant to the investigation or disciplinary processes.

The University has an obligation to make reasonable efforts to investigate and address complaints or reports of violations of this policy. In all such proceedings, the University will take into consideration the privacy of the parties to the extent possible.

In cases involving students, the Title IX Coordinator may notify residential college staff and other University employees of the existence of the complaint for the purpose of overseeing compliance with this policy and addressing any concerns related to educational and residential life. While not bound by confidentiality, these individuals will be discreet and will respect the privacy of those involved in the process.

Any additional disclosure of information related to the complaint or report may be made if consistent with the Family Educational Rights and Privacy Act (FERPA), or the Title IX requirements. In addition, the National Science Foundation mandates certain reporting related to sexual misconduct involving NSF-funded principal investigators (PI) or co-PIs. See Implementation of NSF's Notification Requirements Regarding Harassment and Sexual Assault

< https://web.archive.org/web/20190915224658/https://orpa.princeton.edu/resources/policies-and-procedures/requirements-regarding-harassment-and-sexual-assault>

.

## 4. Responsibility to Report

All members of the University community are encouraged to report any suspected violation of this policy (after consulting a Confidential Resource as appropriate).

In emergency situations, if there is a suspected crime in progress, or imminent or serious threats to the safety of anyone, faculty and staff members must immediately contact the Department of Public Safety by dialing 911 from an on-campus telephone or 609-258-3333 from an off-campus telephone or cell phone.

In non-emergency situations, faculty and staff members who are not Confidential Resources must promptly report suspected violations to the Title IX Coordinator. Some students with special responsibilities, including Residential College Advisers, must promptly report alleged violations of this policy to their Directors of Student Life, who will then consult with the Title IX Coordinator.

A complainant may choose not to make a complaint or report in their own case, even if the complainant otherwise has reporting obligations by virtue of being a faculty member, staff member, or Residential College Adviser.

## 5. Anonymity

For more information regarding the implications of anonymity in the context of reporting a policy violation, see section 1.3.8
#1. For information about how to make an anonymous report, see section 1.3.6
#3.

## 6. Release of Information

If the Department of Public Safety becomes aware of a serious and continuing threat to the campus community, the Department of Public Safety will issue a timely notification to protect the health or safety of the community. The Department of Public Safety may also be required to publicly disclose a reported incident of sexual misconduct in the daily crime log or annual security report. In addition, the University may also share non-identifying information, including data about outcomes and penalties, in aggregate form. At no time will the University release the name or other personally identifiable information of the complainant to the general public without the express consent of the complainant or as otherwise permitted or required by law.

## 1.3.6 Support Resources

A complainant or witness has many options, including counseling with a Confidential Resource, filing an internal complaint, and/or filing a criminal complaint. The University recognizes that deciding among these options can be difficult. Complainants and witnesses are encouraged to seek assistance from a Confidential Resource before deciding how to proceed.

The following resources are available to provide support and/or receive complaints or reports.

### 1. Emergency Resources and Law Enforcement

Emergency medical assistance and campus safety/law enforcement assistance are available both on and off campus. Individuals are encouraged to contact law enforcement and seek medical treatment as soon as possible following an incident that poses a threat to safety or physical well-being or following a potential criminal offense. For more information about filing a criminal complaint, see section 1.3.11 .

**Princeton Municipal Police**
911 or 609-921-2100

**Princeton University Department of Public Safety**
609-258-3333

### 2. Confidential Resources

Information shared with Confidential Resources (including information about whether an individual has received services) will only be disclosed to the Title IX Coordinator or any other person with the individual's express written permission, unless there is an imminent threat of serious harm to the individual or to others, or a legal obligation to

reveal such information (e.g., if there is suspected abuse or neglect of a minor). For more information about confidentiality and Confidential Resources, see section 1.3.5

.

The University's Sexual Harassment/Assault Advising, Resources, and Education (SHARE) office is a Confidential Resource offering support and advocacy services. Individuals are encouraged to access support services and learn about their options by contacting SHARE. The SHARE office can provide information about the roles and reporting obligations of other offices at the University in order to empower individuals to make informed decisions about their options.

Campus Confidential Resources include:

**SHARE Office**
217 McCosh Health Center
Washington Road, Princeton, NJ 08544
609-258-3310
share@princeton.edu
< https://web.archive.org/web/20190915224658/mailto:share@princeton.edu>

https://share.princeton.edu
< https://web.archive.org/web/20190915224658/https://share.princeton.edu/>

**Counseling and Psychological Services (CPS)**
McCosh Health Center, Third Floor
609-258-3141
https://uhs.princeton.edu/counseling-psychological-services
< https://web.archive.org/web/20190915224658/https://uhs.princeton.edu/counseling-psychological-services>

**Medical Services at University Health Services (UHS)**
McCosh Health Center
609-258-3141
https://uhs.princeton.edu
< https://web.archive.org/web/20190915224658/https://uhs.princeton.edu/>

**Ombuds Office**
179 Nassau Street - Suite D
Princeton, NJ 08544
609-258-1775
ombuds@princeton.edu
< https://web.archive.org/web/20190915224658/mailto:ombuds@princeton.edu>

https://ombuds.princeton.edu

< https://web.archive.org/web/20190915224658/https://ombuds.princeton.edu/>

**Office of Religious Life chaplains**

Murray-Dodge Hall

Princeton, NJ 08544

609-258-3047

orl@princeton.edu

< https://web.archive.org/web/20190915224658/mailto:orl@princeton.edu>

https://religiouslife.princeton.edu

< https://web.archive.org/web/20190915224658/https://religiouslife.princeton.edu/>

**Carebridge (Faculty & Staff Assistance Program)**

On initial visit to the site, please enter the Princeton client code **TW8AE** to access the Carebridge Library.

800-437-0911

clientservice@carebridge.com

< https://web.archive.org/web/20190915224658/mailto:clientservice@carebridge.com>

https://www.princeton.edu/hr/benefits/worklife/carebridge

<
https://web.archive.org/web/20190915224658/https://www.princeton.edu/hr/benefits/worklife/carebridge
>

## 3. EthicsPoint Anonymous Hotline

Any individual may make an anonymous report concerning a violation of this policy through the University's EthicsPoint hotline, an independent third-party reporting service. An EthicsPoint report can be made without disclosing the reporting person's own name, identifying the respondent, or requesting any action. However, if the reporter provides limited information, the University may be limited in its ability to take action. EthicsPoint is not a Confidential Resource and making a report to EthicsPoint may result in a University review or investigation.

**EthicsPoint Hotline**

866-478-9804

https://secure.ethicspoint.com/domain/media/en/gui/27291/index.html

<
https://web.archive.org/web/20190915224658/https://secure.ethicspoint.com/domain/media/en/gui/272
91/index.html>

## Other Available Resources

Any individual may also access resources located in the local community. These organizations can provide crisis intervention services, counseling, medical attention and assistance in dealing with the criminal justice system. If accessing these resources, individuals are encouraged to clarify whether the resources are confidential.

**Mercer County Sexual Assault Response Team (SART)**
*Evidence collection and preventative medicine*
Can be activated by contacting:

- Womanspace: 609-394-9000
- Princeton Police: 609-921-2100 (calls will likely result in police involvement)
- Department of Public Safety: 609-258-3333 (calls will likely result in police involvement)

Or going to an emergency room:

- Penn Medicine Princeton Medical Center
- Capital Health Medical Center in Hopewell
- Robert Wood Johnson University Hospital

**Womanspace, Inc.**
*Services for domestic and sexual violence victims/survivors (of all genders)*
609-394-9000 (24-hour hotline) /609-394-0136 (office)
1530 Brunswick Avenue, Lawrenceville, New Jersey 08648
Monday-Friday, 9:00 a.m. - 5:00 p.m. (walk-in hours)

## 1.3.7 Options for Complainants and Other Reporting Parties

The University encourages all individuals to report any alleged or suspected violation of this policy to the Title IX Coordinator, and to report potential criminal conduct to law enforcement. After consulting a Confidential Resource as appropriate, anyone who seeks to make a complaint or report may:

- Request interim measures from the Title IX Coordinator (see section 1.3.9 );
- File a complaint or report with the Title IX Coordinator, thereby invoking the University's internal disciplinary process (see section 1.3.8 );
- Contact the Department of Public Safety for assistance in filing a criminal complaint and preserving physical evidence (see section 1.3.6 ); and/or
- Contact local law enforcement to file a criminal complaint (see section 1.3.6 ).

An individual may pursue some or all of these steps at the same time (e.g., one may simultaneously pursue an internal complaint and a criminal complaint). When initiating any of the above, an individual does not need to know whether they wish to request any particular course of action, nor how to label what happened. Before or during this decision-making process, complainants and other reporting persons are encouraged to consult a Confidential Resource.

## 1.3.8 Filing a Complaint or Report with the Title IX Coordinator

Individuals are encouraged to report any alleged violation of this policy directly to the Title IX Coordinator. In order to do so, individuals may use the sex discrimination and sexual misconduct complaint form
< https://web.archive.org/web/20190915224658/http://sexualmisconduct.princeton.edu/complaint>
, or schedule an appointment with the Title IX Coordinator.

### 1. Anonymous Reporting

If a complainant self-identifies but asks to remain anonymous during the investigation, the Title IX Coordinator will consider how to proceed, taking into account the complainant's articulated concerns; the best interests of the University community; fair treatment of all individuals involved, including the respondent's right to have specific notice of the allegations if the University were to take action that affects the respondent; and the University's obligations under Title IX.

### 2. Amnesty

In order to encourage reports of conduct that is prohibited under this policy, the University may offer leniency with respect to other violations which may come to light as a result of such reports, depending on the circumstances involved.

### 3. Timeliness of Report

Complainants and other reporting individuals are encouraged to report any violation of this policy as soon as possible in order to maximize the University's ability to respond promptly and effectively. Complaints and reports may be made at any time without regard to how much time has elapsed since the incident(s) in question.

If the respondent is no longer a student or employee at the time of the complaint or report, the University may not be able to take disciplinary action against the respondent, but it will still seek to meet its Title IX obligations by providing support for the complainant and taking steps to end the prohibited behavior, prevent its recurrence, and address its effects.

### 1.3.9 Interim Measures

Upon receipt of a complaint or report of a violation of this policy, the University will provide reasonable and appropriate interim measures designed to preserve the complainant's educational experience, the safety of all parties and the broader University community, maintain the integrity of the investigative and/or resolution process, and deter retaliation. The University may provide interim measures regardless of whether the complainant seeks formal disciplinary action.

Interim measures may include:

- Access to counseling services and assistance in arranging an initial appointment;
- Rescheduling of exams and assignments;
- Change in class schedule, including the ability to transfer course sections or withdraw from a course;
- Change in work schedule or job assignment;
- Change in campus housing;
- Providing medical services;
- Imposition of an on-campus "no contact order," an administrative remedy designed to curtail contact and communications between two or more individuals; and/or
- Any other measure that can be used to achieve the goals of this policy.

Any interim measures will not disproportionately impact the complainant. Requests for interim measures may be made by or on behalf of the complainant to any University official, including the Title IX Coordinator. The Title IX Coordinator is responsible for ensuring the implementation of interim measures and coordinating the University's response with the appropriate offices on campus.

All individuals are encouraged to report concerns about the failure of another to abide by any restrictions imposed by an interim measure. The University will take immediate action to enforce a previously implemented measure and disciplinary penalties can be imposed for failing to abide by a University-imposed measure.

### 1.3.10 Investigations and Disciplinary Procedures in General for This Policy

The University is committed to providing a prompt and impartial investigation of all alleged violations of this policy. During the disciplinary process, both parties (complainant and respondent) have equivalent rights, including the opportunity to present evidence, to identify individuals who may possess relevant information and request that such individuals be interviewed, to be accompanied by an adviser of their

choice, and to appeal. The University will concurrently provide both parties with written notification of the outcome of the process and any appeal.

## 1. Responsibility to Investigate

In order to protect the safety of the campus community, the Title IX Coordinator may investigate allegations of violations of this policy even absent the filing of a formal complaint or report, or if a complaint or report has been withdrawn. The Title IX Coordinator may need to proceed with an investigation even if a complainant specifically requests that the matter not be pursued. In such a circumstance, the Title IX Coordinator will take into account the complainant's articulated concerns, the best interests of the University community, fair treatment of all individuals involved, and the University's obligations under Title IX. This policy differs from New Jersey criminal law. Proceedings under this policy may be carried out prior to, simultaneously with, or following civil or criminal proceedings off campus. Neither a decision by law enforcement regarding prosecution nor the outcome of any criminal proceeding will be considered determinative of whether a violation of this policy has occurred.

## 2. Initial Assessment of Complaints

The investigative process is initiated when the Title IX Coordinator receives a complaint or report of a violation of this policy. Upon receipt of such a report, the Title IX Coordinator will respond to any immediate health or safety concerns raised by the report. The Title IX Coordinator will conduct an initial assessment. Following the initial assessment, the Title IX Coordinator may take any of the following actions:

- If the Title IX Coordinator determines that the complaint, even if substantiated, would not rise to the level of a policy violation; the nature and circumstances of the report do not make it appropriate for an investigation; or, after consultation with the complainant about the complainant's preferences regarding participation, the Title IX Coordinator determines that there will be insufficient information to investigate the matter, the Title IX Coordinator may dismiss the complaint.

- If the Title IX Coordinator determines that the complaint is outside the scope of this policy and/or most appropriately handled by another office, the Title IX Coordinator may refer the complaint to another office for review.

- If the Title IX Coordinator determines that the complaint or report would, if substantiated, constitute a violation of this policy, the Title IX Coordinator will determine appropriate interim measures and initiate an investigation.

## 3. Timing of Investigations and Any Related Disciplinary Proceedings

The Title IX Coordinator will seek to complete the investigation and any resulting disciplinary process and provide notice of the outcome within 60 calendar days after the investigative panel's first interview of the complainant. The University will seek to complete any appeal within 20 calendar days after receipt of the appeal.

There may be circumstances that require the extension of timeframes for good cause, including extension beyond 60 calendar days. Timeframes may be extended to ensure the integrity and completeness of the investigation, comply with a request by external law enforcement, accommodate the availability of witnesses, or accommodate delays by the parties; or for other legitimate reasons, including the complexity of the investigation and the severity and extent of the alleged misconduct. The University will notify the parties in writing of any extension of the timeframes for good cause, and the reason for the extension.

Although cooperation with law enforcement may require the University to temporarily suspend the fact-finding aspect of a Title IX investigation, the University will promptly resume its Title IX investigation as soon as it is notified by the law enforcement agency that the agency has completed the evidence gathering process. The University will not, however, wait for the conclusion of a criminal proceeding to begin its own investigation and, if needed, will take immediate steps to provide interim measures for the complainant.

Investigations will proceed according to the aforementioned timeframes during the summer and at other times when the University is not in session. The Title IX Coordinator will work with the parties to balance the need for promptness and the preference for in-person meetings regarding the investigation.

Timeframes for all phases of the disciplinary process, including the investigation, any related disciplinary proceedings, and any related appeal, apply equally to both complainant and respondent.

## 4. Cooperation with Investigation and Disciplinary Procedures

Princeton University expects all members of the University community to cooperate fully with the investigation and disciplinary procedures. The University recognizes that an individual may be reluctant to participate in the process; nevertheless, any student or member of the faculty or staff who refuses to cooperate in an investigation may be subject to discipline. Refusal to cooperate includes delaying or failing to acknowledge requests from University officials for information, and delaying or failing to make oneself available for meetings with University officials.

It is understood that there may be circumstances in which a complainant wishes to limit their participation. The complainant retains this right and will not be subject to discipline, although the University may be obligated to conduct an investigation.

If a respondent chooses not to answer any or all questions in an investigation for any reason, the University process will continue, findings will be reached with respect to the alleged conduct, and the University will issue any penalties, as appropriate. The University will not, however, draw any adverse inference from a respondent's silence.

## 5. Sexual History

The sexual history of the complainant and/or the respondent will generally not be used in determining whether a violation of this policy has occurred. However, in certain circumstances, the sexual history between parties may have limited relevance. For example, if consent is at issue, the sexual history between the parties may be relevant to determining whether consent was sought and given during the incident in question, although it must be remembered that even in the context of a relationship, consent to one sexual act does not constitute consent to another sexual act, and consent on one occasion does not constitute consent on a subsequent occasion. In addition, under very limited circumstances, sexual history may be relevant to explain injury, to provide proof of a pattern, or for another specific question raised by an allegation.

## 6. Consolidation of Investigation

The Title IX Coordinator has the discretion to consolidate multiple complaints or reports into a single investigation if evidence relevant to one incident might be relevant to the others.

## 7. Violations of University Policy Unrelated to Sexual Misconduct

In the situation when an initial assessment or investigation under this policy identifies additional related possible violations of University policy (other than violations of the Sex Discrimination and Sexual Misconduct policy) by the same party(ies) that would normally be handled by another disciplinary authority, the Title IX Coordinator, with the approval of that disciplinary authority, may direct an investigative panel to investigate and adjudicate such other possible violations. In such a situation, the Title IX Coordinator and other disciplinary authorities will determine the procedures to be followed on consideration of the nature of the alleged violation(s) and other relevant factors. The standard of evidence applied to each violation will not be altered: the preponderance of the evidence standard will be applied as appropriate and the clear and persuasive evidence standard will be applied as appropriate.

## 8. Circumstances Relating to Misconduct Affecting Health or Safety

In connection with this policy, in circumstances seriously affecting the health or well-being of any person, or where physical safety is seriously threatened, or where the ability of the University to carry out its essential operations is seriously threatened or

impaired, the president or an authorized representative may summarily suspend, dismiss, or bar any person from the University. In all such cases, actions taken will be reviewed promptly, typically within one week, by the appropriate University authority.

## 1.3.11 Making a Criminal Complaint to Law Enforcement

At the complainant's request, the University will assist the complainant in contacting local law enforcement and will cooperate with law enforcement agencies if a complainant decides to pursue the criminal process. See section 1.3.6 #1 for contact information related to law enforcement.

## 1.3.12 Investigation, Disciplinary, and Appeal Procedures for Cases When the Respondent Is a Student

### 1. Investigation and Adjudication

When the Title IX Coordinator receives a complaint or report alleging that a student violated this policy, the Title IX Coordinator will appoint a three-person investigative panel of University administrators and/or investigators. The investigative panel will conduct an inquiry and determine, by a preponderance of the evidence, whether this policy was violated. All panelists will have training in investigating and evaluating conduct prohibited under the policy. The panelists will also be impartial and unbiased.

The panel will collect information from each party. If parties are interviewed, they will be interviewed separately. Each party may select an adviser of their choice who may accompany them to any meeting or related proceeding, but the adviser may not actively participate in the interview process. All three members of the panel will participate in interviews with the complainant and the respondent. The panel will interview witnesses as necessary and may, at its discretion, delegate witness interviews to one or two of the panelists. Witnesses may not bring advisers. In all meetings, there will be a designated note taker. At the conclusion of each interview, the notes will be reviewed with the interviewee.

The panel will prepare a case file of all interview summaries, witness statements, and other documents. The file, redacted of personally identifiable information as necessary, will be shared with the complainant and the respondent. The panel will describe in writing for the parties the allegations that will be adjudicated.

After reviewing the file, each party will have an opportunity (1) to meet again with the panel, (2) to respond in writing, (3) to request the collection of other information by the panel, and (4) to identify individuals who may possess relevant information (and request that such individuals be interviewed). If the panel believes that further

response by the parties is necessary for purposes of reaching an outcome, the panel will offer each party the opportunity to further respond to the materials collected. The panel will designate reasonably prompt time frames to ensure a timely completion of the process but also an adequate opportunity for both sides to respond thoroughly to the information gathered in the investigation.

Following the investigation, the panel will meet to determine, by a majority decision, whether the respondent, based on the preponderance of evidence standard, violated University policy. The panel will prepare a report, which will include findings of fact, findings of responsibility, and the panel's rationale. All members of the panel must endorse the report as a record of their deliberations and rationale.

## 2. Penalties

If a student is found responsible for violating University policy, the entire case file will be forwarded to the dean of undergraduate students and the deputy dean for academic affairs of the Graduate School, who will jointly determine the penalty. In the event of their unavailability, an appropriately trained administrator will serve as the substitute. Penalties will be determined based on the seriousness of the misconduct as compared to like cases in the past, and the student's previous disciplinary history (if any). Remedial measures will be determined based on the need to afford the parties an educational environment free from discrimination under Title IX. The findings regarding fact and responsibility, as well as the decision regarding the penalty in cases where violations of University policy have occurred, will be conveyed to the parties at the same time in writing. The notification will include the parties' appeal rights.

If a student is found responsible for violating University policy, the Office of the Dean of Undergraduate Students or of the Graduate School will record the penalty and retain records in accordance with protocols for all other disciplinary cases. In all cases, the case file will also be archived by the Title IX Coordinator.

## 3. Rights of Appeal

Both parties, the complainant and the respondent, have equal rights to an impartial appeal and to participate equally in the appeal process, even if the party is not the appealing party.

The appellate body has the following five members: the dean of the college, the dean of the Graduate School, the vice president for campus life, the chair of the Judicial Committee of the Council of the Princeton University Community, and another faculty member appointed by the president. All members will have training regarding Title IX and prohibited conduct defined under this policy. The members will be impartial and unbiased. One member will be appointed by the president to serve as its chair.

Each appeal will be heard by three members of the appellate body (i.e., appeal panel). The chair will assign the appeal panel for each case. All decisions shall be made by a majority of the appeal panel.

A complainant or respondent may file a written appeal on the grounds that: (1) there is substantial relevant information that was not presented, and reasonably could not have been presented during the investigation; (2) the imposed penalty does not fall within the range of penalties imposed for similar misconduct, or (3) there was procedural unfairness during the disciplinary process.

The purpose of an appeal is not to initiate a review of substantive issues of fact or a new determination of whether a violation of University rules has occurred. (In considering an appeal, the appeal panel may communicate with the parties, the investigative panel, and/or disciplinary authority.) The appeal panel may decide to uphold the original decision of the investigative panel and/or the deans; to alter the imposed penalty; or to return the case to the investigative panel for additional proceedings or other action. The deadline for filing an appeal is five business days from the date the parties are notified of the decision. If either party files an appeal, the associate secretary of the University will notify the other party in writing. The associate secretary of the University will serve as secretary for all appeals and will have primary responsibility for interactions with the parties, for the gathering of information needed for the appeal, and for notifying both parties in writing of the outcome of any appeal.

## 4. Expedited Process in Limited Cases

An expedited investigation and adjudication process may be implemented at the sole discretion of the Title IX Coordinator in those cases where: (a) a student is alleged to have violated this policy; (b) based on precedents and the respondent's prior disciplinary history, the penalty for the alleged violation will not interrupt the student's academic career, and (c) the parties to the matter agree to the expedited process. If during the course of the matter the Title IX Coordinator determines that the expedited process is not appropriate, the Title IX Coordinator will re-institute the standard procedures described in section 1.3.12.

The expedited process is identical to the standard procedures described in section 1.3.12 in all respects, except for the following:

- The expedited process will utilize a two-person investigative panel.
- If a student is found responsible for violating this policy, penalties will be determined by an associate dean of undergraduate students for an undergraduate respondent or by an associate dean of the Graduate School for a graduate student respondent.

- Appeals in which the respondent is an undergraduate student will be reviewed by the dean of undergraduate students, and appeals in which the respondent is a graduate student will be reviewed by an associate dean of the Graduate School. If either party files an appeal, the associate secretary of the University or their designee will notify the other party in writing, and that individual will have primary responsibility for interactions with the parties, for the gathering of information needed for the appeal, and for notifying both parties in writing of the outcome of any appeal.

## 5. Student Enrollment and Residence Status

Pending action by the panel and/or the deans on the charges or pending an appeal, the respondent may be permitted to remain in residence on campus, attend classes, and make use of some or all University facilities, except for circumstances relating to the physical or emotional safety or well-being of a member (or members) of the University community, or the ability of the University to carry out its essential functions. Certain restrictions may be imposed by the deans on the respondent in order to provide the complainant with an educational environment free from discrimination under Title IX.

The respondent should understand that if the decision of the panel and/or the deans proves adverse, and if an appeal proves unsuccessful, the penalty will normally be considered effective as of the date of the original adjudicated decision. In cases adjudicated prior to the last day of classes, if the final decision is a separation from the University (i.e., suspension, suspension with conditions, or expulsion), the respondent will normally not earn credit for the semester in which the infraction occurred. If the case is adjudicated during reading or exam period or if the respondent has successfully completed course requirements while awaiting the final disposition of the matter, obtaining credit for the semester will be at the discretion of the deans.

Pending an investigation and adjudication or the respondent's decision about whether to appeal a separation from the University or the withholding of the degree, and/or while an appeal is in process, an administrative hold will be placed on the respondent's University transcript. Should the respondent decide not to appeal a separation or the withholding of the degree, or should an appeal not result in an alteration of the dean's decision to dismiss the respondent or withhold the degree, the registrar will record the fact of the penalty on the respondent's transcript.

## 1.3.13 Investigation, Disciplinary, and Appeal Procedures for Cases When the Respondent Is a Faculty or Staff Member

### 1. Investigation and Adjudication

When the Title IX Coordinator receives a complaint or report alleging that a member of the faculty or staff violated this policy, the Title IX Coordinator will appoint an investigative panel of at least two University administrators and/or investigators.

When either of the parties is a faculty member, one panelist will represent the Office of the Dean of the Faculty. If either of the parties is a staff member, one panelist will represent Human Resources. When the complainant is a student alleging a violation of this policy by a member of the faculty or staff, the panel will have three members, and will include a representative of the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School, as appropriate.

The investigative panel will conduct an inquiry and determine, by a preponderance of the evidence, whether this policy was violated. All panelists will have training in investigating and evaluating conduct prohibited under this policy. The panelists will also be impartial and unbiased and will describe in writing for the parties, the allegations that will be adjudicated.

The panel will collect information from each party. If the parties are interviewed, they will be interviewed separately. Each party may select an adviser of their choice who may accompany them to any meeting or related proceeding, but the adviser may not actively participate in the interview process. All members of the panel will participate in interviews with the complainant and the respondent. The panel will interview witnesses as necessary and may, at its discretion, delegate witness interviews to one or two of the panelists. Witnesses may not bring advisers. In all meetings, there will be a designated note taker. At the conclusion of each interview, the notes will be reviewed with the interviewee.

In the circumstance when the complaint is made by a member of the faculty or staff alleging a violation of this policy by another member of the faculty or staff, the panel will prepare a case file of all interview summaries, witness statements, and other documents. The panel will present both parties with a summary of the case file, after which each party will have an opportunity (1) to meet again with the panel, (2) to provide additional written information to the panel, (3) to request the collection of other information by the panel, and (4) to identify individuals who may possess relevant information (and request that such individuals be interviewed). If the panel believes that further response by the parties is necessary for purposes of reaching an outcome, the panel will offer each party the opportunity to further respond to the materials collected. The panel will designate reasonably prompt time frames to ensure a timely completion of the process but also an adequate opportunity for both sides to provide thorough information in the investigation.

In the circumstance when the complaint is made by a student alleging a violation of this policy by a member of the faculty or staff, the panel will prepare a case file of all

interview summaries, witness statements, and other documents. The file, redacted of personally identifiable information as necessary, will be shared with the complainant and the respondent. After reviewing the file, each party will have an opportunity (1) to meet again with the panel, (2) to respond in writing, (3) to request the collection of other information, and (4) to identify individuals who may possess relevant information (and request that such individuals be interviewed). If any additional information is gathered, it will be shared with both parties and each will have the opportunity for further response. The panel will designate reasonably prompt time frames to ensure both a timely completion of the process but also an adequate opportunity for both sides to respond thoroughly to the information gathered in the investigation.

Following the investigation, the panel will meet to determine whether the respondent, based on the preponderance of evidence standard, violated University policy. The panel will prepare a report, which will include findings of fact, findings of responsibility and the panel's rationale. All members of the panel must endorse the report as a record of their deliberations and rationale.

## 2. Penalties

The appropriate disciplinary authority based on the role of the respondent is as follows:

- If a faculty member is found responsible, the panel's report will be forwarded to the dean of the faculty who will determine the appropriate penalty.
- If a staff member is found responsible, the panel's report will be forwarded to the vice president for human resources, who will determine the appropriate penalty in consultation with the staff member's manager.

Penalties will be determined based on the seriousness of the misconduct as compared to like cases in the past, and on the individual's previous disciplinary history (if any). The findings regarding fact and responsibility as well as the decision regarding the penalty in cases where violations of University regulations have occurred will be conveyed to the parties at the same time in writing. The notification will include the parties' appeal rights. In all cases involving sex discrimination or sexual misconduct, the case file will be archived by the Title IX coordinator.

## 3. Rights of Appeal

Both parties, the complainant and the respondent, have equal rights to an impartial appeal and to participate equally in the appeal process, even if the party is not the appealing party. A complainant or respondent may file a written appeal on the grounds that (1) there is substantial relevant information that was not presented, and reasonably could not have been presented during the investigation; or (2) there was procedural unfairness.

- In a case where the respondent is a **faculty member,** written appeal should be filed with the Committee on Conference and Faculty Appeal. In addition to the two grounds above, either party may raise on appeal "any question of unfair treatment in relation to the appointment, reappointment, or academic duties or privileges."
- In a case where the respondent is an **academic professional** (professional researchers and specialists, professional library staff), a written appeal should be filed with the provost.
- In a case where the respondent is a **non-unionized staff member,** a written appeal should be filed with the executive vice president.
- In a case where the respondent is a **unionized staff member,** in accordance with the grievance procedure under the applicable collective bargaining agreement, a written appeal should be filed with the executive vice president and/or the labor relations representative in Human Resources.

The purpose of an appeal is not to initiate a review of substantive issues of fact or a new determination of whether a violation of University rules has occurred. (In considering an appeal, the appeal panel may communicate with the parties, the investigative panel, and/or disciplinary authority.) The appellate authority may decide to uphold the original decision of the panel and/or disciplinary authority; to alter the imposed penalty; or to return the case to the panel for additional proceedings or other action. The appellate authority will have training regarding Title IX and prohibited conduct defined under this policy and will be impartial and unbiased.

The deadline for filing an appeal is one week from the date the parties are notified of the decision by the dean of the faculty or vice president for human resources or a designee. If either party files an appeal, the other party will be notified. Both parties will be notified in writing of the outcome of the appeal.

## 1.3.14 Disciplinary Procedures Where One Party Is a Member of the University Community and the Other Party Is a Non-Member of the University Community

When a third party, (i.e., a non-member of our University community) is involved as a complainant or a respondent, the University will use disciplinary procedures that are generally consistent with the disciplinary procedures stated in sections 1.3.8 through 1.3.13 , appropriately modified based on the particular circumstances involved and taking into account privacy requirements and the like. In no case will a member of our community (i.e., current student, faculty member or staff member) be afforded lesser rights or lesser opportunities to participate in the disciplinary proceeding than the non-member of the University community.

## 1.3.15 Other Investigation and Resolution Procedures

If a complaint or report of conduct prohibited by this policy is made against multiple individuals, an office, or the University in general, the Title IX Coordinator will review the matter and take appropriate action, in accordance with this policy. The Title IX Coordinator may conduct an investigation, using investigative and disciplinary procedures that are generally consistent with those stated in this policy, appropriately modified based on the particular circumstances involved. The Title IX Coordinator also has the discretion to conduct a climate review, after which the University may implement appropriate remedial action.

## 1.3.16 Range of Penalties under This Policy and Disciplinary Procedures

Members of the University community may be subject to disciplinary penalties for violating this policy.

### 1. Additional Accommodations

If a respondent is found responsible for violating this policy, the complainant may request accommodations not already in place. The University will implement the accommodation as appropriate. In no circumstance will the burden of the accommodation be placed on the complainant. The accommodation shall be effective even if the respondent files an appeal or if such an appeal is pending.

### 2. Penalties Applicable to Students

The penalties for students are listed below.

### Informal Sanctions

Minor violations of rules of conduct may be met with informal responses.

**1. Dean's Warning.** An admonition that does not become part of an individual's permanent record, but that may be taken into account in judging the seriousness of any future violation.

**2. Reprimand.** Reprimand is a stronger admonition than a dean's warning, intended to signal that the student has committed a minor infraction, conveying that the student must be vigilant against future infractions, and providing a disincentive against future infractions in that a reprimand will not become part of the student's permanent record unless there is a subsequent infraction, at which point the reprimand will be formally recorded on the student's permanent record.

Both a dean's warning and a reprimand may be taken into account in judging the seriousness of any future violation.

## Formal Sanctions

More serious violations may be met with the following formal responses which are recorded on the student's permanent record.

**1. Disciplinary Probation.** A more serious admonition assigned for a definite amount of time. It implies that any future violation, of whatever kind, during that time, may be grounds for suspension, suspension with conditions, or in especially serious cases, expulsion from the University. Disciplinary probation will be taken into account in judging the seriousness of any subsequent infraction even if the probationary period has expired.

Disciplinary probation appears on an individual's permanent record at the University (but not on the transcript) and may be disclosed by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School in response to requests for which the student has given permission or as otherwise legally required.

**2. Withholding of Degree.** In cases involving seniors or graduate students in their final semester, the University may withhold a student's Princeton degree for a specified period of time. This penalty is imposed instead of suspension at the end of senior year or final year of graduate study when all other degree requirements have been met. A withheld degree is recorded on a student's transcript. Relevant information remains on the student's permanent record at the University and may be disclosed by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School in response to requests for which the student has given permission or as otherwise legally required.

**3. Suspension.** Removal from membership in the University for a specified period of time. A suspension is recorded on a student's transcript. Relevant information remains on the student's permanent record at the University and may be disclosed by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School in response to requests for which the student has given permission or as otherwise legally required.

**4. Suspension with Conditions.** Removal from membership in the University for at least the period of time specified by the suspension, with the suspension to continue until certain conditions, stipulated by the appropriate body applying this penalty, have been fulfilled. These conditions may include, but are not limited to, restitution of damages, formal apology, or counseling. A suspension with conditions is recorded on a student's transcript. Relevant information remains on the student's permanent record at the University and may be disclosed by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School in response to requests for which the student has given permission or as otherwise legally required.

**5. Expulsion.** Permanent removal from membership in the University, without any opportunity for readmission to the community. Expulsion is recorded on a student's transcript. Relevant information remains on the student's permanent record at the University and may be disclosed by the Office of the Dean of Undergraduate Students or the Office of the Dean of the Graduate School in response to requests for which the student has given permission or as otherwise legally required.

The following may accompany the preceding penalties, as appropriate:

**Censure.** University censure can be added to any of the other penalties listed above, except dean's warning and reprimand. Censure indicates the University's desire to underscore the seriousness of the violation and the absence of mitigating circumstances, and to convey that seriousness in response to future authorized inquiries about the given individual's conduct.

**Campus Service.** Campus service up to 10 hours per week may be added to a reprimand or disciplinary probation. This penalty may be particularly appropriate in cases involving vandalism, disorderly conduct, and alcohol-related infractions.

**University Housing.** When appropriate to the infraction, particularly in instances involving antisocial behavior having a serious impact on the residential community, removal from University housing or relocation within University housing may be added to any of the other penalties listed above, except warning and reprimand. In the case of a first-year or sophomore, removal from housing is not an option as all underclass students must reside in a residential college. Relocation within residential colleges will be imposed only after consultation with the head of the student's residential college.

**Restriction of Access to Space, Resources, and Activities.** When appropriate in cases involving behavioral misconduct between members of the community, restrictions may be placed on access to space and/or resources or on participation in activities so as to limit opportunities for contact among the parties.

**Educational Refresher Programs.** In addition to any of the penalties listed above, a student may be required to participate in educational refresher programs appropriate to the infraction.

**Restitution.** The penalty for willful or reckless damage or vandalism will ordinarily include restitution for replacement or repair.

## 3. Penalties Applicable to Faculty and Staff Members

For violations of this policy by faculty or staff members, disciplinary penalties may include (in accordance with the employment policies governing the employee in question) counseling or training, written warning, financial penalty, unpaid leave of

absence, suspension, demotion or termination in accordance with the employment policies governing the specific employee.

### 4. Penalties Applicable to Non-Members of the University Community

For violations of this policy by non-members of the University community, disciplinary penalties may include being temporarily or permanently barred from the University or subject to other restrictions.

---

# 1.4 The University, the Law, and Property Rights

Members of the University community are expected to act with respect for the safety, personal rights, and property of individuals and groups both within and outside the University, and in accordance with local, state, and federal laws. Some laws, such as those governing equal opportunity and nondiscrimination, underlie fundamental University policy and have been discussed previously in this document. Principles and laws of particular importance to our academic community are discussed below.

## 1.4.1 On-Campus Misconduct and the Law

On-campus misconduct by members of the University will normally result in internal disciplinary action, although in some instances the University may deem it necessary to call upon external authorities and to file charges or claims in the courts. In particular, misconduct by members of the University or others that inflicts or threatens to inflict personal injury or serious damage to property, that severely impairs essential functions of the University, or that cannot be adequately handled by the University Department of Public Safety, may require the intervention of outside authorities. Outside authorities typically will be called only by a senior officer of the University or a specifically designated representative. In addition to the president and the provost, authorized senior officers include the dean of the faculty, the dean of the Graduate School, the dean of the college, the vice president for campus life, the executive vice president, the executive director of the Department of Public Safety, and the general counsel.

### Persons on Leave of Absence; Persons Who Are Not Members of the University

1. Allegations of on-campus misconduct by persons who are, for whatever reason, withdrawn, suspended, whose degrees have been withheld, or on leave of absence from the University will be evaluated before these persons may resume their status as regular members of the University. In these instances, such persons will be

# JD EXHIBIT 20

Page 1

1           UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2
            Civil Action No. 3:22-5887 (RK)(JTQ)
3

JOHN DOE,
4
     Plaintiff,              REMOTE VIDEOTAPED
5                            DEPOSITION OF:
     vs.                     REGAN CROTTY
6

PRINCETON UNIVERSITY,
7
     Defendants.
8    _____
9         TRANSCRIPT of the stenographic notes of the
10   proceedings in the above-entitled matter, as
11   taken by and before RITA GARDNER, a Notary
12   Public and Certified Court Reporter of the State
13   of New Jersey, held REMOTELY VIA ZOOM, on
14   Monday, November 11, 2024, commencing at 9:38
15   a.m.
16
17
18
19
20
21
22
23
24
25

REGAN CROTTY

Page 17

1    how it all fit together.

2           A.    So in that time period, 2014,

3    Michele Minter, she is the Vice Provost of

4    Institutional Equity and Diversity.  She is the

5    Title IX Coordinator.  She has many other

6    responsibilities for discrimination, harassment,

7    bias, ADA.  So she -- she has broader

8    responsibilities than Title IX, so that -- this

9    was a piece of her portfolio.

10          My -- in my role, I will call it

11   Director of Gender Equity, but initially it was

12   called Title IX Administrator, I would -- so

13   there was my role, there was an administrative

14   assistant who was full time, and then we had

15   investigators who were part-time employees, or

16   they were part time and they would come in and

17   investigate the cases, investigate and, at that

18   time, reach outcomes.  And then there was a

19   separate appeal process.

20          Q.    Okay.  So -- okay.  So the

21   investigators would then, themselves, they would,

22   as in this case, they would investigate and reach

23   an outcome, a finding as to responsibility or

24   non-responsibility?

25          A.    Correct, at that time.

REGAN CROTTY

Page 64

1          A.      Correct.

2          Q.      Okay.  And so -- so Dean Chen has

3     identified one of these issues, one of these

4     kinds of contradictions or instances of tension.

5     And your response is to say we don't need to

6     address it because we are not finding her account

7     was substantiated, correct?

8          A.      That -- that is what it says here.

9          Q.      Okay.  But whether or not her

10    account was substantiated has no bearing on

11    whether she is simply telling two inconsistent

12    stories, does it?

13         A.      Can you ask that again?

14         Q.      Sure.  Whether or not she -- her

15    account is substantiated has no bearing on

16    whether she is telling two inconsistent stories,

17    correct?

18         A.      You know, that is -- I am just

19    trying to get my bearings in terms of which -- I

20    am just scrolling through to make sure I am

21    looking at the right account.

22                 You know, I am not sure -- looking

23    back at it.  I am looking at what the words were

24    at the time.  You know, I can't tell you without

25    looking back at this without looking -- I think I

REGAN CROTTY

Page 65

1    would have to look at all of it further to see

2    exactly what I am talking about.

3          Q.    Well, I am not sure that you do.  If

4    -- if someone tells you two inconsistent stories,

5    does it -- you've agreed that like, whether

6    someone is being consistent is something that is

7    relevant to their credibility.  So the question,

8    I guess, is:  It doesn't matter whether you think

9    the first story she told happened the way she did

10   or not.  Whether it happened the way she did or

11   not, there -- it still would be in tension with

12   the second story.  It still would be true --

13   whether it happened or not, the way she said, it

14   still would be true that she said in the first

15   incident, "I kept him from taking off my bra or

16   my clothes," and in the second incident she

17   didn't say that.  She -- she didn't act the same

18   way, and that there is a tension there that

19   potentially needs to be explained.  That is going

20   to be true whether she is telling the truth about

21   either of the incidents or not, correct?

22                 MR. BERNS-ZIEVE:  Objection.  Form.

23         A.    Right.  If there were differences

24   that would exist, whether or not it was

25   substantiated or not.

REGAN CROTTY

Page 69

1    this"?

2            A.    You know, I can't tell you, looking

3    back, why that is what I wrote.  I mean, that is

4    what I thought at the time.

5            Q.    All right.  Let's go to Exhibit 24.

6    And this is just a -- this is just a cover e-mail

7    where Ms. Hubert says to you:  "Hi, Regan, I

8    drafted a fact section and you wanted to edit

9    that before I moved onto the credibility and

10   analysis.  So here is the draft memo with that

11   section written."

12               And then attached is the draft memo,

13   correct?

14           A.    Yes.

15           Q.    So you were directing the Panel on

16   the specific steps to take, the actual like

17   mechanics and logistics of drafting the first

18   memo here, correct?

19           A.    Sorry.  I just closed out.  Was it

20   22 or 23 or 24?

21           Q.    Exhibit 24.

22           A.    Okay.  I mean, I am not in this

23   e-mail, so I wasn't directing anything here.

24           Q.    I am sorry, it is Exhibit 24, 6603.

25           A.    Right.  So I think you said here I

REGAN CROTTY

Page 83

1      "I think you could get to saying that the

2      initiation was non-consensual."

3                  Why did you phrase it that way?

4           A.    I think I was looking at the fact

5      that they used the word "pushing" which implies

6      lack of consensuality.  And if -- so they needed

7      to explain better if they substantiated that it

8      was pushing, whether that was non-consensual or

9      not.  I think I was focused on the word "pushing"

10     and that implies lack of consensuality.

11          Q.    Okay.  But you didn't -- you didn't

12     say if you agreed that it was pushing, then I

13     think you need to explain this better.  What you

14     said was "I think you could get to saying that

15     the initiation was non-consensual."  So I am

16     asking, what did you mean by that, by saying that

17     you could "could get to saying"?

18          A.    I think what I just explained.  If

19     it was pushing, then you need to look at whether

20     it was non-consensual.

21          Q.    But that is not what you said,

22     though.  You didn't say more analysis is

23     required.  You -- you said "I think you could get

24     there."  Why did you think the Panel would "want

25     to get to saying that the initiation was

REGAN CROTTY

Page 96

1     own words, what is happening in this e-mail?

2              A.     So first, I thank Randy for her

3     work.  I said this is a complicated memo.  I've

4     been doing a lot of thinking about it, looking at

5     prior memos and revising.  I am asked to review

6     the attached version.  I said:  "I have found

7     that sometimes, when we see it written out, it

8     doesn't work as well as it seemed to in theory.

9     Therefore, sometimes I write two versions so we

10    can see what they both look like."

11             It says in the second incident

12    findings, it is written in a way to show a

13    potential alternate outcome.  It says I will send

14    another version of Section 2 as well.  This is

15    where Walter is, based on the conversation

16    yesterday.  And it says Michele also said if you

17    think this -- that this happened -- I am sorry.

18    I am reading this poorly.

19             "Michele also said, if you think

20    that this happened (which I feel like is where

21    you are), you should write that memo, and we will

22    defend it."

23             And then I just talked about not

24    having multiple versions circulating.

25             Q.     Okay.  So -- so this is your

REGAN CROTTY

Page 97

1          response, you are basically sending a draft of

2          the memo back after, I guess, talking with

3          Michele Minter about the draft that you had sent

4          her on the 1st.  Is that right?

5                    A.    It looks like I am sending a draft

6          back, but I don't -- I don't recall interactions

7          with Michele, but appears that I had some

8          conversations with her.

9                    (Reporter clarification.)

10                   A.    I don't recall a specific

11         conversation with Michele that this references

12         Michele, so it suggests that we had some

13         interaction.

14         BY MR. MUHA:

15                   Q.    Okay.  Okay.  That was my first

16         question, was whether you remember anything about

17         your conversation with Michele about the draft.

18                   A.    I don't.

19                   Q.    Is it reasonable to assume that she

20         was at least okay with the idea of you drafting a

21         potential alternate outcome?

22                   A.    I don't recall whether we discussed

23         it, but I don't think she would have had an issue

24         with that.

25                   Q.    Okay.  Let's start at the top.  You

REGAN CROTTY

Page 109

1          A.      Correct.

2          Q.      Okay.  So the -- the previous

3     sentence, you say this is where Walter is.  Okay?

4     Walter is voting guilty on everything, especially

5     on the penetration charges.  And then she says --

6     and then you say "I feel like this is where you

7     are."  Obviously, Ms. Hubert, on the 1st, had

8     sent you a rationale that she wrote finding him

9     not responsible for this.  Right?

10         A.      Correct.

11         Q.      Okay.  So whatever you are referring

12    to, say, like, whatever you think that this

13    happened, that absolutely cannot refer to the

14    rationale and what she thinks the evidence shows,

15    because she had just sent that to you on March

16    1st and it made very clear what she thought the

17    evidence showed on March 1st, right?

18         A.      I assume -- she wrote the memo based

19    on the deliberations from the Panel, yes.

20         Q.      Right.  So if -- if there is

21    something different that she, quote, thinks that

22    happened, it is not the rationale.  That is

23    referring to the underlying acts.  Right?

24         A.      Right, I mean, if she had -- if she

25    thought the evidence supported a different

REGAN CROTTY

Page 110

1    outcome based on the facts, then she, you know,

2    would write that memo.

3            Q.    But she just wrote that memo.  She

4    wrote it on March 1st, and she said "not

5    responsible for the penetration charges, and here

6    is a lengthy memo explaining why."

7                 So that -- there was nothing --

8    there was no doubt about the rationale that she

9    had in her head at that time.  It was not -- it

10   was not a rationale that was close to what Walter

11   Wright was thinking, correct?

12               MR. BERNS-ZIEVE:  Objection to form.

13   BY MR. MUHA:

14          Q.    The March 1st rationale is the

15   opposite of what Walter Wright thought, right?

16          A.    I know they had, at that point --

17          Q.    -- penetration charges?

18          A.    I know they had different --

19          Q.    I am sorry, I didn't -- go ahead.

20          A.    -- different views of penetration,

21   the oral sex and the intercourse charges.  I know

22   they had different -- had reached different

23   outcomes, the two of them on that.

24          Q.    Right.  So in saying that -- that

25   you think Ms. Hubert is -- you feel like, feel

REGAN CROTTY

                                              Page 111

1        like she is at the same place where Walter is,

2        you are not talking about rationale, you are

3        talking about the belief in what facts actually

4        happened.  You can't be talking about the

5        rationale, right, because you already knew what

6        her rationale was and what she thought the

7        evidence could support because she sent it to you

8        on March 1st, right?

9              A.    You know, I just don't -- looking

10       back at this, I don't know exactly what I would

11       have been referring to.  I understand your

12       reasoning, but I just --

13             Q.    Okay.  So the reasoning makes sense,

14       right?  Walter Wright and -- and Randy Hubert

15       disagreed about what the evidence could support.

16       So what they -- what they agreed on here, or what

17       you felt like where she must be, that was similar

18       to him, has to be something different than the

19       rationale.  It is, in fact, exactly what you say

20       here, that if -- quote, if you think that this

21       happened -- that is what Ms. Hubert, Ms. Hubert,

22       deep down, thought John Doe must -- must be

23       responsible, but she didn't think there was

24       evidence to support it.  So she drafted a

25       rationale that was true to that belief.

REGAN CROTTY

Page 146

1          A.     My opinion about the question, yes.

2          Q.     Right.  Yeah, we are only talking

3     about your opinion.  In your opinion, it would be

4     weird, or you can ask the people about it.

5          A.     Right.  That is what it says.

6          Q.     Yeah.  So how is this first part not

7     being suggested as a reason that they may decide

8     to not pursue that evidence?

9          A.     They could -- they could decide not

10    to pursue it.  I think it is up to them.

11         Q.     Right.  My question to you is:  How

12    is that not intended as a reason that they might

13    decide not to pursue the evidence?

14         A.     I think it is an observation I

15    offered, and they can decide what to do with it.

16         Q.     Okay.  And it was an observation

17    that was relevant to their question to you that

18    was being asked?

19         A.     Correct.

20         Q.     Okay.  And it was relevant for a

21    different reason than what you offered in the

22    second sentence, and that is why you started the

23    second sentence with "or"?

24         A.     You know, I don't know, looking back

25    four years, why I started with "or."  I think

REGAN CROTTY

Page 205

1        part is I am saying you can assume, for purposes

2        of the question, that the only evidence

3        supporting Jane Roe's version of this part of it

4        is her own testimony, right?

5              A.    I mean, I just -- I don't know -- I

6        can't speak for the Panel as to why they weighed

7        a particular way on this.

8              Q.    The Panel didn't make a finding on

9        this.  They didn't say.  I am asking you.  What

10       does the evidence show here?  Does the evidence

11       show, by a preponderance, that Jane Roe's story

12       about John demanding a hickey is highly unlikely?

13                   MR. BERNS-ZIEVE:  Objection.  Form.

14             A.    Well, highly unlikely isn't the --

15       isn't the standard.

16       BY MR. MUHA:

17             Q.    Does a preponderance of evidence

18       support Jane Roe's version of events on this?

19             A.    You know, I know -- I know you are

20       telling me all these facts, but I am just not

21       comfortable having not delved into things myself.

22             Q.    I understand.  I understand.  And

23       the record is going to reflect exactly what I am

24       saying here.  Assuming what I've told you that

25       there's -- the only thing supporting Jane

# JD EXHIBIT 22

```
                                             Page 1

 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF NEW JERSEY

 3    _____

 4    JOHN DOE,

 5           Plaintiff,

 6       v.                          Civil Action

 7    PRINCETON UNIVERSITY,          No.

 8           Defendant.              3:22-cv-5887-

 9                                   RK-JTQ

10    _____

11            VIDEOTAPED DEPOSITION OF

12                 WALTER WRIGHT

13    DATE:        Monday, November 18, 2024

14    TIME:        9:34 a.m.

15    LOCATION:    Remote Proceeding

16                 Franklin Park, NJ 08823

17    OFFICIATED BY: Kadienne Stoute

18    JOB NO.:     7028290

19

20

21

22

23

24

25
```

Page 103

1    performing other sexual activities?

2        A    Yeah.  Again, just, you know -- and again,

3    you'd -- you'd have to speak to the other two panel

4    members, but in my own mind, if -- if we believe that

5    she had not previously had sexual intercourse, it

6    didn't make sense to me that she would be aggressive

7    in other sexual activities.

8            In -- in my mind, I believe she would be

9    nervous and anxious in both sexual, you know -- other

10   sexual activities that may lead to sexual intercourse.

11       Q    But do you recall if you asked her whether

12   she was nervous to engage in other sexual activities?

13       A    I -- I can't remember today.

14       Q    Okay.  Or do you remember if you asked her,

15   like, "Are you ever aggressive in other sexual

16   situations?"

17       A    I don't believe I asked her that, but I

18   don't recall.

19       Q    Okay.  Okay.  If the panel's using -- but

20   John Doe -- I guess if he had -- if you were able to

21   find evidence somewhere that she had been sexually

22   aggressive in other ways, he would be allowed to -- he

23   would have -- if he could have found them, he would

24   have been allowed to submit that to you guys to rebut

25   this point that you guys were making here; right?

Page 104

1        A    He -- he could have submitted --

2                    MR. BERNS-ZIEVE:  Objection.  Form.

3    BY MR. MUHA:

4        Q    Go ahead.

5        A    Yeah.  I was just going to say I believe he

6    could have submitted whatever evidence he had.

7        Q    Yeah.  But that would have been relevant

8    evidence is my point.  Like if he was able to somehow

9    find that, he would have -- it would have been

10   relevant to addressing this credibility point; right?

11                   MR. BERNS-ZIEVE:  Objection.  Form.

12                   THE WITNESS:  I mean, again, he could

13   have submitted whatever evidence he had and, you know,

14   the panel would have weighed whether or not it was

15   relevant and whether or not it was credible to this

16   point.

17   BY MR. MUHA:

18       Q    Right.  But if the panel is saying, "We

19   don't think Jane Roe would have been sexually

20   aggressive by taking off his pants or pushing him down

21   and the reason is because she's never done this one

22   particular sexual activity," then it'd be relevant if

23   he could show, oh, no, wait, but she has done other

24   sexual activities that are actually closer to what's

25   being described here.

Page 105

1      A     Seems like it -- it would -- it would be

2    relevant if he brought in other evidence.

3      Q     Okay.  Okay.  I'm going to drop this down

4    real quick.  Sorry.  Let me just make a note, like,

5    where we are.  Just give me one minute to find this

6    here.  One second to mark a new document here.  Okay.

7    And then I will Screen Share when it's up in the

8    folder here.  Give me, like, ten seconds.

9      A     Okay.

10     Q     Okay.  Do Screen Share again.  All right.

11   Okay.  Can you see this document now?

12     A     Yes, I can.

13     Q     Okay.  So I've got this as Exhibit 21.

14   Okay.  And so do you see that this is a -- and you

15   can -- I can -- you can read it.  I'll scroll at the

16   bottom if you'd like to read the whole thing, but you

17   see this is an email chain between you and the

18   panelists and Regan Crotty?

19                    (Wright Exhibit 21 was marked for

20                    identification.)

21     A     Yes.

22     Q     Okay.  And it's dated December 17, 2019.

23     A     Okay.

24     Q     Okay.  So this would have been --

25                    THE OFFICER:  And I'm sorry to

Page 110

1    one," and this is evidence that maybe she would have

2    been aggressive.  So of course it's relevant to what

3    happened in the room.

4         A    Yeah.  I -- I disagree.

5              MR. BERNS-ZIEVE:  Objection.  Form.

6    BY MR. MUHA:

7         Q    Why do you think it's irrelevant now when a

8    few minutes ago you admitted that this is exactly the

9    kind of evidence that would be relevant?

10             MR. BERNS-ZIEVE:  Objection.  Form.

11             THE WITNESS:  Well, again, we're

12   talking about two separate incidents.  One incident

13   involves a sexual encounter in a room and another

14   alleged incident involves a sexual related activity in

15   a public place.  And in my mind, it's sort of like

16   apples and oranges.

17   BY MR. MUHA:

18        Q    If -- well, if anything, it's -- where would

19   you expect someone to be more aggressive: In public or

20   in private?

21        A    You would think in -- in private.

22        Q    Which means if they're sexually aggressive

23   in public, there's an even greater likelihood that

24   they're sexually aggressive in private.

25             MR. BERNS-ZIEVE:  Objection.  Form.

Page 111

```
 1                    THE WITNESS:  Are -- are you asking me
 2    if I agree with that -- your statement --
 3    BY MR. MUHA:
 4         Q    Yes, sir.
 5         A    Maybe.
 6         Q    Sir, I'll remind you that you're under oath
 7    right now.
 8         A    Yeah.  I know that.
 9         Q    And it's your testimony that if someone is
10    willing to be sexually aggressive in public, it's only
11    maybe that they're -- would be more sexually
12    aggressive in private?
13                    MR. BERNS-ZIEVE:  Objection.  Form.
14                    THE WITNESS:  And again, my -- again,
15    my statement is "maybe."
16    BY MR. MUHA:
17         Q    How likely -- what do you think is more
18    likely?
19         A    As -- as far as what's concerned?
20         Q    Are people more likely to be sexually
21    aggressive -- are they likely to be more aggressive in
22    private than they are in public?
23         A    Again, I believe people are more likely to
24    be more sexually aggressive in private.
25         Q    Okay.  You also say here that this could
```

Page 173

1    manipulative based on certain things he had already

2    done with witnesses, based on things he had already

3    told us.

4                    I think I had come to believe that John

5    Doe was being manipulative and dishonest.  So I

6    was -- I was being -- trying to be humorous, but

7    cynical at the same time when I made that statement.

8    BY MR. MUHA:

9        Q    Is that an appropriate sentiment for you to

10    be expressing in the middle of an investigation?

11        A    Depends on who you talk to --

12                    MR. BERNS-ZIEVE:  Objection.  Form.

13    BY MR. MUHA:

14        Q    Well, I'm asking you.

15        A    I -- I mean, it is what it is.  I -- I

16    thought it was appropriate.

17        Q    And sitting here today, you -- do you still

18    think it's appropriate?

19        A    To -- to me, whether or not it was

20    appropriate is beside the point.  The point is I

21    believed that John Doe was -- was manipulative with us

22    during the investigation and that he -- he seemed to

23    be dishonest about some things.

24                    And I was trying to be humorous and cynical

25    at the same time about what I believed about John Doe.

Page 174

1    And to -- to your question about whether or not I

2    thought it was appropriate, I wouldn't have written it

3    if I didn't think it was appropriate.

4         Q    Okay.  So you thought it was appropriate

5    then.  You -- and you think it's still appropriate

6    now?

7         A    It depends on who you talk to.

8         Q    Sir, I'm asking you.  You're the one

9    answering questions today.

10        Q    Well, and I'm -- and I think I answered the

11   question that I didn't see anything wrong with what I

12   wrote.

13        Q    So then asked you do you think it was

14   appropriate.  Why isn't that just a "yes"?

15        A    Because it's not a yes no answer.  My -- my

16   answer is I had began to believe that John Doe was

17   being manipulative with us, was being dishonest with

18   us and I was expressing that in that email in a kind

19   of -- what I thought was humorous, but at the same

20   time cynical way.

21        Q    And did anyone talk to you after you

22   expressed that sentiment?

23        A    Not that I recall.

24        Q    You testified at the beginning that you'd

25   maybe done a couple cases before this with Ms. Hubert.

Page 175

1    You felt comfortable enough expressing this sentiment

2    to her even though you guys had only worked together a

3    couple times before?

4         A    I mean, she was my colleague.  So anything I

5    wrote to her, I -- I felt like it was -- it was

6    appropriate.  She was a co-investigator with me in

7    this matter.

8         Q    You weren't worried that she was going to

9    find it offensive?

10        A    No, not at all.

11        Q    What about Dean Chen?  You didn't worry that

12   she was going to find it offensive or inappropriate?

13        A    At the time, I -- and -- and today, no, I

14   did not.

15        Q    Or Ms. Crotty?  You didn't think she'd find

16   it inappropriate?

17        A    Not at the time, nor today.

18        Q    You don't think it's a problem that in the

19   middle of an investigation when you're still

20   collecting evidence you not only have that view of

21   John Doe, but you're willing to express it to the

22   other panelists?

23             MR. BERNS-ZIEVE:  Objection.  Form.

24             THE WITNESS:  No.  My -- my problem at

25   that point in an investigation is I'm -- I'm trying to

Page 177

1    trying to get to the true facts of what happened.

2    BY MR. MUHA:

3        Q    But, sir, you hadn't re-interviewed him yet.

4    You hadn't heard him -- you hadn't asked him any of

5    the evidence about Ivy and how that could have maybe

6    slipped his mind.  You didn't ask him anything about

7    the commendation letter issue or what evidence he had

8    that Jane Roe was actually there and he actually did

9    help a student.

10           That's the problem, sir, is that you haven't

11   even spoken to him again yet and you've already

12   concluded that he's probably -- there's probably a

13   pattern of lying and you're not even able to hold in

14   your feelings about it when you're communicating with

15   the panel.

16       A    Well, maybe it's a problem for you --

17               MR. BERNS-ZIEVE:  Objection.  Form.

18               THE WITNESS:  I was going to say maybe

19   it's -- it's a problem for you, but at this point, I

20   didn't see it as a problem.

21   BY MR. MUHA:

22       Q    Do you see it as a problem now in hindsight?

23       A    No.

24       Q    I'll get our next exhibit up.  Okay.  Can

25   you see this exhibit, sir?

Page 204

1    case.

2         A    My recollection and based on the exhibits

3    we've seen today is that I believe the panel said that

4    she was -- concluded that she was inconsistent.

5         Q    Right.  And you disagreed with that part of

6    their analysis.

7         A    I think so.

8         Q    Okay.  Your testimony -- your position was

9    that she had always said the -- there were hickeys at

10   the end of the encounter, at least --

11        A    At the time, I think that's what I believed.

12        Q    Yeah.  That at least on that part, she'd

13   been consistent.  Even if she'd acknowledged the

14   possibility of hickeys at other times, she'd always

15   been consistent about giving him hickeys at the end.

16        A    I -- I think so.

17        Q    Okay.  Yeah.

18        A    I think that's correct.

19        Q    Yeah.  All right.  And do you recall what

20   the panel's ultimate credibility standard was that it

21   adopted after its analysis of the party's credibility?

22        A    I don't recall what the standard was.

23        Q    All right.  Let's just -- we can toggle back

24   and forth here.  Okay.  So if we look here -- I'll

25   zoom in.  So this is Exhibit 5.  So it's concluding

Page 205

1    the credibility section, you see?  It says, "The panel

2    made additional observations about [sic] Respondent's

3    credibility."

4         A    Yes.

5         Q    And then at the end is the conclusion here,

6    "Based on this assessment, the panel refined its prior

7    credibility assessment in that it concluded that

8    Complainant's account relating to the February 2019

9    incident was largely credible only with respect to

10   those elements that she consistently and clearly

11   recalled."

12             Okay.  So does that ring a bell about what

13   the standard was?

14        A    Yes, it does.

15        Q    Okay.  And your point in Exhibit 20 was that

16   she had been clear and consistent about the fact that

17   hickeys occurred at the end of the encounter?

18        A    At that point, yes.

19        Q    Okay.  All right.  So in other words, you

20   believe that the panel was not consistently applying

21   the credibility standard that it was adopting.

22        A    No.  At that point, I was just commenting

23   what I believed.

24        Q    Right.  Your belief was that her testimony

25   had never changed.

Page 206

1          A    At -- at that point, yes.

2          Q    Yeah.  Well, did you believe that when the

3     final decision was issued as well?

4          A    I don't remember.

5          Q    Okay.  Do you remember changing your view?

6          A    I -- I don't recall.

7          Q    Okay.  All right.  If it's true that her

8     testimony had never changed about getting hickeys at

9     the end of the encounter, then if you applied the

10    panel's credibility standard, it would require them to

11    find that John Doe had gotten hickeys at the end of

12    the encounter; right?

13         A     I mean, it was a long time ago.  I -- I

14    don't remember what my thinking was at the time.  I

15    can only go by what I wrote there and it -- it speaks

16    for itself.

17         Q    Yeah.  And I'm just asking you to apply the

18    panel's credibility standard given your view of the

19    hickeys.

20         A    Now?

21         Q    So if the credibility standard is that we'll

22    credit anything that she clearly and consistently

23    recalls, then if she clearly and consistently says

24    there were hickeys at the end, they would have to

25    credit that there were hickeys at the end.

Page 207

1        A    Again, there -- there were deliberations

2    where, you know, different views by myself and my

3    other co-panelists were discussed and debated and

4    hashed out and whatever was stated in the final memo

5    is what a majority of the panel concluded.

6        Q    I understand that, sir.  And I'm just asking

7    you as a matter of pure logic to apply the panel's

8    credibility standard to Jane Roe's testimony about the

9    hickeys.  And so if the standard is we credit whatever

10   is clear and consistent, and if her testimony about

11   hickeys at the end is clear and consistent, therefore

12   the panel had to find there were hickeys at the end.

13       A    So are you asking me to make an assessment

14   now today or based on what occurred in 2020 or 2021?

15       Q    I'm just taking -- asking you to take the

16   credibility standard that your panel adopted in its

17   final draft --

18       A    Yes.  Yeah.  I understand what you're

19   saying.

20       Q    Okay.  And just saying if you apply that to

21   her testimony about the hickeys, what is the result?

22       A    Honestly, I -- I can't say because

23   there's -- there's so much that I -- that -- that

24   happened in our deliberations that I don't recall.

25            And I -- I think you're asking me today to

Page 208

1    make a determination about the standard, but what I'm

2    saying to you is I -- I don't know because there's so

3    much -- my memory is hazy about that it's hard for me

4    to make some sort of determination today about whether

5    or not the standard was applied correctly or not

6    because I -- I don't know.

7         There's so much I don't recall.

8         Q    Okay.  Well, just to be clear then, sir, I'm

9    not asking you anything about deliberations here.  You

10    can put that completely aside for purposes of the

11    question because the deliberations occurred before the

12    final memo came out; right?

13         A    Right.

14         Q    Okay.  So I'm just asking you the final

15    memo -- you take the credibility standard that the

16    memo says the panel, after all its deliberations, this

17    is what we're adopting; okay?

18         A    Mm-hm.

19         Q    And then if you apply that to her testimony

20    about the hickeys, what is the result of that?  That's

21    my only question.

22         A    I understand what you're saying and again,

23    I -- honestly, I -- I don't know.

24         Q    Well, why not?

25         A    Because I don't know how the standard was

Page 209

1    interpreted then and how it's being viewed now.

2        Q    Well, sir, do you know what it means for

3    testimony to be clear and consistent?

4        A    Yes.

5        Q    Okay.  So you can interpret those words just

6    fine sitting here now.

7        A    Yes.

8        Q    Okay.  So if you apply that standard to her

9    testimony about getting a hickey or two or at least

10   one hickey at the end of the encounter, what is the

11   result of that analysis?

12       A    I -- I feel like you're asking me to do an

13   analysis here now today that I don't feel comfortable

14   doing because there's so much that I don't remember

15   about the standard.

16           And even if I read the standard now as you

17   presented it to me, I would still have to have a good

18   handle on the facts of what happened to be able to

19   give you a accurate assessment of my view of the

20   standard now.

21       Q    But I'm not asking -- first of all, the

22   standard -- all the deliberations -- everything that

23   went into the creation of the standard -- John Doe and

24   Jane Roe wouldn't know any of that.

25       A    Right.

Page 210

1      Q    That was -- private for you guys.

2      A    Right.

3      Q    All we know is what gets published in the

4   decision.

5      A    Right.

6      Q    So if you apply the standard that you guys

7   adopted -- and I'm only asking you to apply it to her

8   testimony about the hickeys.

9      A    Right.

10     Q    Right.  So how does -- how do you -- when

11  you apply that standard to her testimony about the

12  hickeys, what does the panel have to conclude?

13     A    Well, I think you're asking me what I

14  concluded and today, I'm -- I'm not sure because,

15  again, there's just so much I don't remember.  I don't

16  know how I would -- what conclusion I would come to

17  because even as we sit here today, there's so much I

18  don't remember as far as specifics about these issues.

19     Q    You mean just about the testimony about the

20  hickeys?  Because that's all I'm asking you about,

21  sir.

22     A    Yeah.  I know.  I know what you're asking

23  me.

24     Q    Okay.  Was that what you mean -- that you

25  don't remember the testimony about the hickeys?

Page 211

1      A    I -- I don't remember all the testimony

2    about the hickeys including what the -- the respondent

3    stated, what the complainant stated, what other

4    witnesses may have stated.  I don't recall.

5      Q    Okay.  But the standard isn't based on what

6    John Doe said.  The credibility standard that we just

7    read said that Jane Roe would be credited on anything

8    in which she testified clearly and consistently.

9      A    That's what the -- the panel ultimately

10   concluded.

11     Q    Okay.  So let's just start with a

12   hypothetical.  If she were clear and consistent in her

13   testimony about getting a hickey at the end -- if she

14   were -- I'm not asking you was she.  If she were clear

15   and consistent on that, then the panel would have to

16   conclude that she gave John Doe at least one hickey at

17   the end of the encounter.

18     A    Again, I don't feel comfortable giving my

19   assessment of that because I -- there's just so much I

20   don't remember.

21     Q    Sir, why does this turn at all on what you

22   remember?

23     A    Because what I remember would inform how I

24   would view the standard and how it was applied and

25   whether or not I think it was applied correctly or

Page 212

1    incorrectly.

2         Q    So for purposes of the question, I'm asking

3    you to assume that her testimony about the

4    hickeys -- about receiving at least one hickey at the

5    end was clear and consistent; okay?  You are -- I'm

6    instructing you for purposes of this question to

7    assume that fact; okay?

8              So if her testimony on that is clear and

9    consistent, isn't it just a straightforward

10   application of the standard to say yes, at least one

11   hickey happened at the end of the encounter?

12        A    Again, you're speaking in hypotheticals.  I

13   mean, you're asking me -- you're asking me to assume

14   something that I don't know is factual --

15        Q    Correct.  So the value -- right.  And that's

16   something we're allowed to do in depositions and the

17   value of my question then only -- it only has value if

18   the assumption is right.

19        A    Right.

20        Q    So you're only -- you're being told you have

21   to assume the truth of it and if I'm wrong, then, you

22   know, Princeton's counsel's going to point that out

23   and I'm going to look like an idiot.  So assume that

24   her testimony about receiving at least one hickey at

25   the end of the encounter is clear and consistent.

Page 213

1        A     Okay.

2        Q     Okay.  With that assumption, the panel's

3    credibility standard would require them to conclude

4    she gave John Doe at least one hickey at the end.

5        A     It seems like that -- that could be a

6    reasonable conclusion.

7        Q     Right.  I mean, if -- again, if her

8    testimony is clear and consistent, it's the only

9    conclusion; isn't it?

10       A     I don't know because, you know -- you know,

11   again, I -- I feel like you're asking me to -- to

12   reach a -- a definitive answer and there's -- there's

13   so much that would have played into whether or not I

14   believe the standard was being applied correctly.

15            And a lot of that would be based on having a

16   clear recollection of how we either applied the

17   standard or didn't apply the standard.  And I know

18   you're saying, well, what about today?  And it's still

19   difficult for me because there's so much I don't

20   remember.

21            And in this hypothetical scenario you're

22   giving me, you know, it -- it just makes me

23   uncomfortable coming to a conclusion because -- or

24   giving you an assessment or giving you an analysis

25   because there's so much I don't remember.

Page 225

1    she just wants to survive the encounter and she wants

2    to get it over with.

3         So if going along with the continued

4    activity is what she needs to do to survive and get

5    the encounter done, you know, she could continue

6    participating in the sexual activity even though in

7    her mind, it's -- it's coercive and she has -- but she

8    has to continue.

9         Q    Okay.  So you -- what you wrote is, quote,

10   "a sexual assault is based on the victim's point of

11   view of being coerced, not the assaulter's."  So

12   according to you, what matters is what's in her head,

13   not what's in his head.

14        A    Well, again, I think what's in both their

15   heads matters, but again, as far as whether or not

16   it's an assault, it seems like what's in her head is

17   what determines whether or not it's -- it's plain that

18   it was -- it was consensual or it was

19   non-consensual -- what's in her head.

20        Q    Yeah.  What's in her head determines whether

21   it was consensual.  Does it also determine whether it

22   was an assault?

23        A    Well, if it's non-consensual, by definition,

24   I think it's an assault.  If it's non-consensual.

25        Q    Okay.  Give me one second.  Okay.  Let me

Page 233

1   BY MR. MUHA:

2        Q    And what is -- when you say, "What you

3   really believe," what is -- can you elaborate on that?

4        A    That whether or not she believed an -- a

5   sexual assault occurred or did not occur, that, you

6   know, she shouldn't feel peer -- peer pressure from

7   either Joyce or from myself, but that, you know, based

8   on her own belief about what she believed occurred.

9        Q    Okay.

10       A    I'm not sure, but I believe Joyce and I

11  might have had differing opinions.  I don't --

12       Q    Yeah.  I think, you know, since the initial

13  vote was two to one to find him innocent of the

14  penetration charges that obviously you were the one

15  who was voting in favor of that.  So yeah, the two of

16  them were on the other side initially.

17       A    Right.

18       Q    Yeah.

19       A    Right.

20       Q    Yeah.  Okay.  Do you recall any other time

21  where Regan had drafted a potential alternate outcome

22  like this?

23       A    Again, I -- I wasn't privy to her

24  communications with Michele Mintor and I -- I don't

25  believe -- I'm almost sure I never saw this -- this

Page 240

1    interview this person"?

2                    MR. BERNS-ZIEVE:  Objection.  Form.

3                    THE WITNESS:  I -- I -- yeah.  I -- I

4    mean, I guess you could say she would suggest, "hey,

5    you know, you -- you probably should talk to this

6    person," or "you probably should talk to such and such

7    person."

8    BY MR. MUHA:

9        Q    Yeah, yeah.  But, like, beyond just

10   suggesting or whatever.  I guess I'm asking, like, is

11   it -- did it -- did her authority stop at suggesting

12   or was she allowed to do more than just suggest?  Was

13   she allowed to tell you guys, "Go talk to this

14   witness," or do this or do that?

15                   MR. BERNS-ZIEVE:  Objection.  Form.

16                   THE WITNESS:  Well, again, she was my

17   boss.  So, you know, if she suggested that I talk to

18   someone, I pretty much interpreted it that I probably

19   should go talk to them.

20                   MR. MUHA:  Yeah.  I hear you.  All

21   right.  Give me a sec.  Actually, maybe this is a good

22   time for a five-minute break.  I can consolidate and

23   then go from there.

24                   THE WITNESS:  Okay.

25                   MR. MUHA:  All right.  Great.

# JD EXHIBIT 23

```
                                                        Page 1

 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF NEW JERSEY

 3     _____

 4     JOHN DOE,

 5              Plaintiff,

 6         v.                              Case No.

 7     PRINCETON UNIVERSITY,               3:22-cv-05887-

 8              Defendant.                 RK-JTQ

 9     _____

10                 VIDEOTAPED DEPOSITION OF

11                   JOYCE CHEN SHUEH

12     DATE:          Thursday, October 31, 2024

13     TIME:          9:04 a.m.

14     LOCATION:      Remote Proceeding

15                    201 Nassau Street #21

16                    Princeton, NJ 08542

17     OFFICIATED BY: Daniel Wooley

18     JOB NO.:       7005126

19

20

21

22

23

24

25
```

Page 256

1    responsibility on hickeys.

2         Q    That's not what I'm asking about the

3    hickeys.

4         A    Right.

5         Q    But my point is is that she -- you agree

6    with me that she clearly and consistently told the

7    panel that she gave at least one hickey at the very

8    end of the encounter.  Correct?

9         A    Yes.  She did say that.

10         Q    Nevertheless, the panel did not make a

11    finding that such a hickey happened at the end of the

12    encounter.  Correct?

13         A    Right.  It did not feel it needed to make a

14    finding.

15         Q    Right.  And the panel said basically it

16    could not determine that a hickey happened at the end.

17    Correct?

18         A    No, I think what it said is it cannot --

19    could not determine the precise timing of when the

20    hickeys plural happened.

21         Q    Right.  And that would include, so it could

22    not determine whether any hickey happened.

23              It couldn't make -- it was unable to

24    ascertain the precise timing as to when any of the

25    hickeys happened, and that would include whether any

Page 335

1    don't have an independent recollection of that, but --

2        Q    And then --

3        A    I know what I voted, but I don't recall what

4    Randy's sort of journey to the end was.

5        Q    But you recall that the initial draft

6    written by Randy said "not responsible, oral and

7    vaginal sex, second incident."  Correct?

8        A    I -- I recall that from the -- the document

9    you showed me.

10       Q    Okay.  So now, about a week or less than two

11   weeks or around that has passed.  And Reagan Karati

12   [ph] is circulating a new draft that she wrote,

13   finding him responsible, and saying, "Do you guys

14   agree with this?"  Correct?

15                   MR. BERNS-ZIEVE:  Objection.  Form.

16       A    It looks like she's making an -- like, she's

17   making a suggested finding on the -- suggestion on the

18   finding section.  Not -- I don't think she completely

19   rewrote the memo.  Right.

20       Q    She rewrote number two to go the other way.

21       A    Wrote this particular finding section.

22   Yeah.

23       Q    To go from not responsible to responsible.

24   Correct?

25       A    Yeah.  And again, I don't have an

# JD EXHIBIT 24

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

Civil Action No. 22-5887 (RK)(JTQ)

JOHN DOE,

    Plaintiff,            REMOTE VIDEOTAPED

                           DEPOSITION OF:

    vs.                  ROCHELLE CALHOUN

PRINCETON UNIVERSITY,

    Defendants.

_____

    TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before RITA GARDNER, a Notary Public and Certified Court Reporter of the State of New Jersey, held REMOTELY VIA ZOOM, on Wednesday, October 23, 2024, commencing at 9:33 a.m.

ROCHELLE CALHOUN

Page 78

1    credibility standard they adopted after

2    conducting the analysis was that -- and this is

3    -- what we read on Page 9, that based on this

4    assessment, we will credit Jane Roe wherever she

5    has, quote, consistently and clearly recalled

6    something.  Okay.

7                    So they are saying that -- that is

8    how we know it actually happened in this case.

9    We will credit whatever she consistently and

10   clearly recalled.

11                   So I guess that is Point 1.  Point 2

12   then is, as we saw in her first three -- in each

13   of her interviews, she claims she remembers

14   giving John Doe a hickey at the very end of the

15   encounter.  And in her third interview, we saw

16   that she says "I have a vivid memory of this."

17   Okay.

18           A.     Yes.

19           Q.     So by -- by the standard that the

20   Panel is adopting, shouldn't they have had to

21   conclude that -- that the evidence shows Jane Roe

22   gave John Doe a hickey, at least one of the

23   hickeys at the end of the encounter, since she

24   has clearly -- like consistently and clearly

25   testified to that?

ROCHELLE CALHOUN

Page 79

1                    MS. BERMAN:  Objection to form.

2              A.     Yes, I agree with that.

3                    MS. BERMAN:  Foundation.

4        BY MR. MUHA:

5              Q.     Okay.  And can you just repeat the

6        words you said, I think it may have been some

7        crosstalk.

8              A.     I said yes, I agree with your

9        assessment there.

10             Q.     Okay, okay.  So then the -- the next

11       question is:  How -- how does the Panel then

12       conclude that it is unable to say when any of the

13       hickeys happened, including whether a hickey

14       happened at the very end?  Isn't that conclusion

15       inconsistent with what it says is the credibility

16       standard that it is adopting?

17                    MS. BERMAN:  Objection.  Form.

18       Foundation.

19       BY MR. MUHA:

20             Q.     Is that -- am I being clear on that?

21       If not, I will try again.

22             A.     Try again, please.

23             Q.     Okay.  All right.  So we have agreed

24       that the Panel adopted a credibility standard and

25       that according to that standard, the Jane Roe has

ROCHELLE CALHOUN

Page 84

1      pinpoint the timing, irrespective of the

2      consistency of the testimony, that was not a part

3      of -- of their finding.

4                  Do you see what I am saying?  So

5      they -- as I read it, unless I am reading it

6      wrong, they have discounted whether or not it was

7      clear and consistent at the -- you know, when

8      they were at the door, whenever that happened, or

9      whether it was at the Quad eating club, or

10     whether it was during any kind of physical

11     activity, because they cannot determine when all

12     of this happened, that doesn't seem, as I read

13     this, to be relevant to the finding.

14           Q.    Okay.  But the Panel, if it were

15     applying that -- standard, it would have been

16     able to conclude that at least one of the hickeys

17     occurred at the end of the encounter; is that

18     correct?

19           A.    I am going to say it is correct

20     because it is the Complainant's memory that at

21     least one of the hickeys happened at the end of

22     the encounter.

23           Q.    Uh-huh, right.  Okay.

24                  And their testimony about the

25     hickeys -- the testimony in general, at a high

ROCHELLE CALHOUN

Page 97

1    both embarrassed by them, wanted to conceal them,

2    and did not want anyone at eating clubs to see

3    them.  So that does seem inconsistent to me, yes.

4    BY MR. MUHA:

5         Q.    Yeah, and would you say all of that

6    evidence outweighs her testimony?

7         A.    Outweighs her testimony?  In the

8    minds of the Hearing Panel?

9         Q.    In your view.

10        A.    Does all of that testimony outweigh

11   her testimony about the hickeys?

12        Q.    About -- just about her reason for

13   why she supposedly gave them.  This story that

14   she's told about he -- he demanded it because of

15   eating club pickups.  My question is:  Does -- in

16   your view, does the evidence support that,

17   support her story, or does it undermine her

18   story?

19                 MS. BERMAN:  Objection.  Form.

20        A.    I am having a hard time answering

21   this, and I am -- I am sort of thinking -- I will

22   say it this way.  The evidence does make his

23   account more plausible than her account.

24   BY MR. MUHA:

25        Q.    Okay.  That is fair.  And so doesn't

ROCHELLE CALHOUN

                                        Page 103

1        of her -- her charge.  This wasn't sort of just

2        like peripheral testimony for her.  She was

3        saying like, "This, I didn't want to do this, and

4        he told me to do it at the end and I did it after

5        he raped me because I just wanted to get out of

6        there."  So this is kind of like part of her

7        actual allegations.

8                     So again, like I guess my question

9        is just:  How plausible is it that she genuinely

10       thought this conversation happened and just got

11       it wrong?

12                     MS. BERMAN:  Objection.  Form.

13            A.     Yeah.  Given that there are multiple

14       hickeys, irrespective of when we know that --

15       when they happened, given that there are multiple

16       hickeys, I find the Respondent's account more

17       plausible.  And I guess I sort of feel either

18       neutral or none -- you know, not in a position to

19       answer whether or not the Complainant simply made

20       this up.

21       BY MR. MUHA:

22            Q.     Okay.  Let me -- let me ask you a

23       different way.  If somebody -- she said --

24       hickeys obviously can be consensual, could

25       theoretically be non-consensual.  She said the

ROCHELLE CALHOUN

Page 110

1          his consistency with the physical evidence

2          doesn't bolster his credibility.

3                      Do they end up actually doing that

4          in the second decision?  That is -- that is my

5          question.

6                 A.     And what exhibit is the second

7          decision, remind me?

8                 Q.     That is Exhibit 5 again.

9                 A.     I don't know -- I don't see where in

10         the second -- I mean, they address bolstering his

11         credibility.  They do address the hickeys.

12                Q.     Uh-huh.  Yeah.  In general, they

13         still -- they still find him generally not

14         credible at the end, correct?

15                A.     I actually don't agree with that.  I

16         mean, their -- their shift in finding, I believe

17         -- I don't know they -- that they address

18         credibility precisely.  I will have to say that.

19                Q.     Okay.

20                A.     Their shift in funding suggests that

21         they -- that they have credited, based on

22         reasonable person, the testimony of the

23         Respondent.  That is my --

24                Q.     Well, do they say that they are

25         crediting his testimony or just that a reasonable