Linda Wong, Esq.
WONG FLEMING
400 Alexander Park Drive, Suite 201
Princeton, New Jersey 08543
Tel: (609) 951-9520
Fax: (609) 951-0270
lwong@wongfleming.com

Amanda Shafer Berman (*pro hac vice*)
Eli L. Berns-Zieve (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
Tel: (202) 624-2500
aberman@crowell.com
eberns-zieve@crowell.com

*Attorneys for Defendant The Trustees of Princeton University, a not-for-profit educational corp. of the State of New Jersey (incorrectly referenced in the Complaint as "Princeton University")*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### (Trenton)

| | |
|---|---|
| JOHN DOE,<br><br>      Plaintiff,<br><br>-vs-<br><br>PRINCETON UNIVERSITY,<br><br>      Defendant. | Civil Action No. 22-5887 (RK) (JTQ)<br><br>Hon. Robert Kirsch, U.S.D.J.<br>Hon. Justin T. Quinn, U.S.M.J. |

## THE TRUSTEES OF PRINCETON UNIVERSITY'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

FACTUAL BACKGROUND..................................................................................3

LEGAL STANDARD.............................................................................................4

ARGUMENT..........................................................................................................5

I.    Doe's breach of contract claim fails as a matter of law.........................8

    A.    Doe overstates the significance of *Princeton III*. .........................9

    B.    The Court should not allow Doe—and aggrieved students everywhere—to challenge disciplinary proceedings on grounds not first raised via the University's appeals process................11

II.    Plaintiff fails to point to any facts to show that Princeton did not apply the preponderance of the evidence standard. ...........................................13

    A.    The RRR did not prohibit Crotty from advising the Panel....................14

    B.    Crediting only Roe's "consistent and clear" recollections did not breach the RRR's preponderance standard requirement. ...............................................................................17

III.    No reasonable jury could find Princeton breached the RRR because it did not provide an unbiased, impartial, properly trained panel..........................................................................................................20

    A.    No reasonable jury could find Princeton was biased or partial to Roe based on its collection and treatment of the evidence. .................................................................................21

        1.    No reasonable jury could conclude the Panel breached the RRR by not pursuing a lead regarding rumors about Roe's past sexual encounters .................................22

        2.    There is zero evidence to support Doe's fallacious claim that Princeton "intentionally suppressed" Roe's "intake meeting"....................................................24

        3.    Doe's contention that the Panel "artificially curated" the evidence mischaracterizes the record....................................27

    B.    The undisputed record does not support Doe's claim that one particular Panelist was biased against him. .......................................28

C.    No reasonable jury could find Princeton failed to provide a trained Panel.............................................................................34

IV.    There is no evidence Doe's discipline has damaged him..................................36

CONCLUSION ...........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.J. v. Mastery Charter High Sch.,*
No. CV 19-1458, 2022 WL 4292330 (E.D. Pa. Sept. 15, 2022) .................................. 6

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...................................................................... 4, 5

*Bilicki v. Syracuse Univ.,*
127 N.Y.S.3d 228 (N.Y. Sup. Ct. 2019) ................................................. 12, 13

*Brigandi v. John Wiley & Sons, Inc.,*
Civ. No. 13-5193, 2015 WL 4042104 (D.N.J. July 1, 2015) ............................... 24, 39

*Buckley v. Trenton Saving Fund Soc'y,*
111 N.J. 355, 544 A.2d 857 (1988) ...................................................... 40

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
596 U.S. 212 (2022) ..................................................................... 39

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) .................................................................. 1, 6, 9

*Doe v. Moravian Coll.,*
No. 5:20-CV-00377-JMG, 2023 WL 144436 (E.D. Pa. Jan. 10, 2023) ...................... 6

*Doe v. Princeton Univ.,*
30 F.4th 335 (3d Cir. 2022) ..........................................5, 6, 8, 9, 10, 11, 27, 38

*Doe v. Princeton Univ.,*
790 F. App'x 379 (3d Cir. 2019) ........................................... 5, 6, 8, 9, 17, 27

*Doe v. Trs. of Princeton Univ.,*
No. CV 24-7125 (ZNQ) (TJB), 2025 WL 1218314 (D.N.J. Apr. 28, 2025) ...................................................................................... 6, 8

*Donohue v. Capella Univ., LLC,*
No. CV 22-5634, 2023 WL 5425503 (D.N.J. Aug. 22, 2023) ................................. 6

*Fletcher v. Lucent Techs., Inc.,*
No. Civ. 02-3941, 2005 WL 2373191 (D.N.J. Sep. 27, 2005), *aff'd*, 207
F. App'x 135 (3d Cir. 2006) .......................................................................... 39

*Goldfarb v. Solimine,*
245 N.J. 326, 245 A.3d 570 (2021) ................................................................ 5

*Haug v. State Univ. of N.Y. at Potsdam,*
88 N.Y.S.3d 678 (N.Y. App. Div. 2018) ................................................. 12, 13

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class,*
868 F.3d 132 (3d Cir. 2017) .................................................................... 24, 39

*Lampert v. State Univ. of N.Y. at Albany,*
984 N.Y.S.2d 234 (N.Y. App. Div. 2014) ............................................... 12, 13

*M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.,*
969 F.3d 120 (3d Cir. 2020) ........................................................................... 4

*McAvoy v. Dickinson Coll.,*
115 F.4th 220 (3d Cir. 2024) .................................................................... 6, 40

*Mittra v. Univ. of Med. & Dentistry of N.J.,*
719 A.2d 693 (N.J. Super. Ct. App. Div. 1998) ......................................... 5, 8

*Montague v. Yale Univ.,*
No. 3:16-cv-00885, Dkt. No. 177 (D. Conn. Mar. 29, 2019) ................... 33, 34

*Rauer v. State Univ. of N.Y., Univ. at Albany,*
552 N.Y.S.2d 983 (N.Y. App. Div. 1990) ............................................... 12, 13

*Tracey v. Recovco Mortg. Mgmt. LLC,*
451 F. Supp. 3d 337 (D.N.J. 2020) ................................................................ 5

*Williams v. Pa. State Univ.,*
No. 23-3180, 2025 WL 971670 (3d Cir. Apr. 1, 2025), *cert. denied sub
nom. Williams v. PA State Univ.*, No. 25-5275, 2025 WL 2824383 (U.S.
Oct. 6, 2025) ...................................................................................... 31, 32, 37

*Wysocki v. Wardlaw-Hartridge Sch.,*
No. 2:21-CV-14132 (WJM), 2022 WL 2168212 (D.N.J. June 16,
2022) ............................................................................................................... 6

**Rules**

D.N.J. L. Civ. R. 56.1 ........................................................................................... 37

Fed. R. Civ. P. 56(a) ............................................................................................ 4

## INTRODUCTION

Federal law requires Princeton to investigate and adjudicate reports of campus sexual misconduct. To investigate and adjudicate these cases, Princeton, like most universities, has adopted detailed policies and procedures designed to afford fair and equitable treatment to all students, especially the accused student. Here, Plaintiff John Doe was afforded each and every benefit under Princeton's policy, including the right to be accompanied by his legal counsel, the right to present any information he wanted the adjudicators to consider, the right to pose questions to his accuser, and the right to appeal the outcome. In the end, Doe was found ***not responsible* for nine (9) charges**, he was found ***responsible* for two (2) charges,** and he received a penalty of disciplinary probation.

Many such disciplinary matters—like the one at issue here—stem from events that occurred years ago, behind closed doors, between intoxicated students, each of whom tells a different story. Outcomes thus often hinge on credibility determinations certain to dissatisfy at least one student (and often both students)—and sometimes those students turn to the courts. For many of the same reasons this Court is afforded immunity for its weighing of the evidence, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Dkt. No. 39 at 18 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)).

Yet that is precisely what Doe urges. Trying to use what remains of his complaint—a contract claim—as a hook for this Court to review and overturn the

disciplinary findings against him, he alleges Princeton breached its *Rights, Rules, Responsibilities* (2019 Edition) ("RRR") by not applying the preponderance of the evidence standard and not providing a trained and impartial disciplinary panel. But that allegedly biased panel (the "Panel" or the "Panelists") applied the preponderance of the evidence standard and ultimately decided the matter mostly *in Doe's favor*.

Doe, unsurprisingly, does not challenge the nine findings of "not responsible." Rather, he argues only the two "responsible" findings must be the result of bias. Dkt. No. 115-1 at 15. This is a transparent attempt to have this Court second-guess a university's sound disciplinary process and outcome.

Plaintiff deposed eleven University officials, and still no reasonable jury could find in his favor on his breach of contract claim. He complains Regan Crotty, Princeton's then-Director of Gender Equity and Title IX Administration, reviewed and offered feedback on a draft of the Panel Memo. But Doe points to no provision of the RRR preventing her from doing so, so there can be no breach of a contract on this basis, and the undisputed record is that each Panelist understood *they* were the "sole decisionmakers."

Doe also seeks to sustain his RRR breach claim on an argument that Princeton "intentionally suppressed" notes taken during Jane Roe's initial intake meeting. *See* Dkt. No. 115-1 at 30. But Doe too had an initial conversation with Crotty, and notes from it are similarly not in the case file. Keeping that initial conversation with both students confidential was (and is) Princeton's practice—and nothing in the RRR prohibits it.

Further, the Panel's decision was based solely on the record before them, the exact same record that was provided to Doe in its entirety.

Doe also argues that Panel member Walter Wright, a former FBI investigator, exhibited bias through two written comments in draft Panel decision memos during the long course of the Panelists' deliberations. But candid communication among investigators is integral to any disciplinary process, and these comments do not indicate that Wright was predisposed against Doe or did not fairly assess the evidence. To the contrary, the undisputed evidence shows Wright challenged the accounts of both students and based his decision on the witness testimony and other evidence, such as text messages. And Doe points to no evidence showing how Wright's supposed bias manifested in the only two findings for which he was found "responsible."

Doe's ask, at base, is for the Court to serve as a secondary appellate arm of Princeton's disciplinary process. The Court should see this case for what it is: a transparent attempt to get this Court to review a student disciplinary matter from the ground up, re-weigh the evidence, and reach a different outcome. It should decline to play that role—or allow a jury to play that role—and deny Doe's motion for summary judgment while granting Princeton's cross-motion (Dkt. No. 113).

## FACTUAL BACKGROUND

Princeton does not recite here the entirety of this matter's factual background, set forth in detail in its affirmative brief. *See* Dkt. No. 113-1 at 8-12. In short, Jane Roe reported to Princeton that Doe had sexually assaulted her on two occasions. *See*

Princeton's Statement of Undisputed Material Facts, Dkt. No. 113-2, ("Def. SUMF") ¶ 3. In response to Roe's sexual misconduct allegations against Doe, Princeton undertook a robust formal disciplinary process consistent with the RRR. The disciplinary panel the University appointed consisted of two Harvard Law School-educated lawyers and a 25-year veteran of the Federal Bureau of Investigation ("FBI")—all experienced and trained in "investigating and evaluating conduct prohibited under the [RRR]." *Id.* ¶¶ 8, 10, 43-49. The Panel carefully and thoroughly investigated Roe's claims by (1) interviewing Roe and Doe multiple times; (2) conducting a total of thirty-three interviews of twenty-six additional witnesses; and (3) collecting and considering documentary evidence, including text messages, photographs, and video. *See id.* ¶¶ 11-13. The Panel, applying the preponderance of the evidence standard, ultimately found Doe *responsible* only for two of the eleven charges against him. Doe now contends that process violated the RRR. It does not.

## LEGAL STANDARD

Summary judgment is only warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" with respect to any particular claim or part thereof. Fed. R. Civ. P. 56(a). "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Generally speaking, to state a claim for breach of contract, a plaintiff must allege: (1) the existence of a valid contract between the parties; (2) plaintiff's performance of their own obligations under that contract; (3) defective or deficient performance under the contract by a defendant; and (4) damages resulting from defendant's breach. *Goldfarb v. Solimine*, 245 N.J. 326, 338, 245 A.3d 570, 577 (2021); *see also Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 342 (D.N.J. 2020). But New Jersey courts have "warned against a rigid application of the law of contracts" in the student disciplinary context. *Doe v. Princeton Univ.*, 30 F.4th 335, 346 (3d Cir. 2022) ("*Princeton III*") (citation omitted). The role of the court is therefore limited to determining whether Princeton "follow[ed] its own established procedures" and whether those procedures were "fundamentally fair." *Id.* And "for contract claims relating to discipline for misconduct, courts will examine whether 'the institution violate[d] *in some substantial way* its rules and regulations.'" *Doe v. Princeton Univ.*, 790 F. App'x 379, 385 (3d Cir. 2019) ("*Princeton II*") (quoting *Mittra v. Univ. of Med. & Dentistry of N.J.*, 719 A.2d 693, 698 (N.J. Super. Ct. App. Div. 1998)) (emphasis added). Princeton did not do so here.

## ARGUMENT

Doe predicts "Princeton will respond to this filing in the way that all schools do—invariably contending that he just disagrees with the outcome and wants a do-over." Dkt. No. 115-1 at 44. Doe is right. Princeton will so argue—not because it is a "familiar dodge," but because that is the truth of Doe's suit. From the first line of his

brief, Doe makes clear his ask is for the Court to re-consider not just whether the process was fair and complied with Princeton's rules, but the Panel's whole analysis: "Princeton found that Jane Roe didn't consent to foreplay but did consent to the sex that came right after it. That never made any sense[.]" Dkt. No. 115-1 at 5. The Court should decline Doe's invitation, which contradicts the well-established precept that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Dkt. No. 39 at 18 (quoting *Davis ex rel. LaShonda D.*, 526 U.S. at 648).[1]

As a threshold matter, Doe mischaracterizes Princeton's findings. Princeton *never found* Roe "consented to the sex." It found only that a reasonable person in Doe's

---

[1] *See McAvoy v. Dickinson Coll.*, 115 F.4th 220, 233 n.16 (3d Cir. 2024) ("Title IX is not an avenue for second-guessing the disciplinary decisions of school administrators."); *Princeton III*, 30 F.4th at 346 (limiting judicial review to whether the university followed its fair, established procedures); *Princeton II*, 790 F. App'x at 385 (requiring institutions to have "violate[d] *in some substantial way* its rules and regulations"); *Doe v. Trs. of Princeton Univ.*, No. CV 24-7125 (ZNQ) (TJB), 2025 WL 1218314, at *5 (D.N.J. Apr. 28, 2025) (noting that "courts should refrain from second-guessing the disciplinary decisions made by school administrators") (quotations omitted); *Donohue v. Capella Univ., LLC*, No. CV 22-5634, 2023 WL 5425503, at *3 (D.N.J. Aug. 22, 2023) (noting that deference towards a university's decisions regarding student misconduct means courts limit their review to consideration of substantial departures from university rules); *Doe v. Moravian Coll.*, No. 5:20-CV-00377-JMG, 2023 WL 144436, at *6 (E.D. Pa. Jan. 10, 2023) ("In considering a case alleging student-on-student harassment, school administrators are to receive substantial deference with respect to their disciplinary process.") (quotations omitted); *Wysocki v. Wardlaw-Hartridge Sch.*, No. 2:21-CV-14132 (WJM), 2022 WL 2168212, at *5 (D.N.J. June 16, 2022) ("New Jersey courts have recognized that the relationship between a university and its students often times cannot be classified as purely contractual and that some deference towards a university's decisions is warranted."); *A.J. v. Mastery Charter High Sch.*, No. CV 19-1458, 2022 WL 4292330, at *4 (E.D. Pa. Sept. 15, 2022) ("It is not our place to second-guess Defendants' disciplinary decisions following their investigation.").

position would not have known she had not consented, consistent with the RRR's standard for assessing a claimed assault. *See* Certification of Amanda Shafer Berman, Dkt. No. 113-3, Ex. 3 ("Def. Ex.") at § 1.3.3. It is not evidence of bias—let alone of Doe's "obvious innocence" (Dkt. No. 115-1 at 5)—for the Panel to have concluded that some of the conduct was not consensual while also finding that a preponderance of the evidence did not support finding the remainder nonconsensual.

Doe's other arguments fare no better. What remains of his contract claim rests on two theories: (1) the Panel failed to apply the preponderance of the evidence standard, and (2) the Panel was biased and not trained. The evidence he has marshalled after extensive document discovery and a dozen depositions supports neither.

Regarding Doe's first theory—that Princeton applied the wrong standard of review—Doe notably never actually says the Panel failed to apply the preponderance of the evidence standard. That is unsurprising because the undisputed evidence is that the Panel did; it invoked that standard repeatedly in its decision documents and its deliberations, and the Panelists clearly and repeatedly testified to applying that standard to each claimed RRR violation. Def. SUMF ¶ 17. Rather than contesting the fact the preponderance standard was applied, Doe takes issue with *how* the Panel applied that standard. He objects to *how* certain evidence was weighed and considered. *See, e.g.*, Dkt. No. 115-1 at 27-29, 33-35. But that is not the same as disputing *whether* the preponderance standard was in fact applied—which is all the RRR requires. To rule on Doe's breach of contract claim, the Court need only consider whether the Panel in fact

applied the preponderance of the evidence standard. It did.

Doe's bias theory is similarly flawed. He cites a cornucopia of purported deviations from the RRR supposedly showing bias, but *none pertain to the two charges for which he was found "responsible."* That should be fatal to his breach-through-bias claim. His ask is that the Court take note of these instances of supposed bias (even though related to charges for which Doe was found "not responsible"), conclude it needs to re-weigh the evidence as to the two charges for which he was found "responsible," and do so. But that is not how the law works. Because Princeton "substantially complied" with the RRR, it is entitled to judgment on Doe's contract claim. *See Princeton II*, 790 F. App'x at 385 ("[F]or contract claims relating to discipline for misconduct, courts will examine whether 'the institution violate[d] in some substantial way its rules and regulations.'") (quoting *Mittra*, 719 A.2d at 698); *see also Doe v. Trs. of Princeton Univ.*, 2025 WL 1218314 at *7 (holding same and dismissing plaintiff's breach of contract claim).

## I.    Doe's breach of contract claim fails as a matter of law

Doe's breach of contract claim is legally flawed in two significant respects.

First, Doe relies heavily on *Princeton III*—but that case, where breach claims were sustained at the motion to dismiss stage, is not the panacea he thinks it. The Third Circuit reversed the district court because it impermissibly credited documents extraneous to the complaint over the allegations in the complaint—allegations vastly different from the record here, which had not yet been disproven by evidence.

Second, *during* the disciplinary process, Doe raised none of the made-for-

litigation arguments he now advances. He thus waived his right to assert them.

## A. Doe overstates the significance of *Princeton III.*

Doe overstates *Princeton III's* significance. It did not disturb the long line of New Jersey jurisprudence holding that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *See* Dkt. No. 39 at 18 (quoting *Davis ex rel. LaShonda D.*, 526 U.S. at 648); *see also supra* n.1. It is still the law that "for contract claims relating to discipline for misconduct, courts will examine whether the institution violated in some substantial way its rules and regulations." *Princeton II*, 790 F. App'x at 385 (internal quotation marks and citation omitted). Indeed, *Princeton III* recognizes that New Jersey law does not view the private university-student relationship as strictly contractual, and courts therefore do not strictly construe documents like the RRR. *See* 30 F.4th at 345-46.

And *Princeton III* is distinguishable—procedurally and factually. Procedurally, the complaint was dismissed at the motion to dismiss stage. The Third Circuit vacated the dismissal because it found the district court impermissibly credited matters extraneous to the pleadings—specifically, the disciplinary panel's report, including its findings that Roe and all witnesses were credible, but plaintiff was not—over the allegations in plaintiff's complaint. *Id.* at 342. In so doing, the Third Circuit explained that consideration of material external but integral to the pleadings "only goes so far" and that "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Id. Princeton III*

9

thus stands for the unremarkable proposition that factual disputes cannot be resolved at the pleading stage. Indeed, the Third Circuit said as much: "[t]his guidance remains even if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote and unlikely" as "[t]he proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment." *Id.* (internal quotation marks and citation omitted). It *does not* countenance courts to second-guess university disciplinary proceedings via summary judgment or trial.

Factually, the alleged violations of the *RRR* in *Princeton III* have no equivalent here. The male plaintiff in *Princeton III* alleged Princeton did not pursue an investigation when he complained his ex-girlfriend harassed him, but that when the same female student claimed intimate relationship violence, the University urged her to pursue an investigation. *Id.* at 340. The plaintiff there further alleged that Princeton treated no contact order violations by each of the students differently, disciplining him for his violation but ignoring hers. These allegations of different handling of similar rule violations led the court to conclude that the plaintiff had sufficiently alleged that Princeton breached the RRR's guarantees of fairness and non-bias.[2] There are no similar

_____

[2] The *Princeton III* court also framed its analysis of the contract claim around the seriousness of the sanction imposed: expulsion. The court explained that a university must have sufficient evidence to expel a student because of the extreme nature of that sanction. 30 F.4th at 346. Thus, the context in which the *Princeton III* court considered claimed breaches of the RRR differed greatly from the context here, where Doe received probation.

allegations here, and Doe's assertions of bias in the Panel's treatment of the two student parties to the process not only lack evidentiary support, but are in fact completely undermined by testimony and other evidence, as discussed further below. *Princeton III* thus provides Doe no support at this stage of the case.

### B. The Court should not allow Doe—and aggrieved students everywhere—to challenge disciplinary proceedings on grounds not first raised via the University's appeals process.

There is another threshold flaw with Doe's assertions that the Panel deviated from the process required by the RRR. Doe, assisted by counsel, did not appeal the disciplinary finding against him on any of the grounds he now asserts in litigation; he did not claim that the Panel had failed to apply (or even misapplied) the preponderance standard, that it was biased, or that it was untrained.

By way of example: Doe cites journal entries of his from May 2020 (prior to his second disciplinary appeal) to argue that he "had long suspected[] panelist Walter Wright's overt bias against him." Dkt. No. 115-1 at 35; *see also* Dkt. No. 115-5, Pl. Ex. 39 at 1. Doe nevertheless did not appeal his disciplinary outcome on this basis. Doe had a right to raise with Princeton this claimed "procedural unfairness." *See* Def. Ex. 3 at 24-25. He did not do so, and thus waived the arguments he now would have this Court adopt as bases for a grant of judgment in his favor. *See, e.g.*, *Bilicki v. Syracuse Univ.*, 127 N.Y.S.3d 228, at *6 (N.Y. Sup. Ct. 2019) (unpublished table decision) (holding petitioner could not raise claim of procedural error where he "did not make a specific claim of procedural error" in the school's administrative appeal process); *Haug*

*v. State Univ. of N.Y. at Potsdam*, 88 N.Y.S.3d 678, 679 (N.Y. App. Div. 2018) (finding that petitioner did not preserve due process and other procedural arguments by not raising them "at the administrative hearing when they could have been corrected or failing to raise them altogether"); *Lampert v. State Univ. of N.Y. at Albany*, 984 N.Y.S.2d 234, 236 (N.Y. App. Div. 2014) ("Petitioner's claimed procedural errors . . . are unpreserved due to his failure to raise them at the hearing or in his administrative appeal . . . ."); *Rauer v. State Univ. of N.Y., Univ. at Albany*, 552 N.Y.S.2d 983, 984 (N.Y. App. Div. 1990) ("On his administrative appeal, petitioner sought only a mitigation of his punishment and made no reference to any procedural defect; he cannot do so now.").

Holding that students must first raise any challenges to student disciplinary processes with their school makes sense. It affords universities the chance to consider and correct claimed error in their disciplinary processes; whatever the issue—failure to apply a standard, bias, partiality, etc.—universities cannot remediate that of which they are unaware. A holding to the contrary would encourage aggrieved students to concoct *post hoc*, made-for-litigation challenges to disciplinary proceedings. This serves no one. Universities do not benefit—they are hauled into court without the chance to self-correct. Courts do not benefit—they are confronted with issues that might have been resolved without litigation. Students do not benefit—they must sue when they might not have needed to do so. All are best served by requiring students to first assert challenges to disciplinary processes pursuant to school policies. And here, those rules include a specific mechanism and opportunity for Doe to challenge claimed errors in

the Panel's process, such as the alleged failure to apply the preponderance standard.

Doe, represented by counsel, *twice* appealed his disciplinary decision to Princeton. In neither appeal did he raise either of the two specific issues—failure to apply the preponderance of the evidence standard and failure to provide an unbiased, impartial, and properly trained panel—this Court found survived the motion to dismiss stage. He thus waived any right do so before a court. *See, e.g.*, *Bilicki*, 127 N.Y.S.3d 228, at *6; *Haug*, 88 N.Y.S.3d at 679; *Lampert*, 984 N.Y.S.2d at 236; *Rauer*, 552 N.Y.S.2d at 984.

## II.    Plaintiff fails to point to any facts to show that Princeton did not apply the preponderance of the evidence standard.

This Court has already found that "the University conducted a thorough investigation, interviewed both Doe and Roe multiple times, gathered evidence, and weighed testimony from a myriad of witnesses" and that this included "granting Plaintiff's first appeal, and then in large measure found in his favor on a number of the most egregious allegations which resulted in a significantly reduced sanction." Dkt. No. 39 at 2, 19. Doe nevertheless contends Princeton misapplied the preponderance of the evidence standard—presumably only as to the two charges for which he was found "responsible." But the RRR does not require that Princeton have applied the standard *to Doe's liking*. It requires only that Princeton have applied it. And the undisputed record is that Princeton did so. Doe's breach claim, to the extent premised on a theory that Princeton misapplied the preponderance of the evidence standard, fails.

### A.    The RRR did not prohibit Crotty from advising the Panel.

Doe first contends Princeton misapplied the preponderance standard because Crotty "rewrote the panel's first decision to flip the findings on the most serious charges against John." Dkt. No. 115-1 at 17. But the evidence does not support that hyperbolic claim, and even if it were true, it is not an RRR violation.

First, the RRR does not prohibit the head of Princeton's Title IX office from reviewing and revising disciplinary panel decisions. *See generally* Def. Ex. 3. To the contrary, the RRR allows it. *See id.* at § 1.3.1. Section 1.3.1 of the RRR sets forth a non-exhaustive list of the "Title IX Coordinator's activities." These include "[m]onitoring the University's administration of its own applicable policies" and "[r]esponding to any complaint or report regarding conduct that violates [the RRR]," which includes "oversee[ing] the investigation and resolution of such alleged misconduct[.]" *Id.* The RRR further provides that "[t]he Title IX Coordinator may delegate responsibilities under this policy to designated administrators[.]" *Id.* The undisputed record is thus that the RRR empowered Crotty to do as she did. *See id.*; *see also* Def. Ex. 9 at 250:13-251:1. And the undisputed record also is that Crotty regularly made similar contributions to disciplinary panels. Def. Ex. 12 at 74:7-10. No reasonable jury could find breach of contract premised on Crotty's involvement where Princeton's policy allowed—and certainly did not prohibit—Crotty from overseeing Doe's disciplinary process.

Doe's real issue is *not* with Crotty's involvement, but with *how* she advised the Panel after reviewing an early draft of the Memo, which Doe describes as telling them

14

to "apply[] a preponderance of a *what-you-thought-happened* standard, then fit[] the analysis to the desired outcome." Dkt. No. 115-1 at 21 (emphasis added). But there is undisputed evidence that the Panelists, as "sole decisionmakers," were free to accept or reject Crotty's suggested revisions.[3] And in any event, the record does not support Doe's far-fetched theory that "[a]fter Hubert had spent more than a week writing up what she believed the *evidence* supported, Crotty suggested she instead vote based on what Hubert *thought* happened[.]" Dkt. No. 115-1 at 21 (emphasis added). Doe effectively ignores Crotty's contrary testimony, even though his brief cites it: "[I]f [Hubert] thought *the evidence* supported a different outcome based on the facts, then she, you know, would write that memo." Def. Ex. 12 at 109:11-110:2 (emphasis added). That Crotty told Hubert to write the memo that Hubert, as one of the three decisionmakers, thought "the evidence" supported is not a breach of the RRR.

Otherwise, Doe makes much of routine panel deliberations in a complex case. Hubert, for example, testified this case was "more complicated in some ways than an average case." Def. Ex. 9 at 244:14-16. Hubert relayed she and Crotty "had

---

[3] Hubert testified "[T]he three panelists were the sole decision makers with respect to this matter, and every other matter in which I've been one of the panelists working with Regan." Def. Ex. 9 at 250:4-12; *see also id.* at 251:12-252:8. Crotty similarly testified: "I think this goes to the point that ultimately it is the Panel members who are deciding what goes in the memo. I offer suggestions and guidance, but it is ultimately their memo and their outcome." Def. Ex. 12 at 86:18-22. Indeed, Crotty repeatedly testified that the panel, as the ultimate arbiters, could have accepted or rejected her suggestions *See, e.g., id.* at 20:3-10, 26:9-13, 28:19-20, 61:10-12, 71:15-17.

conversations over time" as "the counts about the oral sex and the sexual intercourse, I found were a very close call that I gave a lot of thought to over time[.]" *Id.* at 26:1-27:4. Contrary to Doe's unsupported assertion that "Crotty already knew what Hubert thought the evidence supported," Dkt. No. 115-1 at 19 (emphasis removed), Hubert described that she was "vacillating and very close" as to the findings for these two charges (intercourse and oral sex). Def. Ex. 9 at 31:5-6. As for Crotty's edits, Hubert testified: "I understood that [Crotty] was communicating to me that I should do what I thought was the right finding based on the information and our policies, and not be concerned about changing a possession [sic] if I felt that the information in our policies supported that." *Id.* at 35:20-36:5. The undisputed record is thus that the two charges Doe accuses Crotty of impermissibly "rewriting"—for which he nevertheless ultimately was found *not responsible*—were close calls that the Panel devoted much time, attention, and discussion to over the course of weeks. Discussion, debate, and revision do not breach the RRR just because a responsibility finding changes—particularly where the student is ultimately found *not responsible*, as was Doe.

Arguments like Doe's are precisely why the law requires some "substantial" deviation from policy to sustain a breach claim. *Princeton II*, 790 F. App'x at 385. Aggrieved students everywhere would prevail on breach claims if all that was required was to nitpick and second guess any given aspect of the disciplinary panel's deliberative

16

process.[4] If all that is required to show breach of contract is for litigants to point to comments on an early draft of a disciplinary outcome memo, all cases challenging disciplinary decisions will proceed to trial. That cannot be the law. That is not the law. More is required to show a "substantial" deviation from university policy.

### B.  Crediting only Roe's "consistent and clear" recollections did not breach the RRR's preponderance standard requirement.

Doe next argues the Panel breached the RRR's requirement that Princeton apply the preponderance standard by inconsistently applying the "consistent and clear" approach to assessing credibility it supposedly adopted for Roe. *See* Dkt. No. 115-1 at 21. Doe's argument makes little sense and shows no misapplication of the preponderance-of-the-evidence standard.

As a threshold matter, Doe mischaracterizes the Panel's approach to assessing credibility. Doe says the Panel decided "that Jane *would* be credited on 'those elements [of her testimony] that she consistently and clearly recalled'" and that this means that "under the panel's purported standard, it would *have* to believe her." Dkt. No. 115-1 at 7, 21 (emphasis added). He construes this to mean any failure to credit Roe in regard to events from the night in question that she "consistently and clearly" recalled would constitute a breach of the RRR, even though it does not dictate application of any such

---

[4] Doe's own arguments show this to be true. *See* Dkt. No. 115-1 at 25, Part III. He contends a particular redline edit in a voluminous panel memo—an edit that did not affect the outcome of the charge at issue—means Princeton breached the RRR. All student disciplinary cases will proceed to trial if a redline edit suffices to show adjudicators did not "consider the entirety of the evidence with a neutral gaze."

rule. But the RRR does not require, and the Panel did not articulate any requirement, that Roe be credited for *all* matters she clearly and consistently recalled, regardless of other evidence. Rather, the Panel found Roe credible *only* on matters she "consistently and clearly" recalled, and which were necessary in reaching a finding of responsibility or non-responsibility.[5] Def. Ex. 16 at 9; *see also* Def. Ex. 11 at 252:20-257:19. This is a material distinction. Thus, that the Panel did not credit Roe's recollection of a matter it found she had "consistently and clearly" recalled, where the Panel determined that was not appropriate based on other evidence, is not an "inconsistent" application of its approach to determining credibility. And that general approach to credibility is not, in any event, mandated by the RRR—nowhere does the RRR tell panelists how to decide which of two conflicting narratives they should credit.

Doe's argument confuses and conflates credibility assessments (to which the RRR does not dictate any particular approach) with factual findings of responsibility (which the RRR requires to be supported by a preponderance of the evidence). In so doing, Doe discards the very evidentiary standard he alleges Princeton breached. That the Panel found Roe "was largely credible only with respect to those elements that she consistently and clearly recalled" does not mean it ceased making factual findings based on the preponderance of the evidence. It just means that only Roe's "consistent and

---

[5] "Based on this assessment, the panel refined its prior credibility assessment, in that it concluded that Complainant's account relating to the February 2019 incident was largely credible *only* with respect to those elements that she consistently and clearly recalled." Def. Ex. 16 at 9 (emphasis added).

clear" recollections were weighed with the other evidence. The Panel testified to this at length. *See, e.g.*, Def. Ex. 9 at 72:15-73:19, 100:14-101:21, 161:1-25. It is rich indeed that Doe in effect argues that in order *not* to breach the RRR, the Panel had to jettison the preponderance of the evidence standard.

To demonstrate the absurdity of Doe's argument: the Panel found penetration occurred because "Complainant consistently remembered feeling pain when penetration occurred[.]" Def. Ex. 16 at 11 n.17. But the Panel nevertheless found, based on a preponderance of the evidence, and applying the RRR's definition of consent, that a reasonable person in Doe's position would not have known the intercourse was not consensual, and so found him *not responsible* for penetration. *Id.* at 11. Doe doubtlessly agrees the Panel did not breach the RRR in so finding. He thus must concede that crediting Roe only for that which she "consistently and clearly" remembered does not mean the Panel must credit her, and make factual findings in her favor under the preponderance standard, for *everything* she clearly and consistently remembered irrespective of other evidence.

So too with regard to the hickeys, about which Doe complains.[6] But Doe's argument about the timing of the hickeys is nonsensical for another reason. Roe notably *did not* "consistently and clearly" recall when the hickeys occurred:

---

[6] Other evidence concerning the hickeys included, for example, Doe telling the Panel he did not want them, which was supported by contemporaneous witnesses statements and photographic evidence. Def. Ex. 1 at PU-0000895-96; *see also* Dkt. No. 115-1 at 6.

> [Roe] initially stated that she gave [Doe] a hickey at the end of their
> encounter; when asked about this again in her post-appeal interview, [Roe]
> acknowledged for the first time that it was "possible" that she gave [Doe]
> hickeys at Quad or while they were on his bed. The panel did not credit
> her initial account (that she gave [Doe] multiple hickeys at the end because
> she just "kept going") with respect to the timing of the hickeys.

Def. Ex. 16 at 6. This is hardly "consistent" recollection of when the hickeys occurred.

It thus makes good sense that the Panel would not have credited her recollection of

when and where the hickeys occurred—even had such a finding been necessary to

making a responsibility determination.

In any event, Doe was found *not responsible* for the hickeys in both the pre- and

post-appeal Panel decisions. He seems to complain that the Panel *should* have found

him *responsible*. This makes no sense. And no reasonable jury would find a breach of the

RRR because the Panel found Doe *not responsible* after considering other evidence as well

as Roe's supposedly "clear and consistent" recollection of facts that supported finding

him responsible. And the RRR's simple direction to apply a preponderance standard

requires no such illogical approach.

## III.  No reasonable jury could find Princeton breached the RRR because it did not provide an unbiased, impartial, properly trained panel

This Court, at the motion to dismiss stage, allowed two theories of breach-of-

contract to proceed to discovery. The Court first allowed Doe to take discovery

regarding whether Princeton applied the preponderance of the evidence standard. As

set forth above, Doe has proffered no evidence that Princeton did not apply the

preponderance of the evidence standard. The Court also found Doe adequately alleged

Princeton had failed to provide an impartial, unbiased, and adequately trained panel. As set forth below, discovery has not substantiated this theory either.

### A. No reasonable jury could find Princeton was biased or partial to Roe based on its collection and treatment of the evidence.

Doe argues Princeton breached the RRR because the Panel declined to "pursue evidence that could undermine Jane's credibility." Dkt. No. 115-1 at 27. Not so.

To begin, Doe points to no RRR provision supposedly breached in this regard. That is because none exists. Neither the RRR nor the law required that the Panel have pursued every lead. Nor does "substantial" compliance with the RRR require the Panel to cover every possible base in its investigation. And with good reason. To hold otherwise would expose universities everywhere to liability for not pursuing every lead, no matter how tenuously related to the alleged misconduct.

Such is the case here. To support his claim that the Panel was biased and thereby breached the RRR, Doe argues the Panel impermissibly failed to pursue evidence of Roe's sexual aggression at a different time, in a different place, with a different individual. He further contends the Panel "refused" to follow up with Roe and her witnesses on minor issues and ignored Roe's contradictions. Finally, he contends Princeton "intentionally suppressed" Roe's initial intake meeting with Crotty, all the while ignoring that the case file is similarly devoid of any record of *his* initial intake meeting with Crotty—as is consistent with Princeton's policy and practice. The

evidence does not support any of these arguments, and these claimed deficiencies in the investigation do not, in any event, equate to bias in violation of the RRR.

### 1.    No reasonable jury could conclude the Panel breached the RRR by not pursuing a lead regarding rumors about Roe's past sexual encounters

Doe heard through the grapevine that Roe supposedly had stuck her hands down another student's pants. He told the Panel "I believe the investigators should talk to … the guy who she stuck her hands down his pants." Dkt. No. 115-5, Pl. Ex. 32 at 2. That the Panel opted not to pursue "evidence about a totally separate incident in which Roe was allegedly sexually aggressive with a different student," which plainly is not relevant to determining whether Doe sexually assaulted Roe, is (at the very least) a reasonable judgment call. *Id.* at 1.

Doe argues: "Part of the panel's credibility finding was that it was 'dubious' that Jane would have been the aggressor because at the time she was a virgin. Ex. 17 at 8." Dkt. No. 115-1 at 27-28. But Doe selectively parses the Panel's reasoning. He cherry picks one line from the Panel's fulsome credibility assessment—"Complainant, who had never engaged in sexual intercourse"—to argue the RRR contractually required the Panel to investigate a rumor Doe heard about Roe sticking her hands down another student's pants. The RRR requires no such thing. The Panel has discretion to investigate as it sees fit. *See* Def. SUMF ¶ 8.e. (citing Def. Ex. 3 at 22 (RRR § 1.3.12.1)). To take Doe's argument to its logical endpoint would mean holding that the RRR required the Panel to investigate every prior instance in which Roe was rumored to have been

sexually active. That of course is not the case. Particularly so as the Panel also premised its credibility assessment on the fact that Doe's assertion that Roe was the "aggressor" conflicted with *contemporaneous electronic evidence*—text messages Roe had sent to two friends expressing reticence about returning to Doe's room—which the Panel found showed Roe was "uncomfortable." Def. Ex. 16 at 7.

Doe's argument is even more deeply flawed. He argues the Panel "then found Jane more credible on that point[.]" Dkt. No. 115-1 at 29; *see also* Dkt. No. 115-1 at 28 ("So on the disputed credibility point of how likely it was that Jane had been the aggressor, the panel found in her favor based on her lack of sexual history."). Not so. The Panel's credibility assessment of Roe *does not mention*, let alone credit her for, her recollection that she had not been sexually aggressive. *See* Def. Ex. 16 at 4-5. That the Panel, based on contemporaneous text message evidence, found Doe's account "dubious," is true. *Id.* at 7. But it did not find in Roe's favor "based on her lack of sexual history." The Panel Memo says no such thing.

Finally, Doe's argument on this point relies on pure speculation. He is speculating that the Panel could have obtained an account from this other student about his interactions with Roe; and that the evidence would have helped him. But the student may have declined to speak to the Panel—as is every student's right. *See generally* Def. Ex. 3. And, beyond Doe's speculation, there is *no evidence* to support the idea that this student would provide testimony helpful to Doe. Doe cannot obtain summary judgment in his favor (or even sustain his claim at the summary judgment stage) based

on pure speculation. *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 167 (3d Cir. 2017) ("A plaintiff cannot satisfy the summary judgment burden based on speculation alone."); *Brigandi v. John Wiley & Sons, Inc.*, Civ. No. 13-5193, 2015 WL 4042104, at *4 (D.N.J. July 1, 2015) ("The theory is based on pure speculation, and such speculation is insufficient to defeat summary judgment."). And even had the Panel spoken to this other student, and even had the student told the Panel Roe had put her hands down his pants, that makes neither the Panel's assessment of Roe's credibility, nor its assessment of whether the evidence supported Roe's claim that Doe sexually assaulted her (which, of course, can be true even if Roe was sexually forward with some other student), any less sound. *See* Dkt. No. 115-5, Pl. Ex. 32 at PU-0004686 ("I don't think that the panel should collect evidence about a totally separate incident in which [Roe] was allegedly sexually aggressive with a different student. Thoughts?"); Def. Ex. 10 at 109:15-21 ("[As] far as the -- the encounter itself, I didn't see how this behavior he was describing with, you know, Jane Doe allegedly sticking her hand -- her hands down someone's pants -- I didn't see how it was relevant to what occurred in that room that night of the encounter between Jane [R]oe and John Doe.").

### 2.    There is zero evidence to support Doe's fallacious claim that Princeton "intentionally suppressed" Roe's "intake meeting"

Doe next argues Princeton "intentionally suppressed the notes that Crotty took during Jane's intake meeting[.]" Dkt. No. 115-1 at 30. This too is false, and it is also not a breach of the RRR.

Doe's issue is with the fact that Princeton, as a matter of course, does not include notes from initial intake meetings—the confidential and informal meeting at which a student first reports that they think they have been the victim of some RRR violation, or responds to such assertions by another student, in a one-on-one conversation with the Title IX office—in disciplinary case files. There are good reasons, in Princeton's view, from excluding notes from these initial meetings from the formal case file. But even if one might disagree with that policy, that does not equate to an RRR breach.

Doe makes two arguments. He first says the failure to include notes from Roe's initial meeting with Crotty in the case file was not "procedural fairness." Dkt. No. 115-1 at 32-33. He also asserts any decision that did not include discussion of those interview notes was not based on the preponderance of the evidence. *Id.* Doe is wrong on both.

No reasonable jury could conclude that not including, in the formal case file, notes from the Title IX office's initial meetings *with both the reporting and responding student* at the outset of a disciplinary process somehow constitutes "procedural unfairness." Doe also met with Crotty at the outset of the disciplinary process. *See* Dkt. No. 115-5, Pl. Ex. 42 at PU-0004393. Crotty's notes from that discussion are also not in the case file. And Doe acknowledges notes from these initial meetings with the Title IX office are, as a matter of course, not made part of the disciplinary case file. *See* Def. Ex. 9 at 220:14-221:12; Dkt. No. 115-4 at 26-27 (Pl. Ex. 1 at 238:15-239:20). No reasonable jury could conclude Princeton treating Doe the same as Roe and other students who come

to the Title IX office to report or respond to assertions of sexual misconduct is "procedural unfairness," bias, or any other form of an RRR violation.

There is good reason for this general practice. As Michelle Minter, the Vice Provost for Institutional Equity and Diversity, explained, the purpose of the initial interviews conducted by the Title IX office is to assess whether a complaint is viable and to discuss with the complaining student (and then the responding student) the disciplinary process. *See generally* Dkt. No. 115-4 at 26-27 (Pl. Ex. 1 at 237:10-239:20). Questions are not asked in a systematic matter. *Id.* And because they precede and are not part of the official investigation by the panel, those conversations do not have the many protections that are otherwise built into Princeton's formal disciplinary process— *e.g.*, students may not be accompanied by advisors, as they have the right to be during interviews with the panel, and notes taken are not read back to the students so that they can confirm their accuracy. *Id.* There are thus good reasons for not treating these informal notes as evidence.

Such was the case here. Crotty prepared her notes for Minter to determine if an investigation was at all warranted. And, *according to Doe*, "[Crotty] played no role in the investigation[.]" Dkt. No. 115-1 at 36. It defies credulity to contend Princeton must include in the official case file notes, unreviewed for accuracy by Roe, and collected by someone Doe says "played no role in the investigation," lest it breach the RRR.

Doe's argument is with Princeton's policy. He disputes how Princeton decides what constitutes evidence. But it is undisputed that Princeton, consistent with the RRR,

included in the case file only evidence collected by the Panel (which the RRR required be appointed to investigate sexual misconduct claims). Doe does not grapple with this reality. He instead argues "this Court would never tolerate th[is] kind of behavior in a criminal case, [and so] it should not tolerate it here." Dkt. No. 115-1 at 31. But this is *not* a criminal case. The Court should not superimpose criminal procedure onto its review of a university's student disciplinary process—particularly where the Third Circuit has made clear the inquiry is limited to whether Princeton violated its policies "in some substantial way[.]" *Princeton II*, 790 F. App'x at 385. That can hardly be the case where Princeton's policies do not address how notes from initial meetings with a complainant or respondent should be used—and Princeton treated both students the same in this respect by not including such notes in the formal case file.

### 3.    Doe's contention that the Panel "artificially curated" the evidence mischaracterizes the record.

Doe raises a multitude of other claims regarding the Panel's review of the evidence. None show bias in violation of the RRR, and the Court should reject Doe's attempts to nit-pick the Panel's analysis of the evidence.

Doe first complains about an email in which Crotty counsels against confronting Doe about his inconsistent testimony as "we are giving him a hard time for a changing account on a minor issue, whereas she changed on some more significant issues." Dkt. No. 115-5, Pl. Ex. 37 at 25. Doe construes this to mean Roe's "more significant issues" were *excluded* from her credibility assessment. Dkt. No. 115-1 at 33. But that is *not* what

Crotty said. Her email does not say that the Panel *excluded* Roe's "more significant" inconsistencies from its credibility assessment—only that in her view the Panel should not give Doe a hard time "for a changing account on a minor issue," which she said she found confusing, where Roe had "changed on some more significant issues." *Id.* Crotty reiterated this point during her deposition: that she had not said that the Panel had also excluded Roe's "more significant issues." Def. Ex. 12 at 124:4-125:2. The undisputed record does not support Doe's effort to distort the meaning of Crotty's testimony.

Doe further complains that the Panel refused to follow up with Roe and her witnesses on certain points. Dkt. No. 115-1 at 34-35. Again, this is Doe using his allegations of bias to ask the Court to second guess the Panel's investigative process at every turn. It is not a breach of the RRR for the Panel to decline to further question Roe about a past incident with Doe (the claimed 2017 assault) *where they had already decided that her testimony was not sufficient to sustain her claims*. *See* Def. SUMF ¶ 8.e. (citing Def. Ex. 3 at 22 (RRR § 1.3.12.1)). Nor is it a breach of the RRR for the Panel not to follow up with other witnesses on a minor, tangential issue—whether Roe was more comfortable kissing in public or private—that is obviously of minimal relevance and not the type of fact that third party witnesses would be well-placed to address.

## B.  The undisputed record does not support Doe's claim that one particular Panelist was biased against him.

To support his theory that Princeton breached the RRR by not providing an impartial and unbiased panel, Doe attempts to concoct a theory that one of the three

Panel members was biased against him from the start. He premises this on a one-line email from Walter Wright to Regan Crotty. Even if the Court sets aside that Doe could have, but did not, raise this claim of bias in either of his appeals (*see supra* Part I.b), there is no evidence Wright was biased against Doe, let alone that such "bias" somehow affected the two charges for which Doe was *unanimously* found responsible.

Crotty emailed Doe asking whether he wished to pursue a counterclaim, as he had indicated he wished to file one. But when given the chance to follow through, Doe backtracked. His response to Crotty concluded with:

> However, although I stand by my claims that she was the aggressor, I do not feel her aggressive nature constituted non-consensual conduct. Her actions were not so severe that they violated University policy.

> I am a decent young adult who strives to do the right thing. I would not file an exaggerated accusation out of anger, regret, and negative emotions. Thus, in my reading and understanding of University policy, I do not believe Jane Roe's actions were in violation of Princeton's rules.

Dkt. No. 115-5, Pl. Ex. 40 at 1.

Crotty forwarded this email to the panel. Wright, noting Doe's gratuitous self-aggrandizement, responded: "Wow, what a magnanimous 'decent young adult'. Thanks, Regan." *Id.* These nine words are the primary basis for Doe's bias claim. But they betray no bias. Calling oneself a "decent young adult," particularly in this context, is admittedly bizarre. That Wright found this descriptor odd is hardly indicative of bias, let alone "badmouthing" Doe's character.

Doe's claim that Wright was biased fails on the email's text alone, as no reasonable jury could find those nine words sufficient to establish bias in the Panel's investigation rising to the level of a substantial RRR violation. But were that not enough, Wright's testimony puts any lingering question to bed. Wright testified he was merely "trying to be humorous, but cynical at the same time[.]" Def. Ex. 10 at 172:22-173:7, 173:19-174:3, 174:15-20. This was because, notwithstanding Doe's characterization of himself as a "decent young adult," Wright "had come to believe that John Doe was being manipulative and dishonest" with the Panel. *Id.* Wright's belief was based on "certain things he had already done with witnesses[.]" *Id.* Specifically, Wright testified "I spoke to two or three of John Doe's witnesses and they told me they had spoken to him prior to me contacting them and he had suggested testimony to them." *Id.* at 120:3-6. Wright, noting the contrast between witness tampering and Doe's characterization of himself as a "decent young adult," responded in kind. Wright testified as much:

> Again, I'm trying to get to the facts and if a witness or a complainant or a defendant is doing things that undermine my ability to get to the facts, I'm -- I'm going to feel some way about that even though, you know, from a professional standpoint, I know that I still need to be objective and I still need to be as fair and impartial as I can be. But, you know, I'm -- I'm not going to like it if I think someone is obstructing me from trying to get to the true facts of what happened.

*Id.* at 176:7-177:1. This is hardly evidence of bias in breach of the RRR; it is a panelist responding to a gratuitous comment by a disciplinary respondent with a critical eye— which both reflects the investigators' role (scrutinizing the assertions of both parties) and the facts that had already come to the Panel's attention in this particular matter.

Further, Roe's testimony and Wright's comments on the Panel Memo show that he was equally critical of both parties to the proceeding. Roe testified that all three panel members relentlessly questioned her. *See generally* Dkt. No. 113-1 at 32-34 (detailing Roe's testimony regarding the Panel's "interrogation" of her). That both parties found their interactions with the Panel unpleasant is not indicative of bias. Quite the opposite.

No reasonably jury could conclude that there is sufficient evidence to establish a substantial violation of the RRR's promise of panel impartiality on this record. And even were one to so conclude, the record is devoid of evidence it impacted the investigation and adjudication of the claims against Doe. As the Third Circuit recently affirmed, the absence of evidence of bias actually affecting the disciplinary outcome is fatal to a breach of contract claim. *See Williams v. Pa. State Univ.*, No. 23-3180, 2025 WL 971670, at *3 (3d Cir. Apr. 1, 2025), *cert. denied sub nom. Williams v. PA State Univ.*, No. 25-5275, 2025 WL 2824383 (U.S. Oct. 6, 2025). In *Williams*, the Third Circuit affirmed summary judgment to the university on plaintiff's breach of contract claim as that the appeals officer who affirmed plaintiff's discipline had ruled adverse to plaintiff in a prior disciplinary case was "not evidence of bias against [plaintiff], and [plaintiff] does not point to any record evidence to suggest that [the appeal officer's] prior decision *affected the outcome* of [plaintiff's] disciplinary appeal." *Id.* (emphasis added).

So too here. Doe would have been found responsible regardless. The Panel "unanimously found sufficient information to substantiate" the two charges for which Doe was found responsible. Def. Ex. 16 at 10. Said differently: removing Wright from

the Panel and replacing him with Doe himself would not have changed the outcome. Two other Panel members still voted to find Doe responsible for these two charges. And Doe "does not point to any record evidence to suggest that [Wright's comment] *affected the outcome* of" these two charges. *Williams*, 2025 WL 971670, at *3.

It is unclear what Doe wishes Princeton had done differently. He complains nobody reprimanded Wright. *See* Dkt. No. 115-1 at 37. But doing so would not have prevented Doe from filing suit because it would not have changed the outcome—his real complaint. His position, in essence, is that a sarcastic comment by one Panelist in one email is sufficient evidence of bias to contractually require Princeton to drop all charges. That is absurd, and no disciplinary decision could ever stand were that the standard to which Princeton and other universities were held based on their handbook promises to undertake an unbiased review of disciplinary charges.

Doe points to *Montague v. Yale*, from the United States District Court for the District of Connecticut, to support his argument that "Wright's clear but unaddressed bias violated Princeton's obligation to impartially apply the preponderance standard." Dkt. No. 115-1 at 38-39 (citing *Montague v. Yale Univ.*, No. 3:16-cv-00885, Dkt. No. 177 at 41-43 (D. Conn. Mar. 29, 2019)). This case is more harmful to Doe's cause than helpful. In fact, it highlights the great lengths to which a university must go for it to act with bias constituting a "substantial" deviation from and breach of policy.

Like Doe, Montague asserted a breach of contract theory premised on the university's failure to impartially apply the preponderance of the evidence standard. But

Montague premised that breach claim—and indeed most of his case—on his argument "that Yale's Title IX office has a contractual duty of impartiality requiring it to avoid influencing a complainant's decision *whether to file a formal or informal complaint*." *Montague*, No. 3:16-cv-00885, Dkt. No. 177 at 41 n.59 (emphasis added). Montague relied on evidence showing Yale not only *encouraged* the complainant to file a disciplinary case against him, but that Yale "disclosed to Roe confidential information regarding [a prior disciplinary case against Montague] in order to persuade Roe to pursue a formal complaint." *Id.* at 31. This evidence included a statement by Yale's investigator that Roe "was especially motivated to participate in the investigation and hearing process after she heard that [Montague] had already had another complaint against him, as she felt it was important to protect other women." *Id.* at 31-32. Based on this evidence, the court found "a genuine issue of material fact with respect to the impartiality of the hearing, given the disputed evidence presented in the other breach of contract claims"—all of which largely hinged on Yale pressuring Roe to file a formal complaint and improperly pursuing the complaint on her behalf. *Id.* at 42-43.

The *Montague* case, which in any event is non-binding on this Court, is thus distinguishable in at least two ways. *First*, the *Montague* court found sufficient evidence to establish a dispute "regarding whether Yale pressured or coerced Roe into filing a formal complaint." *Id.* at 34-35; *see also id.* at 32-33, 38, 41 n.59. There is no similar genuine dispute of material fact here. Princeton and Doe agree Wright sent the email. They dispute only whether the Court should hold as a matter of law that a nine-word

33

email is indicative of bias so invidious and contagious that it was a breach of contract not to stop the entire investigation and remove Wright from the Panel. *Second*, disclosing confidential information regarding a respondent's prior disciplinary history to encourage a complainant to file a complaint is a far more serious alleged procedural misstep than a sarcastic comment regarding a respondent's characterization of himself as a "decent young adult." In the first instance, the disciplinary process would not have transpired but for the university's encouragement in violation of its policy. The single email of which Doe complains is a far cry from that level of interference, and in any event has no connection to the outcome of the proceeding, in which all three Panelists ultimately agreed Doe was responsible for only two of eleven claimed RRR violations.

## C.    No reasonable jury could find Princeton failed to provide a trained Panel.

Doe also attempts to premise his breach claim on an argument that Princeton failed to provide an "adequately trained" Panel. He premises this in large part on his assertion that Wright misunderstood the RRR because, in a single comment to a draft memo following Doe's appeal (the "Supplemental Memo"), Wright wrote: "This is illogical and needs clearer justification. A sexual assault is based on the victim's point of view of being coerced, not the assaulter's, especially after we already acknowledged the encounter began non-consensually." Dkt. No. 115-5, Pl. Ex. 28 at 10. This too fails.

To begin, and as noted in Princeton's summary judgment brief, the RRR requires only that "[a]ll panelists will have training in investigating and evaluating conduct

prohibited under the policy." Def. Ex. 3 at § 1.3.12; *see also* Dkt. No. 113-1 at 32. The RRR does not dictate when or where the training must occur, or what specifically it must include. The only requirement is that the Panelists "will have" training—and the undisputed record is that they did. Def. SUMF ¶¶ 50-56; *see also* Dkt. No. 113-1 at 32-37 (Princeton's brief, detailing the Panel members' training). Doe's theory of breach in this regard cannot prevail on this record.

No reasonable jury could conclude the Panel members were not trained. It is indisputable they were trained specifically in how to investigate sexual assault claims. Doe does not even attempt to dispute that each panelist received such training. He takes a different tack, arguing Wright so misconstrued the RRR that Princeton failed "to provide panelists with *adequate* 'training in investigating and evaluating conduct prohibited under the policy.'" Dkt. No. 115-1 at 41 (emphasis added).

But the RRR does not require the panelists to demonstrate perfect understanding and application of its standards at all moments in the disciplinary process lest Princeton be liable for breach for failure to train.[7] This sort of back-and-forth discussion, between Wright and his fellow panelists, of how the University's standards should be applied is a normal part of the disciplinary process. Investigators must be able to discuss the issues and raise internal questions without that leading to a viable claim for breach of the

---

[7] Nor does the RRR require "adequate" training. Doe added "adequate" in front of the language he quotes. There is no such contractual requirement, and so no breach.

RRR—particularly where they then apply the requirement at issue (here, the reasonable person standard) faithfully in their decision.

Indeed, the finalized Supplemental Memo reads: "the panel recognized that individuals in [Jane Roe's] position do have the right to change their mind, and that University policy requires an assessment of whether a reasonable person in [John's] position would have interpreted [Jane's] actions as a willingness to participate in mutually agreed-upon sexual acts." Def. Ex. 16 at 10. Thus, even if Wright's comment in a draft were viewed as inconsistent with the RRR, that is not the approach the Panel ultimately took—and that is what matters, for purposes of compliance with the RRR.

Finally, Wright's comment addressed charges for which Doe was found <u>not</u> <u>responsible</u>. *Compare* Dkt. No. 115-5, Pl. Ex. 28 at 12 *with* Def. Ex. 16 at 10. No reasonable jury could find bias, let alone bias that permeated the process and infected the outcome in a way <u>adverse to Doe</u>, based thereon. *See Williams*, 2025 WL 971670, at *3 (affirming summary judgment to university on plaintiff's contract claim as fact that appeals officer who affirmed plaintiff's discipline had previously ruled against plaintiff in a separate matter was not sufficient evidence of a biased outcome).

## IV.    There is no evidence Doe's discipline has damaged him.

Doe, who has succeeded professionally and academically since graduating from Princeton, did not produce an expert regarding his claimed damages. He instead asserts three unfounded damages theories: (1) "he must live with the stigma of being branded a sexual offender by Princeton," (2) "[h]e has also lost out on educational and job

opportunities," and (3) "John has also suffered emotional harm from Princeton's breach." Dkt. No. 115-1 at 41, 43. None are cognizable under a breach of contract. And—more crucially—he has *no evidence* to support any of these theories. His Statement of Undisputed Material Facts does not include a single purported fact regarding his damages. *See generally* Dkt. No. 115-2. He thus cannot prove damages. *See* L. Civ. R. 56.1. The Court should deny his summary judgment motion on this ground alone.

That Doe feels he has been stigmatized because he was found responsible for non-consensual sexual contact for kissing and fondling Roe is not Princeton's fault. The RRR expressly encourages the parties to exercise discretion regarding the disciplinary process. *See* Dkt. No. 113-5, Def. Ex. 3 at § 1.3.5. Princeton does not disclose outcomes to anyone other than the parties. *See id.* at § 1.3.12. And neither the finding of responsibility nor the sanction or probation are listed on Doe's transcript, and they would not be shared with any third party (employer, educational institution, or other) absent a court order. Def. SUMF ¶ 68.

There is no evidence—and Doe cites none—that Princeton shared the results of Doe's disciplinary process with anyone. There is ample evidence that *Doe* shared the results. *See* Dkt No. 115-5, Pl. Ex. 39 at 44-56; *see also* Def. SUMF ¶ 71. In short, even if Doe had shown some actual harm from a disclosure of the disciplinary outcome, the undisputed evidence is that he—not Princeton, which has carefully safeguarded the confidentiality of the process and its outcome—is responsible for that harm.

Doe's other damages theories fare no better. He claims "[h]e has also lost out on

educational and job opportunities." Dkt. No. 115-1 at 41. But that is not true. Doe testified he was not required to disclose his University disciplinary record to any job. *See* Def. Ex. 8 at 35:5-36:6. And the only educational opportunity to which he disclosed his discipline—one of the most highly selective graduate programs in the country—*admitted him anyway*. Def. SUMF ¶¶ 77-78. There is no evidence Doe was ever denied an educational or job opportunity because Princeton disciplined him. Plus, if such evidence existed—which it does not—it would be because *Doe* disclosed his discipline (as noted above). No reasonable jury would find Princeton damaged Doe where Princeton refused to disclose his discipline but Doe chose to do it anyway.

Doe complains that he has affirmatively opted *not* to apply to certain schools or jobs "because he knows a prior finding that he sexually assaulted someone in college, even if erroneous, would be too big a scandal." Dkt. No. 115-1 at 42. But what Doe thinks he knows is not evidence. *See Fletcher v. Lucent Techs., Inc.*, No. Civ. 02-3941, 2005 WL 2373191, at *6 (D.N.J. Sep. 27, 2005), *aff'd*, 207 F. App'x 135 (3d Cir. 2006) ("[T]he major weakness in Plaintiff's opposition is that she does not point to any facts in the record that would support her propositions. For example, she relies upon an 'awareness' of facts, but an 'awareness' of facts that do not exist, either to her knowledge or in the record, is insufficient to create a genuine issue as to a material fact, for purposes of defeating a summary judgment motion."). There is zero <u>evidence</u> Doe would have been denied from any educational or professional opportunity had he actually applied. Doe is speculating. And speculation is not evidence. *See In re Wellbutrin XL Antitrust Litig.*

*Indirect Purchaser Class*, 868 F.3d at 167 ("A plaintiff cannot satisfy the summary judgment burden based on speculation alone."); *Brigandi*, 2015 WL 4042104, at *4 ("The theory is based on pure speculation, and such speculation is insufficient to defeat summary judgment.").

Doe's claim for "emotional harm"-related damages fails as a matter of law. As explained in Princeton's summary judgment brief, it is well established that emotional harm is not compensable in contract. *See* Dkt. No. 113-1 at 42-43 (citing *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 221-22 (2022) and *Buckley v. Trenton Saving Fund Soc'y*, 111 N.J. 355, 370, 544 A.2d 857, 865 (1988)).

Doe claims he "incurred monetary damages from his therapy sessions" (he has produced receipts showing a few thousand dollars in therapy expenses, *see* Dkt. No. 115-5, Pl. Ex. 39) and says he "also began taking an SSRI he had previously used after he began attending therapy for this case." Dkt. No. 115-1 at 44. But Doe has produced no evidence that he started to attend therapy because of the disciplinary process—let alone because of Princeton's alleged deviations from the RRR—as opposed to simply as an extension of his preexisting anxiety, which he testified he has long struggled with and began therapy to address well prior to the disciplinary process at issue. Def. Ex. 8 at 79:17-82:5. As for the SSRIs, there is no evidence he began taking them again *because of* this case. And it is unclear how taking them anew has damaged Doe. Indeed, his psychotherapist's notes state: "[Doe is] [f]ully on [SSRIs] again and accepting that he's far more comfortable and enjoys life as a result…knows that part of him wishes he

39

didn't 'need' the meds but accepting more readily that it's okay to take them as they improve his [quality of] life." Dkt. No. 115-5, Pl. Ex. 39 at 6. Doe cannot claim to be damaged because he has to take medication his doctor says is "improv[ing] his [quality of] life," and as he has proffered no evidence (for example, testimony from a treatment provider) tying his prescription to actions by Princeton.

Doe has put forth no actual evidence of damages. His breach of contract claim thus fails at the summary judgment stage for this reason too. *McAvoy*, 115 F.4th at 234 (affirming summary judgment to college on student's breach of contract claim as the student "did not produce evidence that she suffered damages caused by the claimed breach").

## CONCLUSION

For the above reasons, the University respectfully requests this Court deny Doe's summary judgment motion in its entirety.

Dated: November 7, 2025              Respectfully submitted,

   /s/ Linda Wong          

Linda Wong, Esq.
**WONG FLEMING, P.C.**
400 Alexander Park Drive, Suite 201
Princeton, NJ  08543-3663
Tel: (609) 951-9520
Fax: (609) 951-0270
lwong@wongfleming.com

Amanda Shafer Berman, Esq. (*pro hac vice*)
Eli L. Berns-Zieve, Esq. (*pro hac vice*)
**CROWELL & MORING LLP**

1001 Pennsylvania Ave., NW
Washington, DC 20004
(202) 624-2500
aberman@crowell.com
eberns-zieve@crowell.com

*Attorneys for Defendant The Trustees of Princeton University, a not-for-profit education corp. of the State of New Jersey*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2025, a true and correct copy of the foregoing was electronically filed via the Court's ECF system will automatically generate and send a Notice of Electronic Filing to all filing users associated with this case. Electronic service by the Court of the Notice of Electronic Filing constitutes service of the filed document and no additional service upon the filing user is required.

  /s/ Linda Wong
Linda Wong, Esq.