# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN DOE**, Plaintiff, | Civil Action No. 22-5887 (RK) (JTQ) |
| v. | Hon. Robert Kirsch, U.S.D.J. |
| **PRINCETON UNIVERSITY**, Defendant. | Oral Argument: December 10, 2025 |

# REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON HIS BREACH-OF-CONTRACT CLAIM

**DYNAMIS LLP**
Jamie Hoxie Solano, Esq.
NJ Bar No. 426422024
200 Connell Drive
Berkeley Heights, NJ 07922
(973) 295-5495
JSolano@dynamisllp.com

**DILLON PLLC**
Justin Dillon (*pro hac vice*)
Christopher C. Muha (*pro hac vice*)
Kimberly Blasey (*pro hac vice*)
1717 K Street NW, Suite 900
Washington, D.C. 20006
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

*Counsel for John Doe*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 4

I. The Panel Failed to Apply the Preponderance of the Evidence Standard ............. 4

    A. Crotty Did Far More Than Just Advise the Panel .................................... 4

    B. The Panel Applied an Inconsistent Credibility Standard ......................... 6

    C. Suppressing the Intake Interview and Hiding Its Existence .................... 9

    D. The Aggression Evidence ...................................................................... 10

II. Princeton Failed to Provide an Impartial and Unbiased Panel .......................... 12

III. Princeton Failed to Provide an Adequately Trained Panel ............................... 14

IV. John Is Entitled to Summary Judgment on Damages ....................................... 15

CONCLUSION ...................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Antoniu v. S.E.C.*,
    877 F.2d 721 (8th Cir. 1989) .......................................................................... 14

*Berkshire Emps. Ass'n of Berkshire Knitting Mills v. N.L.R.B.*,
    121 F.2d 235 (3d Cir. 1941) ........................................................................... 14

*Cinderella Career and Finishing Schools v. Federal Trade Comm'n*,
    425 F.2d 583 (D.C. Cir. 1970) ....................................................................... 14

*Doe v. Princeton Univ.* ("*Princeton III*"),
    30 F.4th 335 (3d Cir. 2022) ..................................................................... *passim*

*Stivers v. Pierce*,
    71 F.3d 732 (9th Cir. 1995) ............................................................................ 14

*Williams v. Pa. State Univ.*,
    No. 23-3180, 2025 WL 971670 (3d Cir. Apr. 1, 2025) .......................... 13, 14

**INTRODUCTION**

Princeton continues to run from *Princeton III*—now more openly. ECF No. 120 (hereafter "Opp. Br.") at 9 ("Doe overstates the significance of *Princeton III*."). *Princeton III* analyzed how Princeton failed to substantially comply with the exact same "Rights, Rules and Responsibilities" (RRR) promises at issue here. *See* ECF No. 121 (hereafter "Doe Opp.") at 7-8. And (like courts everywhere) it specifically rejected the argument that contract claims of this nature amount to "second-guess[ing] university disciplinary proceedings[.]" Opp. Br. at 10; Doe Opp. at 11-12 (documenting rejection of this argument). Those standards do not change on summary judgment; they simply must be satisfied with evidence.

Princeton runs from *Princeton III* in another important way: It asks this Court to view John's arguments in isolation—claiming that, since (in Princeton's view) any one might not amount to a violation of the RRR, there is no violation. *See, e.g.*, Opp. Br. at 14, 15, 17, 28. It then feigns fear at a ghost of its own making and insists that a grant in John's favor would mean that any "nitpick" with a panel's actions would open the floodgates to litigation. Opp. Br. at 16. *Princeton III* forecloses that argument. That Court identified three categories of allegations that, if true, would mean that Princeton had failed to substantially comply with the RRR's preponderance standard. *Princeton III*, 30 F.4th at 347. And it analyzed whether all of the allegations, in all three categories, *collectively* stated a claim. *Id.*

Here, the question is whether the undisputed evidence *collectively* shows that Princeton "failed to consider the entirety of the evidence with a neutral gaze," "disregarded exculpatory evidence," and/or rendered "inconsistent and skewed credibility determinations" (on his preponderance claim); or whether it *collectively* shows that Princeton "applied inconsistent [credibility] standards," "overlooked or minimized glaring factors . . . undermin[ing] Roe's veracity," and/or "disregarded compelling exculpatory evidence" (with respect to his impartial panel claim). *Id.*

The undisputed evidence in that regard is overwhelming. Jane's story never made sense. She told multiple friends after the first incident that it was consensual. ECF No. 115-2 (hereafter "Doe MSJ") at 4. She kept in touch with John until she came to Princeton. *Id.* She texted him at Princeton. *Id.* She said she was "thankful" he was in her life. *Id.*; *see also* Doe MSJ Ex. 5 at 14. She made out with him consensually on the night of the second incident. Doe MSJ at 5. Her story about what happened in his room repeatedly changed (including in what order the sexual activity occurred). *Id.* at 5-6. What she told her friends contradicted what she told Princeton—especially Student H, who took contemporaneous notes. *Id.* at 6. She said she gave John "a" hickey at the end because he demanded it to show off; he produced photos showing she'd *covered* his neck and that he was upset about it. *Id.*

The panel also buried Jane's intake interview—even though it had asked her in her first interview about how she contradicted what she'd said there. *Id.* at 26. It

2

then scrubbed that line of questioning from the summary, ensuring John would never know about it. *Id.* at 26-27. Not long after, one of the panelists referred to Jane as "the victim" and betrayed open disdain for John in an email to the panel. *Id.* at 32. Instead of intervening—as her boss later confessed she should have, *id.* at 33—Crotty directed the panel to pursue witnesses who might hurt John (Doe Opp. at 26) and not to pursue evidence that would undermine Jane (Doe MSJ at 29-31). And when the panel was poised to clear John of the worst claims, she intervened and rewrote their decision, which the RRR did not authorize. *Id.* at 13-17.

When an appeals panel remanded the matter for unfairness *in the assessment of Jane's credibility* (Doe Opp. Ex. 1 at 1) the panel responded by re-interviewing the parties and then conducting three additional interviews (ECF No. 113-2 at 13-14)—all targeting *John's* credibility. Jane's testimony about the hickeys changed dramatically—she admitted she could have given them at nearly any point in their encounter. Doe MSJ at 6. Her friend Student G had even testified that Jane claimed to have consensually kissed John in his room *before* she ever grew uncomfortable and asked him to stop, *id.*—something Jane never admitted to the panel.

The panel reached the exact same finding it had planned to hand down *pre-remand*, before Crotty's intervention. So Crotty intervened *again*, removing language about John and Jane's potentially kissing when they first got to his room—which contradicted Jane's *pre*-remand story that nothing in the room was

3

consensual. Doe MSJ at 21-23. The panel found John responsible for nonconsensual kissing and touching, but cleared him of the oral sex that followed it by "maybe like a minute." Doe MSJ Ex. 6, 10-12. The logic it used to explain that astonishingly quick change? It would credit Jane on anything she had testified to "consistently and clearly." *Id.* at 9. But that made-up standard would founder on the shoals of Jane's lie about the hickey: as every panelist would later admit, Jane had "consistently and clearly" testified to giving John 1)"a" hickey 2) at the *end* 3) because he requested it, which was—as Hubert admitted—"probably" a conscious lie. *See infra at* 7. So they could not apply the "consistently and clearly" standard to the hickey—otherwise, they would be crediting as true something they knew was false. And that would, in turn, *show* that it was a made-up standard. Instead, they just washed their hands of the problem and pretended it did not exist.

Some of John's allegations, even *individually*, are egregious enough to show a breach of the RRR. Together, they overwhelmingly do.

## ARGUMENT

### I. The Panel Failed to Apply the Preponderance of the Evidence Standard

#### A. Crotty Did Far More Than Just Advise the Panel

Princeton first tries to defend Crotty's rewrite of an entire decision and outcome by noting she is permitted to "advis[e] the Panel," "oversee" it, and other similarly vague terms. Opp. Br. at 14. But Minter testified—and Princeton never

4

addresses—that specific duties assigned by the RRR to panelists *cannot* be performed by Crotty. Doe MSJ at 14. That includes the right "to **participate** in the deliberations." Ex. 1 (Minter Dep. at 67:9-11) (emphasis added). Yet that is what Crotty repeatedly did, by any definition of the term. *See Princeton III*, 30 F.4th at 347 (looking to Merriam Webster and Black's Law Dictionary to determine plain meaning of RRR terms).[1] She manifestly "discuss[ed]" with the panel "the reasons for and against" different readings of the evidence.[2] By her own admission, she explained to them why she "didn't think that the analysis around the word 'push' was strong[.]" Princeton MSJ Ex. 12 (Crotty Dep. at 274:17-20).

      Minter's testimony shows how unusual Crotty's actions were. Minter testified that "the only reason I would see a draft at an early stage is because there is some kind of policy or procedural question that the panel wants me—wants my advice on[.]" Ex. 1 (Minter Dep. at 162:5-13). That is not what happened here—Crotty sent it to Minter before most of the panel saw it, because *Crotty* (not Hubert) wanted to discuss the "outcome," not "some kind of policy or procedural question." Doe MSJ Ex. 19 at 1. Minter could not remember another time when

---

[1] *See, e.g.*, https://www.merriam-webster.com/dictionary/deliberation (defining "deliberation" as "a discussion and consideration by a group of persons (such as a jury or legislature) of the reasons for and against a measure"); Black's Law Dictionary (12th ed. 2024) (defining "deliberation" as "the process by which a jury reaches a verdict, as by analyzing, discussing, and weighing the evidence").
[2] *See* https://www.merriam-webster.com/dictionary/deliberation.

Crotty "wr[o]te an alternate outcome" before the full panel had even seen the draft. Ex. 1 (Minter Dep. at 172:19-17:3). Crotty even rewrote the *second* decision, including by (among other things) removing reference to potential consensual kissing in John's room before Jane supposedly said "no" ten or more times. Doe MSJ at 21-23. Princeton's opposition says *nothing* about this second rewrite.

Rewriting a decision to make the most serious charges come out the other way; doing so by suggesting a panelist vote based on what she thought "happened"; and suggesting they "get to" that result by just ignoring one half of a party's testimony about a key act ("pushing" vs. "moving" her head), Doe MSJ at 13-17, is not a "nitpick," Opp. Br. at 16. It is a gross breach of the RRR.

**B.    The Panel Applied an Inconsistent Credibility Standard**

The undisputed evidence also shows that the panel applied its made-up credibility standard unevenly. That standard was to credit "Complainant's *account*," full stop, with respect to those things she "consistently and clearly recalled," full stop. Doe MSJ Ex. 17 at 9 (emphasis added). And since Jane had "consistently and clearly" testified that she gave John at least one hickey at the end because he asked for it, the standard—if evenly applied—would require the panel to credit that. Doe MSJ at 17-21. But doing so would be crazy, because the evidence overwhelmingly contradicted it, and—as even Hubert admitted—this was

6

"probably" a conscious lie by Jane. So the panel just applied the standard unevenly, finding what it wanted to find and ignoring this inconvenient truth.

Princeton sees the problem here. So in its opposition, it tries to rewrite the standard, claiming that it was to "f[i]nd Roe credible *only* on matters she 'consistently and clearly' recalled, **and which were necessary in reaching a finding of responsibility or non-responsibility**." Opp. Br. at 18 (quoting Second Case Summary (Doe MSJ Ex. 17) at 9) (bolded emphasis added). And it claimed "the Panel did not articulate any requirement, that Roe be credited for *all* matters she clearly and consistently recalled, regardless of other evidence." Opp. Br. at 18.

The undisputed evidence disproves both claims. Wright testified that the standard was to credit Jane "on *anything* in which she testified clearly and consistently." Princeton MSJ Ex. 10 (Wright Dep. at 211:6-10) (emphasis added). Hubert agreed that the standard was to credit Jane on "everything" she was clear and consistent on—she just argued (initially) that the panel did not violate it. Princeton MSJ Ex. 9 (Hubert Dep. at 81:5-17).[3] The Second Case Summary thus says the panel credited "Complainant's *account*," full stop, with respect to those

---

[3] In fact, Hubert testified that when there were things Jane had *not* testified to clearly and consistently, that was the basis for finding those things had *not* happened. *See, e.g., id.* (Hubert Dep. at 161:1-16 (panel did not credit John's assertion that he and Jane discussed her phone going off in his room because "that wasn't one of those events that she consistently or—and vividly recalled").

7

things she "consistently and clearly recalled," full stop. Doe MSJ Ex. 17 at 9. Princeton has simply invented the second part of the standard.

As support for this revision, Princeton cites only five pages from Chen's deposition—that it neither quotes nor summarizes. Opp. Br. at 18 (citing Ex. Princeton MSJ Ex. 11 (Chen Dep. at 252:20-257:19)). That is because Chen never said what Princeton claims. In fact, she acknowledged what the standard required, acknowledged that Jane had been clear and consistent about "at least one hickey at the end," and said the panel just did not think it necessary to make a finding. Princeton MSJ Ex. 11 (Chen Dep. at 260:23-261:7). She never said that making that finding would have been inconsistent with the panel's credibility standard.

Princeton thus argues, as a last resort, that Jane was not, in fact, consistent and clear on this, because her testimony about the hickeys *in general* changed so much. Opp. Br. at 19-20. But again, its own panelists agree she was clear and consistent about "at least one hickey at the end, because John requested it." Chen conceded it directly, as noted above. Wright did, too. Doe MSJ at 18-19. And Hubert, after much back and forth (Princeton MSJ Ex. 9 (Hubert Dep. at 81-98)), eventually did as well (*id.* (Hubert Dep. at 98:6-8)).

The panel's credibility standard, if evenly applied, would mean the panel had to treat Jane's most implausible testimony—which even Hubert conceded was "probably" a conscious lie—as *true*. A credibility standard that makes you treat a

8

lie as true is broken. It is irrational. But that broken standard is *the only basis* on which the panel justified its finding that John kissed and touched Jane while she supposedly said "no" ten or more times. Consistently applying the standard would have doomed the panel's desired outcome. So it refused to apply it to the one fact that would undo everything and hoped no one would notice.

### C. Suppressing the Intake Interview and Hiding Its Existence

Princeton has a hard time with the intentional suppression of Jane's exculpatory intake notes. It claims that was OK because it withheld John's, too. Opp Br. at 25. But that argument proves too much—surely Princeton would not agree that it could suppress intake notes showing that a respondent confessed, especially if he later went on to deny everything. It is irrelevant that intake is not "systematic," that the parties do not have advisors, or that notes of the interview are not read back to them. Opp Br. at 26. That makes them exactly like… *every other conversation parties will have about the incident*, which even Minter agreed is highly relevant evidence. Doe MSJ at 27-28.

But what Princeton truly has no answer for (and thus left out of its brief) is the fact the panel *asked* Jane about her intake statements during her interview, *asked* her to explain at least one clear contradiction—and then scrubbed the entire exchange from her interview summary. *Id*. at 26-27. If intake statements are

9

reliable enough to form the basis for interview questions, they are reliable enough to not *intentionally suppress*—which Princeton undisputedly did.

### D. The Aggression Evidence

The very first sentence of the Second Case Summary's "Credibility Assessment" said that whether Jane 1) "repeatedly said no" or 2) "behaved in a sexually aggressive manner" was *the* fundamental credibility question the panel had to answer. Doe MSJ Ex. 17 at 4. It is *undisputed* that the panel then relied on Jane's claim to be a virgin to find it "dubious" that she would have "pushed him down on the bed and 'ripped his pants off,'" as John had claimed. *Id.* at 7. It is *undisputed* that the panel refused to pursue evidence that Jane had "stuck her hands down [another student's] pants (which he did not want)"—in a public place, no less. Doe MSJ Ex. 32 at 1. And it is *undisputed* that Wright conceded that *John's* evidence of Jane's sexual history was relevant, since the panel relied on her sexual history to find against him on this point. Doe MSJ at 24.

Instead of responding on the merits, Princeton puts forth the straw man that finding a breach would mean it has to investigate "every prior instance in which Roe had been sexually active." Opp. Br. at 22-23. No—it would require Princeton to pursue only those leads it had a reasonable basis to believe could corroborate a party's claim that the other party was the aggressor (what John said) or undermine a claim that, because a complainant was a virgin, they were less likely to have been

10

the aggressor (what the panel said). That is what John offered: details about what Jane specifically did to a particular person at a particular place—and which strongly resembled what Jane did to him. The panel not only refused to look into that—it also went on to *rely on Jane's sexual history* in finding against John.[4]

Princeton then says that, because this incident was never investigated, it's "pure speculation" that it would have helped John. Opp. Br. at 23. This is question-begging at its finest. Under Princeton's logic, it could refuse to speak to any witness, no matter how potentially exculpatory, and later defend that decision by crying "Speculation!" What matters is whether a witness is reasonably likely to have relevant evidence. Wright unknowingly conceded this kind of evidence was relevant. Doe MSJ at 24. Even Crotty conceded it could be evidence of sexual aggression—but that you'd have to investigate to find out. Princeton MSJ Ex. 12 (Crotty Dep. at 235:14-25). That is precisely the point.

Princeton's final attempt is to quote Wright's deposition testimony that he "didn't see how this behavior" of "Jane Doe allegedly sticking her hands down

---

[4] Princeton accuses John of misrepresenting the panel's credibility finding when he says the panel found Jane "'more credible'" on this point. Opp. Br. at 23 (quoting Doe MSJ at 23). Princeton's basis for saying that is that "the Panel's credibility assessment of Roe" never explicitly credited her claim of being passive. *Id.* But the panel expressly found John's claim that she was the aggressor to be "dubious" (Doe MSJ Ex. 17 at 7) yet expressed no doubt about Jane's story (*id.* at 4-5). Finding only one party "not credible" on a disputed point necessarily means the other was found "more credible."

11

someone's pants" was "relevant." Opp. Br. at 24 (quoting Princeton MSJ Ex. 10 (Wright Dep. at 109:15-21)). That comes four pages *after* Wright admitted, before realizing its import, that "it would be relevant if [John] brought in other evidence" of Jane being "sexually aggressive" in ways that are "closer to" what he describes than "sexual intercourse." *Id.* (Wright Dep. at 104:18-105:2). And it comes one page *before* Wright explained *why* he supposedly thought it was not relevant— because it happened "in a public place," which he eventually admitted actually cuts the other way, *id.* (Wright Dep. at 110:11-16; 111:23-24).

## II. Princeton Failed to Provide an Impartial and Unbiased Panel[5]

Princeton's effort to recast Wright's overt bias as merely "nine words" is perhaps its boldest move—Opp. Br. at 29, 30, 33—and flatly contradicts the sworn deposition of Michelle Minter, who oversaw the entire Title IX process:

| **Princeton's Legal Team** | **Princeton's Head of Title IX** |
|---|---|
| Wright's words "betray no bias." (29) | Wright's words suggest he was allowing his emotions "to dictate his view of the case." Doe MSJ at 33. |
| He was just "responding . . . with a critical eye" as required by his "role" (30) | It was "a pretty significant oversight" if Crotty never confronted him. *Id.* |

---

[5] In response to Princeton's suggestion that John has waived his preponderance and bias arguments by not raising them during the on-campus process, Opp. Br. at 8-9, 11-13, John respectfully refers this Court to Doe Opp. at 17-19. Tellingly, the only law Princeton cites for this argument is a string of New York state cases brought under Article 78—a New York state law with an *explicit statutory exhaustion requirement*. N.Y.C.P.L.R. 7801(1). Princeton's brief never mentions that.

12

| | |
|---|---|
| Wright was just "'trying to be humorous'" (30) | Wright needed to "check his reactions." *Id.* |

Princeton also argues that Wright was "equally critical of both parties to the proceeding," Opp. Br. at 31, which is preposterous. Princeton cannot cite a single example of this amid the thousands of pages it produced. Because Wright believed Jane from the start: the evidence shows him calling her a "victim" less than a month into the investigation (Doe MSJ at 24), disparaging John less than a month later (*id.* at 32), and repeatedly advocating for the uneven pursuit of evidence (Doe Opp. at 26). Indeed, he was the *only* panelist to believe literally all of Jane's claims. Princeton MSJ Ex. 11 (Chen Dep. at 276:11-15). Princeton's *only* evidence that he was "equally critical" of Jane is her self-serving testimony, Opp. Br. at 31—which, given that she could not even remember the race or sex of any of the panelists, or a single question she was asked, no reasonable juror would credit.

So Princeton adds that Wright's bias should not matter because he was only one vote. Opp. Br. at 31 (citing the unpublished decision *Williams v. Pa. State Univ.*, No. 23-3180, 2025 WL 971670 (3d Cir. Apr. 1, 2025)).[6] But that is not the law. The Third Circuit has long rejected that logic, especially in cases where (unlike *Williams*) the adjudicators were also the investigators:

---

[6] Besides being unpublished, the statement in *Williams* that Princeton relies on is dicta because the court first found there was no evidence of adjudicator bias in the first place. *Williams*, 2025 WL 971670, at *3. The plaintiff there was also *pro se*, suggesting the issue may not have been well-developed for the court.

13

> The Board argues that at worst the evidence only shows that one member of the body making the adjudication was not in a position to judge impartially. Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and *there is no way which we know of whereby the influence of one upon the others can be quantitatively measured.*

*Berkshire Emps. Ass'n of Berkshire Knitting Mills v. N.L.R.B.*, 121 F.2d 235, 239 (3d Cir. 1941) (emphasis added); *see id.* at 238 (noting that Board is at times "simultaneously investigator" and "trier of facts").[7]

### III. Princeton Failed to Provide an Adequately Trained Panel

Princeton is wrong that the RRR requires only that the panelists "have" training, no matter the quality. Opp. Br. at 34-35. Contract provisions must be read to ensure that parties are not denied the fruits of the contract. *Princeton III*, 30 F.4th at 438. Princeton promised John that it would adequately train the panelists who would decide his case; instead, they gave him someone (Wright) who literally *misunderstood how Princeton defined "consent,"* as even Minter herself would

---

[7] *See also Cinderella Career and Finishing Schools v. Federal Trade Comm'n*, 425 F.2d 583, 592 (D.C. Cir. 1970) (quoting *Berkshire* and vacating agency decision where biased panel member had been a "trier[] of the facts" and also had "investigated and developed many of these same facts"); *Stivers v. Pierce*, 71 F.3d 732, 747-48 ("Particularly on a small board like the Board before us, a single person's bias is likely to have a profound impact on the decisionmaking process." (9th Cir. 1995) (vacating decision of 5-member board despite unanimous vote); *Antoniu v. S.E.C.*, 877 F.2d 721, 726 (8th Cir. 1989) (nullifying proceedings where single Commissioner had "in some measure" prejudged case—"[e]ven though [he] recused himself prior to" SEC's final decision—because "there is no way of knowing how [his] participation affected the Commissioner's deliberations").

14

later admit. Doe MSJ at 36-37. That is like an umpire not knowing what a "strike" is. If that does not show inadequate training, it is hard to imagine what would.

### IV. John Is Entitled to Summary Judgment on Damages

John has previously explained why Princeton's damages arguments fail. *See* Doe Opp. at 32-39. They mistake *amount* for *existence*—somewhat like mistaking *weight* for *admissibility*. John could have made this case about money, which would have led to the usual battle of the experts. Instead, he made it about principle and common sense: Being wrongly found responsible for sexual assault *damages* you. It does not have to ruin your life for that to be true. It is true that John was able to find a job; it is true that he was able to get into business school. It is also true that on his first day at work, someone mentioned the finding to him. It is also true that he has not applied to certain places, and cannot apply to others, as long as the finding stands. It is also true that he has suffered emotional anguish—as would anyone—and paid for therapy because of the finding. It is also true that an order by this Court leading to the reversal of those findings would restore a wrongly convicted man to his proper, innocent status. And finally, this Court could obviously grant John's motion on liability and hold a trial solely on damages.

### CONCLUSION

John Doe respectfully requests that his Motion for Summary Judgment be granted.

Dated: November 25, 2025

        Respectfully submitted,

        DYNAMIS LLP

        By: /s/ *Jamie Hoxie Solano*
        Jamie Hoxie Solano, Esq.
        200 Connell Drive
        Berkeley Heights, NJ 07922
        973-295-5495
        JSolano@dynamisllp.com

        DILLON PLLC
        Justin Dillon (*pro hac vice*)
        Christopher C. Muha (*pro hac vice*)
        Kimberly Blasey (*pro hac vice*)
        1717 K Street NW, Suite 900
        Washington, D.C. 20006
        jdillon@dillonpllc.com
        cmuha@dillonpllc.com
        kblasey@dillonpllc.com

        *Counsel for John Doe*

## CERTIFICATE OF SERVICE

I certify that on November 25, 2025, I filed with the Clerk of the Court and all counsel of record, via the Court's electronic filing system, this reply brief.

*/s/ Jamie Hoxie Solano*
Jamie Hoxie Solano

17