# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

X----------------------------X
JOHN DOE, : REMOTE
: VIDEOTAPED
Plaintiff, : DEPOSITION OF:
:
vs. :
:
PRINCETON UNIVERSITY, : MICHELE MINTER
:
Defendant. :
:
X----------------------------X

C O M P U T E R I Z E D T R A N S C R I P T
of the stenographic notes of the proceedings in the above-entitled matter as taken by and before MELISSA J. LUMI, a Certified Court Reporter, No. 30X100237000, and Notary Public of the State of New Jersey, taken remotely, on November 26, 2024 commencing at 9:30 in the forenoon.

Page 67

1   you said that the majority of the administrative
2   work is delegated to the director.
3                    I guess let me sort of maybe come
4   at it a different way.  Like is there -- would it
5   be appropriate for you, and by extension
6   appropriate for you to delegate to her, to sit in
7   with the panel as they deliberate and to cast a
8   vote on the actual outcome of a case?
9           A.      No.  It would never be appropriate
10  for me to -- to participate in the deliberations.
11  I'm not a panelist.  It would not be appropriate
12  for me to substitute my judgment in any way.  I
13  have not interviewed the parties, I have not --
14  that -- that's not my role.
15          Q.      Uh-huh.
16          A.      My role is procedural.
17          Q.      But if you -- but if you had,
18  maybe not interviewed the parties, but if you had
19  read all of the interview summaries and if you
20  had -- you had the same data, all of the same
21  data that the panelists had, would you have the
22  authority or the ability under the policy to sit
23  in and cast a vote?
24          A.      I don't think that the policy
25  grants me that authority.  The policy specifies

Page 162

1  questions in the comments are her questions about
2  their outcome.
3          A.   I think so.  Yes.
4          Q.   Okay.  So how -- how often does --
5  how unusual would it be for Regan to come to you
6  with questions about a panel's outcome and --
7  before even sending the draft to the panel to
8  take a look at it?
9          A.   It would not be common, because I
10 don't -- as I said, the only reason that I would
11 see a draft at an early stage is because there is
12 some kind of policy or procedural question that
13 the panel wants me -- wants my advice on, and
14 therefore I need to read it, you know, to get
15 some sort of understanding of where -- of the
16 contours of the case, so that then they can bring
17 up whatever issue they want to get my thoughts
18 on.  So it's not common.
19         Q.   Okay.  And you said that she would
20 come to you early if there were, quote, "policy
21 or procedural questions".  So, like, what if she
22 just sort of thought that their take on the
23 evidence was wrong?  Like would she raise that
24 would you or would she just discuss that directly
25 with him?

Page 172

1     you are". That's sort of the state of play when
2     she sends this e-mail.
3         A.    That's what it says.
4         Q.    Okay.
5         A.    I don't know what conversations it
6     reflects.
7         Q.    Uh-huh. Okay. So she is giving
8     them an explanation of why she's writing up a
9     second outcome and sending it to them that
10    switches the finding on the most significant
11    charges against John Doe.
12        A.    Is that a question? Should I say
13    yes?
14        Q.    Yes.
15        A.    All right. Yes.
16        Q.    Okay. When my face isn't there,
17    it's harder to maybe know when I'm done asking a
18    question.
19            Okay. Have you ever seen Regan
20    write an alternate outcome like this before when
21    she apparently -- again, I know you say there may
22    be other conversations, but based on this she
23    appears to have had, just based purely on this,
24    no conversations with two of the panelists since
25    the time they sent -- she was received the first

```
                                                    Page 173
 1    draft.  Has she ever done that before in any
 2    other case?
 3            A.    I don't know.
 4            Q.    Okay.  And where she says here, I
 5    have found that sometimes when we see it written
 6    out, it doesn't work as well as it seemed to in
 7    theory, she's referring there to the first draft
 8    that Randy had sent her and that she had made
 9    some comments on and sent to you.  Right?
10                  MS. BERMAN:  Objection.  Form.
11            A.    I think that's correct.
12            Q.    Okay.  So this statement tells the
13    panelists that the rationale had been written up
14    to support their findings that in her view, it,
15    quote, "doesn't work as well as it seemed to in
16    theory".  Right?
17                  MS. BERMAN:  Objection.  Form.
18            A.    I don't read it this way.  It says
19    "I have found that sometimes when we see it
20    written out".  And as I said, it's my
21    understanding that the panel, at times -- you
22    know, it isn't unusual that the panel put things
23    on a page and then use that as part of their
24    process.  You know, part of their deliberation is
25    to see how it -- how it comes out once they've
```